JUDGE ROBINSON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

07 CIV 7984

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,
M.D., and CARDIAC SURGERY GROUP, P.C.,

                Plaintiffs,

-against-

NEW YORK CARDIOTHORACIC GROUP, PLLC,
STEVEN L. LANSMAN, M.D., DAVID SPIELVOGEL,
M.D., WESTCHESTER COUNTY HEALTH CARE
CORPORATION and WESTCHESTER MEDICAL
CENTER,

                Defendants.
--------------------------------------------------------------X

Case No.:

**COMPLAINT**

        Plaintiffs Rocco J. Lafaro, M.D., Arlen G. Fleisher, M.D., and Cardiac Surgery Group, P.C., (collectively, "plaintiffs"), by their attorneys Menaker & Herrmann LLP, for their complaint against New York Cardiothoracic Group, PLLC, Steven L. Lansman, M.D., David Spielvogel, M.D., Westchester County Health Care Corporation and Westchester Medical Center (collectively, "defendants"), allege as follows:

### The Parties

        1.     Plaintiff Rocco J. Lafaro, M.D. ("Lafaro") is a cardiothoracic surgeon licensed to practice medicine in the State of New York, with his principal place of business at Westchester Medical Center, Valhalla, New York.

        2.     Plaintiff Arlen G. Fleisher, M.D. ("Fleisher") is a cardiothoracic surgeon licensed to practice medicine in the State of New York, with his principal place of business at Westchester Medical Center, Valhalla, New York.

3. Plaintiff Cardiac Surgery Group, P. C. ("CSG") is a New York professional corporation consisting of surgeons who specialize in the field of cardiothoracic surgery at Westchester Medical Center, with its office at Macy Pavilion, Westchester Medical Center, Valhalla, New York. Lafaro and Fleisher are principals of CSG.

4. Defendant Westchester County Health Care Corporation ("WCHCC") is a public benefit corporation established by New York State in 1997 to assume the function of Westchester County's Department of Hospitals. Governed by a 15-member Board of Directors, it is charged with providing healthcare services and operating healthcare facilities for seven counties in the lower Hudson Valley.

5. Defendant Westchester Medical Center ("WMC") is a public hospital based in Valhalla, New York. WMC is affiliated with New York Medical College and since January 1998 has been managed by WCHCC.

6. Defendant Steven L. Lansman, M.D. ("Lansman") is a cardiothoracic surgeon licensed to practice medicine in the State of New York, with his principal place of business at Macy Pavilion 114W, Westchester Medical Center, Valhalla, New York.

7. Defendant David Spielvogel, M.D. ("Spielvogel") is a cardiothoracic surgeon licensed to practice medicine in the State of New York, with his principal place of business at Macy Pavilion 128W, Westchester Medical Center, Valhalla, New York.

8. Defendant New York Cardiothoracic Group PLLC ("NYCG") is a New York professional limited liability company operated by Lansman and Spielvogel, with its office at Macy Pavilion, Westchester Medical Center, Valhalla, New York.

**Jurisdiction and Venue**

9. This action is brought in this Court under the authority of 28 U.S.C. §§ 1331 and 1337 (a), Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

10. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 in that the state law claims and the federal antitrust law claims derive from a common nucleus of operative fact.

11. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) in that (a) one or more defendants reside or have a principal office in this district and (b) a substantial part of the events or omissions giving rise to the claim occurred in this district.

**Factual Allegations**

12. At all times relevant to this action, the individual parties were affiliated with defendant WMC (and thus indirectly with its operating corporation, defendant WCHCC). WMC is a public hospital that is charged with providing a wide variety of specialized inpatient and outpatient medical services, including cardiothoracic surgery, for seven counties in the lower Hudson Valley.

13. As a public hospital, WMC grants admitting privileges to any physician in the seven-county area it serves who meets the professional criteria established by the hospital's medical board. While WMC or WCHCC have had physician recruitment agreements and professional services agreements with individual medical staff members providing for guaranteed compensation, particularly in the four services in which the practitioners do not have patients of their own, i.e., radiology, anesthesiology, pathology and emergency medicine, on information and belief, neither has heretofore entered into any exclusive provider arrangements.

