Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,                        :    07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,                           :
                                                                 :
                          Plaintiffs,                            :
                                                                 :
              -against-                                          :    **NOTICE OF MOTION**
                                                                 :
NEW YORK CARDIOTHORACIC GROUP, PLLC,                             :
STEVEN L. LANSMAN, M.D., DAVID                                   :
SPIELVOGEL, M.D., WESTCHESTER COUNTY                             :
HEALTH CARE CORPORATION and                                      :
WESTCHESTER MEDICAL CENTER                                       :
                                                                 :
                          Defendants.                            :
                                                                 :
-----------------------------------------------------------------X

TO THE COUNSEL LISTED BELOW:

           PLEASE TAKE NOTICE, that upon the annexed affidavit of Richard G. Menaker

sworn to January 31, 2008, and the accompanying Memorandum of Law, and upon all of the papers

and proceedings heretofore had herein, the plaintiffs will move this Court in Room 633 on the ___th

day of _____ 2008, at the United States Courthouse located at 300 Quarropas Street, White Plains,

New York 10601, at 9:30 a.m. or as soon thereafter as counsel may be heard, for an order pursuant

to Rule 12(f), Fed. R. Civ. P., dismissing the First, Fifth, Sixth, Seventh, Eighth, Ninth, Twelfth,

Fourteenth, Fifteenth, Nineteenth, Twentieth, Twenty-Second, Twenty-Third, Twenty-Sixth and

Twenty-Ninth affirmative defenses alleged in the First Amended Answer and granting such other

and further relief as the Court deems just and proper.

Dated: New York New York
      January 31, 2008

                                Yours, etc.,

                                MENAKER & HERRMANN LLP

                                By: _____
                                    Richard G. Menaker
                                    (RM 4716)
                                10 East 40th Street
                                New York, New York 10016
                                (212) 545-1900

                                *Attorneys for Plaintiffs*

TO:    LEONARD ROSENBERG, ESQ.
        JUSTIN M. VOGEL, ESQ.
        GARFUNKEL, WILD & TRAVIS, P.C.
        111 Great Neck Road, Suite 503
        Great Neck, New York 11021
        (516) 393-2200

        JORDY RABINOWITZ, ESQ.
        Senior Associate General Counsel
        Westchester Medical Center
        Office of Legal Affairs
        95 Grasslands Road
        Valhalla, NY 10595
        (914) 493-2800

        *Attorneys for Defendants*

MENAKER AFFIDAVIT

Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,      :      07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,

                                               :

                        Plaintiffs,            :

                                                      **AFFIDAVIT OF**
                                               :      **RICHARD G. MENAKER**
        -against-
                                               :

NEW YORK CARDIOTHORACIC GROUP, PLLC,           :
STEVEN L. LANSMAN, M.D., DAVID
SPIELVOGEL, M.D., WESTCHESTER COUNTY           :
HEALTH CARE CORPORATION and
WESTCHESTER MEDICAL CENTER                     :

                                               :
                        Defendants.
                                               :

--------------------------------------------------------------X

STATE OF NEW YORK    )
                     )       ss.:
COUNTY OF NEW YORK   )

        RICHARD G. MENAKER, being duly sworn, deposes and says:

        1.      I am a member of the Bar of this Court and of the firm of Menaker &

Herrmann LLP, attorneys for plaintiffs. I am personally familiar with the matters set forth herein,

and make this affidavit in support of plaintiffs' motion to dismiss affirmative defenses.

        2.      Defendants have interposed thirty-two affirmative defenses to plaintiffs'

Complaint (Exhibit A hereto) in their First Amended Answer (Exhibit B hereto).

        3.      By letter to me, dated January 3, 2008 and received on January 7, 2008

(Exhibit C hereto), Jordy Rabinowitz, counsel for defendants, stated that defendants would consider withdrawing some of their affirmative defenses "to avoid unnecessary motion practice and conserve judicial resources," provided that defendants identified those affirmative defenses they proposed to move against and the reasons therefor.

      4.     By letter dated January 7, 2008, at my request, Mr. Rabinowitz produced to me a copy of the Professional Services Agreement entered into by defendants on or about December 29, 2004, which constitutes the "Exclusive Agreement" identified in ¶¶ 31-33 of plaintiffs' First Amended Complaint. A copy of the Professional Services Agreement is annexed hereto as Exhibit D.

      5.     By letter to Mr. Rabinowitz, dated January 9, 2008 (Exhibit E hereto) I identified those affirmative defenses which plaintiffs believe should be stricken and explained why they are without merit.

      6.     In a subsequent telephone call on January 10, 2008, Mr. Rabinowitz offered to consider withdrawing certain, unspecified affirmative defenses, but only on the condition that defendants be allowed to reassert them at a subsequent stage of the litigation. In a letter to Mr. Rabinowitz, dated January 11, 2008 (Exhibit F hereto), I declined his proposal since, as I stated therein, "it would neither serve the interest of judicial economy nor help us focus on genuinely contested issues to have unmeritorious defenses dismissed now only to re-emerge later."

      7.     By letter dated January 16, 2008 and faxed to me the following day (Exhibit G hereto), Mr. Rabinowitz agreed to withdraw with prejudice the First Affirmative Defense (but "**only** as to Plaintiffs' federal and state antitrust claims") and the Twenty-Eighth Affirmative Defense (incorrectly numbered twenty-seventh in the letter). Mr. Rabinowitz also proposed to withdraw the

Ninth Affirmative Defense, but "without prejudice to reinstate the defense in the event that information provided in discovery or in any subsequent amended pleadings makes reinstatement appropriate."

8.    Based on the foregoing communications, the parties have stipulated to dismissal of three of defendants' affirmative defenses on the terms stated by defendants. (Exhibit H hereto).

9.    As previously advised, plaintiffs now move to dismiss the following affirmative defenses asserted in defendants' First Amended Answer: First, Fifth, Sixth, Seventh, Eighth, Ninth, Twelfth, Fourteenth, Fifteenth, Nineteenth, Twentieth, Twenty-Second, Twenty-Third, Twenty-Six and Twenty-Ninth. Plaintiffs have refrained from moving against five additional affirmative defenses (Second, Third, Fourth, Thirty-First and Thirty-Second) only because Mr. Rabinowitz has stated that they will be put in issue by defendants' motion for judgment on the pleadings. It will simplify the Court's consideration of the issues for plaintiffs to seek dismissal of those defenses in their response to defendants' motion.

_Richard G. Menaker_
Richard G. Menaker

Subscribed and sworn to before me
this 31st day of January, 2008.

_Notary Public_
Notary Public

CHERYL L. DAVIS
Notary Public, State of New York
No. 4907169
Qualified in New York County
Commission Expires Aug. 31, 19~~
2009

-3-

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,      :      Case No.: 07 CIV. 7984 (SCR)(LMS)
M.D., and CARDIAC SURGERY GROUP, P.C.,

                                   Plaintiffs,      :      **COMPLAINT**

            -against-                              :

NEW YORK CARDIOTHORACIC GROUP, PLLC,      :
STEVEN L. LANSMAN, M.D., DAVID SPIELVOGEL,      :
M.D., WESTCHESTER COUNTY HEALTH CARE      :
CORPORATION and WESTCHESTER MEDICAL      :
CENTER,                                            :

                                   Defendants.      :

------------------------------------------------------------------X

Plaintiffs Rocco J. Lafaro, M.D., Arlen G. Fleisher, M.D., and Cardiac Surgery
Group, P.C., (collectively, "plaintiffs"), by their attorneys Menaker & Herrmann LLP, for their
complaint against New York Cardiothoracic Group, PLLC, Steven L. Lansman, M.D., David
Spielvogel, M.D., Westchester County Health Care Corporation and Westchester Medical Center
(collectively, "defendants"), allege as follows:

### The Parties

1.      Plaintiff Rocco J. Lafaro, M.D. ("Lafaro") is a cardiothoracic surgeon
licensed to practice medicine in the State of New York, with his principal place of business at
Westchester Medical Center, Valhalla, New York.

2.      Plaintiff Arlen G. Fleisher, M.D. ("Fleisher") is a cardiothoracic surgeon
licensed to practice medicine in the State of New York, with his principal place of business at
Westchester Medical Center, Valhalla, New York.

3.    Plaintiff Cardiac Surgery Group, P. C. ("CSG") is a New York professional corporation consisting of surgeons who specialize in the field of cardiothoracic surgery at Westchester Medical Center, with its office at Macy Pavilion, Westchester Medical Center, Valhalla, New York. Lafaro and Fleisher are principals of CSG.

4.    Defendant Westchester County Health Care Corporation ("WCHCC") is a public benefit corporation established by New York State in 1997 to assume the function of Westchester County's Department of Hospitals. Governed by a 15-member Board of Directors, it is charged with providing healthcare services and operating healthcare facilities for seven counties in the lower Hudson Valley.

5.    Defendant Westchester Medical Center ("WMC") is a public hospital based in Valhalla, New York. WMC is affiliated with New York Medical College and since January 1998 has been managed by WCHCC.

6.    Defendant Steven L. Lansman, M.D. ("Lansman") is a cardiothoracic surgeon licensed to practice medicine in the State of New York, with his principal place of business at Macy Pavilion 114W, Westchester Medical Center, Valhalla, New York.

7.    Defendant David Spielvogel, M.D. ("Spielvogel") is a cardiothoracic surgeon licensed to practice medicine in the State of New York, with his principal place of business at Macy Pavilion 128W, Westchester Medical Center, Valhalla, New York.

8.    Defendant New York Cardiothoracic Group PLLC ("NYCG") is a New York professional limited liability company operated by Lansman and Spielvogel, with its office at Macy Pavilion, Westchester Medical Center, Valhalla, New York.

## Jurisdiction and Venue

9.      This action is brought in this Court under the authority of 28 U.S.C. §§ 1331 and 1337 (a), Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

10.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 in that the state law claims and the federal antitrust law claims derive from a common nucleus of operative fact.

11.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) in that (a) one or more defendants reside or have a principal office in this district and (b) a substantial part of the events or omissions giving rise to the claim occurred in this district.

## Factual Allegations

12.     At all times relevant to this action, the individual parties were affiliated with defendant WMC (and thus indirectly with its operating corporation, defendant WCHCC). WMC is a public hospital that is charged with providing a wide variety of specialized inpatient and outpatient medical services, including cardiothoracic surgery, for seven counties in the lower Hudson Valley.

13.     As a public hospital, WMC grants admitting privileges to any physician in the seven-county area it serves who meets the professional criteria established by the hospital's medical board.  While WMC or WCHCC have had physician recruitment agreements and professional services agreements with individual medical staff members providing for guaranteed compensation, particularly in the four services in which the practitioners do not have patients of their own, i.e., radiology, anesthesiology, pathology and emergency medicine, on information and belief, neither has heretofore entered into any exclusive provider arrangements.

14.    The professional services arrangements between WMC or WCHCC and the fulltime staff physicians in the four services referred to in paragraph 13 above are an accepted and standard practice at many hospitals, often including exclusive arrangements, because such staff specialists provide critically important services needed by other departments of a hospital and do not have patients of their own. A hospital therefore needs to keep each such service staffed at a high enough level and quality to meet patient needs from the other departments.

15.    In all other specialties besides the four staff services, WMC grants privileges to practitioners in the seven-county region on a non-exclusive basis. This inclusive policy, which encompasses the specialty of surgery and its various sub-specialties, assures WMC patients of choice among medical service providers and encourages competition to provide the latest and most effective treatments, the highest standard of care, and reasonable cost.

16.    WMC also has an affiliation with New York Medical College (the "College"), a teaching institution that awards advanced degrees to students who are preparing for careers in medicine, science and the health professions. The College, which has approximately 1,350 full-time faculty and 1,450 part-time faculty members, operates its principal teaching facility at the WMC complex at Valhalla. Many of the physicians who obtain privileges at WMC also become members of the College faculty. The College governs the functioning of the clinical faculty via an unincorporated Federated Faculty Practice Plan (the "FFPP"). The combined College, Hospital and FFPP constitute an Academic Medical Center ("AMC").

17.    Any physician with privileges at WMC who applies for and receives an appointment to the full-time faculty of the College is required to comply with the Bylaws of the FFPP for recognition as a "full-time" faculty member and to qualify for various rights and

- 4 -

benefits that inure only to "full-time" faculty. WMC has been contractually bound to the College - FFPP via their Affiliation Agreement, which created the AMC and established the framework for the administration and supervision of the graduate medical education program. WMC also incorporates the terms of the FFPP Bylaws in its own Medical Staff Bylaws and Rules and Regulations as set forth below.

18.    In accordance with certain obligations and requirements mandated by the FFPP Bylaws, the "full-time" faculty must conduct their entire practice of medicine within a self-governing practice group which as been approved by the FFPP as a Faculty Clinical Practice ("FCP"). Also per the FFPP Bylaws, "No FCP may retain or employ an individual to provide a service which an approved FCP already provides, unless the hiring of such person is approved by the existing FCP and the Executive committee of the FFPP." [Article II.G.3 (b) of the FFP Bylaws 2002]. Therefore, absent a qualifying waiver, each distinct subspecialty service is provided by only one FCP. No such waiver has ever been approved for the Cardiothoracic Service at the AMC, in which the individual plaintiffs and defendants have their practices.

19.    WMC recognizes the existence of the vital role the FFPP in the AMC by incorporating in its own Medical Staff Bylaws and in the Rules and Regulations of the Medical Staff Bylaws the requirement that each of its Directors of Service (e.g. for the Departments of Surgery, Medicine, Pediatrics, etc.) and each of its Chiefs of Section (e.g. within Surgery, Cardiothoracic, Plastics, General, Transplant, etc.) be "full-time staff". [Article VII, Sec. 2 (2)(b) Bylaws, 2005]. To meet that requirement, they "must practice as a member of an FFPP approved faculty clinical practice unless either or both of these requirements are waived by a majority of the voting members of the Executive Committee of the medical staff present." [Subsection J, p. 29, 2005 Rules and Regulations].

20.    Plaintiffs Lafaro and Fleisher are both full-time faculty members of the College of long standing, and their professional corporation CSG has been the approved heart surgery FCP under the FFPP since 1999. Membership in CSG is open to any thoracic surgeon who obtains privileges at WMC and appointment as a full-time member of the College faculty. CSG is self-governing on democratic principles in accordance with the FFPP Bylaws.

