**EXHIBIT 5**

CMC–5755

## PROFESSIONAL SERVICES AGREEMENT

## SECTION OF CARDIO-THORACIC SURGERY OF THE SECTION OF SURGERY

AGREEMENT made this 29th day of December, 2004, effective as of January 1, 2005 ("Effective Date") by and between **WESTCHESTER COUNTY HEALTH CARE CORPORATION**, d/b/a **WESTCHESTER MEDICAL CENTER**, a New York public benefit corporation, with its principal place of business at Westchester Medical Center, c/o Taylor Care Center Executive Offices, C-1, Valhalla, New York 10595 (the "Hospital"); **SLDS Cardiothoracic Surgery PLLC**, a professional limited liability company engaged in the practice of medicine under the laws of the State of New York, with its principal place of business at Westchester Medical Center, Valhalla Campus, Valhalla, New York 10595 (the "Company"); **Steven L. Lansman, M.D.**, a physician having primary residential address at 200 East 61st Street, Apt. 27E, New York, New York 10021 ("Dr. Lansman"); and **David Spielvogel, M.D.**, a physician having primary residential address at 6 Mayhew Avenue, Larchmont, New York 10538 ("Dr. Spielvogel"). The Hospital, the Company, Dr. Lansman and Dr. Spielvogel may hereafter be referred to individually as a "Party" and collectively as the "Parties".

### RECITALS

WHEREAS, the Hospital is the operator of an tertiary acute care medical center in Valhalla, New York, one of the clinical departments of which is the Section of Cardio-Thoracic Surgery of the Department of Surgery (the "Section"); and

WHEREAS, the Section is responsible for the provision of cardio-thoracic surgical services (hereinafter collectively referred to as "cardio-thoracic surgery") at the Hospital; and

WHEREAS, the Company is organized as a professional limited liability company in accordance with the laws of the State of New York with Dr. Lansman as its Controlling Person (as such term is defined in Section 12.1(c) hereof) and Managing Member; and

WHEREAS, the Company and its physicians (defined to include physicians who are either employees or independent contractors of the Company, hereinafter the "Physicians") are capable of providing clinical services in the specialty of cardio-thoracic surgery ("Professional Services") and administrative, supervising and teaching services relating to the Section and cardio-thoracic surgery ("Administrative Services") (Professional Services and Administrative Services hereinafter sometimes collectively referred to as "Services"); and

WHEREAS, the Hospital desires to engage the Company and its Physicians to provide Services in the Section and to render high quality professional care to patients who receive cardio-thoracic surgery services in the Hospital; and

WHEREAS, the Company and the Physicians desire to render such Professional Services and Administrative Services to the Hospital; and

1

WHEREAS, the Parties desire to enter into this Agreement to provide a full statement of their respective responsibilities in connection with the provision of Professional Services and Administrative Services during the term of this Agreement.

NOW, THEREFORE, it is mutually agreed as follows:

1.      **Engagement of Company; Exclusivity.**

1.1     The Hospital hereby engages the Company as an independent contractor to provide on an exclusive basis, except as provided otherwise herein with regard to Grandfathered Physicians (as defined in **Exhibit A** attached hereto), all Professional Services and Administrative Services in the Section at all sites of Hospital, and the Company hereby agrees to render such Professional Services and Administrative Services under the terms and conditions stated herein and as the Parties may from time to time mutually agree in writing. In furtherance thereof, the Company shall cause the Physicians to perform all of the duties and obligations required pursuant to this Agreement, including, but not limited to, such duties and obligations required in connection with the Services set forth on attached **Exhibit A**. The Company shall provide such number of Physicians throughout the Term of this Agreement who, when considered in combination with the Grandfathered Physicians, shall be sufficient to fully provide to the satisfaction of the Hospital all of the Services required by Hospital.

1.2     Hospital has determined that the proper, orderly and efficient delivery of quality cardio-thoracic surgery Services at the Hospital can best be accomplished by entering into an exclusive arrangement with the Company. Therefore, beginning on the Effective Date, this Agreement is intended to be exclusive for all Services provided at the Hospital, except as may otherwise set forth in **Exhibit A** with respect to Grandfathered Physicians, if any. Beginning on the Effective Date and continuing for so long as the Company and the Physicians satisfactorily perform their obligations hereunder, the Hospital will not enter into similar agreements with other entities or individuals to provide Services at the Hospital, except as otherwise set forth on **Exhibit A**.

2.      **Independent Contractor Status.** The Company and its Physicians shall be independent contractors and not employees of the Hospital and shall not hold itself or themselves out as employees of the Hospital.

2.1     The Company will be the employer of, will have control over, and will be liable for all incidents of employment of, the Physicians. The Physicians will not be deemed employees, agents or servants of Hospital and Hospital will not be liable for any benefit, incident, right or entitlement of their employment by the Company. It is mutually understood and agreed that each and every person and entity who furnishes services to Hospital pursuant to this Agreement will be deemed an independent contractor with respect to the Hospital.

2.2     The Company agrees that it shall be liable for its own debts, obligations, acts, and omissions, and will timely pay to the appropriate governmental authority, on behalf of itself and the Physicians, all required employment-related taxes, fees and assessments, including but not limited to Social Security (FICA), unemployment insurance, Medicare, and other

required withholdings, taxes and/or benefits on behalf of or otherwise relating to the Company's employment of the Physicians.

2.3    The Hospital shall not withhold any sums for income tax, unemployment insurance, social security or any other withholding or benefit pursuant to any law or requirement of any governmental body on behalf of the Company's employees or independent contractors.

2.4    Nothing in this Agreement is intended, nor shall be construed, to create an employer/employee, a partnership, or a joint venture relationship between the Hospital and the Company or its Physicians, and neither the Company nor any Physician will be constituted the agent of Hospital by virtue of the terms of this Agreement.

