**EXHIBIT 9**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

CARDIAC SURGERY GROUP, P.C.,

        Plaintiff,

-against-

MOHAN R. SARABU, M.D.,

        Defendant.

Index No. 6401/04

AFFIDAVIT OF
GEORGE E. REED, M.D.

STATE OF NEW YORK   )
                            ) ss.:
COUNTY OF WESTCHESTER  )

GEORGE E. REED, M.D., being duly sworn, deposes and says:

1. I am the founder of the Cardiac Surgery Group, P.C. ("CSG"). I have been a Board certified thoracic surgeon at the Westchester Medical Center (the "Hospital") since 1978. For the past ten years, I was the Medical Director of the Hospital and the Vice-Dean of New York Medical College which, together with the Hospital, comprise a single academic medical center. I retired from both of these positions at the end of 2003. I submit this affidavit to provide some background to the Court concerning the creation and operation of CSG, and to address certain misstatements contained in the affidavit of Mohan R. Sarabu, M.D.

2. The Hospital first opened in 1977. In 1978, the Hospital recruited me to establish the heart surgery program. Because the cardiac surgeons at that time were not permitted to join in a single professional corporation, the surgeons operated as a group practice out of a single office. I paid for all of the office expenses including the rent.

3. A few years after I founded the cardiac surgical service Dr. Sarabu came to our group as a rotating general surgery resident. He spent several months with the group in that capacity, after which time we assisted him to get a residency in thoracic surgery. After the completion of his residency, he approached me for a position with the cardiac surgical service at the Hospital and was accepted. Dr. Sarabu operated out of the same single office as did the other members of the cardiac surgical service. He did not bring any patients to the group; rather, he received his patients from me after they were referred to the cardiac surgical service.

4. In 1988 the surgeons in the cardiac surgical service formed CSG as a single professional corporation. At that time, the members of CSG consisted of six surgeons: myself, Dr. Richard Moggio, Dr. Sarabu, and three other surgeons who have since left the Hospital. When we formed CSG, I paid half of CSG's office expenses and the rest of the group shared in the remaining half.

5. I have reviewed Dr. Sarabu's affidavit and he is in error in stating in paragraph 10 that we did not execute employment agreements or restrictive covenants at that time. On the contrary, at the time we created CSG, to the best of my knowledge all of the members executed employment contracts containing a restrictive covenant.

6. The structure of CSG was integral to its success in affording patients the best care possible. Cardiac patients are typically referred to cardiac surgeons -- and are referred to CSG for cardiac surgery -- in several ways including the patient's cardiologist, the in-hospital cardiologist who performs a cardiac catheterizations, the internist, the family doctor, or through word of mouth.

7. As the senior partner and the principal source of patients at CSG, I was in charge of distributing patients to each of the surgeons. I used criteria designed to ensure that the highest

2

risk patient was assigned to the most experienced surgeon or, alternatively, to the surgeon with the particular expertise required for the operation. I was responsible for that process until approximately 1996, at which time I reduced my clinical activities.

8. This model benefited the patients, the Hospital and CSG. It reduced the length of each patient's stay, and made maximum use of personnel and of other hospital resources. It was not only the model that best served the patients' health needs but it also was the most economical model for the Hospital. It had the additional benefit of avoiding any infighting between physicians jockeying to ensure or, alternatively, to avoid operating on particular patients (who were very high risk or uninsured).

9. Moreover, the revenues that derived from the cardiac surgeries performed by members of CSG belonged to CSG. Under this procedure, the members of CSG were each paid the same once they became a partner in the corporation. This was done in part to ensure that the surgeons would assume responsibility for non-income producing activities that were nonetheless essential for the operation of the corporation. These duties not only included administrative and other non-clinical duties directly benefiting the corporation but also included services to the Hospital that CSG was required to provide, such as surgical and financial support for its pediatric cardiology program.

10. In approximately 1996, when I reduced my involvement in clinical activities, CSG enacted a new policy that the senior surgeon at the hospital on any given day would be responsible for assigning the patients according to the criteria I have described. To the best of my recollection, subsequent to that time Dr. Sarabu began to increasingly engage in conduct that benefited himself at the expense of CSG. For example, Dr. Sarabu's patient case load consisted largely of elective cardiac surgery patients. Elective cardiac surgery patients are statistically

better able to withstand the rigors of cardiac surgery than are the more unstable emergency patients. By filling his schedule with elective cases, Dr. Sarabu left the higher risk emergency cases to the other members of CSG.

11. Despite his claim that his case load was overwhelming, and despite my urging that he prevail upon some of his patients to see the other members of CSG, as had been the custom in the group previously, Dr. Sarabu retained his patient case load. By retaining his case load, Dr. Sarabu was able to schedule himself for surgery over long periods of time, thereby insulating himself from necessary administrative duties and other obligations that were readily assumed by the remaining members of CSG. In this manner, Dr. Sarabu also ensured that he would not be available for many emergency cardiac surgeries. Because Dr. Sarabu's practice was largely concentrated on elective cardiac patients, Dr. Sarabu's statistical data reflected a lower mortality rate, thereby enhancing his statistical reputation.

