**EXHIBIT 10**

Case 7:07-cv-07984-SCR   Document 20-11   Filed 02/01/2008   Page 1 of 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------------------------
CARDIAC SURGERY GROUP, P.C.,                 Index No. 6401/04

                Plaintiff,

  -against-                                 **AFFIDAVIT OF
                                         ANTHONY G. DEMETRACOPOULOS**
MOHAN R. SARABU, M.D.,

                Defendant.
---------------------------------------------------------

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF WESTCHESTER  )

        ANTHONY G. DEMETRACOPOULOS, being duly sworn, deposes and says:

        1.    I am Executive Director and General Counsel for the Medical Faculty Health Alliance, Inc. ("MFHA"). I have held the position of Executive Director for 9 years and I have held the position of General Counsel for 7 years. My MFHA roles specifically, by contract, permit me to be engaged by other clients for legal and business consulting assignments.

        2.    From the period November 1, 1998 through November 30, 1999 I was counsel to Cardiac Surgery Group, P.C. ("CSG"), in connection with certain contract negotiations on behalf of CSG, and from the period July 1, 2000 until July 1, 2003, I was counsel to CSG for all purposes. In that capacity, in addition to general day-to-day assistance in business affairs, I prepared contracts for recruiting cardiothoracic (pediatric and transplant) surgeons; drafted and negotiated with the Westchester Medical Center ("WMC") a joint-CSG-Pediatrics Department Pediatric Cardio-thoracic Surgery and Post-Operative Care Proposal; drafted a proposal for a Long-Term Designation by WMC of CSG as the sole Cardiothoracic Surgery Service at WMC;

drafted the revised Employment Agreements of all professional employees of CSG per the direction of its members; negotiated with WMC the Agreement for Director of Heart Transplant Surgery; and provided counsel on other similar matters.

3.     I have reviewed the affidavit of Mohan R. Sarabu, M.D. submitted in opposition to the application of CSG for a preliminary injunction in this matter ("Sarabu Affidavit"). I submit this affidavit to refute certain misstatements in the Sarabu Affidavit.

4.     Specifically, Dr. Sarabu claims that he did not have the benefit of counsel prior to executing the Partner Employment Contract containing the Restrictive Covenant at issue in this case (the "Contract"). Sarabu Affidavit ¶10. Dr. Sarabu also claims that I "coerced" him into signing the Contract and he was not advised to seek his own counsel. Sarabu Affidavit ¶11. In fact, prior to signing the Contract, Dr. Sarabu advised me that he intended to review the Contract with his own private counsel and needed time to do so (as did other members of CSG, all with my encouragement in late October or early November). Indeed, Dr. Sarabu signed the Contract on November 28, 2001, on the day of one of the regularly scheduled meetings, as did Drs. Rocco Lafaro and Howard Axelrod, two weeks later than had Drs. Zias, Fleisher and Moggio.

5.     Dr. Sarabu also claims that, at the time I was counsel to CSG, I had a conflict of interest by virtue of my representation of the MFHA and that I resigned my counsel role as a result of that conflict of interest. Sarabu Affidavit ¶11. The MFHA is a non-profit physician organization, of the "full-time" medical staff of the WMC, that negotiates managed care contracts with HMOs and other insurance programs. The claim that I had a conflict of interest arose not from the members of CSG, but from cardiology members of our MFHA, who objected that my negotiating a "sole-source" agreement (on or about November 28, 2001) for CSG with WMC adversely affected the cardiologists' flexibility to choose among other cardiac surgeons to

2

refer their patients. (A "sole source" agreement is an exclusive arrangement for a single group of doctors to provide services). This claim had dubious merit, as the New York Medical College Faculty Practice Plan rules did not permit more than one faculty practice of Cardiac Surgeons and there were no non-CSG surgeons at WMC from which to pick. However, due to the concerns of the cardiologists, the negotiations for the sole-source agreement were terminated. I continued to represent the CSG on other matters, until July 2003.