14.  The professional services arrangements between WMC or WCHCC and the fulltime staff physicians in the four services referred to in paragraph 13 above are an accepted and standard practice at many hospitals, often including exclusive arrangements, because such staff specialists provide critically important services needed by other departments of a hospital and do not have patients of their own. A hospital therefore needs to keep each such service staffed at a high enough level and quality to meet patient needs from the other departments.

15.  In all other specialties besides the four staff services, WMC grants privileges to practitioners in the seven-county region on a non-exclusive basis. This inclusive policy, which encompasses the specialty of surgery and its various sub-specialties, assures WMC patients of choice among medical service providers and encourages competition to provide the latest and most effective treatments, the highest standard of care, and reasonable cost.

16.  WMC also has an affiliation with New York Medical College (the "College"), a teaching institution that awards advanced degrees to students who are preparing for careers in medicine, science and the health professions. The College, which has approximately 1,350 full-time faculty and 1,450 part-time faculty members, operates its principal teaching facility at the WMC complex at Valhalla. Many of the physicians who obtain privileges at WMC also become members of the College faculty. The College governs the functioning of the clinical faculty via an unincorporated Federated Faculty Practice Plan (the "FFPP"). The combined College, Hospital and FFPP constitute an Academic Medical Center ("AMC").

17.  Any physician with privileges at WMC who applies for and receives an appointment to the full-time faculty of the College is required to comply with the Bylaws of the FFPP for recognition as a "full-time" faculty member and to qualify for various rights and

benefits that inure only to "full-time" faculty. WMC has been contractually bound to the College - FFPP via their Affiliation Agreement, which created the AMC and established the framework for the administration and supervision of the graduate medical education program. WMC also incorporates the terms of the FFPP Bylaws in its own Medical Staff Bylaws and Rules and Regulations as set forth below.

18. In accordance with certain obligations and requirements mandated by the FFPP Bylaws, the "full-time" faculty must conduct their entire practice of medicine within a self-governing practice group which as been approved by the FFPP as a Faculty Clinical Practice ("FCP"). Also per the FFPP Bylaws, "No FCP may retain or employ an individual to provide a service which an approved FCP already provides, unless the hiring of such person is approved by the existing FCP and the Executive committee of the FFPP." [Article II.G.3 (b) of the FFP Bylaws 2002]. Therefore, absent a qualifying waiver, each distinct subspecialty service is provided by only one FCP. No such waiver has ever been approved for the Cardiothoracic Service at the AMC, in which the individual plaintiffs and defendants have their practices.

19. WMC recognizes the existence of the vital role the FFPP in the AMC by incorporating in its own Medical Staff Bylaws and in the Rules and Regulations of the Medical Staff Bylaws the requirement that each of its Directors of Service (e.g. for the Departments of Surgery, Medicine, Pediatrics, etc.) and each of its Chiefs of Section (e.g. within Surgery, Cardiothoracic, Plastics, General, Transplant, etc.) be "full-time staff". [Article VII, Sec. 2 (2)(b) Bylaws, 2005]. To meet that requirement, they "must practice as a member of an FFPP approved faculty clinical practice unless either or both of these requirements are waived by a majority of the voting members of the Executive Committee of the medical staff present." [Subsection J, p. 29, 2005 Rules and Regulations].

20. Plaintiffs Lafaro and Fleisher are both full-time faculty members of the College of long standing, and their professional corporation CSG has been the approved heart surgery FCP under the FFPP since 1999. Membership in CSG is open to any thoracic surgeon who obtains privileges at WMC and appointment as a full-time member of the College faculty. CSG is self-governing on democratic principles in accordance with the FFPP Bylaws.

21. Both Lafaro and Fleisher are recognized as pre-eminent heart and lung surgeons and for many years have played a role in establishing WMC's reputation as the leading center for cardiothoracic surgery in the lower Hudson Valley. Lafaro has spent his entire career at WMC, having obtained his medical degree and served as a chief resident in surgery there. He is an Assistant Professor of Cardiothoracic Surgery at New York Medical College, co-author of a number of peer-reviewed scholarly articles, and a respected practitioner of open-heart surgery. Fleisher is likewise a graduate of New York Medical College and, after interim work at St. Lukes/Roosevelt Medical Center, has been on the WMC surgical staff and faculty of the College since 1990 as a thoracic surgeon.