21.    Both Lafaro and Fleisher are recognized as pre-eminent heart and lung surgeons and for many years have played a role in establishing WMC's reputation as the leading center for cardiothoracic surgery in the lower Hudson Valley. Lafaro has spent his entire career at WMC, having obtained his medical degree and served as a chief resident in surgery there. He is an Assistant Professor of Cardiothoracic Surgery at New York Medical College, co-author of a number of peer-reviewed scholarly articles, and a respected practitioner of open-heart surgery. Fleisher is likewise a graduate of New York Medical College and, after interim work at St. Lukes/Roosevelt Medical Center, has been on the WMC surgical staff and faculty of the College since 1990 as a thoracic surgeon.

22.    During the period 2001 through 2004, WCHCC and WMC experienced widely publicized problems with their management and fiscal operations. An audit by the New York State Comptroller found that the operating company went from a $2.6 million surplus in 2000 to a cumulative operating loss of $207 million by the end of 2004. According to the State Comptroller, WCHCC's "combination of fiscal challenges, financial control weaknesses and accounting problems brought it close to the point of collapse."

23.    Among the improper practices identified by the State Comptroller at WCHCC were dishonest financial reports that "dramatically understated expenses and liabilities," establishment of an off-shore captive insurance company that was insufficiently

- 6 -

funded, failure to document reimbursement of a variety of expenses claimed by consultants and corporation executives, and improper use of credit cards by WCHCC officials "to circumvent competitive bidding requirements."

24.    The disclosure of these circumstances created a crisis environment at WMC, resulting in disagreements among the professional staff and ultimately in the departures of a number of physicians. Cardiothoracic Surgery was among sections that experienced unrest and attrition during this period, although Drs. Lafaro and Fleisher remained loyal to the institution and continued their practices at WMC and their membership on the faculty of New York Medical College.

25.    In late 2004, authorized representatives of WMC recruited defendant Lansman to affiliate with WMC as head of the Section of Cardiothoracic Surgery in the Department of Surgery. At the time he was recruited, Lansman had surgical privileges at Mount Sinai Hospital in Manhattan and experience in cardiac transplant procedures, a specialty WCHCC and WMC were seeking to restore to the Hospital in the wake of the financial issues and reputational decline WMC had experienced in the immediate past.

26.    On information and belief, as part of the inducement to join WMC, Lansman was also promised a full-time faculty position in the College.

27.    On information and belief, Lansman conditioned his acceptance of WMC's offer on the appointment of his Mount Sinai colleague, defendant Spielvogel, to both the Section of Cardiothoracic Surgery and to the full-time faculty of the College, and the WMC representatives agreed to those conditions.

28.    On or about January 4, 2005, NYCG was established as a limited liability entity through which Lansman and Spielvogel could operate in their affiliation with WMC.

29.    In early 2005, plaintiffs invited Lansman and Spielvogel to join CSG. While membership in CSG was not a precondition to obtain privileges to serve in the Section of Cardiothoracic Surgery at WMC, CSG is the sole approved FCP for such service in the FFPP, and membership thereof is, as stated in paragraph 18 above, a precondition to obtaining appointment as a full-time member of the College faculty.

30.    Lansman and Spielvogel rejected plaintiffs' invitation, telling Lafaro and Fleisher that they should disband CSG and affiliate with NYCG instead under Lansman's control. Lafaro and Fleisher declined to accept that proposal due to Lansman's absolute control of NYCG, which violated the democratic self-governance requirements of the FFPP Bylaws.

31.    In or about early 2005, WCHCC entered into a written agreement with NYCG and/or Lansman and Spielvogel (the "Exclusive Agreement") under which NYCG was engaged to be the exclusive provider of cardiothoracic surgery professional and administrative services at WMC. No prior notice was given to plaintiffs of such agreement, nor was any effort made to obtain consent from the governing body of the FFPP.

32.    The Exclusive Agreement covenanted to Lansman and Spielvogel that NYCG (and thus effectively its owners, Lansman and Spielvogel) would be the only surgeons who could provide the service of cardiothoracic surgery at WMC, with an exception for certain specified "Grandfathered" physicians, namely Lafaro and Fleisher. The effect of that restrictive covenant would be to bar any heart and lung surgeon other than one controlled by Lansman and Spielvogel from obtaining privileges to perform that service at WMC and thereby to prevent CSG from bringing in other professionals to expand its capacity to provide cardiothoracic surgery.

33.    The Exclusive Agreement has had an adverse effect on competition in cardiothoracic surgery in a number of respects. It has eliminated the incentive for Lansman and Spielvogel to be price sensitive in their delivery of services. On information and belief, neither defendant has been willing to be a provider under several major healthcare insurance plans that might reimburse them at less than the rate they choose to command. The Exclusive Agreement has also empowered Lansman and Spielvogel to exclude competitors at WMC, thereby limiting patient choice and reducing the quantity and quality of cardiothoracic surgeons available to patients in the relevant markets (see paragraphs 49-50 below).

34.    Defendants have sought to have NYCG declared an approved FCP under the terms of the FFPP Bylaws, but the Executive Committee of the FFPP has repeatedly found that NYCG does not meet the requirements of the FFPP Bylaws for FCP approval based, *inter alia*, on the unchecked control Lansman maintains over NYCG's governance. Lansman and Spielvogel are accordingly not members of an approved FCP.

35.    Despite the requirement of the FFPP Bylaws that all physicians with a full-time faculty appointment must be a member of an approved FCP, Lansman and Spielvogel after their arrival at WMC received appointments to the faculty without being members of any such group. Moreover, despite the requirement that the Chief of the Section of Cardiothoracic Surgery be a member of an approved FCP, Lansman was appointed Chief of that Section and continues in that capacity to the date hereof.

36.    As Chief of the Section of Cardiothoracic Surgery, Lansman has directed that the scheduling of access to the operating rooms, assignment of staff, and availability of equipment for heart and lung surgery at WMC be handled in a manner that gives preference to him and Spielvogel and causes maximum disadvantage to plaintiffs and their patients. At the

- 9 -

same time, Lansman and Spielvogel have introduced practices for their convenience and advantage that have adversely affected the quality of patient well-being and care.

37.    The size and skill level of the support staff at WMC for heart and lung surgery during Lansman's tenure as Chief of the Section, including physician's assistants and nurse practitioners, have been insufficient in view of the volume of operations and procedures performed.

38.    To address the problem of increasing volume and insufficient staff support in the WMC operating rooms, in August 2006, CSG extended a proposed invitation to a highly qualified physician's assistant, Michael Evans, practicing at Saint Joseph's Hospital in Paterson, New Jersey, to join CSG and provide operating room support. In connection with that potential employment, Evans applied to WMC for privileges, and his application received approval from both the Credentials Committee and the Executive Committee of the Medical Board.

39.    Notwithstanding the foregoing approvals, by letter dated February 16, 2007, Linda Glickman, WMC's Vice President for Clinical and Academic Affairs, advised plaintiffs and Evans that the latter's "application cannot be processed because there is an existing exclusive agreement" with NYCG with respect to the Section of Cardiothoracic Surgery. A true and correct copy of that letter is annexed hereto as Exhibit A.

40.    Plaintiffs have objected to WMC's refusal to allow Evans to receive privileges as an employee of CSG pursuant to the restrictive covenant in the Exclusive Agreement and have requested that it be withdrawn as an unreasonable restraint of trade and commerce in violation of federal and state law.

41. By letter dated April 5, 2007, WMC's Associate General Counsel rejected plaintiffs' request for withdrawal of the restraint and reiterated that it was an element of the Exclusive Agreement.

42. Thereafter, plaintiffs requested defendants to provide a copy of the Exclusive Agreement. Defendants have refused to do so.

43. By letter dated April 23, 2007, WMC's Associate General Counsel, writing on behalf of all defendants including Lansman and Spielvogel, advised plaintiffs that, even aside from the Exclusive Agreement, "all of the Cardiothoracic Physician Assistants practicing at WMC are WMC employees. PA assignments to the Cardiothoracic ORs, ICU and ward are made through WMC's Nursing department, thus ensuring accountability, and efficient and consistent coverage for the whole service." The letter then contended that allowing Evans to join the WMC staff through CSG "would disrupt the overall role, administration and integration of the Cardiothoracic Physician's Assistants in the Section of Cardiothoracic Surgery at WMC."

44. The April 23, 2007 letter went on to state that "should Mr. Evans seek employment through WMC his application would be given every consideration and I encourage you to advise Mr. Evans to do so."

45. The April 23, 2007 letter was a belated, bad faith and pretextual attempt to cover up the real reason for WMC's rejection of the Evans application – i.e., the exclusionary, anticompetitive arrangement with Lansman and Spielvogel. In reality, physician's assistants and nurse practitioners are privately employed by the FCPs for a number of the services at WMC. NYCG itself privately employs a nurse practitioner who provides patient care within the Section of Cardiothoracic Surgery without "disrupting" the work of the Section.

46.    In effect, WMC has told plaintiffs that Evans cannot work at WMC as their employee, only under the control of Lansman, Spielvogel and their entity NYCG, who control the Section of Cardiothoracic Surgery as a result of their Exclusive Agreement with WMC. Defendants' restraint on competition wrongfully undermines plaintiffs' ability to meet growing demand for their services and enhance the quality of patient care.

## COUNT I

47.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 46 as if fully stated herein.

48.    The activities of defendants and the services described above are in or affect interstate commerce because, *inter alia*, the equipment and medications used in cardiothoracic surgery are obtained in interstate commerce, the staffing of the Section of Cardiothoracic Surgery and related WMC facilities is accomplished through interstate commerce, Evans was recruited for a position at WMC and CSG from employment in New Jersey, and many payments for the services at issue are made in interstate commerce by third-party payers.

49.    For purposes of analyzing the applicability of the antitrust laws to the conduct described above, the relevant product or services markets are (a) the market for emergency cardiothoracic surgery; (b) the market for urgent cardiothoracic surgery; and (c) the market for emergency pulmonary surgery. In the vast majority of relevant patient cases, such services are not interchangeable either with treatment by medication or with intervention by nonsurgical procedures using a catheter.

50.    The relevant geographic market for the services referred to in paragraph 49 is the segment of the lower Hudson Valley north of the Cross County Parkway in Westchester

County, south of Interstate 84 and Rockland and Orange Counties. This is because emergency services involving apparent heart attack or collapsed lung are highly time- and distance-sensitive, and WMC, where the individual plaintiffs and defendants perform their specialties, is the medical facility used by greater than 80% of the patients experiencing symptoms of such conditions in that geographic area. Less than 20% of such patients use the services of any other medical facility.

51.     Third-party payers have virtually no role in the selection of the medical facility with respect to the patients needing the products or services referred to in paragraph 49 in the relevant geographic market because the selection of facility for such products or services must be made on an expedited basis without time or opportunity for consultation with the third-party payers.

52.     By reason of the foregoing, WMC and its parent WCHCC have market power in the relevant geographic markets with respect to the relevant products or services.

53.     Since early 2005, all of the defendants have had the legal capacity to conspire between and among themselves. The individual defendants and their entity NYCG are independent economic actors who have entered into the Exclusive Agreement with WCHCC on an arm's length basis.

54.     Beginning in or about early 2005 and continuing thereafter up to and including the present date, defendants, between and among themselves and other persons whose identities are unconfirmed as of this writing, entered into and engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the New York State Donnelly Act, Gen. Bus. Law § 340. The contract, combination or conspiracy consisted of a continuing agreement,

- 13 -

understanding and concert of action between and among defendants and others, the substantial terms of which are to eliminate competition from plaintiffs through exclusionary conduct.

55.    For the purpose of forming and effectuating their continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce, defendants did those things which they contracted, combined or conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following:

(a)    To eliminate competition by entering into the Exclusive Agreement, including the provision therein making NYCG the exclusive provider of cardiothoracic services at WMC, to the injury of CSG and its principals;

(b)    To eliminate competition by enforcing the Exclusive Agreement so as to obstruct CSG's employment of a physician's assistant, i.e., Evans, who would have privileges at WMC and thereby be able to assist Lafaro and Fleisher in their provision of cardiothoracic surgical services to their patients;

(c)    To eliminate competition by strategic denial of access to the operating room and to required medical staff and equipment.

56.    Defendants' illegal conduct has caused material harm to competition in unreasonable restraint of trade and commerce by reducing the availability and supply of providers of cardiothoracic surgery by limiting the ability of "grandfathered" providers of cardiothoracic surgery to expand their capacity and enhance their quality of care, by raising the cost of cardiothoracic surgery to patients and third-party payers, and by causing a demonstrable decline in the quality of patient care.

57.    Plaintiffs have been injured in their business or property by reason of the unreasonable restraint of trade and commerce described above.

58.    The injury to plaintiffs is cognizable in equity because such injury cannot be fully redressed by monetary damages and the conduct from which it arises threatens to cause future harm for which an award of damages would be an inadequate remedy. In addition, the injury directly and proximately results from the conduct complained of, and the injury constitutes the kind of injury that the antitrust laws are intended to prevent, namely harm to competition by adversely affecting consumer welfare and the quality of services.

59.    Insofar as the damages to plaintiffs resulting from defendants' unreasonable restraint of trade and commerce are measurable, they amount to in excess of $1,000,000, which sum is required to be trebled pursuant to Clayton Act § 4, 15 U.S.C. § 15(a).

## COUNT II

60.    Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 46 as if fully set forth herein.

61.    WMC and WCHCC are bound to honor the Bylaws of the FFPP by provisions in WMC's Medical Staff Bylaws and Rules and Regulations. [Article VII, Sec. 2 (2)(b), Bylaws 2005, and Subsection J, p. 29, 2005 Rules and Regulations]. Such duty to honor the Bylaws constitutes a contractual obligation on the part of WMC and WCHCC to the FFPP and its members who have privileges to practice at WMC.

62.    Plaintiffs are also intended third-party beneficiaries of the contractual duties of WMC and WCHCC under the Bylaws of the FFPP.