2.5    In the event the Internal Revenue Service or any other governmental agency shall, at any time, question or challenge the independent contractor status of the Company or its Physicians, both the Hospital and the Company, upon receipt of either of them of notice from the Internal Revenue Service or any other governmental agency, irrespective of for whom or by whom such discussions or negotiations are initiated, shall notify the other Party about such discussions/negotiations. The other Party shall participate in any such discussions or negotiations to the extent permitted by the Internal Revenue Service or other governmental agency.

2.6    The Company shall cause all Physicians to be guided by and conform to all lawful directions given to the Company and to such Physicians by Hospital, provided that such directions do not conflict with the provisions of this Agreement. Notwithstanding the foregoing, the Parties hereby agree that each Physician shall be responsible for all decisions regarding cardio-thoracic procedures during the course of providing such Professional Services by such Physician. Nothing herein will be construed as giving Hospital control over, or the right to control, the professional judgment or actions of the Physicians with respect to the Professional Services rendered hereunder; provided, however, that it is understood by each of the Parties that, because each Physician must be an active member of the Hospital Medical Staff, his/her professional services will be reviewed in connection with, and will be subject to the provisions of, the Bylaws of the Hospital's Medical Staff (the **"Medical Staff Bylaws"**, which term shall include all related rules, regulations, policies and procedures promulgated under or pursuant to the Medical Staff Bylaws), a copy of which has been provided to the Company.

3.    **Chief**. Dr. Lansman shall be Chief of the Section. As Chief of the Section, Dr. Lansman will be responsible for the overall oversight, management and program development of the Section.    The Section and its Chief shall have equivalent rights, privileges and responsibilities of other Hospital departmental sections and section chiefs.

4.    **Retention of Physicians.**

4.1    The Company shall be required to employ, at its own expense, a sufficient number of Physicians as may be required to properly discharge the duties of the Company under this Agreement and who shall be individually bound by the terms of this Section 4.

4.2    All of the Physicians who will, at any time during the Term hereof (as defined in Section 16), provide Services on behalf of the Company pursuant to this Agreement must be listed on attached **Exhibit B** and must be approved in advance by Hospital prior to providing any Services at the Hospital. The initial list of such Physicians will be provided by the Company to Hospital at least twenty (20) days prior to the Effective Date, and, subject to Hospital's approval, will be finalized and attached to this Agreement as **Exhibit B** no later than the business day immediately preceding the Effective Date. If the Company wishes to add any Physician to **Exhibit B** at any time following Hospital's approval of the initial list, the Company must obtain Hospital's prior written approval to do so.

4.3    All Physicians must apply for medical staff privileges at the Hospital and obtain approval for staff membership at the Hospital in accordance with Hospital and Medical Staff Bylaws. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws. Each Physician shall have the same responsibilities as other members of the Medical Staff including attendance at Medical Staff Sectional, general staff, and committee meetings.

4.4    (a)    The Company represents that each of the Physicians have been informed and have expressly acknowledged his or her understanding and agreement that, upon termination of his or her employment with the Company for any reason whatsoever (whether by voluntary action of the Physician or by action of the Company with or without cause), such Physician's membership on the Medical Staff of, and clinical privileges at, the Hospital shall terminate effective at the same time as the termination of such employment status, and such Physician shall not be entitled in connection therewith to any appeal or other due process rights under the Medical Staff Bylaws, notwithstanding any provision of the Bylaws of the Hospital or the Medical Staff Bylaws to the contrary. Each Physician shall expressly (i) waive any due process rights afforded by such Medical Staff Bylaws and (ii) agree to resign his/her Medical Staff membership and privileges upon termination or expiration of this Agreement or termination or expiration of their shareholder interest in the Company, or employment by the Company. The Company further represents that each Physician is familiar with the terms of this Section 4.4 and has agreed to be bound hereby. In evidence of the foregoing, and his/her agreement to be bound hereby, each Physician who will provide Services pursuant to this Agreement must, prior to providing any such Services, execute a waiver and acknowledgement agreement in the form attached hereto as **Exhibit C**. All such signed waiver and acknowledgement agreements shall be obtained by the Company and delivered by the Company to Hospital prior to the date on which the subject Physician provides Services hereunder, and such agreements shall be automatically incorporated into, and be made a part of, this Agreement when so delivered.

(b)    The Company and the Physicians acknowledges that upon the expiration, termination or non-renewal of this Agreement for any reason whatsoever, each Physician's membership on the medical staff of, and clinical privileges at, the Hospital may terminate at the Hospital's sole and absolute discretion.

4.5    The Company may discharge, suspend or terminate any Physician at will or in accordance with the terms of employment or membership agreement, as the case may be, between the Physician and the Company. Upon termination of a Physician's employment with the Company and/or a Physician's shareholder or membership status with the Company, such

Physician shall be automatically deemed removed from **Exhibit B** as of the date of such discharge, suspension or termination. The Company must promptly notify Hospital in writing of any such action and, before such Physician is listed again on **Exhibit B** or is again entitled to provide Services to Hospital, the Company must obtain Hospital's prior written approval to do so.