12. In this manner, Dr. Sarabu enhanced his word of mouth and statistical reputation at the expense of CSG and these factors became the foundation for his later claim that he should be compensated more than the other members based upon his surgeries.

13. In 2003 I resigned my position as President of CSG. In an attempt to mollify Dr. Sarabu, who claimed to want more responsibility within the group, CSG made Dr. Sarabu President. At that time, the CSG was comprised of its current membership of myself, Dr. Maggio, Dr. Fleisher, Dr. Rocco Lafaro and Dr. Howard Axelrod.

14. Despite Dr. Sarabu's position as President of CSG, despite the fact that he was always notified of Board of Directors meetings, and despite the fact that the meetings were always scheduled for times that he was available, Dr. Sarabu frequently did not show up. On multiple occasions, he left suddenly even though he had reason to know that a vote was

4

imminent. The assertion that Dr. Sarabu was excluded from CSG's shareholder meetings or meetings of the Board of Directors is completely false.

15. Dr. Sarabu also shunned participation in time-consuming administrative activities that were a vital part of the functioning of the group.

16. Dr. Sarabu's conduct led to friction in the group because he refused to follow the policies that were necessary for the best interests of the group and, instead, engaged in self promotion. All the while, he was benefiting from the efforts of the remaining members of the group, who were working to promote CSG.

17. In 2003 the Hospital's Chief Executive Officer requested that I take a more active role in CSG in an effort to restore cohesion to the group. I did take a more active role and convened a Board of Directors meeting to vote to formally adopt the patient distribution model and other protocols for scheduling activities and absences that had proved so successful in the past, and that the group had previously adhered to on an honor system. Unfortunately, Dr. Sarabu did not change his behavior.

18. Dr. Sarabu consistently refused to discuss his problems with me. I repeatedly asked him to meet with me to seek an amicable resolution of any issues, but he refused.

19. I believe that Dr. Sarabu was able to take advantage of the patient referrals that came to CSG by shunning the administrative and hospital responsibilities of the group while all the other members assumed those same responsibilities for the benefit of CSG. He also took advantage of CSG's other members, who assisted him in cardiac operations and saw his patients in follow up post-operative visits. He used CSG's relationships with referring cardiologists to ingratiate himself with those cardiologists, as a means of ensuring that the cardiologists would refer patients to him alone, instead of to CSG as had been the practice.

5

20. In January 2004 Dr. Sarabu created a separate corporation and is currently practicing cardiac surgery at the Hospital through that corporation. He is operating on patients referred to him by the same sources that had previously referred cardiac patients to CSG.

21. A Restrictive Covenant is essential to CSG's economic viability. Cardiac surgery is not generally a practice that requires ongoing treatment of patients. While cardiac patients may remain in the care of their cardiologists, the surgeon's post-operative care of the patient generally ends soon after the patient is released from the hospital. Therefore, it is vital to maintain ongoing referrals in order to generate revenues. CSG competes with other cardiac surgery services for patients within market area defined by the Restrictive Covenant, including Vassar Brothers Hospital and Montefiore Hospital. CSG is in a highly competitive market with numerous cardiac surgery programs in, or immediately adjoining, the market area.

22. The intense competition for patient referrals is one reason that the Restrictive Covenant is vital to CSG's economic viability. CSG does not seek to enjoin Dr. Sarabu from practicing cardiac surgery, as he claims. CSG seeks only to enjoin him from competing with CSG for the two-year period of the Restrictive Covenant. Dr. Sarabu is, of course, free to practice cardiac surgery as a member of CSG as long as he abides by the same rules that apply to all its members.

23. Dr. Sarabu's various charges against all of the members of CSG are uniformly untrue. His charge that I did not contribute to the group is entirely unfounded. During this period I was working for the benefit of CSG to establish affiliations with other hospitals, community cardiologists and internists and large family practice groups, for the purpose of generating patient referrals.

7

24. While Dr. Sarabu attests that he could not trust Drs. Moggio and Lafaro to cover his patients he nonetheless asked each of them to join him in forming his new practice. Each refused.

25. CSG delayed filing this lawsuit only at the urging of the Hospital's administration, which sought an amicable resolution of this dispute.

26. While Dr. Sarabu is a good surgeon, his skills are not so extraordinary that other competent cardiac surgeons could not easily take his place. Should the Court grant CSG's application for a preliminary injunction, the Hospital will not be left with a shortage of cardiac surgeons. I have a lengthy list of cardiac surgeons who have expressed a strong interest in joining CSG's practice.

_____
GEORGE E. REED, M.D.

Sworn to before me this
16 day of June, 2004

_____
Notary Public

JACQUELINE P. DAGGINI
NOTARY PUBLIC, State of New York
No. 41-4692948
Qualified in Westchester County
Commission Expires: 6/30/07