6. Dr. Sarabu asserts that he was (inferably since at least 2001) the busiest and most profitable surgeon for CSG, taught classes at New York Medical College, conducted extensive research, and performed various administrative duties, but complains that his compensation was at all times equal to all other shareholders, contrary to the provision of the employment agreement. Sarabu Affidavit ¶14. Dr. Sarabu fails to note that he has benefited from being paid the same as all other shareholders (since well before the November 2001 agreement), despite the fact that there were periods where he was not the most "productive" surgeon. Indeed, Dr. Sarabu's productivity is due in large part to the fact that he often carefully avoided virtually every non-surgical task required of all other members; frequently, in violation of group rules and apparently with indifference for other patients' health, provided CSG clerical staff with fictitious patient names to hold precious operating room elective scheduling slots so as to ensure that he could later insert "his" elective cases (and thus appear more responsive to referring cardiologists); and, routinely violated office protocol by scheduling elective cases for the days on which he was scheduled for office patient consultations (post- and pre-op), thus compromising patient care by obligating other CSG members to consult with patients about whom they knew little or nothing, all the while once again enabling himself to be "more productive" doing surgery and appearing more responsive to referring cardiologists.

3

7.  Dr. Sarabu's eleventh-hour claim that CSG breached the employment agreement by failing to adequately compensate him is also belied by the fact that, in nearly six years of my representation of CSG, and many private conversations with Dr. Sarabu (both before and after he became President of the group), he has never orally or in written communication suggested that the compensation arrangement be modified to include variable compensation based, in whole or in part, on the volume of surgery performed.

8.  Dr. Sarabu states that there were only two excellent cardiothoracic surgeons in CSG, Dr. Zias and himself. Sarabu Affidavit ¶23. Sarabu laments that Dr. Zias had been deprived of a promised shareholder status. Sarabu Affidavit ¶24. Dr. Sarabu neglects to mention that the CSG partners voted to offer Dr. Zias shareholder status and that Dr. Sarabu inexplicably failed to extend the offer, despite the fact that I reminded him orally and in writing that he had the responsibility as President of CSG to do so.

9.  Dr. Sarabu seeks to justify his "practice within a practice" exploits in New Windsor, by claiming that Dr. Lafaro and Dr. Fleisher did the same thing in Poughkeepsie and Goshen, NY. Sarabu Affidavit ¶36. Dr. Sarabu fails to disclose that there are two significant differences in this comparison. Neither of the other two is for cardiac surgery (both were at the invitation of community physicians and hospitals affiliated with WMC for thoracic patients) and both of the other examples were after meetings of the CSG for discussion and approval.

10. WMC has intervened in this matter with a submission of an Affidavit in opposition to the petition for an injunction to enforce the covenant not to compete. I have reviewed the Affidavit. The current WMC Chief Administrative Officer, Joe Pisani, has stated that the WCM is in dire financial condition and Dr. Sarabu's volume of cases is vital to the WMC financial health. He also states that any disruption in Dr. Sarabu's services would be

dangerous to patients' health, as not having a choice in their surgeon would cause delay in their care. Pisani Affidavit ¶5-7. Mr. Pisani has been at WMC for less than a year. Prior to his arrival, WMC and the CSG recruited Dr. Suvro Sett, a highly acclaimed pediatric surgeon, from Vancouver, Canada. Dr. Sett's contract was negotiated by me and Dr. Moggio in his role as Chief of Cardiac Surgery at WMC, and Dr. Sarabu participated in the final drafting of the contract on behalf of CSG. WMC was fully apprised of every aspect of the contract, as WMC and CSG shared financial responsibility for the contract. An essential element in Dr. Sett's contract is his Covenant Not to Compete. Dr. Sarabu, the WMC and CSG all agreed that this was vital to the well-being of the WMC and the CSG. Dr. Sett is currently the only pediatric heart surgeon at WMC serving as primary operator (others assist him). Dr. Sett is without doubt crucial to the clinical and financial future of the new Maria Fareri Children's Hospital at WMC. It is indisputable that many children's care would be diverted to other institutions if Dr. Sett were not allowed to practice at WMC. (Whereas Dr. Sarabu's patients could be treated by his impeccably qualified partners.) Yet, everyone involved in this case, including Dr. Sarabu and WMC, perceived the covenant not to compete as proper and necessary for Dr. Sett.

_____
ANTHONY G. DEMETRACOPOULOS

Sworn to before me this
_17_ day of June, 2004

_____
Notary Public

PATRICIA E. LEAVY
Notary Public, State of New York
No. 01LE4813841
Qualified in Westchester County
Commission Expires August 31, ~~1996~~ 2006

5