22. During the period 2001 through 2004, WCHCC and WMC experienced widely publicized problems with their management and fiscal operations. An audit by the New York State Comptroller found that the operating company went from a $2.6 million surplus in 2000 to a cumulative operating loss of $207 million by the end of 2004. According to the State Comptroller, WCHCC's "combination of fiscal challenges, financial control weaknesses and accounting problems brought it close to the point of collapse."

23. Among the improper practices identified by the State Comptroller at WCHCC were dishonest financial reports that "dramatically understated expenses and liabilities," establishment of an off-shore captive insurance company that was insufficiently

funded, failure to document reimbursement of a variety of expenses claimed by consultants and corporation executives, and improper use of credit cards by WCHCC officials "to circumvent competitive bidding requirements."

24. The disclosure of these circumstances created a crisis environment at WMC, resulting in disagreements among the professional staff and ultimately in the departures of a number of physicians. Cardiothoracic Surgery was among sections that experienced unrest and attrition during this period, although Drs. Lafaro and Fleisher remained loyal to the institution and continued their practices at WMC and their membership on the faculty of New York Medical College.

25. In late 2004, authorized representatives of WMC recruited defendant Lansman to affiliate with WMC as head of the Section of Cardiothoracic Surgery in the Department of Surgery. At the time he was recruited, Lansman had surgical privileges at Mount Sinai Hospital in Manhattan and experience in cardiac transplant procedures, a specialty WCHCC and WMC were seeking to restore to the Hospital in the wake of the financial issues and reputational decline WMC had experienced in the immediate past.

26. On information and belief, as part of the inducement to join WMC, Lansman was also promised a full-time faculty position in the College.

27. On information and belief, Lansman conditioned his acceptance of WMC's offer on the appointment of his Mount Sinai colleague, defendant Spielvogel, to both the Section of Cardiothoracic Surgery and to the full-time faculty of the College, and the WMC representatives agreed to those conditions.

28. On or about January 4, 2005, NYCG was established as a limited liability entity through which Lansman and Spielvogel could operate in their affiliation with WMC.

29. In early 2005, plaintiffs invited Lansman and Spielvogel to join CSG. While membership in CSG was not a precondition to obtain privileges to serve in the Section of Cardiothoracic Surgery at WMC, CSG is the sole approved FCP for such service in the FFPP, and membership thereof is, as stated in paragraph 18 above, a precondition to obtaining appointment as a full-time member of the College faculty.

30. Lansman and Spielvogel rejected plaintiffs' invitation, telling Lafaro and Fleisher that they should disband CSG and affiliate with NYCG instead under Lansman's control. Lafaro and Fleisher declined to accept that proposal due to Lansman's absolute control of NYCG, which violated the democratic self-governance requirements of the FFPP Bylaws.

31. In or about early 2005, WCHCC entered into a written agreement with NYCG and/or Lansman and Spielvogel (the "Exclusive Agreement") under which NYCG was engaged to be the exclusive provider of cardiothoracic surgery professional and administrative services at WMC. No prior notice was given to plaintiffs of such agreement, nor was any effort made to obtain consent from the governing body of the FFPP.

32. The Exclusive Agreement covenanted to Lansman and Spielvogel that NYCG (and thus effectively its owners, Lansman and Spielvogel) would be the only surgeons who could provide the service of cardiothoracic surgery at WMC, with an exception for certain specified "Grandfathered" physicians, namely Lafaro and Fleisher. The effect of that restrictive covenant would be to bar any heart and lung surgeon other than one controlled by Lansman and Spielvogel from obtaining privileges to perform that service at WMC and thereby to prevent CSG from bringing in other professionals to expand its capacity to provide cardiothoracic surgery.

33. The Exclusive Agreement has had an adverse effect on competition in cardiothoracic surgery in a number of respects. It has eliminated the incentive for Lansman and Spielvogel to be price sensitive in their delivery of services. On information and belief, neither defendant has been willing to be a provider under several major healthcare insurance plans that might reimburse them at less than the rate they choose to command. The Exclusive Agreement has also empowered Lansman and Spielvogel to exclude competitors at WMC, thereby limiting patient choice and reducing the quantity and quality of cardiothoracic surgeons available to patients in the relevant markets (see paragraphs 49-50 below).