63.    WMC and WCHCC have violated their duties under the Bylaws of the FFPP by (a) WCHCC's entering into the Exclusive Agreement with NYCG, (b) allowing NYCG and its principals to act as if they had FCP status when they have not qualified for such status, (c) appointing Lansman to be the Chief of the Section of Cardiothoracic Surgery when he is not a

member of an FFPP approved FCP, and (d) granting NYCG a variety of preferential benefits that undermine plaintiffs' ability to compete on even terms for the provision of cardiothoracic services at WMC.

64.    Lansman, Spielvogel and NYCG have wrongfully, unlawfully and through improper acts procured the breach by WMC and WCHCC of their contractual obligations.

65.    The acts of WMC and WCHCC as stated in paragraph 63 constitute breaches of their contractual duties to plaintiffs.

66.    The acts of Lansman, Spielvogel and NYCG in procuring the breaches of contract by WMC and WCHCC constitute tortious interference with the latters' contractual duties to plaintiffs.

67.    Defendants' acts as aforesaid have caused and will continue in the future to cause injury to plaintiffs and to their patients by undermining the quality of patient care and preventing plaintiffs from expanding their capacity to respond to the demand for their services.

68.    Plaintiffs have no adequate remedy at law because the injury to them from defendants' tortious acts is not fully measurable in monetary damages.

69.    A portion of the injury to plaintiffs can be measured in monetary damages but only to the extent quantifiable from the lost volume of services caused by defendants' acts, which damages amount to not less than $1,000,000.

## COUNT III

70.    Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 46 as if fully set forth herein.

71.    Defendants by their exclusionary conduct as aforesaid have wrongfully interfered with plaintiffs' ability to expand and enhance their services, thereby preventing them

from serving the full volume of patient needs that have needed to be served since 2005 and that will continue to grow and exist in the foreseeable future.

72.    Such exclusionary conduct by defendants constitutes tortious interference with plaintiffs' prospective business relations.

73.    Plaintiffs have no adequate remedy at law because the injury to them from defendants' tortious acts is not fully measurable in monetary damages.

WHEREFORE, plaintiffs pray for judgment:

(a)    preliminarily and permanently enjoining defendants from engaging in the exclusionary conduct alleged herein, including but not limited to enjoining defendants from enforcing between and among themselves any provision of the Exclusive Agreement that bars WMC from granting privileges to any medical personnel not employed by NYCG to practice in WMC's Section of Cardiothoracic Surgery;

(b)    preliminarily and permanently enjoining WMC and WCHCC from dishonoring any of the Bylaws of the FFPP that they are required to honor under the terms of WMC's Medical Staff Bylaws and Rules and Regulations;

(c)    preliminarily and permanently enjoining Lansman, Spielvogel and NYCG from tortiously interfering with the duties of WMC and WCHCC to plaintiffs under the terms of WMC's Medical Staff Bylaws and Rules and Regulations;

(d)    preliminarily and permanently enjoining defendants from tortiously interfering with plaintiffs' ability to expand and enhance the services they provide to future patients by wrongfully preventing medical personnel they propose to have affiliate with them from obtaining privileges in WMC's Section of Cardiothoracic Surgery;

(e)    awarding plaintiffs damages in the sum of not less than $1,000,000, which

damages must be trebled by reason of defendants' violations of the antitrust laws;

(f)    awarding plaintiffs the costs and disbursements of this action, together

with interest and reasonable attorney's fees; and

(g)    granting such other and further relief as to the Court may seem just and

proper.

Dated: New York, New York
       September 10, 2007

MENAKER & HERRMANN LLP

By: _Richy & Menker_
    Richard G. Menaker (RM-4716)

Attorneys for Plaintiffs
10 East 40th Street
New York, NY 10016
(212) 545-1900

# EXHIBIT A TO COMPLAINT



# WESTCHESTER MEDICAL CENTER

February 16, 2007

Michael Evans, PA
P.O. Box 849
Lake Hopatcong, NJ 07849

Dear Mr. Evans:

Thank you for your interest in Westchester Medical Center. I am writing to inform you that Westchester Medical Center cannot process your application for privileges in the Department of Surgery, Section of Cardio-Thoracic Surgery on the Allied Health Professional staff. Your application cannot be processed because there is an existing exclusive agreement with The New York Cardiothoracic Group, within the Section of Cardio-Thoracic Surgery.

Enclosed you will find a check in the amount of $100.00 refunding your original application fee. We apologize for any inconvenience you may have experienced and wish you well in your future endeavors.

Sincerely,

Linda Glickman

Vice President,
Clinical & Academic Affairs

cc:    Michael Israel, Pres. & CEO
       Arlen Fleisher, MD

EXHIBIT B

Leonard Rosenberg (LR-6910)
Garfunkel, Wild & Travis, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                    :
ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,                           :
M.D., and CARDIAC SURGERY GROUP, P.C.,                              :
                                                                    :
                                                                    :
                              Plaintiffs,                           :          **FIRST AMENDED**
                                                                    :          **ANSWER WITH JURY**
                                                                    :          **DEMAND**
              -against-                                             :
                                                                    :
NEW YORK CARDIOTHORACIC GROUP, PLLC,                                :          O7 Civ. 7984 (SCR)
STEVEN L. LANSMAN, M.D., DAVID                                      :
SPIELVOGEL, M.D., WESTCHESTER COUNTY                                :
HEALTH CARE CORPORATION and                                         :
WESTCHESTER MEDICAL CENTER,                                         :
                                                                    :
                              Defendants.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

    Defendants New York Cardiothoracic Group, PLLC. ("NYCG"), Steven L.

Lansman, M.D. ("Dr. Lansman"), David Spielvogel, M.D. ("Dr. Spielvogel"),

Westchester County Health Care Corporation ("WCHCC") , and Westchester Medical

Center ("WMC") by their attorneys, Garfunkel, Wild & Travis, P.C, answer the

complaint dated September 10, 2007 as follows:

### The Parties

1.    Admit the allegations set forth in Paragraph 1 of the complaint.

2.    Admit the allegations set forth in Paragraph 2 of the complaint.

3.    Admit the allegations set forth in Paragraph 3 of the complaint.

4.    Deny the allegations set forth in Paragraph 4 of the complaint, except admit that WCHCC is a Public Benefit Corporation created by the New York State Public Authorities Law § 3300, *et seq.*

5.    Admit the allegations set forth in Paragraph 5 of the complaint.

6.    Admit the allegations set forth in Paragraph 6 of the complaint.

7.    Admit the allegations set forth in Paragraph 7 of the complaint and clarify that Dr. Spielvogel's principal place of business is Macy Pavilion 114W, Westchester Medical Center, Valhalla, New York..

8.    Admit the allegations set forth in Paragraph 8 of the complaint.

## Jurisdiction and Venue

9.    As to the allegations set forth in Paragraph 9 of the complaint, deny that plaintiffs state a claim sufficient to invoke the Court's subject matter jurisdiction under the Sherman Act, 15 U.S.C. §§ 1 et seq. or the Clayton Act, 15 U.S.C. §§ 12 et seq.

10.    Deny the allegations set forth in Paragraph 10 of the complaint.

11.    Deny the allegations set forth in Paragraph 11 of the complaint, except respectfully refer to the Court all questions of venue.

708362v.3

## Factual Allegations

12.    Deny the allegations set forth in the first sentence of Paragraph 12 of the complaint. As to the remaining allegations set forth in Paragraph 12, admit that WCHCC operates a hospital licensed under Article 28 of the New York State Public Health Law, that such hospital is known as Westchester Medical Center located in Westchester County, and that the hospital provides medical services to its patient population.

13.    Deny the allegations set forth in Paragraph 13 of the complaint, except admit that WCHCC grants medical staff membership and clinical privileges consistent with its obligations under New York State Public Health Law and its Medical Staff bylaws.

14.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the complaint.

15.    Deny the allegations set forth in Paragraph 15 of the complaint, except admit that WCHCC grants medical staff membership and clinical privileges in a manner consistent with the New York State Public Health Law and its own medical staff bylaws.

16.    Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 16 of the complaint, except admit that WCHCC is affiliated with the New York Medical College ("NYMC") and that NYMC, WCHCC, and the Federated Faculty Practice Plan ("FFPP") constitute an academic medical center.

17.    Deny the allegations set forth in Paragraph 17 of the complaint, except admit that WCHCC and NYMC are parties to an Affiliation Agreement, and respectfully

3

708362v.3

refer the Court to that agreement and to the Medical Staff and FFPP bylaws for their true and complete terms.

18.     Deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 18 of the complaint, and respectfully refer the Court to the FFPP  Bylaws for its true and complete terms.

19.     Deny the allegations set forth in Paragraph 19 of the complaint, and respectfully refer the court to the Medical Staff and FFPP Bylaws and WMC's rules and regulations for their true and complete terms.

20.     Deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the complaint.

21.     Deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the complaint.

22.     Deny the allegations set forth in Paragraph 22 of the complaint, and respectfully refer the Court to the audit alleged to have been performed and issued by the New York State Comptroller for its true and complete terms.

23.     Deny the allegations set forth in Paragraph 23 of the complaint, and respectfully refer the Court to the audit alleged to have been performed and issued by the New York State Comptroller for its true and complete terms.

24.     Deny the allegations set forth in Paragraph 24 of the complaint.

4

25.    Admit the allegations set forth in Paragraph 25 of the complaint, except deny that WCHCC and WMC recruited Dr. Lansman only out of concern over purported financial issues and reputational decline of WMC.

26.    Deny the allegations set forth in Paragraph 26 of the complaint.

27.    Deny the allegations set forth in Paragraph 27 of the complaint.

28.    Admit the allegations set forth in Paragraph 28 of the complaint.

29.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29, except deny that plaintiffs invited Drs. Lansman and Spielvogel to join CSG.

30.    Deny the allegations set forth in Paragraph 30 of the complaint.

31.    Deny the allegations set forth in the first sentence of Paragraph 31 of the complaint, except admit WCHCC entered into a Professional Services Agreement with respect to cardiothoracic services at WCHCC, and respectfully refer the Court to that Agreement for its true and complete terms.  Deny knowledge and information sufficient to form a belief as to the truth of the remaining allegations set forth in that paragraph.

32.    Deny the allegations set forth in Paragraph 32 of the complaint, except admit WCHCC entered into a Professional Services Agreement with respect to cardiothoracic services at WCHCC, and respectfully refer the Court to that Agreement for its true and complete terms.

33.    Deny the allegations set forth in Paragraph 33 of the complaint.

34.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 34 of the complaint.

35.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the complaint, except admit that Lansman and Spielvogel are members of the faculty at NYMC and that Lansman is Chief of the Section of Cardiothoracic Surgery.

36.    Deny the allegations set forth in Paragraph 36 of the complaint.

37.    Deny the allegations set forth in Paragraph 37 of the complaint.

38.    Deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 38 of the complaint, except admit that Michael Evans applied to WCHCC for privileges.

39.    Admit the allegations set forth in Paragraph 39 of the complaint.

40.    Deny the allegations set forth in Paragraph 40 of the complaint.

41.    As to the allegations set forth in Paragraph 41 of the complaint, respectfully refer the Court to the letter dated April 5, 2007, for its true and complete terms.

42.    Admit the allegations contained in Paragraph 42 of the complaint to the extent that Plaintiffs requested a copy of the Professional Services Agreement with respect to Cardiothoracic Services at WCHCC, but deny that defendants refused to

6

708362v.3

provide a copy of that agreement to plaintiffs. Rather, the Agreement contains a confidentiality provision which prevents its disclosure.

43.    As to the allegations set forth in Paragraph 43 of the complaint, defendants respectfully refer the Court to the letter dated April 23, 2007, for its true and complete terms.

44.    As to the allegations set forth in Paragraph 44 of the complaint, defendants respectfully refer the Court to the letter dated April 23, 2007, for its true and complete terms.

45.    Deny the allegations set forth in Paragraph 45 of the complaint.

46.    Deny the allegations set forth in Paragraph 46 of the complaint.

**Count I**

47.    Defendants repeat and reallege each and every allegation set forth in Paragraphs 1 through 46 of this Answer, and incorporate same as if fully set forth herein.

48.    Deny the allegations set forth in Paragraph 48 of the complaint, and respectfully refer all questions of law to the Court.

49.    Deny the allegations set forth in Paragraph 49 of the complaint, and respectfully refer all questions of law to the Court.

50.    As to the allegations set forth in Paragraph 50 of the complaint, deny plaintiffs' allegation characterizing the "relevant geographic market" and deny knowledge or information sufficient to form a belief as to the truth of the remaining

7

allegations set forth in that paragraph. Defendants respectfully refer all questions of law to the Court.

51.    Deny the allegations set forth in Paragraph 51 of the complaint.

52.    Deny the allegations set forth in Paragraph 52 of the complaint, and respectfully refer all questions of law to the Court.

53.    Deny the allegations set forth in Paragraph 53 of the complaint.

54.    Deny the allegations set forth in Paragraph 54 of the complaint.

55.    Deny the allegations set forth in Paragraph 55 of the complaint and the allegations made in all subparagraphs therein.

56.    Deny the allegations set forth in Paragraph 56 of the complaint.

57.    Deny the allegations set forth in Paragraph 57 of the complaint.

58.    Deny the allegations set forth in Paragraph 58 of the complaint.

59.    Deny the allegations set forth in Paragraph 59 of the complaint.

## Count II

60.    Defendants repeat and reallege each and every allegation set forth in Paragraphs 1 through 59 of this Answer, and incorporate same as though set forth fully herein.

8

708362v.3

61.    Deny the allegations set forth in Paragraph 61 of the complaint, and respectfully refer the Court to the FFPP Bylaws and WMC's Medical Staff Bylaws and Rules and Regulations for their true and complete terms.

62.    Deny the allegations set forth in Paragraph 62 of the complaint.

63.    Deny the allegations set forth in Paragraph 63 of the complaint.

64.    Deny the allegations set forth in Paragraph 64 of the complaint.

65.    Deny the allegations set forth in Paragraph 65 of the complaint.

66.    Deny the allegations set forth in Paragraph 66 of the complaint.

67.    Deny the allegations set forth in Paragraph 67 of the complaint.

68.    Deny the allegations set forth in Paragraph 68 of the complaint.

69.    Deny the allegations set forth in Paragraph 69 of the complaint.

## Count III

70.    Defendants repeat and reallege each and every allegation set forth in Paragraphs 1 through 69 of this Answer, and incorporate same as though set forth fully herein.