      4.6    The Company shall enter into employment and/or membership agreements, as the case may be, with the Physicians which shall provide for termination of a Physician's employment with, and ownership of any stock or membership interest in, the Company in the event of:

      (a)    Loss or limitation of medical licensure, DEA number, malpractice insurance, or professional certification; or

      (b)    Suspension or limitation of credentials or privileges at the Hospital or in a Hospital endorsed managed care plan; or

      (c)    Suspension or limitation of a Physician in the Medicare program, the Medicaid program, or any insurance or reimbursement program in which the Hospital is also involved; or

      (d)    The limitation of or inability of a Physician to practice, or to be scheduled to provide Professional Services, due to legal or civil action resulting from claims related to sexual harassment or conviction of a crime constituting a felony; or

      (e)    The limitation of or inability of an Physician to practice, or to be scheduled to provide Professional Services, due to substance abuse or dependency matters; or

      (f)    If the Physician has been:

      (i)    convicted of (1) any criminal offense related to the delivery of an item or service under the Medicare or Medicaid programs or any program funded under Title V or Title XX of the Social Security Act (the Maternal and Child Health Services Program or the Block Grants to States for Social Security Program, respectively); (2) any criminal offense relating to neglect or abuse of patients in connection with the delivery of a health care service; (3) fraud, theft, embezzlement or other financial misconduct in connection with the delivery of a health care service; or (4) obstructing an investigation into the manufacture, distribution, prescription or dispensing of a controlled substance;

      (ii)    required to pay any civil monetary penalty under 42 U.S.C. § 1128A, regarding false, fraudulent or impermissible claims under, or payments to induce a reduction or limitation of health care services to beneficiaries of any state or federal health care program which may result in such payment; or

5

(iii)    excluded from participation in the Medicare, Medicaid or Maternal and Child Health Services (Title V) Program, or any program funded under the Block Grants to States for Social Services (Title XX) Program; or

(iv)    totally restricted from research by the Food and Drug Administration for research misconduct.

(g)    The failure of the Physician to maintain his/her Medical Staff membership or clinical privileges at the Hospital.

4.7    The Parties agree that there will be a mechanism established by which a Physicians' performance (and behavior) will be subject to Hospital review and feedback. In the event that the Hospital determines that a Physician's performance and/or behavior fails to maintain a level consistent with that expected by the Hospital, the Hospital shall provide the Company with notice of such failure and the Company shall develop and implement a plan of correction for such physician. The plan of correction must be approved by the Hospital.

4.8    Notwithstanding anything herein to the contrary, nothing in this Agreement shall restrict, limit or otherwise diminish the rights of the Hospital or the Medical Board of the Hospital regarding the suspension, termination, revocation, withdrawal of medical staff privileges of any Physician.

5.    **Administrative Services.**    The Company and its Physicians shall provide and fulfill the following duties and responsibilities in furtherance of their obligation to perform the Administrative Services hereunder:  (a) clinical oversight of all activities of the Section; (b) clinical oversight of activities of voluntary attending physicians; (c) 24/7 coverage of cardio-thoracic surgical procedures at the Hospital; (d) scheduling of all cardio-thoracic surgery procedures at the Hospital; (e) continuing medical education of physicians with privileges in the Section; (f) research oversight; (g) marketing and public relations assistance; (h) resident and fellow education and support; (i) new program/service development; (j) coordination of affiliated hospital cardio-thoracic surgical services (which hospitals currently are The Pinnacle Hospitals and Bon Secours); (k) assistance in selection of devices/equipment in the cardio-thoracic surgery operating room facilities of the Hospital; (l) efficient utilization of services and supplies in accordance with Hospital budgetary goals and length of stay objectives; (m) helping to assure the delivery of Professional Services to Medicaid, self-pay, uninsured and charity care patients in accordance with Hospital policies; and (n) such other duties and responsibilities as may be mutually agreed upon by the Parties.

6.    **Coverage.**  The Company shall have full-time responsibility for the provision of Professional Services in the Section and shall ensure that Professional Services are available twenty-four (24) hours per day, three hundred sixty five (365) days per year. The Company agrees to provide the same quality of Professional Services to all patients regardless of their ability to pay or source of payment. As set forth in Section 4 hereof, if the Company desires to increase or decrease the number of its Physicians at any time it must first receive the written consent of the Hospital.

7.    **Compensation; Severance.**

7.1    (a)    In consideration for the provision of all Services by Dr. Lansman as Chief of the Section contemplated hereby, for each Contract Year during the Term hereof the Hospital shall pay to the Company, subject to Section 7.2 hereof, the sum of Four Hundred Thousand Dollars ($400,000.00) ("**Annual Compensation**"), which amount shall be payable in equal monthly installments of Thirty-Three Thousand and Three Hundred and Thirty Three Dollars and Thirty-Three Cents ($33,333.33) ("**Monthly Compensation Installment Payments**") on the first weekday of each month that is not a bank or governmental holiday (a "**Business Day**").

(b)    If this Agreement or Dr. Lansman's position as Chief of the Section is terminated by the Hospital without cause, the Company shall be entitled to receive, and the Hospital shall be required to pay to the Company, severance compensation in an amount equal to the lesser of: (a) thirty (30) Monthly Compensation Installment Payments payable on the first Business Day of each month following the date of termination until the thirtieth (30th) payment is made; or (b) the number of remaining Monthly Compensation Installment Payments that would have payable by the Hospital to the Company over the remaining Term of this Agreement if this Agreement or Dr. Lansman's position as Chief of the Section had not been so terminated, payable on the first Business Day of each month following the date of termination until the end of the Term hereof ("**Severance Compensation**").

7.2    All payments of Annual Compensation and Severance Compensation required to be made by the Hospital to the Company hereunder shall be made by the Hospital to the New York Medical College, which acting as paying agent on behalf of the Hospital, shall make such payment to the Company.

8.    **Hospital Responsibilities.**

8.1    The Hospital shall provide the Company sufficient resources and support, including access to all Hospital facilities and appropriate personnel, at the Hospital's expense, as determined necessary for the proper functioning of the Section consistent with such resources and support customarily provided by the Hospital to other department sections of the Hospital. The Chief shall be consulted to provide input concerning all such resources and support. A list of the principal resources and items of support to be provided by the Hospital to the Company pursuant to this Section 8.1 is set forth in **Exhibit E**.