34. Defendants have sought to have NYCG declared an approved FCP under the terms of the FFPP Bylaws, but the Executive Committee of the FFPP has repeatedly found that NYCG does not meet the requirements of the FFPP Bylaws for FCP approval based, *inter alia*, on the unchecked control Lansman maintains over NYCG's governance. Lansman and Spielvogel are accordingly not members of an approved FCP.

35. Despite the requirement of the FFPP Bylaws that all physicians with a full-time faculty appointment must be a member of an approved FCP, Lansman and Spielvogel after their arrival at WMC received appointments to the faculty without being members of any such group. Moreover, despite the requirement that the Chief of the Section of Cardiothoracic Surgery be a member of an approved FCP, Lansman was appointed Chief of that Section and continues in that capacity to the date hereof.

36. As Chief of the Section of Cardiothoracic Surgery, Lansman has directed that the scheduling of access to the operating rooms, assignment of staff, and availability of equipment for heart and lung surgery at WMC be handled in a manner that gives preference to him and Spielvogel and causes maximum disadvantage to plaintiffs and their patients. At the

same time, Lansman and Spielvogel have introduced practices for their convenience and advantage that have adversely affected the quality of patient well-being and care.

37. The size and skill level of the support staff at WMC for heart and lung surgery during Lansman's tenure as Chief of the Section, including physician's assistants and nurse practitioners, have been insufficient in view of the volume of operations and procedures performed.

38. To address the problem of increasing volume and insufficient staff support in the WMC operating rooms, in August 2006, CSG extended a proposed invitation to a highly qualified physician's assistant, Michael Evans, practicing at Saint Joseph's Hospital in Paterson, New Jersey, to join CSG and provide operating room support. In connection with that potential employment, Evans applied to WMC for privileges, and his application received approval from both the Credentials Committee and the Executive Committee of the Medical Board.

39. Notwithstanding the foregoing approvals, by letter dated February 16, 2007, Linda Glickman, WMC's Vice President for Clinical and Academic Affairs, advised plaintiffs and Evans that the latter's "application cannot be processed because there is an existing exclusive agreement" with NYCG with respect to the Section of Cardiothoracic Surgery. A true and correct copy of that letter is annexed hereto as Exhibit A.

40. Plaintiffs have objected to WMC's refusal to allow Evans to receive privileges as an employee of CSG pursuant to the restrictive covenant in the Exclusive Agreement and have requested that it be withdrawn as an unreasonable restraint of trade and commerce in violation of federal and state law.

41. By letter dated April 5, 2007, WMC's Associate General Counsel rejected plaintiffs' request for withdrawal of the restraint and reiterated that it was an element of the Exclusive Agreement.

42. Thereafter, plaintiffs requested defendants to provide a copy of the Exclusive Agreement. Defendants have refused to do so.

43. By letter dated April 23, 2007, WMC's Associate General Counsel, writing on behalf of all defendants including Lansman and Spielvogel, advised plaintiffs that, even aside from the Exclusive Agreement, "all of the Cardiothoracic Physician Assistants practicing at WMC are WMC employees. PA assignments to the Cardiothoracic ORs, ICU and ward are made through WMC's Nursing department, thus ensuring accountability, and efficient and consistent coverage for the whole service." The letter then contended that allowing Evans to join the WMC staff through CSG "would disrupt the overall role, administration and integration of the Cardiothoracic Physician's Assistants in the Section of Cardiothoracic Surgery at WMC."

44. The April 23, 2007 letter went on to state that "should Mr. Evans seek employment through WMC his application would be given every consideration and I encourage you to advise Mr. Evans to do so."

45. The April 23, 2007 letter was a belated, bad faith and pretextual attempt to cover up the real reason for WMC's rejection of the Evans application – i.e., the exclusionary, anticompetitive arrangement with Lansman and Spielvogel. In reality, physician's assistants and nurse practitioners are privately employed by the FCPs for a number of the services at WMC. NYCG itself privately employs a nurse practitioner who provides patient care within the Section of Cardiothoracic Surgery without "disrupting" the work of the Section.

46. In effect, WMC has told plaintiffs that Evans cannot work at WMC as their employee, only under the control of Lansman, Spielvogel and their entity NYCG, who control the Section of Cardiothoracic Surgery as a result of their Exclusive Agreement with WMC. Defendants' restraint on competition wrongfully undermines plaintiffs' ability to meet growing demand for their services and enhance the quality of patient care.