71.    Deny the allegations set forth in Paragraph 71 of the complaint.

72.    Deny the allegations set forth in Paragraph 72 of the complaint.

73.    Deny the allegations set forth in Paragraph 73 of the complaint.

9

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses to plaintiffs' complaint, without assuming the burden of proof of such defenses that would otherwise rest with plaintiffs. Discovery has not yet commenced, the results of which may reveal additional defenses, and defendants reserve their right to amend this Answer as appropriate.

### FIRST AFFIRMATIVE DEFENSE

74.    Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations.

### SECOND AFFIRMATIVE DEFENSE

75.    Plaintiffs lack antitrust standing to bring claims under the Sherman Act and Clayton Act.

### THIRD AFFIRMATIVE DEFENSE

76.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, because plaintiffs have not adequately alleged an antitrust injury or an unreasonable restraint of trade.

### FOURTH AFFIRMATIVE DEFENSE

77.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, because plaintiffs have not adequately alleged that they are the proper parties to bring an antitrust action.

10

## FIFTH AFFIRMATIVE DEFENSE

78.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, because plaintiffs have not adequately alleged, and defendants' actions do not constitute, a substantial effect upon interstate commerce.

## SIXTH AFFIRMATIVE DEFENSE

79.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, because plaintiffs have not adequately alleged the existence of a proper relevant product market and geographic market in which defendants' purported actions unreasonably restrained trade.

## SEVENTH AFFIRMATIVE DEFENSE

80.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, because plaintiffs have not adequately alleged that the defendants combined or conspired with an intent to unreasonably restrain trade.

## EIGHTH AFFIRMATIVE DEFENSE

81.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, because plaintiffs have not adequately alleged that defendants have market power over the relevant market.

11

## NINTH AFFIRMATIVE DEFENSE

82.    The complaint fails to state a claim upon which relief may be granted under the Sherman Act § 1, 15 U.S.C. § 1 and the Clayton Act §§ 4, 16, 15 U.S.C. §§ 15(a), 26, in that with respect to their actions concerning plaintiff and his employment status, defendants were not separate economic actors, but employees, officers, agents, and/or divisions of a single enterprise, whose coordinated conduct does not constitute concerted action under antitrust law.

## TENTH AFFIRMATIVE DEFENSE

83.    All of defendants' alleged anticompetitive actions were undertaken for pro-competitive and legitimate business reasons.

## ELEVENTH AFFIRMATIVE DEFENSE

84.    Plaintiffs' claims are barred, in whole or in part, because the conduct of which plaintiffs complain has not, and will not, lessen competition, tend to create a monopoly or injure, destroy or prevent competition.

## TWELFTH AFFIRMATIVE DEFENSE

85.    Plaintiffs' antitrust claims are conclusory.

## THIRTEENTH AFFIRMATIVE DEFENSE

86.    The complaint fails to state a claim upon which relief may be granted under the New York State Donnelly Act, General Business Law § 340, because licensed physicians and the medical profession are exempt from liability under that Act.

708362v.3

## FOURTEENTH AFFIRMATIVE DEFENSE

87.    Plaintiffs' claims of injury to Drs. Lafaro and Fleisher and Cardiac Surgery Group are barred due to the existence of documentary evidence, i.e., the Professional Services Agreement.

## FIFTEENTH AFFIRMATIVE DEFENSE

88.    Plaintiffs' claim of defendants' strategic "denial of [plaintiffs'] access to the operating room and to required medical staff equipment" is barred due to the existence of documentary evidence, i.e., the Professional Services Agreement.

## SIXTEENTH AFFIRMATIVE DEFENSE

89.    The complaint fails to state a claim upon which relief may be granted for tortious interference with contractual duties because any purported duty of WCHCC to honor the bylaws of the Federated Faculty Practice Plan ("FFPP") does not constitute a contractual obligation under New York law.

## SEVENTEENTH AFFIRMATIVE DEFENSE

90.    Defendants have not violated any purported duties under the FFPP Bylaws, WCHCC's Medical Staff Bylaws or its Rules and Regulations.

## EIGHTEENTH AFFIRMATIVE DEFENSE

91.    WCHCC has no contractual duty to plaintiffs.

## NINETEENTH AFFIRMATIVE DEFENSE

92.    The complaint fails to state a claim upon which relief may be granted for interference with prospective business relations because plaintiffs have not adequately

13

alleged that but for defendants' alleged conduct, plaintiffs would have treated a greater number of patients.

## TWENTIETH AFFIRMATIVE DEFENSE

93.    The complaint fails to state a claim upon which relief may be granted for interference with prospective business relations because plaintiffs have not adequately alleged that defendants' purported conduct was undertaken with the sole purpose of harming plaintiffs.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

94.    Plaintiffs' state law claims should be dismissed under 28 U.S.C. § 1367(c).

## TWENTY-SECOND AFFIRMATIVE DEFENSE

95.    The claims are barred to the extent that plaintiffs failed to exhaust all necessary administrative remedies and procedures prior to the commencement of this action.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

96.    To the extent plaintiffs complain of any action relating to their medical staff membership and hospital privileges, the complaint must be dismissed on grounds of primary jurisdiction because plaintiffs failed to commence and exhaust their administrative remedies with the New York State Public Health Council.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

97.    Plaintiffs are not entitled to injunctive relief because the complaint fails to establish a likelihood of success on the merits of plaintiffs' claims.

14

708362v.3

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

98.    Plaintiffs are not entitled to injunctive relief because the complaint fails to establish that plaintiffs will be irreparably harmed absent such relief.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

99.    Plaintiffs' claims are barred, in whole or in part, by the principles of waiver, release, estoppel, and laches.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

100.    Upon information and belief, plaintiffs had and continue to have the opportunity to mitigate their alleged damages, but have failed and refused to do so.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

101.    The claims are barred to the extent that plaintiff failed to satisfy the statutory and/or jurisdictional prerequisites for the commencement of this action.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

102.    Plaintiffs are not entitled to treble damages.

## THIRTIETH AFFIRMATIVE DEFENSE

103.    To the extent plaintiffs seek equitable relief, plaintiffs are barred from obtaining said relief for, among other reasons, they have an adequate remedy at law.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

104.    Plaintiffs' claims are barred, in whole or in part, by the State Action Doctrine, pursuant to *Parker v. Brown*, 317 U.S. 341, 63 S. Ct. 307 (1943).

708362v.3

## THIRTY-SECOND AFFIRMATIVE DEFENSE

105.    Plaintiff's claims are barred, in whole or in part, pursuant to the Local Government Antitrust Act, 15 U.S.C. §§ 34-36.

WHEREFORE, defendants New York Cardiothoracic Group, PLLC, Steven L. Lansman, M.D., David Spielvogel, M.D., Westchester County Health Care Corporation and Westchester Medical Center respectfully requests judgment dismissing the complaint in its entirety together with an award of the costs and disbursements of this action, including reasonable attorneys fees, and such other relief as the Court may deem just and proper

## JURY DEMAND

PLEASE TAKE NOTICE that defendants New York Cardiothoracic Group, PLLC, Steven L. Lansman, M.D., David Spielvogel, M.D., Westchester County Health Care Corporation and Westchester Medical Center hereby demand a trial by jury of all issues in the captioned litigation.

Dated:   Great Neck, New York
          November 19, 2007

                                        GARFUNKEL, WILD & TRAVIS, P.C.
                                        *Attorneys for Defendants*

                                        By:

                                        Leonard Rosenberg
                                        (LR-6910)

                                        111 Great Neck Road
                                        Great Neck, New York  11021
                                        (516) 393-2200
                                        (516) 466-5964 (fax)

16

708362v.3

Jordy Rabinowitz (JR-6558)
Barbara Kukowski (BK-    )
Westchester County Health Care Corporation
Office of Legal Affairs
Executive Offices at Taylor Care Center
Valhalla, New York 10595
(914) 493-2101
(914) 493-2321 (fax)

708362v.3

**EXHIBIT C**




**WESTCHESTER**
**MEDICAL CENTER**

Jordy Rabinowitz
Senior Associate General Counsel

January 3, 2008

**By Facsimile: 212-545-1656**

Richard G. Menaker, Esq.
Menaker & Hermann, LLP
10 East 40th Street
New York, New York 10016-0301

Re:    Lafaro et al. v. New York Cardiothoracic Group, et al.
       07 Civ. 7984 (SCR)

Dear Dick:

  I understand from your statements to the Court on December 7, 2007, and from your December 26, 2007 letter, that you intend to move to strike various affirmative defenses raised in defendants' amended answer. In order to avoid unnecessary motion practice and preserve judicial resources, defendants may be willing to voluntarily withdraw certain affirmative defenses. Accordingly, I would request that you set forth the affirmative defenses that you find to be subject to a motion to strike, with a brief explanation of why such defense is inappropriately pleaded, and defendants will take such position under advisement.

  Due to the present briefing schedule requiring motion papers to be filed on January 25, I would request that you inform me of your positions by January 9. Defendants will thereafter respond by January 11, 2008. Thus, should the parties not reach an agreement, you will still have sufficient time to file your motion.

Very truly yours,

Jordy Rabinowitz

c:    Leonard M. Rosenberg, Esq.

EXHIBIT D

CMC–5755

# PROFESSIONAL SERVICES AGREEMENT

## SECTION OF CARDIO-THORACIC SURGERY
## OF THE SECTION OF SURGERY

**AGREEMENT** made this 29th day of December, 2004, effective as of January 1, 2005 ("**Effective Date**") by and between **WESTCHESTER COUNTY HEALTH CARE CORPORATION**, d/b/a **WESTCHESTER MEDICAL CENTER**, a New York public benefit corporation, with its principal place of business at Westchester Medical Center, c/o Taylor Care Center Executive Offices, C-1, Valhalla, New York 10595 (the "**Hospital**"); **SLDS Cardiothoracic Surgery PLLC**, a professional limited liability company engaged in the practice of medicine under the laws of the State of New York, with its principal place of business at Westchester Medical Center, Valhalla Campus, Valhalla, New York 10595 (the "**Company**"); Steven L. Lansman, M.D., a physician having primary residential address at 200 East 61st Street, Apt. 27E, New York, New York 10021 ("**Dr. Lansman**"); and David Spielvogel, M.D., a physician having primary residential address at 6 Mayhew Avenue, Larchmont, New York 10538 ("**Dr. Spielvogel**"). The Hospital, the Company, Dr. Lansman and Dr. Spielvogel may hereafter be referred to individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

**WHEREAS**, the Hospital is the operator of an tertiary acute care medical center in Valhalla, New York, one of the clinical departments of which is the Section of Cardio-Thoracic Surgery of the Department of Surgery (the "**Section**"); and

**WHEREAS**, the Section is responsible for the provision of cardio-thoracic surgical services (hereinafter collectively referred to as "cardio-thoracic surgery") at the Hospital; and

**WHEREAS**, the Company is organized as a professional limited liability company in accordance with the laws of the State of New York with Dr. Lansman as its Controlling Person (as such term is defined in Section 12.1(c) hereof) and Managing Member; and

**WHEREAS**, the Company and its physicians (defined to include physicians who are either employees or independent contractors of the Company, hereinafter the "**Physicians**") are capable of providing clinical services in the specialty of cardio-thoracic surgery ("**Professional Services**") and administrative, supervising and teaching services relating to the Section and cardio-thoracic surgery ("**Administrative Services**") (Professional Services and Administrative Services hereinafter sometimes collectively referred to as "**Services**"); and

**WHEREAS**, the Hospital desires to engage the Company and its Physicians to provide Services in the Section and to render high quality professional care to patients who receive cardio-thoracic surgery services in the Hospital; and

**WHEREAS**, the Company and the Physicians desire to render such Professional Services and Administrative Services to the Hospital; and

1

WHEREAS, the Parties desire to enter into this Agreement to provide a full statement of their respective responsibilities in connection with the provision of Professional Services and Administrative Services during the term of this Agreement.

NOW, THEREFORE, it is mutually agreed as follows:

1.    **Engagement of Company; Exclusivity.**

1.1    The Hospital hereby engages the Company as an independent contractor to provide on an exclusive basis, except as provided otherwise herein with regard to Grandfathered Physicians (as defined in **Exhibit A** attached hereto), all Professional Services and Administrative Services in the Section at all sites of Hospital, and the Company hereby agrees to render such Professional Services and Administrative Services under the terms and conditions stated herein and as the Parties may from time to time mutually agree in writing. In furtherance thereof, the Company shall cause the Physicians to perform all of the duties and obligations required pursuant to this Agreement, including, but not limited to, such duties and obligations required in connection with the Services set forth on attached **Exhibit A.** The Company shall provide such number of Physicians throughout the Term of this Agreement who, when considered in combination with the Grandfathered Physicians, shall be sufficient to fully provide to the satisfaction of the Hospital all of the Services required by Hospital.

1.2    Hospital has determined that the proper, orderly and efficient delivery of quality cardio-thoracic surgery Services at the Hospital can best be accomplished by entering into an exclusive arrangement with the Company. Therefore, beginning on the Effective Date, this Agreement is intended to be exclusive for all Services provided at the Hospital, except as may otherwise set forth in **Exhibit A** with respect to Grandfathered Physicians, if any. Beginning on the Effective Date and continuing for so long as the Company and the Physicians satisfactorily perform their obligations hereunder, the Hospital will not enter into similar agreements with other entities or individuals to provide Services at the Hospital, except as otherwise set forth on **Exhibit A.**

2.    **Independent Contractor Status.**    The Company and its Physicians shall be independent contractors and not employees of the Hospital and shall not hold itself or themselves out as employees of the Hospital.

2.1    The Company will be the employer of, will have control over, and will be liable for all incidents of employment of, the Physicians. The Physicians will not be deemed employees, agents or servants of Hospital and Hospital will not be liable for any benefit, incident, right or entitlement of their employment by the Company. It is mutually understood and agreed that each and every person and entity who furnishes services to Hospital pursuant to this Agreement will be deemed an independent contractor with respect to the Hospital.