8.2    The Hospital shall have overall responsibility for the administration and operation of the Hospital and will set all policies and procedures pursuant to which the Physicians will perform the Services. The Hospital will be responsible for establishing a uniform quality assurance program. The Physicians will participate as required by the Hospital in such quality assurance program.

9.    **Operating Room Priority.** In order to meet the objectives of the Hospital, the Company and the Physicians, the Company and the Physicians shall have preferential access to the operating room facilities at the Hospital with respect to time slots allocated by the Hospital

7

for cardio-thoracic surgery. The Chief of the Section and the Hospital shall establish the parameters of this preferential access based on the utilization of the operating rooms by the full-time physicians, provided that for purposes of this sentence, the term "full-time physicians" shall include the Grandfathered Physicians. To maximize the utilization of the operating rooms, voluntary attending physicians (unaffiliated with the Company including the Grandfathered Physicians) may be granted privileges in, and access to, the operating rooms, upon the recommendation and concurrence of the Chief and the Hospital, and in accordance with the Medical Staff Bylaws.

10.    **Company Office Space; Equipment.**    The Hospital shall provide office space to the Company to be utilized by the Company for its private practice and the operation of the Section on substantially the same basis as provided to other department sections of the Hospital. In connection therewith, the Hospital shall provide (x) necessary and appropriate office equipment, furniture, fixtures, supplies, materials, (y) maintenance, repairs and replacement of such equipment, furniture and fixtures, and (z) telephone service, internal mail delivery service, and janitorial services, for the Sectional space. The Company shall take good care of the office space, equipment, supplies, and materials.

11.    **Patient Referrals.**    Nothing in this Agreement shall be construed to require either the Company nor any of the Physicians to refer patients to, or otherwise generate business for, Hospital. The Company, the Hospital and the Physicians will at all times comply with all applicable state and federal laws relating to physician referrals.

12.    **Company and Physician Representations and Covenants.** The Company and its Physicians, make the following representations and covenants, the continuing validity of which shall be a prerequisite to all of the obligations of the Hospital hereunder. The representations of the Physicians shall be contained in any employment or membership agreement between the Physicians and the Company.

12.1    The Company hereby represents and warrants that:

(a) the Company (i) is and shall remain duly organized as a professional corporation in the State of New York; (ii) has and shall maintain all requisite capacity and authority to enter into this Agreement and to fulfill the obligations required of the Company hereunder; and (iii) has taken all necessary action to authorize the Company's entering into this Agreement and consummating the transactions contemplated hereby; and

(b) this Agreement constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms;

(c) except as may otherwise be consented to in writing by the Hospital, in its sole and absolute discretion, at all times during the Term hereof, the Company shall maintain Dr. Lansman as: (i) the controlling person of the Company (holding at least a majority (by vote and by value) of all of the outstanding shares or membership interests of all classes of capital stock or membership interests of the Company (**"Controlling Person"**), and (ii) the Managing Member of the Company; and

8

(d)    the Company shall maintain professional liability insurance covering itself and its Physicians as required hereunder.

12.2    The Company hereby represents and warrants that the Company and each Physician, as the case may be, at all times during the term of this Agreement:

(a)    shall discharge his/her and/or its responsibilities consistent with generally accepted standards of the medical profession and in a manner consistent with the principles of medical ethics;

(b)    shall (i) be licensed to practice medicine within his or her specialty discipline of cardio-thoracic surgery in accordance with the laws of the State of New York, (ii) duly registered with the Department of Education of the State of New York, and (iii) be board-certified in Cardiac Surgery;

(c)    shall apply for, be awarded, and maintain membership in good standing on the active Medical Staff of the Hospital with appropriate and requisite privileges, all in accordance with Hospital policies as well as applicable Hospital and Medical Staff Bylaws;

(d)    shall (i) conduct itself and themselves in compliance with all applicable federal, state, and local laws, rules, and regulations, the Hospital and Medical Staff Bylaws, rules, and regulations and applicable Hospital policies and codes of conduct, including, without limitation, the Hospital's compliance program, conflict of interest and financial disclosure policies, and billing policies, which are provided to all physicians on the Medical Staff of the Hospital; and (ii) not be subject to any sanction by a governmental regulatory agency or enter into a consent decree to settle allegations by a governmental regulatory agency related to illegal conduct in the delivery of health care.

(e)    shall maintain such standards, and comply with all laws, rules, regulations and requirements as will, at all times, warrant: (i) full accreditation of the Hospital by the Joint Commission on Accreditation of Healthcare Organizations, the New York State Department of Health, and the New York State Education Department; (ii) continuance of the Hospital's license or operating certificate; and (iii) approval, accreditation and certification by applicable reviewing or certifying boards and/or agencies in connection with such postgraduate training programs as are or may be adopted by the Hospital;

(f)    shall implement and maintain an effective compliance plan as recommended by the Office of the Inspector General, Department of Health and Human Services or as otherwise required by the Hospital, which compliance plan shall be subject to periodic review and approval by the Hospital;

(g)    shall comply with all applicable portions of the federal Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), as it may be amended from time to time, with all regulations promulgated pursuant thereto and with all other applicable federal, state and local laws, rules and regulations;

9

        (h)     shall have a current narcotics registration certificate issued by the United States Drug Enforcement Agency;

        (i)     shall be enrolled as a participating provider, in good standing, with the Medicare and Medicaid programs and with such other third-party payor programs as Hospital may require;

        (j)     shall provide professional services to patients receiving care at Hospital without any unlawful discrimination based upon any such patient's ability to pay, insurance coverage or lack thereof, race, creed, color, national origin, gender, age or disability;

        (k)     shall, in the case of each Physician, be an employee or member of the Company;

        (l)     shall notify Hospital immediately if his/her staff privileges at any other health care facility are temporarily or permanently suspended, modified, terminated, not renewed, surrendered or relinquished for any reason whatsoever;

        (m)     has never been (i) the subject of any professional disciplinary proceedings, (ii) excluded from participating in the Medicare or Medicaid programs, nor (iii) otherwise sanctioned by any governmental agency in connection with the delivery of a health care service;

        (n)     has been granted a license to practice medicine in every state to which he/she has ever applied and has not surrendered any such license as a consequence of, or for the purpose of avoiding, a disciplinary proceeding; and

        (o)     has never been convicted of a felony or misdemeanor.