## COUNT I

47. Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 46 as if fully stated herein.

48. The activities of defendants and the services described above are in or affect interstate commerce because, *inter alia*, the equipment and medications used in cardiothoracic surgery are obtained in interstate commerce, the staffing of the Section of Cardiothoracic Surgery and related WMC facilities is accomplished through interstate commerce, Evans was recruited for a position at WMC and CSG from employment in New Jersey, and many payments for the services at issue are made in interstate commerce by third-party payers.

49. For purposes of analyzing the applicability of the antitrust laws to the conduct described above, the relevant product or services markets are (a) the market for emergency cardiothoracic surgery; (b) the market for urgent cardiothoracic surgery; and (c) the market for emergency pulmonary surgery. In the vast majority of relevant patient cases, such services are not interchangeable either with treatment by medication or with intervention by nonsurgical procedures using a catheter.

50. The relevant geographic market for the services referred to in paragraph 49 is the segment of the lower Hudson Valley north of the Cross County Parkway in Westchester

County, south of Interstate 84 and Rockland and Orange Counties. This is because emergency services involving apparent heart attack or collapsed lung are highly time- and distance-sensitive, and WMC, where the individual plaintiffs and defendants perform their specialties, is the medical facility used by greater than 80% of the patients experiencing symptoms of such conditions in that geographic area. Less than 20% of such patients use the services of any other medical facility.

51. Third-party payers have virtually no role in the selection of the medical facility with respect to the patients needing the products or services referred to in paragraph 49 in the relevant geographic market because the selection of facility for such products or services must be made on an expedited basis without time or opportunity for consultation with the third-party payers.

52. By reason of the foregoing, WMC and its parent WCHCC have market power in the relevant geographic markets with respect to the relevant products or services.

53. Since early 2005, all of the defendants have had the legal capacity to conspire between and among themselves. The individual defendants and their entity NYCG are independent economic actors who have entered into the Exclusive Agreement with WCHCC on an arm's length basis.

54. Beginning in or about early 2005 and continuing thereafter up to and including the present date, defendants, between and among themselves and other persons whose identities are unconfirmed as of this writing, entered into and engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the New York State Donnelly Act, Gen. Bus. Law § 340. The contract, combination or conspiracy consisted of a continuing agreement,

understanding and concert of action between and among defendants and others, the substantial terms of which are to eliminate competition from plaintiffs through exclusionary conduct.

55. For the purpose of forming and effectuating their continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce, defendants did those things which they contracted, combined or conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following:

(a) To eliminate competition by entering into the Exclusive Agreement, including the provision therein making NYCG the exclusive provider of cardiothoracic services at WMC, to the injury of CSG and its principals;

(b) To eliminate competition by enforcing the Exclusive Agreement so as to obstruct CSG's employment of a physician's assistant, i.e., Evans, who would have privileges at WMC and thereby be able to assist Lafaro and Fleisher in their provision of cardiothoracic surgical services to their patients;

(c) To eliminate competition by strategic denial of access to the operating room and to required medical staff and equipment.

56. Defendants' illegal conduct has caused material harm to competition in unreasonable restraint of trade and commerce by reducing the availability and supply of providers of cardiothoracic surgery by limiting the ability of "grandfathered" providers of cardiothoracic surgery to expand their capacity and enhance their quality of care, by raising the cost of cardiothoracic surgery to patients and third-party payers, and by causing a demonstrable decline in the quality of patient care.

57. Plaintiffs have been injured in their business or property by reason of the unreasonable restraint of trade and commerce described above.

58. The injury to plaintiffs is cognizable in equity because such injury cannot be fully redressed by monetary damages and the conduct from which it arises threatens to cause future harm for which an award of damages would be an inadequate remedy. In addition, the injury directly and proximately results from the conduct complained of, and the injury constitutes the kind of injury that the antitrust laws are intended to prevent, namely harm to competition by adversely affecting consumer welfare and the quality of services.

59. Insofar as the damages to plaintiffs resulting from defendants' unreasonable restraint of trade and commerce are measurable, they amount to in excess of $1,000,000, which sum is required to be trebled pursuant to Clayton Act § 4, 15 U.S.C. § 15(a).

## COUNT II

60. Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 46 as if fully set forth herein.