2.2    The Company agrees that it shall be liable for its own debts, obligations, acts, and omissions, and will timely pay to the appropriate governmental authority, on behalf of itself and the Physicians, all required employment-related taxes, fees and assessments, including but not limited to Social Security (FICA), unemployment insurance, Medicare, and other

2

required withholdings, taxes and/or benefits on behalf of or otherwise relating to the Company's employment of the Physicians.

2.3    The Hospital shall not withhold any sums for income tax, unemployment insurance, social security or any other withholding or benefit pursuant to any law or requirement of any governmental body on behalf of the Company's employees or independent contractors.

2.4    Nothing in this Agreement is intended, nor shall be construed, to create an employer/employee, a partnership, or a joint venture relationship between the Hospital and the Company or its Physicians, and neither the Company nor any Physician will be constituted the agent of Hospital by virtue of the terms of this Agreement.

2.5    In the event the Internal Revenue Service or any other governmental agency shall, at any time, question or challenge the independent contractor status of the Company or its Physicians, both the Hospital and the Company, upon receipt of either of them of notice from the Internal Revenue Service or any other governmental agency, irrespective of for whom, or by whom such discussions or negotiations are initiated, shall notify the other Party about such discussions/negotiations. The other Party shall participate in any such discussions or negotiations to the extent permitted by the Internal Revenue Service or other governmental agency.

2.6    The Company shall cause all Physicians to be guided by and conform to all lawful directions given to the Company and to such Physicians by Hospital, provided that such directions do not conflict with the provisions of this Agreement. Notwithstanding the foregoing, the Parties hereby agree that each Physician shall be responsible for all decisions regarding cardio-thoracic procedures during the course of providing such Professional Services by such Physician. Nothing herein will be construed as giving Hospital control over, or the right to control, the professional judgment or actions of the Physicians with respect to the Professional Services rendered hereunder; provided, however, that it is understood by each of the Parties that, because each Physician must be an active member of the Hospital Medical Staff, his/her professional services will be reviewed in connection with, and will be subject to the provisions of, the Bylaws of the Hospital's Medical Staff (the "Medical Staff Bylaws", which term shall include all related rules, regulations, policies and procedures promulgated under or pursuant to the Medical Staff Bylaws), a copy of which has been provided to the Company.

3.    **Chief.** Dr. Lansman shall be Chief of the Section. As Chief of the Section, Dr. Lansman will be responsible for the overall oversight, management and program development of the Section. The Section and its Chief shall have equivalent rights, privileges and responsibilities of other Hospital departmental sections and section chiefs.

4.    **Retention of Physicians.**

4.1    The Company shall be required to employ, at its own expense, a sufficient number of Physicians as may be required to properly discharge the duties of the Company under this Agreement and who shall be individually bound by the terms of this Section 4.

3

4.2     All of the Physicians who will, at any time during the Term hereof (as defined in Section 16), provide Services on behalf of the Company pursuant to this Agreement must be listed on attached **Exhibit B** and must be approved in advance by Hospital prior to providing any Services at the Hospital. The initial list of such Physicians will be provided by the Company to Hospital at least twenty (20) days prior to the Effective Date, and, subject to Hospital's approval, will be finalized and attached to this Agreement as **Exhibit B** no later than the business day immediately preceding the Effective Date. If the Company wishes to add any Physician to **Exhibit B** at any time following Hospital's approval of the initial list, the Company must obtain Hospital's prior written approval to do so.

4.3     All Physicians must apply for medical staff privileges at the Hospital and obtain approval for staff membership at the Hospital in accordance with Hospital and Medical Staff Bylaws. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws. Each Physician shall have the same responsibilities as other members of the Medical Staff including attendance at Medical Staff Sectional, general staff, and committee meetings.

4.4     (a)     The Company represents that each of the Physicians have been informed and have expressly acknowledged his or her understanding and agreement that, upon termination of his or her employment with the Company for any reason whatsoever (whether by voluntary action of the Physician or by action of the Company with or without cause), such Physician's membership on the Medical Staff of, and clinical privileges at, the Hospital shall terminate effective at the same time as the termination of such employment status, and such Physician shall not be entitled in connection therewith to any appeal or other due process rights under the Medical Staff Bylaws, notwithstanding any provision of the Bylaws of the Hospital or the Medical Staff Bylaws to the contrary. Each Physician shall expressly (i) waive any due process rights afforded by such Medical Staff Bylaws and (ii) agree to resign his/her Medical Staff membership and privileges upon termination or expiration of this Agreement or termination or expiration of their shareholder interest in the Company, or employment by the Company. The Company further represents that each Physician is familiar with the terms of this Section 4.4 and has agreed to be bound hereby. In evidence of the foregoing, and his/her agreement to be bound hereby, each Physician who will provide Services pursuant to this Agreement must, prior to providing any such Services, execute a waiver and acknowledgement agreement in the form attached hereto as **Exhibit C**. All such signed waiver and acknowledgement agreements shall be obtained by the Company and delivered by the Company to Hospital prior to the date on which the subject Physician provides Services hereunder, and such agreements shall be automatically incorporated into, and be made a part of, this Agreement when so delivered.

(b)     The Company and the Physicians acknowledges that upon the expiration, termination or non-renewal of this Agreement for any reason whatsoever, each Physician's membership on the medical staff of, and clinical privileges at, the Hospital may terminate at the Hospital's sole and absolute discretion.

4.5     The Company may discharge, suspend or terminate any Physician at will or in accordance with the terms of employment or membership agreement, as the case may be, between the Physician and the Company. Upon termination of a Physician's employment with the Company and/or a Physician's shareholder or membership status with the Company, such

4

Physician shall be automatically deemed removed from **Exhibit B** as of the date of such discharge, suspension or termination. The Company must promptly notify Hospital in writing of any such action and, before such Physician is listed again on **Exhibit B** or is again entitled to provide Services to Hospital, the Company must obtain Hospital's prior written approval to do so.

      4.6    The Company shall enter into employment and/or membership agreements, as the case may be, with the Physicians which shall provide for termination of a Physician's employment with, and ownership of any stock or membership interest in, the Company in the event of:

      (a)    Loss or limitation of medical licensure, DEA number, malpractice insurance, or professional certification; or

      (b)    Suspension or limitation of credentials or privileges at the Hospital or in a Hospital endorsed managed care plan; or

      (c)    Suspension or limitation of a Physician in the Medicare program, the Medicaid program, or any insurance or reimbursement program in which the Hospital is also involved; or

      (d)    The limitation of or inability of a Physician to practice, or to be scheduled to provide Professional Services, due to legal or civil action resulting from claims related to sexual harassment or conviction of a crime constituting a felony; or

      (e)    The limitation of or inability of an Physician to practice, or to be scheduled to provide Professional Services, due to substance abuse or dependency matters; or

      (f)    If the Physician has been:

      (i)    convicted of (1) any criminal offense related to the delivery of an item or service under the Medicare or Medicaid programs or any program funded under Title V or Title XX of the Social Security Act (the Maternal and Child Health Services Program or the Block Grants to States for Social Security Program, respectively); (2) any criminal offense relating to neglect or abuse of patients in connection with the delivery of a health care service; (3) fraud, theft, embezzlement or other financial misconduct in connection with the delivery of a health care service; or (4) obstructing an investigation into the manufacture, distribution, prescription or dispensing of a controlled substance;

      (ii)    required to pay any civil monetary penalty under 42 U.S.C. § 1128A, regarding false, fraudulent or impermissible claims under, or payments to induce a reduction or limitation of health care services to beneficiaries of any state or federal health care program which may result in such payment; or

(iii)    excluded from participation in the Medicare, Medicaid or Maternal and Child Health Services (Title V) Program, or any program funded under the Block Grants to States for Social Services (Title XX) Program; or

(iv)    totally restricted from research by the Food and Drug Administration for research misconduct.

(g)    The failure of the Physician to maintain his/her Medical Staff membership or clinical privileges at the Hospital.

4.7    The Parties agree that there will be a mechanism established by which a Physicians' performance (and behavior) will be subject to Hospital review and feedback. In the event that the Hospital determines that a Physician's performance and/or behavior fails to maintain a level consistent with that expected by the Hospital, the Hospital shall provide the Company with notice of such failure and the Company shall develop and implement a plan of correction for such physician. The plan of correction must be approved by the Hospital.

4.8    Notwithstanding anything herein to the contrary, nothing in this Agreement shall restrict, limit or otherwise diminish the rights of the Hospital or the Medical Board of the Hospital regarding the suspension, termination, revocation, withdrawal of medical staff privileges of any Physician.

5.    **Administrative Services.**    The Company and its Physicians shall provide and fulfill the following duties and responsibilities in furtherance of their obligation to perform the Administrative Services hereunder:  (a) clinical oversight of all activities of the Section; (b) clinical oversight of activities of voluntary attending physicians; (c) 24/7 coverage of cardio-thoracic surgical procedures at the Hospital; (d) scheduling of all cardio-thoracic surgery procedures at the Hospital; (e) continuing medical education of physicians with privileges in the Section; (f) research oversight; (g) marketing and public relations assistance; (h) resident and fellow education and support; (i) new program/service development; (j) coordination of affiliated hospital cardio-thoracic surgical services (which hospitals currently are The Pinnacle Hospitals and Bon Secours); (k) assistance in selection of devices/equipment in the cardio-thoracic surgery operating room facilities of the Hospital; (l) efficient utilization of services and supplies in accordance with Hospital budgetary goals and length of stay objectives; (m) helping to assure the delivery of Professional Services to Medicaid, self-pay, uninsured and charity care patients in accordance with Hospital policies; and (n) such other duties and responsibilities as may be mutually agreed upon by the Parties.

6.    **Coverage.**    The Company shall have full-time responsibility for the provision of Professional Services in the Section and shall ensure that Professional Services are available twenty-four (24) hours per day, three hundred sixty five (365) days per year. The Company agrees to provide the same quality of Professional Services to all patients regardless of their ability to pay or source of payment. As set forth in Section 4 hereof, if the Company desires to increase or decrease the number of its Physicians at any time it must first receive the written consent of the Hospital.

7.    Compensation; Severance.

7.1    (a)    In consideration for the provision of all Services by Dr. Lansman as Chief of the Section contemplated hereby, for each Contract Year during the Term hereof the Hospital shall pay to the Company, subject to Section 7.2 hereof, the sum of ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ("Annual Compensation"), which amount shall be payable in equal monthly installments ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓("Monthly Compensation Installment Payments") on the first weekday of each month that is not a bank or governmental holiday (a "Business Day").

(b)    If this Agreement or Dr. Lansman's position as Chief of the Section is terminated by the Hospital without cause, the Company shall be entitled to receive, and the Hospital shall be required to pay to the Company, severance compensation in an amount equal to the lesser of: (a) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ payable on the first Business Day of each month following the date of termination until the end of the Term hereof ("Severance Compensation").



7.2    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8.    Hospital Responsibilities.

8.1    The Hospital shall provide the Company sufficient resources and support, including access to all Hospital facilities and appropriate personnel, at the Hospital's expense, as determined necessary for the proper functioning of the Section consistent with such resources and support customarily provided by the Hospital to other department sections of the Hospital. The Chief shall be consulted to provide input concerning all such resources and support. A list of the principal resources and items of support to be provided by the Hospital to the Company pursuant to this Section 8.1 is set forth in Exhibit E.

8.2    The Hospital shall have overall responsibility for the administration and operation of the Hospital and will set all policies and procedures pursuant to which the Physicians will perform the Services. The Hospital will be responsible for establishing a uniform quality assurance program. The Physicians will participate as required by the Hospital in such quality assurance program.

9.    Operating Room Priority. In order to meet the objectives of the Hospital, the Company and the Physicians, the Company and the Physicians shall have preferential access to the operating room facilities at the Hospital with respect to time slots allocated by the Hospital

7

for cardio-thoracic surgery. The Chief of the Section and the Hospital shall establish the parameters of this preferential access based on the utilization of the operating rooms by the full-time physicians, provided that for purposes of this sentence, the term "full-time physicians" shall include the Grandfathered Physicians. To maximize the utilization of the operating rooms, voluntary attending physicians (unaffiliated with the Company including the Grandfathered Physicians) may be granted privileges in, and access to, the operating rooms, upon the recommendation and concurrence of the Chief and the Hospital, and in accordance with the Medical Staff Bylaws.

10.    **Company Office Space; Equipment.**    The Hospital shall provide office space to the Company to be utilized by the Company for its private practice and the operation of the Section on substantially the same basis as provided to other department sections of the Hospital. In connection therewith, the Hospital shall provide (x) necessary and appropriate office equipment, furniture, fixtures, supplies, materials, (y) maintenance, repairs and replacement of such equipment, furniture and fixtures, and (z) telephone service, internal mail delivery service, and janitorial services, for the Sectional space. The Company shall take good care of the office space, equipment, supplies, and materials.

11.    **Patient Referrals.**    Nothing in this Agreement shall be construed to require either the Company nor any of the Physicians to refer patients to, or otherwise generate business for, Hospital. The Company, the Hospital and the Physicians will at all times comply with all applicable state and federal laws relating to physician referrals.

12.    **Company and Physician Representations and Covenants.** The Company and its Physicians, make the following representations and covenants, the continuing validity of which shall be a prerequisite to all of the obligations of the Hospital hereunder. The representations of the Physicians shall be contained in any employment or membership agreement between the Physicians and the Company.

12.1    The Company hereby represents and warrants that:

(a) the Company (i) is and shall remain duly organized as a professional corporation in the State of New York; (ii) has and shall maintain all requisite capacity and authority to enter into this Agreement and to fulfill the obligations required of the Company hereunder; and (iii) has taken all necessary action to authorize the Company's entering into this Agreement and consummating the transactions contemplated hereby; and

(b) this Agreement constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms;

(c) except as may otherwise be consented to in writing by the Hospital, in its sole and absolute discretion, at all times during the Term hereof, the Company shall maintain Dr. Lansman as: (i) the controlling person of the Company (holding at least a majority (by vote and by value) of all of the outstanding shares or membership interests of all classes of capital stock or membership interests of the Company ("Controlling Person"), and (ii) the Managing Member of the Company; and

8

       (d)    the Company shall maintain professional liability insurance covering itself and its Physicians as required hereunder.