    12.3    The representations and warranties in this Section 12 will continue in effect for the Term of this Agreement. The Company shall notify the Hospital immediately in writing of any change in the status of any representation and warranty.

    12.4    The Company shall, upon the request of the Hospital, require each Physician as a condition of his employment and/or holding a shareholder or membership interest in the Company, to agree to resign his/her Medical Staff privileges at the Hospital immediately upon the termination of this Agreement or upon the termination of the Physician's employment agreement or shareholder or membership interest with the Company.

    **13.**    **Hospital Representations and Covenants.** As consideration for the Professional Services and Administrative Services to be rendered by the Company, the Hospital represents to the Company that it shall:

    13.1    Maintain its operating certificate and its accreditation by the Joint Commission on Accreditation of Healthcare Organizations; and

13.2    Conduct itself in compliance with all applicable federal, state, and local laws, rules, and regulations and in compliance with the Hospital and Medical Staff Bylaws and compliance program. Notwithstanding any other provision contained in this Agreement, the Hospital remains responsible for ensuring that any service provided pursuant to this Agreement complies with all pertinent provisions of federal, state, and local statutes, rules, and regulations.

14.    **Professional Liability Insurance Coverage.** The Company and the Physicians shall be entitled to participate in the Hospital sponsored program for professional liability insurance coverage for full-time members of the Medical Staff, as such program may exist and may be modified from time to time, on the same basis made available to other full-time members of the Hospital's Medical Staff. A description of the principal terms of the Hospital's current professional liability insurance coverage program is attached hereto as **Exhibit D.** Physicians have the option not to participate in the Hospital's professional liability insurance coverage program in which case each such Physician shall be required to (x) present acceptable proof of coverage to the Hospital before appointment to the Medical Staff and (y) maintain such coverage at all times thereafter during which the Physician is a member of the Medical Staff in order to remain a member of the Medical Staff.

15.    **Billing And Collection/Financial Arrangement.**

15.1    Professional and Technical Components.

(a)    Technical Component. The Hospital shall be entitled to bill and collect, and shall be responsible for billing and collecting, all fees for the technical component of all Professional Services that are rendered by the Company and/or the Physicians pursuant to this Agreement. In connection therewith, the Hospital shall charge and bill patients in its name for the use of applicable Hospital personnel, rooms, equipment, supplies, materials and facilities, together with such other costs as may be incurred by the Hospital.

(b)    Professional Component. Except as otherwise provided in Section 15.5, the Company shall be entitled to bill and collect, and shall be responsible for billing and collecting, all fees for the professional component of the Professional Services rendered to patients by the Physicians. The bills for the professional component shall be rendered in the name of the Company or its Physicians. The Company shall, at its sole cost and expense, process and collect all bills rendered to patients and/or third party payors for Professional Services rendered by the Company and its Physicians. The Company shall conduct its billing and collection activities in accordance with Hospital policies, which shall be provided to the Company in advance of the Effective Date. The Hospital shall have the right to approve the Company's billing vendor.

15.2    Cooperation. The Parties shall cooperate with each other in providing the necessary information for each to bill its respective charges.

11

15.3    Recordkeeping.  The Company shall require each Physician to promptly complete all medical records, execute any time allocation forms, participate in any time studies and keep auditable supporting time records as Hospital may require.

15.4    Medicare Assignment.  The Company shall accept Medicare assignment.

15.5    Courtesy Allowances.  The Company shall honor Hospital policies for charity care, courtesy allowances and discount arrangements.  The Hospital shall provide such policies to the Company on an annual basis.

16.    Term.  This Agreement shall commence on the Effective Date and shall continue in effect until December 31, 2009 ("Term").  Each annual period from January 1st to December 31st of the same calendar year shall be defined as a Contract Year.  If the Agreement is not earlier terminated as permitted herein, the Parties agree to commence good faith negotiations no later than September 1, 2008 for a renewal of the Agreement.  Except with respect to obligations accruing prior to the date of termination or expiration and those obligations specified in Sections 2.5, 7, 14, 17.2, 18.1, 21.5, 21.13, and 21.14, if there is no mutual agreement on the terms of a renewal, this Agreement shall expire on December 31, 2009.

17.    Termination.

17.1    Events of Termination.    This Agreement shall terminate upon the occurrence of any of the following events, with such termination to be effective immediately upon the giving of notice by the terminating party:

(a).    The dissolution or liquidation of a Party, voluntary or otherwise;

(b)    The material breach by the Company or its Physicians of their responsibility to provide Professional Services or Administrative Services, which breach remains uncured for thirty (30) days' following receipt of written notice to cure such breach;

(c)    The material breach of a Party to comply with its representations, duties and obligations hereunder, which breach remains uncured for thirty (30) days' following receipt of written notice to cure such breach;

(d)    At the option of the affected party, upon failure of the Parties to renegotiate the terms of this Agreement pursuant to Section 19.2 hereof;

(e)    In the event that Dr. Lansman is no longer the Controlling Person or Managing Member of the Company; provided, however, the Hospital shall have the option of not terminating this Agreement, but continuing this Agreement with the Company with the remaining members or with a successor members acceptable to the Hospital, all of whom shall be Physicians of the Company;

(f)    In the event that the Company or any Physician is sanctioned by a governmental regulatory agency or enters into a consent decree to settle allegations by a