61. WMC and WCHCC are bound to honor the Bylaws of the FFPP by provisions in WMC's Medical Staff Bylaws and Rules and Regulations. [Article VII, Sec. 2 (2)(b), Bylaws 2005, and Subsection J, p. 29, 2005 Rules and Regulations]. Such duty to honor the Bylaws constitutes a contractual obligation on the part of WMC and WCHCC to the FFPP and its members who have privileges to practice at WMC.

62. Plaintiffs are also intended third-party beneficiaries of the contractual duties of WMC and WCHCC under the Bylaws of the FFPP.

63. WMC and WCHCC have violated their duties under the Bylaws of the FFPP by (a) WCHCC's entering into the Exclusive Agreement with NYCG, (b) allowing NYCG and its principals to act as if they had FCP status when they have not qualified for such status, (c) appointing Lansman to be the Chief of the Section of Cardiothoracic Surgery when he is not a

member of an FFPP approved FCP, and (d) granting NYCG a variety of preferential benefits that undermine plaintiffs' ability to compete on even terms for the provision of cardiothoracic services at WMC.

64. Lansman, Spielvogel and NYCG have wrongfully, unlawfully and through improper acts procured the breach by WMC and WCHCC of their contractual obligations.

65. The acts of WMC and WCHCC as stated in paragraph 63 constitute breaches of their contractual duties to plaintiffs.

66. The acts of Lansman, Spielvogel and NYCG in procuring the breaches of contract by WMC and WCHCC constitute tortious interference with the latters' contractual duties to plaintiffs.

67. Defendants' acts as aforesaid have caused and will continue in the future to cause injury to plaintiffs and to their patients by undermining the quality of patient care and preventing plaintiffs from expanding their capacity to respond to the demand for their services.

68. Plaintiffs have no adequate remedy at law because the injury to them from defendants' tortious acts is not fully measurable in monetary damages.

69. A portion of the injury to plaintiffs can be measured in monetary damages but only to the extent quantifiable from the lost volume of services caused by defendants' acts, which damages amount to not less than $1,000,000.

## COUNT III

70. Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 46 as if fully set forth herein.

71. Defendants by their exclusionary conduct as aforesaid have wrongfully interfered with plaintiffs' ability to expand and enhance their services, thereby preventing them

from serving the full volume of patient needs that have needed to be served since 2005 and that will continue to grow and exist in the foreseeable future.

72.     Such exclusionary conduct by defendants constitutes tortious interference with plaintiffs' prospective business relations.

73.     Plaintiffs have no adequate remedy at law because the injury to them from defendants' tortious acts is not fully measurable in monetary damages.

WHEREFORE, plaintiffs pray for judgment:

(a)     preliminarily and permanently enjoining defendants from engaging in the exclusionary conduct alleged herein, including but not limited to enjoining defendants from enforcing between and among themselves any provision of the Exclusive Agreement that bars WMC from granting privileges to any medical personnel not employed by NYCG to practice in WMC's Section of Cardiothoracic Surgery;

(b)     preliminarily and permanently enjoining WMC and WCHCC from dishonoring any of the Bylaws of the FFPP that they are required to honor under the terms of WMC's Medical Staff Bylaws and Rules and Regulations;

(c)     preliminarily and permanently enjoining Lansman, Spielvogel and NYCG from tortiously interfering with the duties of WMC and WCHCC to plaintiffs under the terms of WMC's Medical Staff Bylaws and Rules and Regulations;

(d)     preliminarily and permanently enjoining defendants from tortiously interfering with plaintiffs' ability to expand and enhance the services they provide to future patients by wrongfully preventing medical personnel they propose to have affiliate with them from obtaining privileges in WMC's Section of Cardiothoracic Surgery;

(e) awarding plaintiffs damages in the sum of not less than $1,000,000, which damages must be trebled by reason of defendants' violations of the antitrust laws;

(f) awarding plaintiffs the costs and disbursements of this action, together with interest and reasonable attorney's fees; and

(g) granting such other and further relief as to the Court may seem just and proper.

Dated: New York, New York
      September 10, 2007

    MENAKER & HERRMANN LLP

By: *Richard G. Menaker*
Richard G. Menaker (RM-4716)

Attorneys for Plaintiffs
10 East 40th Street
New York, NY 10016
(212) 545-1900