      12.2    The Company hereby represents and warrants that the Company and each Physician, as the case may be, at all times during the term of this Agreement:

       (a)    shall discharge his/her and/or its responsibilities consistent with generally accepted standards of the medical profession and in a manner consistent with the principles of medical ethics;

       (b)    shall (i) be licensed to practice medicine within his or her specialty discipline of cardio-thoracic surgery in accordance with the laws of the State of New York; (ii) duly registered with the Department of Education of the State of New York; and (iii) be board-certified in Cardiac Surgery;

       (c)    shall apply for, be awarded, and maintain membership in good standing on the active Medical Staff of the Hospital with appropriate and requisite privileges, all in accordance with Hospital policies as well as applicable Hospital and Medical Staff Bylaws;

       (d)    shall (i) conduct itself and themselves in compliance with all applicable federal, state, and local laws, rules, and regulations, the Hospital and Medical Staff Bylaws, rules, and regulations and applicable Hospital policies and codes of conduct, including, without limitation, the Hospital's compliance program, conflict of interest and financial disclosure policies, and billing policies, which are provided to all physicians on the Medical Staff of the Hospital; and (ii) not be subject to any sanction by a governmental regulatory agency or enter into a consent decree to settle allegations by a governmental regulatory agency related to illegal conduct in the delivery of health care.

       (e)    shall maintain such standards, and comply with all laws, rules, regulations and requirements as will, at all times, warrant: (i) full accreditation of the Hospital by the Joint Commission on Accreditation of Healthcare Organizations, the New York State Department of Health, and the New York State Education Department; (ii) continuance of the Hospital's license or operating certificate; and (iii) approval, accreditation and certification by applicable reviewing or certifying boards and/or agencies in connection with such postgraduate training programs as are or may be adopted by the Hospital;

       (f)    shall implement and maintain an effective compliance plan as recommended by the Office of the Inspector General, Department of Health and Human Services or as otherwise required by the Hospital, which compliance plan shall be subject to periodic review and approval by the Hospital;

       (g)    shall comply with all applicable portions of the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as it may be amended from time to time, with all regulations promulgated pursuant thereto and with all other applicable federal, state and local laws, rules and regulations;

(h)    shall have a current narcotics registration certificate issued by the United States Drug Enforcement Agency;

(i)    shall be enrolled as a participating provider, in good standing, with the Medicare and Medicaid programs and with such other third-party payor programs as Hospital may require;

(j)    shall provide professional services to patients receiving care at Hospital without any unlawful discrimination based upon any such patient's ability to pay, insurance coverage or lack thereof, race, creed, color, national origin, gender, age or disability;

(k)    shall, in the case of each Physician, be an employee or member of the Company;

(l)    shall notify Hospital immediately if his/her staff privileges at any other health care facility are temporarily or permanently suspended, modified, terminated, not renewed, surrendered or relinquished for any reason whatsoever;

(m)    has never been (i) the subject of any professional disciplinary proceedings; (ii) excluded from participating in the Medicare or Medicaid programs, nor (iii) otherwise sanctioned by any governmental agency in connection with the delivery of a health care service;

(n)    has been granted a license to practice medicine in every state to which he/she has ever applied and has not surrendered any such license as a consequence of, or for the purpose of avoiding, a disciplinary proceeding; and

(o)    has never been convicted of a felony or misdemeanor.

12.3    The representations and warranties in this Section 12 will continue in effect for the Term of this Agreement. The Company shall notify the Hospital immediately in writing of any change in the status of any representation and warranty.

12.4    The Company shall, upon the request of the Hospital, require each Physician as a condition of his employment and/or holding a shareholder or membership interest in the Company, to agree to resign his/her Medical Staff privileges at the Hospital immediately upon the termination of this Agreement or upon the termination of the Physician's employment agreement or shareholder or membership interest with the Company.

13.    **Hospital Representations and Covenants.** As consideration for the Professional Services and Administrative Services to be rendered by the Company, the Hospital represents to the Company that it shall:

13.1    Maintain its operating certificate and its accreditation by the Joint Commission on Accreditation of Healthcare Organizations; and

10

13.2  Conduct itself in compliance with all applicable federal, state, and local laws, rules, and regulations and in compliance with the Hospital and Medical Staff Bylaws and compliance program.  Notwithstanding any other provision contained in this Agreement, the Hospital remains responsible for ensuring that any service provided pursuant to this Agreement complies with all pertinent provisions of federal, state, and local statutes, rules, and regulations.

14.  <u>Professional Liability Insurance Coverage.</u>  The Company and the Physicians shall be entitled to participate in the Hospital sponsored program for professional liability insurance coverage for full-time members of the Medical Staff, as such program may exist and may be modified from time to time, on the same basis made available to other full-time members of the Hospital's Medical Staff.  A description of the principal terms of the Hospital's current professional liability insurance coverage program is attached hereto as <u>Exhibit D.</u>  Physicians have the option not to participate in the Hospital's professional liability insurance coverage program in which case each such Physician shall be required to (x) present acceptable proof of coverage to the Hospital before appointment to the Medical Staff and (y) maintain such coverage at all times thereafter during which the Physician is a member of the Medical Staff in order to remain a member of the Medical Staff.

15.  <u>Billing And Collection/Financial Arrangement.</u>

15.1  <u>Professional and Technical Components.</u>

(a)  <u>Technical Component.</u>  The Hospital shall be entitled to bill and collect, and shall be responsible for billing and collecting, all fees for the technical component of all Professional Services that are rendered by the Company and/or the Physicians pursuant to this Agreement.  In connection therewith, the Hospital shall charge and bill patients in its name for the use of applicable Hospital personnel, rooms, equipment, supplies, materials and facilities, together with such other costs as may be incurred by the Hospital.

(b)  <u>Professional Component.</u>  Except as otherwise provided in Section 15.5, the Company shall be entitled to bill and collect, and shall be responsible for billing and collecting, all fees for the professional component of the Professional Services rendered to patients by the Physicians.  The bills for the professional component shall be rendered in the name of the Company or its Physicians.  The Company shall, at its sole cost and expense, process and collect all bills rendered to patients and/or third party payors for Professional Services rendered by the Company and its Physicians.  The Company shall conduct its billing and collection activities in accordance with Hospital policies, which shall be provided to the Company in advance of the Effective Date.  The Hospital shall have the right to approve the Company's billing vendor.

15.2  <u>Cooperation.</u>  The Parties shall cooperate with each other in providing the necessary information for each to bill its respective charges.

15.3    Recordkeeping.  The Company shall require each Physician to promptly complete all medical records, execute any time allocation forms, participate in any time studies and keep auditable supporting time records as Hospital may require.

15.4    Medicare Assignment.  The Company shall accept Medicare assignment.

15.5    Courtesy Allowances.  The Company shall honor Hospital policies for charity care, courtesy allowances and discount arrangements.  The Hospital shall provide such policies to the Company on an annual basis.

16.    Term.  This Agreement shall commence on the Effective Date and shall continue in effect until December 31, 2009 ("Term").  Each annual period from January 1st to December 31st of the same calendar year shall be defined as a Contract Year.  If the Agreement is not earlier terminated as permitted herein, the Parties agree to commence good faith negotiations no later than September 1, 2008 for a renewal of the Agreement.  Except with respect to obligations accruing prior to the date of termination or expiration and those obligations specified in Sections 2.5, 7, 14, 17.2, 18.1, 21.5, 21.13, and 21.14, if there is no mutual agreement on the terms of a renewal, this Agreement shall expire on December 31, 2009.

17.    Termination.

17.1    Events of Termination.  This Agreement shall terminate upon the occurrence of any of the following events, with such termination to be effective immediately upon the giving of notice by the terminating party:

(a)    The dissolution or liquidation of a Party, voluntary or otherwise;

(b)    The material breach by the Company or its Physicians of their responsibility to provide Professional Services or Administrative Services, which breach remains uncured for thirty (30) days' following receipt of written notice to cure such breach;

(c)    The material breach of a Party to comply with its representations, duties and obligations hereunder, which breach remains uncured for thirty (30) days' following receipt of written notice to cure such breach;

(d)    At the option of the affected party, upon failure of the Parties to renegotiate the terms of this Agreement pursuant to Section 19.2 hereof;

(e)    In the event that Dr. Lansman is no longer the Controlling Person or Managing Member of the Company; provided, however, the Hospital shall have the option of not terminating this Agreement, but continuing this Agreement with the Company with the remaining members or with a successor members acceptable to the Hospital, all of whom shall be Physicians of the Company;

(f)    In the event that the Company or any Physician is sanctioned by a governmental regulatory agency or enters into a consent decree to settle allegations by a

12

governmental regulatory agency related to illegal conduct in the delivery of the Professional Services; notwithstanding the foregoing, in the event a Physician (other than Dr. Lansman) is sanctioned or enters into the aforementioned consent decree and the Company terminates its relationship with such Physician, this Agreement shall not be terminated by the Hospital; or

(g)    The Board of Directors of the Hospital determines that clinical and/or non-clinical (business) activities of the Company or any Physician related to (i) the delivery of Professional Services or Administrative Services at the Hospital or (ii) the professional, ethical or moral conduct of any Physician in his role as a physician, are so injurious to the reputation of the Hospital and the Section so as to require immediate termination of this Agreement; this decision shall only be made after a Special Review Committee of the Hospital's Board of Directors has heard all applicable persons and their positions on the activities in question. Notwithstanding the foregoing, in the event the Company terminates its relationship with the Physician in question (other than Dr. Lansman), this Agreement shall not be terminated by the Hospital;

17.2    Effect of Termination Upon Obligations of Parties.  Upon termination of this Agreement, neither Party shall have any further obligation hereunder, except for those obligations accruing prior to the date of termination or which survive the expiration or termination of this Agreement. Notwithstanding the foregoing, in the event that this Agreement is terminated by the Hospital without cause and the Hospital enters into an agreement with any other physician or legal entity for the provision of services substantially similar to the Services contemplated hereunder to be provided on an exclusive basis, the agreement between the Hospital and such other physician or legal entity shall expressly provide in a manner substantially similar to the exclusivity exception provided for Grandfathered Physicians in Exhibit A hereof, that (i) the Company and each Physician employed by the Company at the time of such termination shall be permitted to retain full privileges at the Hospital and to continue to engage in the practice of medicine specializing in cardio-thoracic surgery at the Hospital, and (ii) they shall not be subject to, or otherwise restricted by, any such exclusivity arrangement between the Hospital and any such third party.

18.    Medical Records/HIPAA.

18.1    Medical Records.  The Company shall maintain and file accurate and complete medical records in form and content consistent with Hospital policies and procedures as established from time to time. The medical records shall at all times remain the property of the Hospital. The Physicians of the Company shall have access consistent with Hospital policies and procedures established from time to time, but in no event will the Hospital deny reasonable access for the purposes of patient care, billing, collection, malpractice cases or other services consistent with fulfilling the purposes of the Company. The Parties agree to maintain the medical records consistent with Hospital, federal, state and local laws, rules and regulations.

18.2    HIPAA Compliance.  The Company agrees on behalf of itself and its physicians that it shall comply with the statutory requirements concerning the privacy and security of identifiable health information as governed under HIPAA and any regulations promulgated thereunder and the Company agrees to execute any and all further documents

13

and/or agreements in furtherance of such requirements. The Company's obligations under this Section 18.2 shall survive any termination of this Agreement for any reason whatsoever.

19.    **Regulatory Changes.**

19.1    **Reimbursement.** This Agreement shall be construed to be in accordance with federal and state statutes and third-party carrier rules, regulations, principles and interpretations regarding Hospital and hospital-based physician reimbursement.

19.2    **Renegotiation of Agreement.**

(a)    In the event that there is a change in any federal or state statutes, regulations, reimbursement rules or guidelines (or the application thereof) that may materially impact on the legality of this Agreement; or if any existing or amended law, regulation or rule would cause any provision of this Agreement to jeopardize: (i) the Hospital's status as either (x) an organization described under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or (y) an organization classified as an organization that is not a private foundation under Section 509(a)(1) of the Code (i.e., a public charity) by reason of being described in Section 170(b)(1)(A)(iii) and/or Section 170(b)(1)(A)(v) of the Code; (ii) the tax-exempt status of interest on the Hospital's tax-exempt bond financing; or (iii) cause any transaction provided for herein to constitute an excess benefit transaction engaged in by a charitable organization, as defined in the Code, or in the event that the Internal Revenue Service gives notice that any transaction provided for in this Agreement constitutes an excess benefit transaction under Section 4958 of the Code, then the Hospital and/or the Company shall have the right to remedy such condition through the immediate renegotiation of the affected portion(s) of this Agreement. All other terms and conditions of this Agreement shall continue unaffected.

(b)    Should the Parties be unable to renegotiate this Agreement within ninety (90) days after written notice of renegotiation is given, the adversely affected Party shall be entitled to immediately terminate this Agreement pursuant to Section 16 hereof.

20.    **Indemnification.** The Company and the Hospital each agree to indemnify and hold harmless the other and the other's employees from any claim made against the indemnified party arising out of the indemnifying party's or its employees' acts, failure to act or conduct in the course of such party's performance of its obligations pursuant to this Agreement.

14

21.    Miscellaneous.

21.1    Compliance With Omnibus Reconciliation Act of 1980.    It is hereby understood that if the Company is determined to be a "subcontractor" under the provision of subparagraph (1) of §1861 (V) (I) of the Social Security Act as amended by Section 952 of the Omnibus Reconciliation Act of 1980, or regulations adopted pursuant thereto, the Company will, until the expiration of four (4) years after furnishing of services under this Agreement, make available upon the request of the Secretary of Health and Human Services or the Comptroller General or its representatives, this Agreement, invoices for services rendered to the Hospital and the supporting documents and records as may be necessary to verify the nature and extent of the costs of this Agreement.

21.2    Amendment of Agreement.    This Agreement shall not be modified or amended except in writing, signed by the Parties.

21.3    Entire Understanding.    This Agreement including the Exhibits attached hereto sets forth the entire agreement and understanding between the Parties as to the matters contained herein, and merges and supersedes all prior discussions, agreements, and understandings of every kind and nature among them. No Party shall be bound by any condition, definition or representation other than as expressly provided for in this Agreement.

21.4    Binding Effect.    This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective legal representatives, trustees, receivers, successors and permitted assigns.