12

governmental regulatory agency related to illegal conduct in the delivery of the Professional Services; notwithstanding the foregoing, in the event a Physician (other than Dr. Lansman) is sanctioned or enters into the aforementioned consent decree and the Company terminates its relationship with such Physician, this Agreement shall not be terminated by the Hospital; or

(g)     The Board of Directors of the Hospital determines that clinical and/or non-clinical (business) activities of the Company or any Physician related to (i) the delivery of Professional Services or Administrative Services at the Hospital or (ii) the professional, ethical or moral conduct of any Physician in his role as a physician, are so injurious to the reputation of the Hospital and the Section so as to require immediate termination of this Agreement; this decision shall only be made after a Special Review Committee of the Hospital's Board of Directors has heard all applicable persons and their positions on the activities in question. Notwithstanding the foregoing, in the event the Company terminates its relationship with the Physician in question (other than Dr. Lansman), this Agreement shall not be terminated by the Hospital;

17.2    Effect of Termination Upon Obligations of Parties.    Upon termination of this Agreement, neither Party shall have any further obligation hereunder, except for those obligations accruing prior to the date of termination or which survive the expiration or termination of this Agreement. Notwithstanding the foregoing, in the event that this Agreement is terminated by the Hospital without cause and the Hospital enters into an agreement with any other physician or legal entity for the provision of services substantially similar to the Services contemplated hereunder to be provided on an exclusive basis, the agreement between the Hospital and such other physician or legal entity shall expressly provide in a manner substantially similar to the exclusivity exception provided for Grandfathered Physicians in Exhibit A hereof, that (i) the Company and each Physician employed by the Company at the time of such termination shall be permitted to retain full privileges at the Hospital and to continue to engage in the practice of medicine specializing in cardio-thoracic surgery at the Hospital, and (ii) they shall not be subject to, or otherwise restricted by, any such exclusivity arrangement between the Hospital and any such third party.

18.    **Medical Records/HIPAA.**

18.1    Medical Records.    The Company shall maintain and file accurate and complete medical records in form and content consistent with Hospital policies and procedures as established from time to time. The medical records shall at all times remain the property of the Hospital. The Physicians of the Company shall have access consistent with Hospital policies and procedures established from time to time, but in no event will the Hospital deny reasonable access for the purposes of patient care, billing, collection, malpractice cases or other services consistent with fulfilling the purposes of the Company. The Parties agree to maintain the medical records consistent with Hospital, federal, state and local laws, rules and regulations.

18.2    HIPAA Compliance.    The Company agrees on behalf of itself and its physicians that it shall comply with the statutory requirements concerning the privacy and security of identifiable health information as governed under HIPAA and any regulations promulgated thereunder and the Company agrees to execute any and all further documents

and/or agreements in furtherance of such requirements. The Company's obligations under this Section 18.2 shall survive any termination of this Agreement for any reason whatsoever.

### 19.    Regulatory Changes.

19.1    Reimbursement. This Agreement shall be construed to be in accordance with federal and state statutes and third-party carrier rules, regulations, principles and interpretations regarding Hospital and hospital-based physician reimbursement.

19.2    Renegotiation of Agreement.

(a)    In the event that there is a change in any federal or state statutes, regulations, reimbursement rules or guidelines (or the application thereof) that may materially impact on the legality of this Agreement; or if any existing or amended law, regulation or rule would cause any provision of this Agreement to jeopardize: (i) the Hospital's status as either (x) an organization described under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or (y) an organization classified as an organization that is not a private foundation under Section 509(a)(1) of the Code (*i.e.*, a public charity) by reason of being described in Section 170(b)(1)(A)(iii) and/or Section 170(b)(1)(A)(v) of the Code; (ii) the tax-exempt status of interest on the Hospital's tax-exempt bond financing; or (iii) cause any transaction provided for herein to constitute an excess benefit transaction engaged in by a charitable organization, as defined in the Code, or in the event that the Internal Revenue Service gives notice that any transaction provided for in this Agreement constitutes an excess benefit transaction under Section 4958 of the Code, then the Hospital and/or the Company shall have the right to remedy such condition through the immediate renegotiation of the affected portion(s) of this Agreement. All other terms and conditions of this Agreement shall continue unaffected.

(b)    Should the Parties be unable to renegotiate this Agreement within ninety (90) days after written notice of renegotiation is given, the adversely affected Party shall be entitled to immediately terminate this Agreement pursuant to Section 16 hereof.

### 20.    Indemnification. The Company and the Hospital each agree to indemnify and hold harmless the other and the other's employees from any claim made against the indemnified party arising out of the indemnifying party's or its employees' acts, failure to act or conduct in the course of such party's performance of its obligations pursuant to this Agreement.

14

21.    <u>Miscellaneous</u>.

21.1    <u>Compliance With Omnibus Reconciliation Act of 1980</u>.    It is hereby understood that if the Company is determined to be a "subcontractor" under the provision of subparagraph (1) of §1861 (V) (1) of the Social Security Act as amended by Section 952 of the Omnibus Reconciliation Act of 1980, or regulations adopted pursuant thereto, the Company will, until the expiration of four (4) years after furnishing of services under this Agreement, make available upon the request of the Secretary of Health and Human Services or the Comptroller General or its representatives, this Agreement, invoices for services rendered to the Hospital and the supporting documents and records as may be necessary to verify the nature and extent of the costs of this Agreement.

21.2    <u>Amendment of Agreement</u>.    This Agreement shall not be modified or amended except in writing, signed by the Parties.

21.3    <u>Entire Understanding</u>.    This Agreement including the Exhibits attached hereto sets forth the entire agreement and understanding between the Parties as to the matters contained herein, and merges and supersedes all prior discussions, agreements, and understandings of every kind and nature among them. No Party shall be bound by any condition, definition or representation other than as expressly provided for in this Agreement.