21.5    Notices.    All notices, requests, demands and other communications provided for in this Agreement shall be in writing and shall be deemed to have been given at the time when personally delivered, or mailed via registered or certified mail, return receipt requested, addressed to the address of the other Party stated at the beginning of this Agreement or to such other address as such Party may have fixed by notice; provided, however, that any notice of change of address shall be effective only upon receipt.

21.6    Invalidity of Provision.    If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, the remainder of this Agreement and the application of such provision to the persons or circumstances shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement.

21.7    Governing Law.    This Agreement shall be governed by and construed under the laws of the State of New York.

21.8    Headings.    The headings of the sections hereof are inserted for convenience only and in no way define, limit or prescribe the intent of this Agreement.

21.9   Counterpart Signatures.  This Agreement and its amendments may be executed in multiple copies, with each multiple copy to be deemed an original, but all multiple copies together constituting one and the same instrument.

21.10   Non-Discrimination.  Each Party agrees that such Party will not discriminate on the basis of age, race, color, religion, creed, national origin, sex or marital status.

21.11   Binding Effect/Non-Assignment.  This Agreement and all rights of the Parties hereunder shall inure to the benefit of and be enforceable by their legal successors, executors, and administrators.  This Agreement shall not be assigned by any Party.

21.12   Waiver.  No waiver by a Party of any condition or of the breach by the another Party of any term or covenant contained in his Agreement, whether by conduct or otherwise, at any time or in any one or more instances shall be deemed or construed as a further or continuing waiver of any such condition or breach of any similar or dissimilar term or covenant set forth in this Agreement.  Moreover, the failure of any Party to exercise any right hereunder shall not bar the later exercise thereof.

21.13   Confidentiality.  Subject to any disclosure required by Court order or pursuant to legal process, each Party shall keep confidential the terms and provisions of this Agreement and shall not at any time during the term of this Agreement, divulge, furnish or make known or assessable to anyone whatsoever, any provision of this Agreement or to any discussions, records, papers and documents relating to this Agreement.  This Section 21.13 shall not be construed, however, to preclude the Company or the Hospital from disclosing confidential information to its attorney or accountant for the purpose of obtaining professional advice.

21.14   Dispute Resolution.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration conducted in accordance with the Health Care Arbitration Rules of the AHLA Alternative Resolution Service (c/o American Health Lawyers Association), 1120 Connecticut Avenue, N.W., Suite 950, Washington, DC 20036).  Judgment upon the award rendered by the arbitrator(s) shall be supported by written opinion, shall be incorporated into and made a part of this Agreement and may, at the option of any Party, be enforced in law or in equity by any court having jurisdiction hereof.  Any proceeding under this section shall be held in New York, New York, unless the Parties agree in writing to an alternative location.

16

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first set forth herein.

WESTCHESTER COUNTY HEALTH CARE
CORPORATION d/b/a WESTCHESTER MEDICAL
CENTER

BY: _____
Name:
Title:

SLDS CARDIOTHORACIC SURGERY PLLC

BY: _____
Name: Steven L. Lansman, MD
Title: Managing Member

_____
Steven L. Lansman, MD

_____
David Spielvogel, MD

17

## EXHIBIT A

## DUTIES TO BE PERFORMED

### Cardio-Thoracic Surgery Services

1. Provide to all patients of the Hospital cardio-thoracic surgery services including, but not limited to, the following:

   - Coronary bypass procedures
   - Valve replacement and repair procedures
   - Aortic surgery procedures for acute thoracic aortic dissections and acute and chronic thoracic aortic aneurysms
   - Atrial and ventricular septal defect repairs in adults
   - Non-cardiac thoracic surgical procedures
   - Pacemaker and AICD implantation

2. Provide timely (within 24 hours) consultation.

3. Participate in the active management of cardio-thoracic patients post-operatively.

4. Assist administration in developing treatment protocols and care paths to more effectively manage cardiothoracic patients.

5. Assist administration in developing strategies and processes to achieve a NYS risk adjusted mortality and major complication rate for Hospital that is within the top 1/3 of all NYS programs.

6. Participate in new technology assessment and selection.

7. Participate and assist in developing peer review and quality improvement initiatives related to the cardiothoracic program.

8. Actively participate in the weekly cardiac cath conference and the monthly cardiac surgery morbidity and mortality conference.

9. Develop an emergency call schedule for patients presenting to any Hospital facility who have no Hospital physician or who have been referred from another institution and who are in need of immediate cardiothoracic surgery consultation or intervention.

10. Assist in the development and implementation of a clinical marketing and outreach program.

11. Assist administration in developing processes and programs that allow for the efficient utilization of resources.

12. Assist administration in planning for the consolidation of cardiac surgery and other tertiary cardiac services at the Hospital site.

13. Assist Hospital in enhancing the academic and research mission and reputation of the cardiac surgical program.

## EXCEPTIONS TO EXCLUSIVITY PROVISION:

The Company's right to be the exclusive provider of cardio-thoracic services at the Hospital, pursuant to Section 1 of this Agreement, is subject to the following exceptions. During the term of this Agreement, (i) the surgeons listed below who are not employees or independent contractors of the Company or otherwise classified as Physicians hereunder and who were members of the Hospital's Medical Staff having concomitant staff privileges at the Hospital and were performing cardio-thoracic surgery services at the Hospital immediately prior to the Effective Date ("Grandfathered Physicians") shall be entitled to provide cardio-thoracic surgery services and device implantation; provided, however, that in the case of any Grandfathered Physician who elects to become employed by, and/or a shareholder or member of, the Company, such Grandfathered Physician shall, effective as of the date of such association with Company, no longer qualify as a Grandfathered Physician for purposes of this Agreement and, concomitantly, shall be considered a "Physician" for all purposes of this Agreement; and provided, further, that in the event a Grandfathered Physician resigns or otherwise terminates his/her medical staff privileges at the Hospital, such Grandfathered Physician shall no longer qualify as a Grandfathered Physician for purposes of this Agreement; and (ii) all cardiologists shall be entitled to implant pacemakers and/or AICDs, and Hospital may enter into agreements with any such physicians to provide such services even though they are not members or employees of Company:

1.  Arlen Fleischer, M.D.

2.  Rocco LaFaro, M.D.

3.  Mohan Sarabu, M.D.

4.  Suvro Sett, M.D.

5.  Elias Zias, M.D

EXHIBIT B

PHYSICIANS

Steven L. Lansman, MD

David Spielvogel, MD

## EXHIBIT C

## WAIVER AND ACKNOWLEDGEMENT AGREEMENT

I, Steven L. Lansman, M.D., acting in my individual capacity as party to that certain Professional Services Agreement - Section of Cardio-Thoracic Surgery of the Section of Surgery, dated the same date hereof (the "Professional Services Agreement") in accordance with Section 4.4 of said Professional Services Agreement, do hereby expressly and affirmatively:

(A)     consent and agree that upon termination or expiration of (i) my employment with SLDS Cardiothoracic Surgery, PLLC (the "Company") for any reason whatsoever (whether by voluntary action on my part or by action of the Company with or without cause), (ii) my ownership of a controlling membership interest in the Company, or (iii) the Professional Services Agreement, my membership on the Medical Staff of, and clinical privileges at, Westchester Medical Center (the "Hospital") shall immediately terminate and I shall promptly resign from such Medical Staff membership and my related privileges at the Hospital; and

(B)     waive any rights of appeal or other due process rights that I may have or otherwise be entitled to pursuant to the Medical Staff Bylaws regarding the termination of my membership on the Medical Staff of, and clinical privileges at, the Hospital, notwithstanding any provision of the Bylaws of the Hospital or the Medical Staff Bylaws to the contrary.

IN WITNESS WHEREOF, the undersigned has hereunto set forth his hand this 29th day of December 2004.

_Steven L. Lansman MD_

Steven L. Lansman, M.D.

## WAIVER AND ACKNOWLEDGEMENT AGREEMENT

I, David Spielvogel, M.D., acting in my individual capacity as party to that certain Professional Services Agreement - Section of Cardio-Thoracic Surgery of the Section of Surgery, dated the same date hereof (the "Professional Services Agreement") in accordance with Section 4.4 of said Professional Services Agreement, do hereby expressly and affirmatively:

(A)    consent and agree that upon termination or expiration of (i) my employment with SLDS Cardiothoracic Surgery, PLLC (the "Company") for any reason whatsoever (whether by voluntary action on my part or by action of the Company with or without cause), (ii) my ownership of a membership interest in the Company, or (iii) the Professional Services Agreement, my membership on the Medical Staff of, and clinical privileges at, Westchester Medical Center (the "Hospital") shall immediately terminate and I shall promptly resign from such Medical Staff membership and my related privileges at the Hospital; and

(B)    waive any rights of appeal or other due process rights that I may have or otherwise be entitled to pursuant to the Medical Staff Bylaws regarding the termination of my membership on the Medical Staff of, and clinical privileges at, the Hospital, notwithstanding any provision of the Bylaws of the Hospital or the Medical Staff Bylaws to the contrary.

IN WITNESS WHEREOF, the undersigned has hereunto set forth his hand this 29th day of December 2004.

David Spielvogel, M.D.

3

<u>EXHIBIT D</u>

<u>HOSPITAL'S CURRENT PROFESSIONAL LIABILITY INSURANCE COVERAGE
PROGRAM</u>

Professional malpractice insurance coverage in the minimum amounts of $1.3 million per occurrence/$3.9 million aggregate. The Director's professional liability coverage will be provided by the Medical Center on the condition that the Director elects to participate in the Medical Center's defense and indemnification program. The defense and indemnification coverage provided is on an occurrence basis or the equivalent and is without annual or aggregate limits. In implementation of the foregoing coverage, the Medical Center uses a commercial insurance carrier, National Union Fire Insurance Company, through which it provides the primary layer of coverage at the $1.3 million/$3.9 million level, which is purchased through WCHC Purchasing Group, Inc. The Risk Management Department at Westchester Medical Center is the administrator for the program. The Medical Center also provides physicians with a first layer of excess coverage for $1.3 million/$3.9 million through the Section 18-19 coverage provided through the New York State fund administered by HANYS or another approved carrier. In addition, there is an umbrella liability policy of $25,000,000 in excess over the primary and first excess layer for physicians. Physicians also have the option not to participate in the Medical Center defense and indemnification program in which case each such physician must present acceptable proof of coverage underwritten by a New York State admitted carrier of not less than $1.3 million per occurrence and $3.9 million in the aggregate to the Medical Center before appointment to the staff and maintain such coverage thereafter while remaining on the staff. The Director can select WMC as his/her primary hospital for excess coverage. Applications for the New York State Excess Malpractice Insurance are available in the Medical Affairs office. If the Director so elects, he/she may do so and if determined to be eligible, WMC will apply to the New York State Excess Malpractice Insurance Pool for the additional excess insurance coverage of $1 million dollars per occurrence and $3 million dollars in the aggregate.

4

## EXHIBIT E

## SCHEDULE OF HOSPITAL-PROVIDED RESOURCES AND SUPPORT

1. One full-time secretary/administrative assistant dedicated to assist Dr. Lansman

2. The number of nurse practitioners and physician assistants assigned to the Section as of the date hereof, currently 14, shall not be reduced unless mutually agreed upon by the Hospital and Dr. Lansman.

# EXHIBIT E

MENAKER & HERRMANN

A LIMITED LIABILITY PARTNERSHIP

10 EAST 40ᵀᴴ STREET

NEW YORK, NEW YORK 10016-0301

TELEPHONE
(212) 545-1900

FACSIMILE
(212) 545-1656

WEBSITE
www.mhjur.com

RICHARD G. MENAKER
EXTENSION: 223
rmenaker@mhjur.com

January 9, 2008

By Telefax

Jordy Rabinowitz, Esq.
Senior Associate General Counsel
Westchester Medical Center
Office of Legal Affairs
Valhalla, NY 10595

Re:    Lafaro v. NYCG
       07 Civ. 7984 (SCR)

Dear Jordy:

I am writing in response to your letter, dated January 3, 2008, in which you requested me to identify the affirmative defenses we may move to strike with a brief explanation of our position as to each. I have done so below. You have indicated that you will let me know by January 11 which of these defenses you may withdraw in order to avoid unnecessary motion practice and to conserve judicial resources.

**First Affirmative Defense**

Plaintiffs' claims are not barred by the statute of limitations. Continuing violations of the Sherman Act may be enjoined, and damages actions are subject to a four-year statute of limitations. See § 4B of the Clayton Act, 15 U.S.C.A. §15b. The Donnelly Act also has a four-year statute of limitations. See N.Y. General Business Law, §340(5). The complaint alleges continuing, ongoing violations of the antitrust laws commencing in late 2004 or early 2005, well within the statute of limitations period.

**Second, Third and Fourth Affirmative Defenses**

These affirmative defenses lack merit because plaintiffs have alleged that their direct competitors are engaged in a combination, conspiracy and agreement that has the purpose and effect of injuring them in their business and has adversely affected consumers by diminishing the quality

Jordy Rabinowitz, Esq.
January 9, 2008
Page 2

of care received by cardiothoracic surgery patients in the relevant geographic area. See *Reddy v. Puma*, 2006 WL 2711535, 2006-2 Trade Cases ¶75, 497 (E.D.N.Y. 2006).

## Fifth Affirmative Defense

The Fifth Affirmative Defense asserts that plaintiffs have not separately alleged a substantial effect upon interstate commerce. Plaintiffs' allegations, however, are more than adequate to establish this element of their cause of action. Plaintiffs do not merely allege that defendants' activities "are in or affect interstate commerce," but provide specific examples of such activities. See Complaint, ¶48.

## Sixth Affirmative Defense

The Sixth Affirmative Defense is based on plaintiffs' purported failure to allege the existence of relevant product and geographic markets. The complaint, however, includes allegations that identify with clarity and specificity both the relevant product and geographic markets. See Complaint, ¶¶ 49 and 50.

## Seventh Affirmative Defense

The Seventh Affirmative Defense asserts that plaintiffs have not alleged that defendants conspired "with an intent" to unreasonably restrain trade. There is, however, no such pleading requirement with respect to a violation of Section 1 of the Sherman Act as there would be if plaintiffs had alleged a violation of Section 2 of the Sherman Act (which requires a specific intent to monopolize) or were prosecuting a criminal violation of the Sherman Act (which requires criminal intent). Plaintiffs have more than adequately alleged that defendants' conduct constitutes an unreasonable restraint on trade. See, e.g., ¶54 of the Complaint.