21.4    <u>Binding Effect</u>.    This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective legal representatives, trustees, receivers, successors and permitted assigns.

21.5    <u>Notices</u>.    All notices, requests, demands and other communications provided for in this Agreement shall be in writing and shall be deemed to have been given at the time when personally delivered, or mailed via registered or certified mail, return receipt requested, addressed to the address of the other Party stated at the beginning of this Agreement or to such other address as such Party may have fixed by notice; provided, however, that any notice of change of address shall be effective only upon receipt.

21.6    <u>Invalidity of Provision</u>.    If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, the remainder of this Agreement and the application of such provision to the persons or circumstances shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement.

21.7    <u>Governing Law</u>.    This Agreement shall be governed by and construed under the laws of the State of New York.

21.8    <u>Headings</u>.    The headings of the sections hereof are inserted for convenience only and in no way define, limit or prescribe the intent of this Agreement.

21.9    Counterpart Signatures. This Agreement and its amendments may be executed in multiple copies, with each multiple copy to be deemed an original, but all multiple copies together constituting one and the same instrument.

21.10    Non-Discrimination. Each Party agrees that such Party will not discriminate on the basis of age, race, color, religion, creed, national origin, sex or marital status.

21.11    Binding Effect/Non-Assignment. This Agreement and all rights of the Parties hereunder shall inure to the benefit of and be enforceable by their legal successors, executors, and administrators. This Agreement shall not be assigned by any Party.

21.12    Waiver. No waiver by a Party of any condition or of the breach by the another Party of any term or covenant contained in his Agreement, whether by conduct or otherwise, at any time or in any one or more instances shall be deemed or construed as a further or continuing waiver of any such condition or breach of any similar or dissimilar term or covenant set forth in this Agreement. Moreover, the failure of any Party to exercise any right hereunder shall not bar the later exercise thereof.

21.13    Confidentiality. Subject to any disclosure required by Court order or pursuant to legal process, each Party shall keep confidential the terms and provisions of this Agreement and shall not at any time during the term of this Agreement, divulge, furnish or make known or assessable to anyone whatsoever, any provision of this Agreement or to any discussions, records, papers and documents relating to this Agreement. This Section 21.13 shall not be construed, however, to preclude the Company or the Hospital from disclosing confidential information to its attorney or accountant for the purpose of obtaining professional advice.

21.14    Dispute Resolution. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration conducted in accordance with the Health Care Arbitration Rules of the AHLA Alternative Resolution Service (c/o American Health Lawyers Association), 1120 Connecticut Avenue, N.W., Suite 950, Washington, DC 20036). Judgment upon the award rendered by the arbitrator(s) shall be supported by written opinion, shall be incorporated into and made a part of this Agreement and may, at the option of any Party, be enforced in law or in equity by any court having jurisdiction hereof. Any proceeding under this section shall be held in New York, New York, unless the Parties agree in writing to an alternative location.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first set forth herein.

WESTCHESTER COUNTY HEALTH CARE
CORPORATION d/b/a WESTCHESTER MEDICAL
CENTER

BY: _____
Name:
Title:


SLDS CARDIOTHORACIC SURGERY PLLC


BY: _____
Name: Steven L. Lansman, MD
Title:  Managing Member


_____
Steven L. Lansman, MD


_____
David Spielvogel, MD

17

## EXHIBIT A

## DUTIES TO BE PERFORMED

### Cardio-Thoracic Surgery Services

1. Provide to all patients of the Hospital cardio-thoracic surgery services including, but not limited to, the following:

   - Coronary bypass procedures
   - Valve replacement and repair procedures
   - Aortic surgery procedures for acute thoracic aortic dissections and acute and chronic thoracic aortic aneurysms
   - Atrial and ventricular septal defect repairs in adults
   - Non-cardiac thoracic surgical procedures
   - Pacemaker and AICD implantation

2. Provide timely (within 24 hours) consultation.

3. Participate in the active management of cardio-thoracic patients post-operatively.

4. Assist administration in developing treatment protocols and care paths to more effectively manage cardiothoracic patients.

5. Assist administration in developing strategies and processes to achieve a NYS risk adjusted mortality and major complication rate for Hospital that is within the top 1/3 of all NYS programs.

6. Participate in new technology assessment and selection.

7. Participate and assist in developing peer review and quality improvement initiatives related to the cardiothoracic program.

8. Actively participate in the weekly cardiac cath conference and the monthly cardiac surgery morbidity and mortality conference.

9. Develop an emergency call schedule for patients presenting to any Hospital facility who have no Hospital physician or who have been referred from another institution and who are in need of immediate cardiothoracic surgery consultation or intervention.

10. Assist in the development and implementation of a clinical marketing and outreach program.

11. Assist administration in developing processes and programs that allow for the efficient utilization of resources.

A-1

12. Assist administration in planning for the consolidation of cardiac surgery and other tertiary cardiac services at the Hospital site.

13. Assist Hospital in enhancing the academic and research mission and reputation of the cardiac surgical program.

## EXCEPTIONS TO EXCLUSIVITY PROVISION:

The Company's right to be the exclusive provider of cardio-thoracic services at the Hospital, pursuant to Section 1 of this Agreement, is subject to the following exceptions. During the term of this Agreement, (i) the surgeons listed below who are not employees or independent contractors of the Company or otherwise classified as Physicians hereunder and who were members of the Hospital's Medical Staff having concomitant staff privileges at the Hospital and were performing cardio-thoracic surgery services at the Hospital immediately prior to the Effective Date ("**Grandfathered Physicians**") shall be entitled to provide cardio-thoracic surgery services and device implantation; provided, however, that in the case of any Grandfathered Physician who elects to become employed by, and/or a shareholder or member of, the Company, such Grandfathered Physician shall, effective as of the date of such association with Company, no longer qualify as a Grandfathered Physician for purposes of this Agreement and, concomitantly, shall be considered a "Physician" for all purposes of this Agreement; and provided, further, that in the event a Grandfathered Physician resigns or otherwise terminates his/her medical staff privileges at the Hospital, such Grandfathered Physician shall no longer qualify as a Grandfathered Physician for purposes of this Agreement; and (ii) all cardiologists shall be entitled to implant pacemakers and/or AICDs, and Hospital may enter into agreements with any such physicians to provide such services even though they are not members or employees of Company:

    1.     Arlen Fleischer, M.D.

    2.     Rocco LaFaro, M.D.

    3.     Mohan Sarabu, M.D.

    4.     Suvro Sett, M.D.

    5.     Elias Zias, M.D

EXHIBIT B

PHYSICIANS

Steven L. Lansman, MD

David Spielvogel, MD

## EXHIBIT C

## WAIVER AND ACKNOWLEDGEMENT AGREEMENT

I, Steven L. Lansman, M.D., acting in my individual capacity as party to that certain Professional Services Agreement - Section of Cardio-Thoracic Surgery of the Section of Surgery, dated the same date hereof (the "Professional Services Agreement") in accordance with Section 4.4 of said Professional Services Agreement, do hereby expressly and affirmatively:

(A)    consent and agree that upon termination or expiration of (i) my employment with SLDS Cardiothoracic Surgery, PLLC (the "Company") for any reason whatsoever (whether by voluntary action on my part or by action of the Company with or without cause), (ii) my ownership of a controlling membership interest in the Company, or (iii) the Professional Services Agreement, my membership on the Medical Staff of, and clinical privileges at, Westchester Medical Center (the "Hospital") shall immediately terminate and I shall promptly resign from such Medical Staff membership and my related privileges at the Hospital; and

(B)    waive any rights of appeal or other due process rights that I may have or otherwise be entitled to pursuant to the Medical Staff Bylaws regarding the termination of my membership on the Medical Staff of, and clinical privileges at, the Hospital, notwithstanding any provision of the Bylaws of the Hospital or the Medical Staff Bylaws to the contrary.

IN WITNESS WHEREOF, the undersigned has hereunto set forth his hand this 29th day of December 2004.

_Steven L. Lansman, M.D._

Steven L. Lansman, M.D.

## WAIVER AND ACKNOWLEDGEMENT AGREEMENT

I, David Spielvogel, M.D., acting in my individual capacity as party to that certain Professional Services Agreement – Section of Cardio-Thoracic Surgery of the Section of Surgery, dated the same date hereof (the "Professional Services Agreement") in accordance with Section 4.4 of said Professional Services Agreement, do hereby expressly and affirmatively:

(A)     consent and agree that upon termination or expiration of (i) my employment with SLDS Cardiothoracic Surgery, PLLC (the "Company") for any reason whatsoever (whether by voluntary action on my part or by action of the Company with or without cause), (ii) my ownership of a membership interest in the Company, or (iii) the Professional Services Agreement, my membership on the Medical Staff of, and clinical privileges at, Westchester Medical Center (the "Hospital") shall immediately terminate and I shall promptly resign from such Medical Staff membership and my related privileges at the Hospital; and

(B)     waive any rights of appeal or other due process rights that I may have or otherwise be entitled to pursuant to the Medical Staff Bylaws regarding the termination of my membership on the Medical Staff of, and clinical privileges at, the Hospital, notwithstanding any provision of the Bylaws of the Hospital or the Medical Staff Bylaws to the contrary.

IN WITNESS WHEREOF, the undersigned has hereunto set forth his hand this 29th day of December 2004.

David Spielvogel, M.D.

3

## EXHIBIT D

## HOSPITAL'S CURRENT PROFESSIONAL LIABILITY INSURANCE COVERAGE PROGRAM

Professional malpractice insurance coverage in the minimum amounts of $1.3 million per occurrence/$3.9 million aggregate. The Director's professional liability coverage will be provided by the Medical Center on the condition that the Director elects to participate in the Medical Center's defense and indemnification program. The defense and indemnification coverage provided is on an occurrence basis or the equivalent and is without annual or aggregate limits. In implementation of the foregoing coverage, the Medical Center uses a commercial insurance carrier, National Union Fire Insurance Company, through which it provides the primary layer of coverage at the $1.3 million/$3.9 million level, which is purchased through WCHC Purchasing Group, Inc. The Risk Management Department at Westchester Medical Center is the administrator for the program. The Medical Center also provides physicians with a first layer of excess coverage for $1.3 million/$3.9 million through the Section 18-19 coverage provided through the New York State fund administered by HANYS or another approved carrier. In addition, there is an umbrella liability policy of $25,000,000 in excess over the primary and first excess layer for physicians. Physicians also have the option not to participate in the Medical Center defense and indemnification program in which case each such physician must present acceptable proof of coverage underwritten by a New York State admitted carrier of not less than $1.3 million per occurrence and $3.9 million in the aggregate to the Medical Center before appointment to the staff and maintain such coverage thereafter while remaining on the staff. The Director can select WMC as his/her primary hospital for excess coverage. Applications for the New York State Excess Malpractice Insurance are available in the Medical Affairs office. If the Director so elects, he/she may do so and if determined to be eligible, WMC will apply to the New York State Excess Malpractice Insurance Pool for the additional excess insurance coverage of $1 million dollars per occurrence and $3 million dollars in the aggregate.

EXHIBIT E

SCHEDULE OF HOSPITAL-PROVIDED RESOURCES AND SUPPORT

1. One full-time secretary/administrative assistant dedicated to assist Dr. Lansman.

2. The number of nurse practitioners and physician assistants assigned to the Section as of the date hereof, currently 14, shall not be reduced unless mutually agreed upon by the Hospital and Dr. Lansman.