## Eighth Affirmative Defense

The Eighth Affirmative Defense asserts that plaintiffs have failed adequately to allege that defendants have market power in the relevant market. The Complaint, however, not only contains a specific allegation of defendants' market power in the relevant product and geographic markets, but explains the basis of defendants' market power. See, e.g., Complaint ¶¶51 and 52.

## Ninth Affirmative Defense

The Ninth Affirmative Defense asserts that plaintiffs have failed to state a claim upon which relief can be granted on the grounds that plaintiffs are not separate economic actors (*i.e.* the so-called *Copperweld* defense). This defense, however, is contradicted by defendants' Professional Services Agreement, recently produced to plaintiffs, which makes it clear that defendants are

Jordy Rabinowitz, Esq.
January 9, 2008
Page 3

separate entities and that the defendant doctors and their corporation are "independent contractors and not employees of the hospital."

## Twelfth Affirmative Defense

Defendants' assertion that plaintiffs' antitrust claims are "conclusory" is without merit. Plaintiffs' claim is specified in great detail and is based upon an express agreement among defendants (embodied in the Professional Services Agreement recently produced to plaintiffs), not upon an indirect agreement inferred from defendants' conduct.

## Fourteenth and Fifteenth Affirmative Defenses

These defenses based on "the existence of documentary evidence" have no merit. The Professional Services Agreement cannot bar plaintiffs' claims even if it purported to - which it does not - because plaintiffs are not parties thereto.

## Nineteenth and Twentieth Affirmative Defenses

These affirmative defenses attack the sufficiency of plaintiffs' allegations necessary to state a claim for interference with prospective business relations. The assertion in the Nineteenth Affirmative Defense that plaintiffs' allegations are deficient because they do not assert that "but for defendants' alleged conduct, plaintiffs would have treated a greater number of patients" is incorrect in view of ¶¶ 37, 38, 46, 56 and 71 of the Complaint. The assertion in the Twentieth Affirmative Defense that plaintiffs' allegations are deficient because they do not allege that "defendants' purported conduct was undertaken with the sole purpose of harming plaintiffs" is incorrect because the Complaint satisfies the necessary pleading requirement by alleging that defendants have used "wrongful means" (here a combination, contract or conspiracy in violation of the Sherman Act) to the detriment of plaintiffs' business relationships. See, e.g., Advanced Global Technology LLC v. Sirius Satellite Radio, Inc., 15 Misc.3d 776, 836 N.Y.S.2d 807 (Sup. Ct. New York Co. 2007).

## Twenty-Second and Twenty-Third Defenses

Defendants' assertion that plaintiffs' complaint should be barred because of plaintiffs' failure "to commence and exhaust their administrative remedies with the New York Public Health Council" is without merit. Plaintiffs do not seek staff membership or hospital privileges and the claims are not medically-based, which would invoke the expertise of the Public Health Council. See Chime v. Sicuranza, 221 A.D.2d 401, 633 N.Y.S.2d 536 (2nd Dep't 1995); Tsadik v. Beth Israel Medical Center, 13 Misc.3d 359, 822 N.Y.S.2d 395 (Sup. Ct. New York Co. 2006); Fritz v. Huntington Hospital, 39 N.Y.2d 339, 384 N.Y.S.2d 92 (1976).

Jordy Rabinowitz, Esq.
January 9, 2008
Page 4

## Twenty-Fourth Affirmative Defense

This defense - that defendants have failed to establish likelihood of success on the merits - is inapposite because defendants do not seek a preliminary injunction and, accordingly, it should be stricken.

## Twenty-Fifth Affirmative Defense

The premise of this defense, that plaintiffs must show irreparable harm to obtain an injunction, is erroneous. Under §16 of the Clayton Act, 15 U.S.C.A.§26, plaintiffs need only show "a threatened loss or damage by a violation of the antitrust laws" to their business in order to obtain injunctive relief.

## Twenty-Sixth Affirmative Defense

Plaintiffs will move to strike the affirmative defense of waiver, release, estoppel and laches on the grounds that it is vague and insufficiently pleaded to give plaintiffs notice of the facts and circumstances on which it purports to be based. Plaintiffs are aware of no facts or circumstances that would implicate any of the matters alleged in this affirmative defense.

## Twenty-Eighth Affirmative Defense

Plaintiffs will also move to strike the affirmative defense "that plaintiff failed to satisfy the statutory and/or jurisdictional prerequisites for the commencement of this action" on the grounds that it is vague and insufficiently pleaded to give plaintiffs notice of the facts and circumstances on which it purports to be based. Plaintiffs are aware of no facts or circumstances that would implicate this affirmative defense.

## Twenty-Ninth Affirmative Defense

Defendants' assertion that plaintiffs are not entitled to treble damages is without merit and is contrary to express statutory provision. Any antitrust damages established by plaintiffs are trebled automatically by statute. See §4 of the Clayton Act, 15 U.S.C.A.§ 15(a), and Donnelly Act, N.Y. General Business Law §340(5).

Jordy Rabinowitz, Esq.
January 9, 2008
Page 5

### Thirty-First and Thirty-Second Affirmative Defenses

Plaintiffs do not intend to move against these defenses at this time because they understand defendants' motion to dismiss will be based on these defenses. Plaintiffs will respond to defendants' motion to dismiss.

Yours sincerely,

Richard G. Menaker

RGM:lfs.003
cc:  Leonard M. Rosenberg, Esq. (by telefax)

**EXHIBIT F**

MENAKER & HERRMANN

A LIMITED LIABILITY PARTNERSHIP

10 EAST 40TH STREET

NEW YORK, NEW YORK 10016-0301

TELEPHONE
(212) 545-1900

FACSIMILE
(212) 545-1656

WEBSITE
www.mhjur.com

RICHARD G. MENAKER
EXTENSION: 223
rmenaker@mhjur.com

January 11, 2008

<u>By Telefax</u>

Jordy Rabinowitz, Esq.
Senior Associate General Counsel
Westchester Medical Center
Office of Legal Affairs
Valhalla, NY 10595

            Re:    Lafaro v. NYCG
                    <u>07 Civ. 7984 (SCR)</u>

Dear Jordy:

        Thank you for your telephone call yesterday offering to withdraw most of the affirmative defenses we propose to move against, on the condition that they could be reinstated for a motion for summary judgment or for trial.

        We would be glad to stipulate to a consent dismissal of affirmative defenses, but any such dismissal would have to be for the balance of the case. It would neither serve the interest of judicial economy nor help us focus on genuinely contested issues to have unmeritorious defenses dismissed now only to re-emerge later.

        I hope defendants can see their way clear to dropping a substantial number of the defenses. Please let me know as soon as possible.

                        Yours sincerely,

                        Richard G. Menaker

RGM:lfs.001
cc:  Leonard M. Rosenberg, Esq. (by telefax)

# EXHIBIT G




**WESTCHESTER**
**MEDICAL CENTER**

Jordy Rabinowitz
Senior Associate General Counsel

January 16, 2008

**By Facsimile (212-545-1656)**

Richard G. Menaker, Esq.
Menaker & Herrmann, LLP
10 East 40th Street
New York, NY 10016-0301

Re:    Lafaro, et al. v. New York Cardiothoracic Group, PLLC, et al.
       Index No.: 07 Civ. 7984 (SCR)

Dear Dick:

      I write in response to your letters dated January 9 and 11, 2008 with regard to Plaintiffs' anticipated motion to strike affirmative defenses contained in Defendants' First Amended Answer and Defendants' potential stipulation to withdraw some of these defenses. While Defendants are willing to withdraw some of their defenses, we believe that, for the reasons set forth below, the remaining defenses have merit and that withdrawal is unwarranted at this time.

First Affirmative Defense

      Defendants agree to withdraw their statute of limitations defense only as to Plaintiffs' federal and state antitrust claims. Defendants believe, however, that they have viable statute of limitations defenses as to Counts II and III of the Complaint.

Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses

      Defendants decline to withdraw these affirmative defenses because, as we discussed, the parties will be litigating these defenses on Defendants' motion on the pleadings and, in the event the motion is not granted, these defenses may still be viable depending on facts adduced in discovery. Accordingly, dismissal of these defenses is completely premature, unnecessary and unwarranted. Any motion to strike would be frivolous and a waste of the Court's and the parties' time.

*Rec'd 1/17/08*
*R.S...*

Richard G. Menaker, Esq.
January 16, 2008
Page 2

Ninth Affirmative Defense

Defendants agree to withdraw their Ninth Affirmative Defense at this time, without
prejudice to reinstate the defense in the event that information provided in discovery or in any
subsequent amended pleadings makes reinstatement appropriate.

Twelfth Affirmative Defense

Defendants decline to withdraw this defense because Plaintiffs' antitrust claims are
conclusory under applicable case law.

Fourteenth and Fifteenth Affirmative Defenses

Defendants decline to withdraw these defenses because the terms and conditions of the
Professional Services Agreement demonstrate an absence of injury to the Plaintiffs. Further,
there is nothing inappropriate about defending Plaintiffs' claims based on documentary evidence.
Seeking to strike these defenses is completely premature, unnecessary and unwarranted.

Nineteenth and Twentieth Affirmative Defenses

Defendants decline to withdraw these defenses because Defendants disagree with your
interpretation of what is required to plead and/or establish such claims under New York law.
Plaintiffs have not adequately pleaded their claim, nor will they be able to establish it at trial.

Twenty-Second and Twenty-Third Affirmative Defenses

These defenses were interposed "to the extent" that Plaintiffs failed to exhaust all
administrative remedies and "to the extent" that Plaintiffs complain with regard to their medical
staff membership and hospital privileges. Since it is not completely clear whether Plaintiffs are
complaining of any limitation or restriction of their privileges, it is premature to withdraw these
defenses at this time.

Twenty-Fourth and Twenty-Fifth Affirmative Defenses

Defendants decline to withdraw these defenses. Frankly, we are somewhat surprised at
your objection because Plaintiffs seek to "preliminarily" enjoin Defendants no less than four
times in the "Wherefore" clause of the Complaint. If Plaintiffs are willing to stipulate to
withdraw, with prejudice, their multiple requests for preliminary injunctive relief, the Defendants
will withdraw these affirmative defenses. To be clear, Defendants' Twenty-Fifth Defense was in
response to Plaintiffs seeking a preliminary injunction and not pleading standards under the
Clayton Act as you suggested in your January 9 letter. Defendants do not concede, however, that
your position is correct.

Twenty-Sixth Affirmative Defense

Defendants decline to withdraw this defense. We believe that Defendants have viable
defenses of waiver, estoppel, release and laches which will be asserted in detail at the appropriate

Richard G. Menaker, Esq.
January 16, 2008
Page 3

time, including on Defendants' motion on the pleadings. In addition, even if not asserted in the motion, withdrawal of these defenses is premature pending facts elicited in discovery. However, we note that Plaintiffs waited nearly three years before filing a complaint seeking injunctive relief for conduct alleged to have occurred in January 2005. Certainly, this provides Defendants with a strong laches defense.

<u>Twenty-Seventh Affirmative Defense</u>

Defendants agree to withdraw this defense.

<u>Twenty-Ninth Affirmative Defense</u>

Defendants decline to withdraw this defense because whether Plaintiffs will be entitled to treble damages is an issue to be decided in the case.

In conclusion, Defendants agree to withdraw the following Affirmative Defenses:

- The First Affirmative Defense, *i.e.*, the statute of limitations defense, **only** as to Plaintiffs' federal and state antitrust claims;

- The Ninth Affirmative Defense, *i.e.*, the *Copperweld* defense, without prejudice to reinstate that defense as dictated by discovery or amended pleadings; and

- The Twenty-Seventh Affirmative Defense.

Feel free to contact me to discuss.

Very truly yours,

Jordy Rabinowitz, Esq.

cc:    Leonard M. Rosenberg, Esq.
       Justin M. Vogel, Esq.

**EXHIBIT H**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,
M.D., and CARDIAC SURGERY GROUP, P.C.,

                        Plaintiffs,

        -against-

NEW YORK CARDIOTHORACIC GROUP, PLLC,
STEVEN L. LANSMAN, M.D., DAVID
SPIELVOGEL, M.D., WESTCHESTER COUNTY
HEALTH CARE CORPORATION and
WESTCHESTER MEDICAL CENTER,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                        STIPULATION

                                        07 Civ. 7984 (SCR)


        IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for

the respective parties in the above-entitled action, that defendants hereby withdraw

certain affirmative defenses contained in their First Amended Answer with Jury Demand

as follows:

        a.    Defendants withdraw their First Affirmative Defense, that Plaintiffs'
              claims are barred in whole or in part by the applicable statute of
              limitations, only as to Plaintiffs' federal and state antitrust claims;

        b.    Defendants withdraw their Ninth Affirmative Defense, i.e., the
              *Copperweld* defense, without prejudice to reinstate that defense in the
              event that information provided in discovery or amended pleadings makes
              reinstatement appropriate;

        c.    Defendants withdraw their Twenty-Eighth Affirmative Defense, alleging
              that Plaintiffs' claims are barred to the extent that Plaintiffs failed to
              satisfy the statutory and/or jurisdictional prerequisites for the
              commencement of this action.


820772v.1

Dated: New York, New York
     January 18, 2008

Dated: Valhalla, New York
     January 18, 2008

By: _Richard O. Menaker_

   Richard O. Menaker, Esq. (RM-4716)
     *Attorney for Plaintiffs*
Menaker & Herrmann, LLP
10 East 40th Street
New York, New York 10016
(212) 545-1900
(212) 545-1656 (fax)

By: _____

   Jordy Rabinowitz (JR-6558)
     *Attorney for Defendants*
Westchester County Health Care Corporation
Office of Legal Affairs
Executive Offices at Taylor Care Center
Valhalla, New York 10595
(914) 493-2191
(914) 493-2321 (fax)

GARFUNKEL, WILD & TRAVIS, P.C.
Leonard Rosenberg (LR-6910)
Justin M. Vogel (JV-5839)
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200
(516) 466-5964 (fax)

SO ORDERED:

_____
      U.S.D.J.

824172v.1

2