UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROCCO J. LAFARO, M.D.,
ARLEN G. FLEISHER, M.D.,
and CARDIAC SURGERY GROUP, P.C.,

               Plaintiff,

    -against-

NEW YORK CARDIOTHORACIC
GROUP, PLLC, STEVEN L. LANSMAN, M.D.,
DAVID SPIELVOGEL, M.D., WESTCHESTER
COUNTY HEALTH CARE CORPORATION
and WESTCHESTER MEDICAL CENTER,

               Defendants.

Case No. 07 Civ. 7984 (SCR)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

*Attorneys for Defendants*

Jordy Rabinowitz (JR-6558)
Senior Associate General Counsel
WESTCHESTER COUNTY HEALTH CARE CORPORATION
Executive Offices – Taylor Care Center
Valhalla, New York  10595
(914) 493-2101

Leonard M. Rosenberg (LR-6910)
Justin M. Vogel (JV-5839)
GARFUNKEL, WILD & TRAVIS, P.C.
111 Great Neck Road
Great Neck, New York  11021
(516) 393-2200

824248v.7

Table of Contents

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 3

    A.    The Parties ................................................................................. 3

        1.    Westchester County Health Care Corp. And Westchester Medical Center.......................................................... 3

        2.    Defendants Drs. Lansman, Spielvogel, And New York Cardiothoracic Group................................................ 4

        3.    Plaintiffs............................................................................. 5

    B.    CSG's Prior Relationship with WMC........................................... 5

    C.    The Cardiothoracic Program Begins to Decline ............................ 6

    D.    WMC Recruits Dr. Lansman And Enters Into An Exclusive Contract.............................................................................. 7

    E.    This Lawsuit.............................................................................. 8

ARGUMENT

POINT I

PLAINTIFFS' ANTITRUST CLAIMS ARE BARRED BY THE STATE ACTION DOCTRINE ........................................................................ 9

    A.    The State Action Doctrine: *Parker v. Brown* and its Progeny................ 9

    B.    *Cine 42nd Street Theatre Corp. v. Nederlander Org., Inc,. et al.* The Second Circuit's Application Of The State Action Doctrine To A Public Benefit Corporation ................................................. 10

    C.    WCHCC And WMC Are Entitled To Immunity Under The State Action Doctrine................................................................ 12

    D.    The Private Defendants Are Also Entitled To The State Action Immunity.............................................................................. 17

POINT II

WCHCC AND WMC ARE IMMUNE FROM ANTITRUST DAMAGES
UNDER THE LOCAL GOVERNMENT ANTITRUST ACT ..........................................19

A.    WCHCC And WMC Are Immune From Antitrust Damages Under
      The LGAA Because They Are "Local Government" Entities As
      Defined By The LGAA...........................................................................................19

B.    The Individual Defendants And NYCG Are Also Immune From
      Antitrust Liability Under The LGAA ...................................................................21

POINT III

PLAINTIFFS' CLAIMS ARE BARRED BECAUSE PLAINTIFFS
LACK ANTITRUST STANDING.........................................................................................23

A.    Plaintiffs Have Not Suffered Antitrust Injury.......................................................23

B.    Plaintiffs Are Not "Efficient Enforcers" Of The Antitrust Laws ..........................30

      1.    Plaintiffs, Who Seek To Reinstate Their Own Exclusive
            Provider Status, Are The Poorest Possible Choice To
            Enforce Alleged Antitrust Claims.............................................................30

      2.    There Are Other Parties That Would Be More Efficient
            Enforcers Than Plaintiffs .........................................................................32

      3.    The Alleged Antitrust Damages Are Speculative......................................35

POINT IV

THIS COURT SHOULD NOT MAINTAIN JURISDICTION OVER
PLAINTIFFS' STATE-LAW CLAIMS ...............................................................................37

CONCLUSION.....................................................................................................................38

824248v.7

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Associated Gen. Contractors of Cal., Inc. v. California State Council
  of Carpenters*, 459 U.S. 519, 103 S.Ct. 897 (1983).....................23, 32, 35

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994).............................2, 23, 24, 26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477, 97 S.Ct. 690 (1977)...............................................23

*California Retail Liquor Dealers v. Midcal Aluminum, Inc.*,
  445 U.S. 97, 100 S.Ct. 937 (1980)............................................9, 10, 11

*Capital Freight Servs., Inc. v. Trailer Marine Transp. Corp.*,
  704 F. Supp 1190 (S.D.N.Y. 1989) ..............................................19, 20

*Cargill, Inc. v. Monfort of Colorado*,
  479 U.S. 104, 107 S.Ct. 484 (1986)...........................................23, 30, 32

*Cine 42nd Street Theatre Corp. v. Nederlander Organization, Inc.*,
  609 F. Supp. 113 (S.D.N.Y. 1985) ..................................................37

*Cine 42nd Street Theatre Corp v. Nederland Org., Inc.*,
  790 F.2d 1032 (2d Cir. 1986)................................................10, 11. 14, 18

*Coastal Neuro-Psychiatric Assoc. v. Onslow Memorial Hospital*,
  795 F.2d 340 (4th Cir. 1986) ......................................................15

*Coffey v. Healthtrust, inc.*, 955 F.2d 1388 (10th Cir. 1992) .....................24, 26

*Crosby v. Hosp. Auth. of Valdosta and Lowndes Cty.*,
  93 F.3d 1515 (11th Cir. 1996), *cert. denied*, 117 S.Ct. 1246 (1997).......................21

*Daniel v. American Board of Emergency Medicine*,
  428 F.3d 408 (2d Cir. 2005)...............................2, 23, 24, 30, 33, 34, 36

*Daniel v. American Board of Emergency Medicine*,
  988 F. Supp. 127 (W.D.N.Y. 1997) .........................10, 13, 14, 16, 19, 20

*Doron Precision Systems, Inc. v. FAAC, Inc.*,
  423 F. Supp.2d 173 (S.D.N.Y. 2006)............................10, 13, 15, 17, 20

*Electrical Inspectors, Inc. v. Village of East Hills*,
  320 F.3d 110 (2d Cir. 2003).........................................................17

iii

*Gentile v. Fifth Avenue Otolaryngology, Inc., et al.,*
  2006 WL 2505915, August 28, 2006 (N.D. Ohio) ............................................31

*In Re Enron Corp,*
  2007 WL 2446498, August 27, 2007 (S.D.N.Y.) ...........................................5

*Jefferson Parish Hospital Dist. No. 2 v. Hyde,*
  466 U.S. 2 .........................................................................................................23

*Johnson v. University Health Services, Inc.,*
  161 F. 3d 1334 (11th Cir. 1998) .................................................................27, 28

*Konik v. Champlain Valley Physicians Med. Ctr.,*
  733 F.2d 1007 (2d Cir. 1984).........................................................................24

*Korshin v. Benedictine Hosp.,*
  34 F. Supp.3d ...............................................................................................24, 26

*Kramer v. Time Warner, Inc.,*
  937 F.2d 767 (2d. Cir 1991)..............................................................................5

*Montauk-Caribbean Airways, Inc. v. Hope,*
  784 F.2d 91 (2d Cir. 1986)..........................................................................19, 21

*Nilavar v. Mercy Health Sys.-Western Ohio,*
  2007 WL 2264439 (6th Cir. 2007) .................................................................24

*Oksanen v. Page Memorial Hosp.,*
  945 F.2d 696 (4th Cir. 1991)..........................................................................26

*Parker v. Brown,*
  317 U.S. 341, 63 S.Ct. 307 (1943)...........................................................9, 11, 12

*Patel v. Midland Memorial Hospital and Medical Center,*
  298 F.3d 333 (5th Cir. 2002) .........................................................................21

*Robles v. Humana Hosp. Catersville,*
  785 F. Supp. 989 (N.D. Ga. 1992)...............................................................33, 34

*Rodal v. Anesthesia Group of Onondaga, P.C.,*
  369 F.3d 113 (2d Cir. 2004)............................................................................30

*Salomon v. Our Lady of Victory Hospital,*
  1999 WL 955513, October 5, 1999 (W.D.N.Y.) ............................................27, 28

*Sandcrest Outpatient Servs., Inc. v. Cumberland Cty Hosp. Sys.,*
  853 F.2d 1139 (4th Cir. 1988) ......................................................................21

iv

*Sweeney v. Athens Regional Medical Ctr.*,
   705 F. Supp. 1556 (M.D. Ga. 1989) ................................................................15, 20

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ......................................2, 23, 24, 26, 31, 32, 34, 35

*Town of Hallie v. City of Eau Claire*,
   471 U.S. 34, 105 S.Ct. 1713 (1985) ..................................................................9, 10

## FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

Local Government Antitrust Act, 15 U.S.C. §§ 34 ................................................2, 19, 20

## STATE: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

Civil Service Law § 200 ..........................................................................................4

N.Y. Pub. Auth. Law § 3300 ...................................................................................3

N.Y. Pub. Auth. Law § 3301 ..................................................................3, 12, 13, 16, 20

N.Y. Pub. Auth. Law § 3304 ...................................................................................4

N.Y. Pub. Auth. Law § 3305 .................................................................................4, 16

N.Y. Pub. Auth. Law § 3305 ................................................................................13, 16

Public Officers Law §§ 86, 102 ...............................................................................4

## PRELIMINARY STATEMENT

This lawsuit is a study in contradiction. In their primary cause of action, Plaintiffs Arlen Fleisher, M.D., Rocco Lafaro, M.D., and their professional corporation, Cardiac Surgery Group, P.C. ("CSG"), allege that Westchester Medical Center ("WMC") violated the Sherman Antitrust Act to the detriment of cardiac patients located in the lower Hudson Valley by entering into an exclusive agreement with defendant New York Cardiothoracic Group, PLLC ("NYCG"). However, in affidavits submitted by Dr. Fleisher, his partner, and his counsel in a prior restrictive covenant lawsuit against another CSG physician, Plaintiffs admit that CSG was the *de facto* sole provider of cardiothoracic surgery at WMC for almost two decades and had, in fact, been negotiating with WMC for their own exclusive agreement. Indeed, George Reed, M.D., Dr. Fleisher's partner and the founder of CSG, argued in that litigation that a "sole provider" model was in the best interests of all cardiac patients.

While Plaintiffs' antitrust claims necessarily rely on allegations that WMC's exclusive arrangement with NYCG stifles competition, Plaintiff CSG sued to enforce a restrictive covenant against one of its prior physicians by arguing that its *de facto* exclusive arrangement "benefited the patients, the Hospital and CSG" and "reduced the length of each patients' stay, and made maximum use of personnel and other hospital resources" (*See* Affidavit of George E. Reed, M.D. at ¶ 8, Exhibit 9 to Rabinowitz Decl.).

Even within the complaint at bar, Plaintiffs take contradictory positions. As noted, Plaintiffs' first cause of action seeks to undo an exclusive provider arrangement on the theory that such a model harms patients. However, Plaintiffs' second and third causes of action – state law tortious interference claims – are based on provisions of third-party bylaws that Plaintiffs argue preclude WMC from allowing anyone on staff that does not practice with Plaintiffs' group, which they contend is the only existing "approved" professional corporation at WMC. Thus,

824248v.7

Plaintiffs in one part of the complaint argue for the unfettered provision of cardiothoracic services, yet in the very next breath seek to enforce an anticompetitive rule for their own benefit.

These contradictions are more than mere technicalities. Indeed, this simple set of facts – including the fact that Plaintiffs have been "grandfathered" under the exclusive agreement and still practice cardiothoracic surgery WMC – is fatal to Plaintiffs' ability to demonstrate either (i) antitrust injury, *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994); or (ii) that they would be "efficient enforcers of the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991). As the Second Circuit and other courts have held, to have antitrust standing, a plaintiff must show an injury to competition and not to themselves as competitors. *See Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 438 (2d Cir. 2005).

Moreover, Plaintiffs' antitrust claim must be dismissed as a matter of law because Westchester County Health Care Corporation ("WCHCC") is a New York State Public Benefit Corporation, expressly created by statute to further the aims of NY State in providing medical care to its patient population. As such, WCHCC and WMC are immune from antitrust liability (including injunctive relief) under the *Parker* or "State Action" Doctrine, and also immune from antitrust damages under the Local Government Antitrust Act ("LGAA"), codified at 15 U.S.C. §§ 34 – 36. Well-established law also holds that if a public entity is immune from antitrust liability, then the private actors with whom it contracts must also be shielded. Thus, Defendants Drs. Lansman and Spielvogel and Defendant NYCG are also immune.

Finally, because the one federal claim must be dismissed under well established doctrines and the case law, this Court should not retain supplemental jurisdiction over Plaintiffs' state-law claims. In sum, it is respectfully submitted that this Court should grant Defendants' motion in its entirety.

2

824248v.7

## STATEMENT OF FACTS

The facts underlying this motion are not complicated, largely undisputed, and can be mostly gleaned from the pleadings and from the exhibits attached to the accompanying declaration of defendants' counsel, Jordy Rabinowitz, executed on February 1, 2008 ("Rabinowitz Decl."). For the court's convenience, a summary of those facts is provided here.

**A.     The Parties**

**1.     Westchester County Health Care
Corp. And Westchester Medical Center**

Defendant WCHCC is a New York State Public Benefit Corporation created by the State in 1997 when the Legislature amended the New York Public Authorities Law by adding Article 10-C, Title 1. *See* N.Y. Pub. Auth. §§ 3300 *et seq.* According to the Legislative findings and purpose, WCHCC was created with the express purpose of operating the Westchester County Medical Center by "having the legal, financial and managerial flexibility to take full advantage of opportunities and challenges presented by the evolving health care environment." N.Y. Pub. Auth. § 3301(4). The Legislature also made clear that it was making WCHCC a public benefit corporation to perform essential public and government functions ("the exercise by [WCHCC] of the functions, powers and duties as [provided by the statute] constitutes the performance of an essential public and governmental function)." N.Y. Pub. Auth. § 3301(5).

WCHCC is governed by fifteen voting directors. N.Y. Pub. Auth. § 3303(b). Of these fifteen voting directors, eight are appointed by the Governor and seven are appointed by the Westchester County Legislature, subject to approval by the County Executive. *Id.*

The Public Authorities Law grants WCHCC General and Special powers, including (i) the power to enter into contracts "necessary or convenient or desirable for the purposes of the corporation ...; (ii) "to provide health and medical services for the public directly or by agreement ... with any person ... and to make internal policies governing ... health and medical

3

services; and (iii) "to determine the conditions under which a physician may be extended the privilege of practicing" at WCHCC. *See* N.Y. Pub. Auth. §§ 3305(11), 3306(2), and 3306(6).

Today, WCHCC's primary responsibility is the operation of Westchester Medical Center ("WMC" or the "Medical Center") in Valhalla, New York. WMC, also named as a defendant in the lawsuit, is an 1100-bed tertiary care hospital licensed under Article 28 of the New York State Public Health Law.

As a public benefit corporation, WCHCC is part of New York State government. WCHCC is subject to the Freedom of Information and Open Meetings provisions of Public Officers Law (*see* Public Officers Law §§ 86, 102). Further, WCHCC's officers and employees are public officers and public employees and are subject to the Civil Service laws (*see* N.Y. Pub. Auth. § 3304), including the Taylor Law (New York's no-strike law, which was enacted "to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government"), *see* Civil Service Law § 200, and participate in the New York State and Local Retirement System.

### 2.    Defendants Drs. Lansman, Spielvogel, And New York Cardiothoracic Group

Defendants Steven L. Lansman, M.D., and David Spielvogel, M.D., are cardiothoracic and transplant surgeons and are members of the WMC medical staff. Dr. Lansman is the Director of the Department of Cardiothoracic Surgery. Drs. Lansman and Spielvogel are shareholders of Defendant New York Cardiothoracic Group, PLLC ("NYCG"). (*See* Plaintiffs' complaint dated September 10, 2007 ["Complaint"] at ¶¶ 6, 7 and 28, attached as Exhibit 1 to the Rabinowitz Decl.).

824248v.7

3.    **Plaintiffs**

Plaintiffs Rocco J. Lafaro, M.D., and Arlen G. Fleisher, M.D., are also cardiothoracic surgeons, and members of WMC's medical staff. Both are principals of Plaintiff CSG. *(See* Complaint at ¶¶ 1, 2 and 3).

**B.    CSG's Prior Relationship with WMC**

The membership and history of plaintiff CSG is notable in the context of this lawsuit. The following information is derived from the affidavits of (i) George E. Reed, sworn to June 16, 2004 ("Reed Aff."), (ii) Dr. Fleisher, sworn to April 26, 2004 ("Fleisher Aff.") and (iii) CSG's counsel, Anthony G. Demetracopoulos, Esq., sworn to June 17, 2004 ("Demetracopoulos Aff."), all submitted in connection with CSG's 2004 restrictive covenant litigation against a former CSG surgeon, Mohan R. Sarabu, M.D. (the "Sarabu Action"). Copies of these three affidavits are attached to the Rabinowitz Decl. as Exhibits 9, 8, and 10, respectively.[1]

According to Dr. Reed, he was recruited by WMC in 1978, one year after the Hospital opened, in order to establish a heart surgery program. Dr. Reed states that, while prohibited from forming a single professional corporation, the cardiac surgeons that joined Dr. Reed operated as a group practice with Dr. Reed in charge of distributing the patients to each of the other surgeons. (*See* Reed Aff. at ¶¶ 2, 7). In 1988, Dr. Reed and five partners created Plaintiff CSG and his practice of controlling patient distribution continued. (*See* Reed Aff. at ¶¶ 4, 7). Drs. Reed and Fleisher (along with their counsel, Mr. Demetracopoulos) all describe how CSG was the de facto "sole source" provider of cardiac surgery services at the Hospital and, in fact, had tried to negotiate their own exclusive arrangement. (*See* Reed Aff. at ¶¶ 4, 8; Fleisher Aff. at ¶¶ 3-4; Demetracopoulos Aff. at ¶ 5). Both Dr. Reed and Dr. Fleisher take great pains to

---

[1] This Court can take judicial notice of these publicly-filed court documents. *See In Re Enron Corp*, 2007 WL 2446498 at n.18, August 27, 2007 (S.D.N.Y.); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d. Cir 1991).

824248v.7

describe how this "model" and "structure" was both "integral to its [own] success" and *"provided the most benefit to the hospital in affording comprehensive coverage of patient care, which results in a decreased length of stay and more efficient uses of hospital resources."* (*See* Fleisher Aff. at ¶ 23; Reed Aff. at ¶¶ 6, 8) (emphasis added). These statements, combined with Drs. Reed's and Fleisher's concomitant reflections on how critical enforcement of the restrictive covenant against Dr. Sarabu is in what they expressly describe as an already "highly competitive market," are directly contrary to the position taken in this litigation which decries anticompetitive conduct as highly detrimental to patient care. (*See* Complaint at ¶¶ 33, 56, 58, and 67).

## C.    The Cardiothoracic Program Begins to Decline

Upon information and belief, CSG's restrictive covenant litigation against Dr. Sarabu was successful, either by judicial decision or settlement. In any event, prior to the end of 2004, Dr. Sarabu left his practice at WMC, taking the majority of his (or CSG's, depending on one's point of view) patients with him. As Plaintiffs themselves note in their complaint, both prior to and during this same time period, other cardiothoracic surgeons affiliated with CSG began to leave its practice, including Lazlo Fuzesi, M.D., CSG's only cardiothoracic transplant surgeon. (*See* Complaint at ¶ 24, Exhibit 1 to Rabinowitz. Decl.). In fact, both plaintiff physicians in this action also were involved in their own problems which detracted from CSG's volume. For example, in April 2004, Dr. Lafaro formally requested a one-year medical leave of absence from the Medical Staff and as Section Chief from January 2004. (*See* Rabinowitz Decl. at Exhibit 6). Dr. Fleisher was experiencing somewhat different issues. In early 2005, it was widely reported in the media that Dr. Fleisher and two other area physicians were indicted by the U.S. District Attorney for providing Viagra and other prescription drugs to the Gambino crime family in return for personal and financial benefits. (*See* Rabinowitz Decl. at Exhibit 7)

824248v.7

What cannot be disputed is that starting in August 2004, WMC's cardiothoracic surgery volume dropped significantly from 2003, and WMC administration understood that it needed to take action to revive the program.

**D.      WMC Recruits Dr. Lansman And Enters Into An Exclusive Contract**

In late-2004, WMC took steps to address these significant concerns, and recruited Drs. Lansman and Spielvogel, both well-known cardiothoracic and cardio-transplant surgeons from Mt. Sinai Medical Center in New York City to join WMC. (*See* Complaint at ¶ 5, Exhibit 1 to Rabinowitz Decl.). WMC and Dr. Lansman both agreed that the most effective way to enhance patient care and address the concerns of the Department would be through an exclusive arrangement with Dr. Lansman's professional corporation, defendant New York Cardiothoracic Group, P.C. ("NYCG"). This arrangement is set forth in a Professional Services Agreement, dated December 29, 2004. In recognition of Plaintiffs' long history with WMC, the Professional Services Agreement at paragraph 1.2 and Exhibit A expressly "grandfathers" all five CSG physicians, including Plaintiffs Fleisher and Lafaro, thus permitting them to continue practicing at WMC. (A copy of the Professional Services Agreement between WCHCC and SLDS Cardiothoracic Surgery PLLC, dated December 29, 2004, is attached as Exhibit 5 to the Rabinowitz Decl.[2] Exhibit A to the Professional Services Agreement lists the "Grandfathered Physicians"). To date, Plaintiffs Fleisher and Lafaro continue to practice cardiothoracic surgery at WMC.

---

[2]      SLDS Cardiothoracic Surgery PLLC is the predecessor entity to defendant NYCG formed by Dr. Lansman. Almost immediately after beginning his practice at WMC, Drs. Lansman and Spielvogel changed the name of SLDS to NYCG.

**E.**    **This Lawsuit**

By Complaint filed September 12, 2007, Plaintiffs allege that the Professional Services Agreement between NYCG and WMC violates the Sherman Antitrust Act.   A copy of the Complaint is attached to the Rabinowitz Declaration as Exhibit 1.[3]

By Amended Answer, dated November 19, 2007, Defendants denied that any of their conduct violated the antitrust laws.  Defendants also interposed affirmative defenses, including that Defendants were immune from antitrust claims under both the State Action Doctrine and the Local Government Antitrust Act ("LGAA").  Defendants also allege that Plaintiffs lack antitrust standing.  A copy of Defendants' amended answer is attached to the Rabinowitz Declaration as Exhibit 2.

---

[3]    As noted above, in what can only be described as the very definition of irony, plaintiffs also bring state-based claims that, in essence, argue that only CSG and CSG physicians are permitted to offer cardiothoracic services at WMC.  (*See* Complaint at ¶¶ 17-20).

824248v.7

## ARGUMENT

### POINT I

### PLAINTIFFS' ANTITRUST CLAIMS ARE
### BARRED BY THE STATE ACTION DOCTRINE

**A.**    **The State Action Doctrine: Parker v. Brown and its Progeny**

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307 (1943), the Supreme Court held that states, acting in their sovereign capacities, are exempt from the federal antitrust laws. In *Cine 42nd Street Theatre Corp v. Nederland Org., Inc.*, 790 F.2d 1032 (2d Cir. 1986), the Second Circuit reviews *Parker's* progeny and explains how the doctrine should be applied to quasi-governmental entities, such as public benefit corporations. 790 F.2d 1040-1047.

In *Parker*, the Supreme Court held that the legislative and judicial branches of state government act as the state in its sovereign capacity, 317 U.S. at 351, 63 S.Ct. at 313-314. Several Supreme Court decisions after *Parker* examined how the immunity was to be applied when the state was not acting through its legislature or judiciary; for instance through a municipality. By 1980, after a series of such cases, the Court adopted what is now referred to as the *Midcal* two-part test for decisions that could be attributed to the state, but were not made directly by the legislature or the court. *California Retail Liquor Dealers v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937 (1980). In short, the *Midcal* court held that under such circumstances, the challenged restraint must be one "clearly articulated and affirmatively expressed as state policy" and the policy must be "actively supervised" by the state itself. *Id.* at 105, 100 S.Ct. at 943.

In 1985, the Supreme Court issued *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713 (1985). *Town of Hallie*, clarified, in two important respects, how the *Midcal* test applied to quasi-governmental entities.

824248v.7

First, the Court held that *Midcal's* first prong (*i.e.,* a clearly articulated and affirmatively expressed policy) should be one of foreseeability – whether the legislature could foresee the anticompetitive effects that would follow from the express authority delegated by the state. 471 U.S. at 41-31, 105 S.Ct. at 1718-19. In the case before them, the Court held that this test was met because the statute at issue plainly showed that "the legislature contemplated the kind[s] of acts complained of." *Id.*

Equally important was that, for the first time, the Supreme Court held that, unlike a private party, the defendant municipality was presumed to have acted in the public's interest and that it need not satisfy the second *Midcal* prong by showing that the anticompetitive conduct was "actively supervised by the state." *Id.*

**B.**    ***Cine 42nd Street Theatre Corp. v. Nederlander Org.,*** ***Inc,. et al.* The Second Circuit's Application Of The** <u>**State Action Doctrine To A Public Benefit Corporation**</u>

It is against this background, that the Second Circuit Court of Appeals first reviewed the state action doctrine and decided how it should be applied to a Public Benefit Corporation – *i.e.,* defendant New York's Urban Development Corporation ("UDC"). *See Cine 42nd Street Theatre Corp. v. Nederlander Org., Inc.,* 790 F.2d 1032 (2d Cir. 1986). *Cine* has been followed by the only two district courts applying the doctrine to public benefit corporations. *See Doron Precision Systems, Inc. v. FAAC, Inc.,* 423 F. Supp.2d 173 (S.D.N.Y. 2006); *Daniel v. American Board of Emergency Medicine,* 988 F. Supp. 127 (W.D.N.Y. 1997). All three courts held that the defendant public benefit corporation was immune from federal antitrust laws.

In *Cine 42nd Street Theatre,* the plaintiff brought an action against the New York Urban Development Corporation (the "UDC"), a New York Public Benefit Corporation, for alleged violations of the federal antitrust laws by using its leasing powers to redevelop the Times Square area of New York. As part of its mission, the UDC acquired certain targeted theatres through condemnation or purchase and subsequently leased them to private parties who would renovate

10

the theatres for Broadway shows. 790 F.2d at 1035. The plaintiffs alleged that these leases restrained competition within the Broadway theatre industry, prevented new competitors from entering the relevant market, and increased the likelihood of collusive behavior among the remaining theatre owners. *Id.* at 1038.

The Court of Appeals noted that the predicate questions to determine whether the UDC was immune from liability under the antitrust laws were:

> First, whether the actions of the UDC were those of the state in its sovereign capacity ... or, if not, whether there was a clearly articulated state policy authorizing the UDC's actions; and second, whether the active state supervision over those actions had to be demonstrated.

*Id.* at 1044.

As to the preliminary question, the Second Circuit quickly held that while UDC was a "creature of statutory origin" and that New York courts recognized that public benefit corporations "perform role[s] essentially governmental in nature," the UDC was not acting in a sovereign capacity. *Id.* But, the court firmly held that the UDC "need not satisfy the active state supervision prong of the *Midcal* test." In short, the Second Circuit held that "The UDC, like a municipality, is by statute a political subdivision of the state ... Therefore, its interests must be defined as public rather than private, and consequently, the active state supervision requirement in unnecessary." *Id.* at 1047.

The Court did, however, grapple with whether the UDC was acting pursuant to a clearly articulated state regulatory policy under the analytical framework established by the *Parker* progeny. *Id.* at 1044-1047.

First, the Court looked at the UDC's general powers, and noted that the UDC was granted broad powers to improve the urban environment in that "[i]t was established and structured to be free of the typical political forces that strangle urban development efforts." *Id.* at 1044.

The Court then examined the UDC's special powers, which it held to be even more significant to show that the UDC's alleged anticompetitive conduct was foreseeable under its statute. Specifically, the Court noted that the UDC had all-but unfettered rights to acquire and then to lease property – which the Court understood to show "that the legislature envisioned the UDC would lease property in an anticompetitive manner." *Id.* at 1045. Indeed, the Court noted that "none of the specific limitations placed on the UDC's power to lease real estate for land use improvement projects mentions that the leases must be awarded in such a manner that market competition is maintained." *Id.* at 1045.[4] Thus, the Court of Appeals held that because the legislature granted the UDC power to acquire and then lease property, placing almost no restrictions on that power, then the legislature necessarily "envisioned" or "foresaw" anticompetitive consequences of this power and thus articulated a clearly authorized state policy.

## C.    WCHCC And WMC Are Entitled To Immunity Under The State Action Doctrine

Like the UDC in *Cine,* Plaintiff WCHCC is a public benefit corporation, and its enabling statute makes clear that it is acting for a public rather than private purpose. *See* N.Y. Pub. Auth. § 3301(5). Also like the UDC, the legislature granted WCHCC broad, general powers, *i.e.*, to provide health care services for the benefit of New York residents. In so doing, the legislature made it plain that WCHCC should operate free from the restraints it faced as a county hospital. WCHCC's enabling legislation states:

> The needs of the residents of the state of New York and of the County of Westchester can best be served by the operation of the Westchester County Medical Center by a public benefit corporation having the legal, financial and managerial flexibility to take full advantage of the opportunities and challenges presented by the evolving health care environment.

---

[4]    The UDC statute contains only two limitations – (i) public notice under certain circumstances; and (ii) the UDC must first find that a proposed project will actually improve a blighted area and then make three corollary findings and state the basis for them. See UDC Act, 65 N.Y. Uncons. §§ 6260(c) and (f).

824248v.7

N.Y. Pub. Auth. § 3301(4).

In addition, like the UDC, WCHCC's special powers are broad and unfettered and make no mention that its powers must be used in a manner to preserve competition. For example, WCHCC is empowered:

- "To Provide health and medical services for the public *directly or by agreement or lease with any person, firm or private or public corporation or association* ... and to make internal policies governing admissions and health and medical services ..." and;

- "To determine the conditions under which a physician may be extended the privilege of practicing within a health facility under the jurisdiction of the corporation ..."

*See* N.Y. Pub. Auth. § 3306(2) and (6) (emphasis added).

Under *Cine 42nd Street Theatre* analysis, because WCHCC operates for a public purpose and because the legislature granted WCHCC unfettered power to contract with private parties to provide medical care, it was foreseeable to the legislature that there could be anticompetitive consequences resulting from an exercise of those powers – *i.e.,* an exclusive contract with a single provider. And, because WCHCC "acted in accordance with its powers" by entering into an exclusive agreement with NYCG, this conduct was "foreseeable" and WCHCC was acting in accordance with a clearly articulated state policy. 790 F.2d at 1045-46.

Only two other New York Courts address the application of the State Action Doctrine to New York State public benefit corporations, and both hold that the doctrine is applicable without the need to show "active state supervision." *See Doron Precision Systems, Inc. v. FAAC, Inc.,* 423 F. Supp.2d 173 (S.D.N.Y. 2006); *Daniel v. American Board of Emergency Medicine,* 988 F. Supp. 127 (W.D.N.Y. 1997).

13

*Daniel* addresses the application of the doctrine to a public benefit corporation hospital system – the New York Health and Hospitals Corporation ("HHC") – and one of its member hospitals, Lincoln Hospital. *Daniel* involved an antitrust challenge by physician plaintiffs against the American Board of Emergency Medicine ("ABEM"), hospitals and medical schools. In that case, plaintiffs alleged that ABEM conspired with other defendants to unreasonably restrict competition between ABEM certified and non-certified emergency physicians by eliminating ABEM's prior alternative qualification examination that was based on years of practice. 988 F. Supp. at 148. The defendant hospitals, created by state law, sought dismissal of the claims based on the State Action Doctrine. *Id.* at 181.

*Citing Cine 42nd Street Theatre*, and the Parker progeny, the District Court held that because none of the hospitals could be said to be acting in a sovereign capacity, its first inquiry must be "whether the anticompetitive conduct attributable to the defendants was authorized by their respective states." *Id.* at 183-84. The District Court's findings as to HHC and Lincoln Hospital are instructive. The District Court noted the following relevant statutory provisions upon which it later held that HHC and Lincoln were operating pursuant to clearly articulated state policy:

- "HHC is a public corporation, created and empowered by New York State to operate a public hospital system ..." *Id.* at 184.

- "HHC is empowered to 'operate, manage, superintend, and control' the hospitals under its authority." *Id., citing* N.Y. Uncons. § 7385(7).

- HHC has the "capacity to sue or be sued, make contracts, borrow money, acquire or sell property, and adopt, alter, or repeal rules and regulations for management organization, and regulation of its affairs." *Id., citing* N.Y. Uncons. §§ 7385(1)-(6).

- HHC "was intended to provide continuous medical services, and sponsor and conduct research, educational and training programs, in connection with its purpose of providing quality care and treatment through adequately trained and qualified personnel." *Id., citing* N.Y. Uncons. §§ 7382, 7385(8).

- And, in fulfilling these purposes, HHC was granted the authority to

14

establish "the conditions under which a physician may be extended the privilege of practicing within a facility under the jurisdiction of HHC ..." *Id, citing* N.Y. Uncons. §§ 7385(10), (12), (18).

Based on this statutory background, the District Court had no trouble exempting Lincoln Hospital from antitrust liability pursuant to the state action doctrine:

> The New York Legislature clearly expressed concern about hiring a highly qualified and trained medical staff to provide services for residents of New York City. *See N.Y. Uncons.* §§ 7382, 7385(10). Thus, it is probable that the legislature envisioned in creating HHC that anticompetitive effects could result from its legislation. Further, as it was reasonably foreseeable that anticompetitive consequences would result from a requirement for well-trained physicians, the statute must be considered a clearly articulated state policy authorizing anticompetitive behavior.

988 F. Supp. at 185.[5]

In *Doron Precision Systems, Inc. v. FAAC*, 423 F. Supp.2d 173 (S.D.N.Y. 2006), the District Court (Crotty, J.) reviewed the New York City Transit Authority enabling statute – N.Y. Pub. Auth. § 1200 *et seq.* – and found the public benefit corporation to have been granted all-but unfettered power to "make and enforce contracts" and "do all things necessary or convenient to carry out" its purpose, and held that under such circumstances it was reasonably foreseeable that anticompetitive consequences would occur. Thus, the District Court held that the conduct at

---

[5]    *See also Coastal Neuro-Psychiatric Assoc. v. Onslow Memorial Hospital*, 795 F.2d 340, 342 (4th Cir. 1986) (state action doctrine applied, as conduct was foreseeable because "local restrictions on staff privileges under this state statute may reduce the supply or variety of medical services to the surrounding community. The North Carolina legislature must have foreseen this anticompetitive consequence and decided that the regulatory benefits conferred by the statute simply outweighed it."); *Sweeney v. Athens Regional Medical Ctr.*, 705 F. Supp. 1556, 1563 (M.D. Ga. 1989) (state action doctrine applied to hospital relying on statute that authorized hospital to regulate staff privileges:

> Under this provision, a public hospital can limit the privileges of a medical practitioner who otherwise would have complete access to treat patients at the hospital. This statute clearly contemplates that a public hospital could become involved in anticompetitive conduct by denying or limiting the staff privileges of certain medical practitioners ... Because ARMC was acting in accordance with the State's policy to displace competition with regulation in the area of denying or revoking hospital staff privileges, ARMC's conduct is immune from suit under the state action exemption.

Frankly, under this analysis, not only could WCHCC and WMC enter into exclusive agreements with NYCG and the defendant physicians, they could, if they so chose, deny or revoke plaintiffs' medical staff privileges in their entirety – an action clearly not taken since plaintiffs were "grandfathered" and allowed to continue their practice at WMC.

15

issue (contracting with a private company to produce a driver training system), even if anticompetitive as alleged, was immune from federal antitrust laws. 423 F. Supp.2d at 187-188.

The New York legislature grants WCHCC the same statutory authority as the statutes examined in *Daniel* and *Doran* – authority which prompted those Courts to dismiss the plaintiffs' antitrust claims based on the State Action Immunity Doctrine. Specifically, as in *Daniel,* the WCHCC is empowered to:

- "operate, manage, superintend and control any health facility under its jurisdiction ..." *See* Pub. Auth. § 3306 (1);

- ... "provide health care services and health facilities for the benefit of the residents of the State of New York and the county of Westchester ..." *See* Pub. Auth. § 3301 (5);

- have the "legal, financial and managerial flexibility to take full advantage of opportunities and challenges presented by the evolving health care environment." *See* Pub. Auth. § 3301(4)

- "enter into contracts and to execute all instruments necessary or convenient or desirable for the purposes of the corporation to carry out any powers expressly given to it in this title," the performance of which "constitutes the performance of an essential public and governmental function." *See* Pub. Auth. §§ 3301 (5) and 3305 (11);

- "sue and be sued," "make and alter by-laws for its organization and management ...," and "acquire by purchase, grant, lease, gift, or otherwise to hold and use property necessary, convenient or desirable to carry out its corporate purposes ..." *See* Pub. Auth. §§ 3305 (1), (4) and (5)(a); and

- "determine the conditions under which a physician may be extended the privilege of practicing within a health facility under the jurisdiction of the corporation, and to promulgate reasonable internal policies for the conduct of all persons, physicians and nurses within such facility." *See* Pub. Auth. § 3306 (6).

Based on the forgoing, this Court should arrive at the same conclusion as the Courts in *Daniel* and *Doran.* In creating WCHCC, the legislature granted it broad powers with respect to the right to contract and the right to credential and grant physician privileges. *See* Pub. Auth. §§ 3301; 3305 (1)-(11); and 3306(1),(2) and (6). In addition, as with HHC, the legislature was

16

clearly concerned that WCHCC provide high level medical care through a highly qualified and trained medical staff. And, as with HHC, it was highly likely that the legislature would envision anticompetitive effects and consequences deriving from these powers – particularly since there is no "mention of any limitation" on how these powers are to be employed. *See Cine 42nd Street Theatre,* 790 F.2d at 1045.

Accordingly, and for all of the reasons set forth above and in the cited cases, Defendants respectfully request that the Court dismiss the Sherman Act claims as against WCHCC and WMC.

**D.    The Private Defendants Are Also Entitled To The State Action Immunity**

Once the Court establishes that WCHCC and WMC are entitled to State Action Doctrine immunity, it is well-established that the private defendants alleged to have acted in concert with WCHCC and WMC are equally entitled to the defense. Both *Cine 42nd Street Theatre* and *Doron Precision Systems* hold as much in applying the immunity to the public defendants' private co-defendants:

> Since the UDC's actions are shielded from antitrust law violations, it would defeat the purpose of the defense were we to allow appellants to prevent the award designation simply by suing New York City rather than the UDC. Because the UDC and its subsidiary had the authority to conduct the challenged sales and award the leases in an anticompetitive manner, the City's participation in those sales, which is recognized and affirmatively encouraged in the UDC's enabling legislation, is also protected.
>
> For the same reasons, the private [parties] acting in concert with the UDC are also entitled to state immunity.

790 F.2d at 1048 (internal citations omitted). *See also, Electrical Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110, 125-127 (2d Cir. 2003); *see also Doron,* 423 F. Supp.2d at 188 n.14 (*citing Cine 42nd Street Theatre and Automated Salvage Transp., Inc. v. Wheelabrator Envt'l*

17

*Sys., Inc.*, 155 F.3d 59, 74 (2d Cir. 1998)). For these reasons, Defendants Drs. Lansman and Spielvogel and NYCG respectfully request that the Sherman antitrust claims be dismissed as to them as well.

18

## POINT II

## WCHCC AND WMC ARE IMMUNE FROM ANTITRUST
## DAMAGES UNDER THE LOCAL GOVERNMENT ANTITRUST ACT

Congress enacted the Local Government Antitrust Act, 15 U.S.C. §§ 34-36 ("LGAA"), to broaden the scope of antitrust immunity applicable to local governments. *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 94 (2d Cir. 1986); *see also Daniel*, 988 F. Supp. at 191 (*citing Sandcrest Outpatient Servs., Inc. v. Cumberland Cty. Hosp. Sys.*, 853 F.2d 1139, 1142 (4th Cir. 1988). The LGAA provides immunity from monetary damages, costs, and attorneys fees to any defined local government entity under Sections 15, 15(a) and 15(c) in an antitrust case. 988 F. Supp. at 191 (*citing* 15 U.S.C. § 35(a)).

A local government entity covered by the LGAA is immune from attack for any antitrust action undertaken in an official capacity regardless of whether it acted within its lawful regulatory authority. *Montauk Caribbean Airways*, 784 F.2d at 94. *See also Daniel*, 988 F. Supp. 127 at 192. Thus, the Second Circuit has held, so long as the actions of the entity do not violate any criminal laws its conduct is exempted from federal antitrust laws by the LGAA. *Montauk, 784 F.2d at 94; see also Capital Freight Servs., Inc. v. Trailer Marine Transp. Corp.*, 704 F. Supp 1190, 1200 (S.D.N.Y. 1989); *Daniel*, 988 F. Supp at 192.

**A.    WCHCC And WMC Are Immune From Antitrust
Damages Under The LGAA Because They Are
"Local Government" Entities As Defined By The LGAA**

It is clear that WCHCC is a local government under the LGAA. The LGAA defines "local government" as:

> a city, county, parish, town, township, village, or any other general function governmental unit established by state law, or ... any other special function governmental unit established by state law in one or more states ...

15 U.S.C. § 34(1).

The special function governmental unit provision is "designed to protect those political subdivisions of the state, which though they don't have broad governmental powers, nonetheless serve a public function in the provision of a particular service." *Daniel*, 988 F. Supp. at 192 (*citing Capital Freight*, 704 F. Supp. at 1198). Congress intended the definitional section of 15 U.S.C. § 34(1)(b), regarding special function governmental units, to be inclusive, not exclusive. *See Capital Freight*, 704 F. Supp. at 1198.

WCHCC's enabling legislation is dispositive. In creating WCHCC as a public benefit corporation, the New York State Legislature noted that:

> ... The creation and operation of [WCHCC], as hereinafter provided, is in all respects for the benefit of the people of the State of New York and the County of Westchester, and is a state, county and public purpose; and that the exercise by such corporation of the functions, powers and duties as hereinafter provided constitutes the performance of an essential public and governmental function.

N.Y. Pub. Auth. § 3301(5).

Identical language in the enabling legislation of the New York City Health and Hospitals Corporation was sufficient for the District Court in *Daniel* to find that Lincoln Hospital was a special purpose governmental unit entitled to LGAA protection. There, the Court held:

> [Lincoln] does not have broad governmental powers typical of a municipality and therefore would not qualify as a general function governmental unit, however, the HHC has powers necessary to carry out and effectuate the special health care purposes and provisions of the New York City Health and Hospitals Corporation Act in providing for the efficient administration of Lincoln. ... *Further, the legislature has provided that the HHC's operation of Lincoln serves a 'state, city and public purpose,' and in exercising its powers, the HHC performs 'an essential public and governmental function.'*

*Daniel*, 988 F. Supp. at 193 (emphasis added). *See also Sweeney v. Athens Regional Med. Ctr.*, 705 F. Supp. 1556, 1561-1562 (M.D. Ga. 1989) (public hospital authority servicing the city of Athens, Georgia, was a local governmental within the meaning of the LGAA); *Doron*,

20

423 F. Supp.2d at 192 n.18 ("As a public benefit corporation of the state of New York, operating for the special purpose of maintaining a commuter transportation system within the geographic area of New York City, NYCTA is a 'special purpose governmental unit' and is therefore protected by the LGAA); *Patel v. Midland Memorial Hospital and Medical Center*, 298 F.3d 333 (5th Cir. 2002) (LGAA barred plaintiffs from recovering damages base on antitrust claims from hospital and physicians acting in their official capacity); *Sandcrest Outpatient Servs., Inc. v. Cumberland Cty. Hosp. Sys.*, 853 F.2d 1139, 1142 (4th Cir. 1988) (LGAA enacted to "broaden the scope of antitrust immunity applicable to local governments. This was in response to the filing of an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in the public interest").

Accordingly, all monetary claims arising out of the Sherman and Clayton Antitrust Acts must be dismissed against WCHCC and WMC.

## B.    The Individual Defendants And NYCG Are Also Immune From Antitrust Liability Under The LGAA

As under the State Action Doctrine, Drs. Lansman, Spielvogel, and NYCG are also immune from all monetary claims arising out of the antitrust laws under the LGAA. Courts interpreting the Act uniformly hold that LGAA immunity extends not only to the acts of local government, but also to any person engaged in official action directed by a government or official or employee thereof. *See Crosby v. Hosp. Auth. of Valdosta and Lowndes Cty.*, 93 F.3d 1515, 1535-1536 (11th Cir. 1996), *cert. denied*, 117 S.Ct. 1246 (1997); *see also Sandcrest Outpatient Servs. v. Cumberland Cty. Hosp Sys.*, 853 F.2d 1139 (4th Cir. 1988); *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 94 (2d Cir. 1986).

In this case, Drs. Lansman, Spielvogel, and NYCG, act in their official capacity – providing cardiothoracic services at the direction of WMC, WCHCC and pursuant to the

Hospital's bylaws. Therefore, because WCHCC operates as a local government, the individual Defendants and NYCG are immune form antitrust liability under the LGAA.

Moreover, similar to the Second Circuit's analysis of the State Action Doctrine in *Cine,* it would defeat the purpose of the LGAA if WMC and WCHCC were shielded from liability but the individual Defendants and NYCG – who are contractually obligated to perform their services -were nevertheless deemed liable to Plaintiffs for damages. Like the UDC and its subsidiary in *Cine,* "Because [WCHCC and WMC] had the authority" under WCHCC's enabling legislation to enter into contracts for the provision of medical care "in an anticompetitive manner", then, like the private defendants in *Cine* Dr. Lansman, Spielvogel and NYCG's participation under the same contract (the Professional Services Agreement) is also protected. *See Cine* 790, F.2d at 1049.

22

## POINT III

### PLAINTIFFS' CLAIMS ARE BARRED
### BECAUSE PLAINTIFFS LACK ANTITRUST STANDING

A series of Supreme Court decisions and their progeny provide the backdrop for determining whether a plaintiff has standing to bring a private antitrust lawsuit. In sum, a plaintiff needs to show (i) antitrust injury; and (ii) that the plaintiff is an efficient enforcer of the antitrust laws. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690 (1977); *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897 (1983); *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, abrogated on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281 (1984); *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 107 S.Ct. 484 (1986); *see also Daniel v. American Bd. Emergency Medicine*, 428 F.3d 408, 436-444; *Balaklaw v. Lovell*, 14 F.3d 793, 798 n.9 (2d Cir. 1993); *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1449 (1991).

Under the framework established by these courts, Plaintiffs cannot satisfy either prong of this two-part test.

### A.    Plaintiffs Have Not Suffered Antitrust Injury

It is well-settled that to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them injury. *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1993). Specifically:

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* (*citing Brunswick Corp. v. Pueblo Bowl-O-Mat., Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977). The purpose of this requirement is to underscore that "the antitrust laws were enacted for the protection of competition, not competitors." 14 F.3d at 797; *Daniel*, 428 F.3d at 438.

> The requirement has been held to be essential because it:
>
> > requires the private antitrust plaintiff to show his own injury coincides with the public detriment tending to result from the alleged violation increasing the likelihood that public and private enforcement of the antitrust laws will further the same goals of increased competition.

*Todorov*, 921 F.2d at 1450.

Courts have held, in this context, that where there is no change to the market, but instead "only a reshuffling of competitors" there is no antitrust injury. *See Balaklaw*, 14 F.3d at 799; *Konik v. Champlain Valley Physicians Med. Ctr.*, 733 F.2d 1007, 1015 (2d Cir. 1984); *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992); *Nilavar v. Mercy Health Sys.-Western Ohio*, 2007 WL 2264439 at *8 (6th Cir. 2007); *Korshin v. Benedictine Hosp.*, 34 F. Supp.3d 133, 139 (N.D.N.Y. 1999). Stated another way, the Second Circuit has thus held that "injuries resulting from competition alone are not sufficient to constitute antitrust injuries." *Balaklaw* at 797.

Even a cursory review of the facts of this case show that Plaintiffs are complaining about nothing more than a "reshuffling" of competitors that is legally insufficient to show antitrust injury. Although Plaintiffs' attempt to couch injury in terms of patient care to feign antitrust standing, it is obvious that they are concerned only with injuries to themselves as competitors, *i.e.,* the loss of their status as the *de facto* exclusive providers of cardiothoracic care at WMC.

First, up until the Professional Services Agreement commenced on December 29, 2004, Plaintiff CSG and the physicians affiliated with CSG, including Plaintiffs Drs. Fleisher and Lafaro, were the *de facto* sole providers of cardiothoracic surgical services at WMC -- a status

24

they held for nearly 30 years.  (See Rabinowitz Decl. Exhibits. 8 and 9 at ¶¶ 3-4 and, 6-7 respectively).

Second, CSG had very recently attempted to negotiate their own formal exclusive provider relationship with the Hospital.  See Rabinowitz Decl. at Exhibits 10 at ¶ 5).

Third, and fatal to their ability to establish antitrust injury, in the Sarabu Action, Plaintiffs claimed that their own *de facto* exclusive arrangement was beneficial to WMC and to cardiac patient care.

In that recent state court action, CSG sued Dr. Sarabu, a former CSG partner.  CSG alleged that Dr. Sarabu, *inter alia*, breached a non-compete clause contained in his partner employment contract with CSG.  That clause prohibited him, for a period of two-years after leaving CSG, from practicing cardiac surgery within the market area of WMC's heart surgery program. (*See* Fleisher Affidavit at ¶¶ 6, 9, Exhibit 8 to Rabinowitz Decl.).  In making their case to enforce the non-compete clause, Plaintiff Dr. Fleisher and his partner, CSG founder, George E. Reed, M.D., as well as CSG's attorney, submitted affidavits wherein they described CSG as the long-time *de facto* exclusive provider of cardiothoracic services at WMC, and touted the benefits of such an exclusive arrangement as beneficial to both the hospital and its patients.

Specifically, in his Affidavit sworn to on April 26, 2004, Dr. Fleisher confirmed that "CSG is the only practice whose members are permitted under the Federated Faculty Practice Plan and by laws to perform cardiac surgery at Westchester Medical Center."  (*See* Fleischer Affidavit at ¶ 4, Exhibit 8 to Rabinowitz Decl.)  Moreover, in support of CSG's lawsuit seeking to preclude Dr. Sarabu from competing with it at WMC, Dr. Fleisher attested that:

> a single full service cardiac care provider such as CSG provided the most benefit to the hospital in affording complete coverage of patient care, which results in a decreased length of stay and more efficient use of hospital resources.

25

*See id.* at ¶ 23.

Dr. George E. Reed, the founder of CSG, also attested that such an exclusive arrangement was beneficial in several respects:

> This model benefited the patients, the Hospital and CSG. It reduced the length of each patients' stay, and made maximum use of personnel and other hospital resources. It was not only the model that best served the patients' health needs but it also was the most economical model for the Hospital. It had the additional benefit of avoiding infighting between physicians jockeying to ensure, or alternatively to avoid, operating on particular patients (who were very high risk or uninsured).

*See* Reed Affidavit at ¶ 8, Exhibit 9 to the Rabinowitz Decl.

On this set of facts, the courts have been quick to dismiss the alleged antitrust claims. *Korshin* and *Balaklaw* are most instructive. In both instances, anesthesiologists who had previously provided services to hospitals on an exclusive basis to hospitals were barred from practicing because of subsequent exclusive arrangements with P.C.'s that they were unable to join. And in both instances, the Courts held that "the claimed injury came as a result of losing out in the competition for an exclusive anesthesiology contract ... and nothing more." *Balaklaw*, 14 F.3d at 798; *Korshin*, 34 F. Supp.2d at 139. Both courts felt that "from the consumers' point of view, nothing about the market changed ... it is clear that what occurred after the implementation of the exclusive contract ... was a reshuffling of competitors." *Balaklaw*, 14 F.3d at 798; *Korshin*, 34 F. Supp.2d at 139; *see also Coffee v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992).

In fact, case law is clear that physicians do not suffer antitrust injury when a hospital awards an exclusive contract to a competing group. *See, generally, Imaging Center of Western Maryland Health Systems, Inc.*, 2005 WL 3403627 (4th Cir 2005); *Balaklaw v Lovell. supra*, 14 F.3d 793, *Coffey v. Healthtrust, Inc., supra* 955 F.2d 1388; *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir. 1991); *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 708

26

(4th Cir. 1991) ("the fact that a hospital's decision caused a disappointed physician to practice elsewhere does not of itself constitute an antitrust injury"). This conclusion is in complete accord with the most fundamental tenant of antitrust law doctrine: that "it is perfectly permissible under the Sherman Act for one business entity to refuse to deal with another business entity." *See McMorris v. Williamsport* Hospital, 597 F. Supp. 899, 913 (M.D. Pa. 1984); *citing Cerunto, Inc. v. United Cabinet Corp.*, 595 F.2d, 164, 167 (3d Cir. 1979).

Moreover, unlike the plaintiffs in *Balaklaw, Korshin* and *Coffey*, who were barred from practicing at certain hospitals as a result of exclusive agreements, here, by express agreement, Drs. Fleisher and Lafaro have been "grandfathered" and have been permitted to retain and use their clinical privileges at WMC. Thus, nothing has changed from the patients' perspective and there is no restraint on competition as a result of the exclusive agreement.

Not surprisingly, the courts decline to find antitrust standing when a physician alleges antitrust violations while retaining privileges at a defendant hospital. In such an instance, the plaintiff is hard-pressed to argue that the defendant's conduct interferes with the complaining party's right to compete. *See, Salomon v. Our Lady of Victory Hospital*, 1999 WL 955513, October 5, 1999 (W.D.N.Y.); *Johnson v. University Health Services, Inc.*, 161 F. 3d 1334 (11th Cir. 1998).

In *Salomon*, plaintiff, a gastroenterologist, commenced an action under the antitrust laws against the hospital and other physicians alleging the defendants conspired to drive her from the relevant market by subjecting her to various quality assurance reviews and by steering referring practitioners toward competing physicians. Despite these allegations, the Court dismissed plaintiffs' antitrust allegations for failure to establish an antitrust injury, in part, because she maintained her privileges at the hospital:

> A plaintiff doctor may not survive a motion to dismiss by making sweeping assertions about the impact her exclusion from the marketplace will have on competition generally. ... **This is especially true, where, as here, the plaintiff has retained some**

> **semblance of her physician privileges at the hospital in question** ... Thus, even assuming the near total curtailment of physician referrals to [plaintiff] at [the hospital] from 1995 to 1998, the facts contained in the Amended Complaint support at very most a finding of injury to the plaintiff herself.  Accordingly, the antitrust claims ... will be dismissed.

See *id* at *3 (emphasis added) (internal citations omitted).

Similarly, in *Johnson,* the Eleventh Circuit affirmed dismissal a perinatologist's antitrust claims for lack of antitrust injury because her freedom to compete was not interfered with by the hospital or other physicians after defendants declined to subsidize the cost of plaintiff's private practice.  The Court focused on the fact that plaintiff maintained her privileges at the hospital and was not curtailed from practicing in the relevant market:

> "On the contrary, even after deciding to deny [plaintiff] her requested funding, [defendants] allowed [plaintiff] to retain her privileges at University Hospital, offered to help her to obtain a commercial loan and office space and encouraged her to stay in Augusta."

*Johnson,* 161 F.3d at 1338.

In this case, pursuant to the "grandfather clause" contained in the exclusive agreement, Plaintiffs enjoy the same clinical privileges as defendants and, in fact, continue to practice medicine at WMC.  (*See* Complaint at ¶ 32, Exhibit 1 to Rabinowitz Decl.).    Plainly, Defendants' conduct has not precluded Plaintiffs' ability to practice in the relevant market or to restrain competition.  As in *Salomon,* the Complaint fails to allege any injury to competition, only to Plaintiffs as competitors.

Moreover, the "grandfather clause," actually encourages competition for patients between CSG and NYCG at WMC. Plaintiffs allege that the Professional Services Agreement has an adverse effect on competition in cardiothoracic surgery because it "has eliminated the incentive for Lansman and Spielvogel to be price sensitive in their delivery of services" and that "on information and belief, neither defendant has been willing to be a provider under several major

28

824248v.7

healthcare insurance plans that might reimburse them for less than they choose to command." (*See* Complaint at ¶ 33, Exhibit 1 to Rabinowitz Decl.). It would appear obvious that since Plaintiffs are "grandfathered" and continue to practice at WMC, defendants' purported unwillingness to participate in certain insurance plans creates an opportunity for Plaintiffs to compete by joining such plans.

Thus, the exclusive agreement pits two cardiothoracic surgery groups in direct competition with each other, not only in the same market, but in the same hospital!

The disingenuous nature of Plaintiffs' antitrust claims is further revealed by their state law claim for tortious interference with contract. Through that claim, plaintiffs seek to enforce and perpetuate an exclusionary faculty practice bylaw so as to preclude defendants from practicing at WMC on the grounds that CSG is the only "approved provider of cardiothoracic service." Specifically, Plaintiffs allege that in early 2005, they "invited Lansman and Spielvogel to Join CSG: and that "CSG is the sole approved [Faculty Clinical Practice]" at WMC. *See* Complaint at ¶ 29, Exhibit 1 to Rabinowitz Decl.). Further, in a letter to Michael Israel, the President and CEO of WMC, dated March 22, 2007, Plaintiffs' counsel wrote:

> Since 1998, the surgeons of CSG have comprised the approved clinical facility practice group ("FCP") for cardio-thoracic surgery within the Federated Faculty Practice Plan (the "FFPP") of New York Medical College at WMC. *Any cardio-thoracic surgeon who wished to receive the prerequisites and privileges of 'a full time faculty appointment' or serve as Chief or Section or Director of Department at WMC was required to be in the FFPP and thus employed by CSG.*

*See id.*(emphasis added). A copy if this letter is annexed to the Rabinowitz Declaration as Exhibit 11.

Thus, Plaintiffs assert that they are the only cardiothoracic group permitted to practice at WMC – and somehow, that arrangement is not anticompetitive. Yet, when the Hospital chose to enter into an exclusive agreement with NYCG, suddenly, the antitrust claims arose. This Court

simply cannot find that Plaintiffs suffered an antitrust injury when they exalted the virtues of an exclusive arrangement in the Sarabu Action, recently attempted to negotiate their own exclusive provider agreement with WMC, and now seek to enforce bylaws to reinstate and preserve their *de facto* exclusive agreement.  As the Court of Appeals noted in *Daniel*: "[a] plaintiff who seeks to join the exclusive arrangement of which he complains while leaving the exclusivity requirement otherwise intact is simply not a victim of antitrust injury."  *See Daniel v. American Board of Emergency Medicine*, 428 F.3d at 441 (internal quotations omitted).

What is more, because Plaintiffs take an entirely inconsistent position in this case than in the Sarabu Action, Plaintiffs' antitrust claims should be dismissed under the doctrine of judicial estoppel.  Under the doctrine a party is estopped "from asserting a factual position in one legal proceeding that is contrary to a position that is successfully advanced in another proceeding." *See Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  Because Plaintiffs succeeded in restraining Dr. Sarabu from breaching his non-compete clause by submitting sworn statements attesting that their *de facto* exclusive arrangement with WMC was beneficial to patient care in a highly competitive market, Plaintiffs should be judicially estopped from taking the completely contrary position in this action *i.e.*, that the exclusive agreement between NYCG and WMC harms competition by "causing a demonstrable decline in the quality of patient care." (*See* Complaint at ¶ 56, Exhibit 1 to Rabinowitz Decl.)

**B.**     **Plaintiffs Are Not "Efficient Enforcers" Of The Antitrust Laws**

      **1.**     **Plaintiffs, Who Seek To Reinstate Their Own Exclusive Provider Status, Are The Poorest Possible Choice To Enforce Alleged Antitrust Claims**

The Supreme Court in *Associated General* and then again in *Cargill* held that an antitrust injury, while necessary to establish an antitrust claim, may not always be sufficient to confer standing "because a party may have suffered antitrust injury but may not be a proper plaintiff for other reasons."  *Cargill*, 479 U.S. 110 n.5, 107 S.Ct. at 489 n.5.  *See also Daniel v. American*

*Board of Emergency Medicine*, 428 F.3d 408, 443 (2d Cir. 2005) ("Even if we were to conclude that the Plaintiffs had adequately stated an antitrust injury, that would not necessarily establish their standing to sue in this case.").

As succinctly put by Chief Judge Tjoflat in *Todorov*, "[A]ntitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *See Todorov* at 1448. An integral component of that search is to determine whether the complaining party is an "efficient enforcer" of the antitrust laws, "which requires some analysis of the directness or remoteness of the plaintiff's injury." *See Todorov*, 921 F.2d 1438 at 1449. *See also Gentile v. Fifth Avenue Otolaryngology, Inc., et al.*, 2006 WL 2505915, August 28, 2006 (N.D. Ohio) ("To establish standing a plaintiff must present a proper claim for antitrust injury as well as demonstrate that plaintiff is the proper party to bring the antitrust suit.").

Here, for the same reasons that Plaintiffs fail to establish an antitrust injury, they are also not efficient enforcers of the antitrust laws. In fact, they are the worst possible choice to bring these claims. First, prior to the agreement between WMC and NYCG, Plaintiffs enjoyed their own *de facto* exclusive agreement at the hospital and resorted to litigation in the Sarabu Action to maintain that position. In so doing, Plaintiffs repeatedly stated that their *de facto* exclusive arrangement was beneficial to WMC and to patient care in the "highly competitive" cardiothoracic surgery market. (*See* Exhibits 8, 9, and 10 to the Rabinowitz Decl.).

Moreover, in the instant action, Plaintiffs seek to reinstate their *de* facto exclusive provider status at WMC through enforcement of faculty practice bylaws. Specifically, Plaintiffs claim that under the bylaws, they are the only authorized cardiothoracic group and therefore, seek to supplant NYCG. (*See* Complaint ¶ 20, Exhibit 1 to Rabinowitz Decl.). In fact, Plaintiffs allege that they invited Defendant Drs. Lansman and Spielvogel to join CSG – which would, of course, result in CSG continuing as the *de facto* exclusive provider. *See* Complaint at ¶ 29, Exhibit 1 to Rabinowitz Decl.). Plaintiffs' position, however, is in and of itself, anticompetitive.

31

Thus, it is beyond the bounds of sound reason to suggest that Plaintiffs are efficient enforcers of the antitrust laws.

Under factors considered by United States Supreme Court and several other courts, including the Second Circuit Court of Appeals, also establish that Plaintiffs are not "efficient enforcers." One such factor that is critical to the analysis is the existence of other parties that have been directly harmed by the alleged anticompetitive conduct and, therefore, would be more motivated and better suited to bring an antitrust action. *See Cargill Inc. v. Monfort of Colorado Inc.*, 479 U.S. 111 n.5. The courts also consider the speculative nature of alleged damages. In this case, Plaintiffs are unable to establish that they are efficient enforcers of the antitrust laws. Accordingly, Plaintiffs lack antitrust standing for this reason as well.

> ### 2.    There Are Other Parties That Would Be More Efficient Enforcers Than Plaintiffs

Assuming, *arguendo*, that Defendants' conduct was somehow anticompetitive, which it is not, Plaintiffs would not be the most direct or motivated parties to protect competition in the relevant market. In such a case, the Supreme Court instructs that antitrust standing will not be found:

> "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party, such as the [plaintiff], to perform the office of a private attorney general."

*See Associated General Contractors of California, Inc., supra* at 542. *See also Todorov, supra* at 1451.

In application to the medical profession, the courts routinely refuse to find that physicians possess antitrust standing when the alleged injury to competition is an effect on pricing or quality of medical procedures to the public. The courts hold, that in such cases, insurance providers and patients are far more efficient enforcers.

This factor was recently analyzed by the Second Circuit in *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005). In *Daniel*, emergency medicine physicians brought suit against the Board of Emergency Medicine, a medical specialty certification board, and hospitals alleging that defendants conspired to unreasonably restrict competition in the market for emergency medicine physicians. As part of their claim, plaintiffs alleged that consumers would be harmed by inflated prices for emergency medical services if defendants' conduct was allowed to proceed. The District Court dismissed the complaint.

The Court of Appeals affirmed the dismissal noting that because the plaintiffs (as do the Plaintiffs in this action), "sue for both monetary damages and injunctive relief one factor raises particular standing concerns, the presence of other efficient antitrust enforcers." In determining that plaintiffs were not efficient enforcers, the court astutely noted that "plaintiffs have no natural economic self-interest in reducing the cost of emergency medical care to consumers." The court further noted that both government and private insurance providers would be more efficient enforcers of concerns over the cost of medical care:

> While it is questionable whether plaintiffs' damages demanded and their particular prayer for injunctive relief would genuinely promote the public interest in antitrust enforcement, no such concern would arise if defendants' actions were challenged by another group of plaintiffs: the health care insurers, including employers and government agencies, who compensate hospitals for most emergency medical care.

*See id.* at 444.

Other courts have also paid special attention to the existence of more efficient enforcers of the antitrust laws in finding a lack of antitrust standing. For example, in *Robles v. Humana Hosp. Catersville*, 785 F. Supp. 989 (N.D. Ga. 1992), the plaintiff, an obstetrician, sued the defendants after plaintiffs' staff privileges were revoked. The plaintiff alleged that defendant hospital and other physicians conspired to eliminate individual obstetricians from the market in

33

an effort, in part, to control pricing. The *Robels* Court found that even if plaintiff's allegations were true:

> ... two or more easily imagined efficient enforcers in this case are obstetric patients and the government. Both have a stronger interest in ensuring that prices and services remain at competitive levels ... Dr. Robles has only made conclusory statements and unsupported allegations concerning what might happen in the future to obstetric prices and services if he is not allowed to compete in this particular geographic market. As in *Todorov*, however, '[i]f the [obstetricians] or [the hospital] are acting anti-competitively and are charging an inflated price, [or providing inferior services for the same prices now that Dr. Robles is gone], the patients, the insurers or the government, all of whom are interested in ensuring that consumers pay a competitive price may bring an action to enjoin such practices.

*See id.* at 999 (internal citations omitted). *See also Todorov, supra* at 1455.

Here, as in *Daniel*, *Robles* and *Todorov*, to the extent there exists any public interest in pursuing antitrust claims against WCHCC, such interest would be better served by actions commenced by other parties.

Moreover, the fact that the Professional Services Agreement commenced more than three years ago, and yet, upon information and belief, no third-party payers have challenged NYCG's agreement with WMC further detracts from Plaintiffs' antitrust standing. As stated by the Second Circuit in *Daniels:*

> private and government health care insurers that routinely reimburse hospitals for millions of dollars in emergency care provided to thousands of covered patients have a direct and undivided economic interest in obtaining lower costs, as well as the legal sophistication and resources necessary to pursue an antitrust challenge. The fact that none has done so to date does not support recognizing plaintiffs' standing.

*See id.* at 444.

In sum, Plaintiffs are hard-pressed to argue that they are appropriate enforcers of the antitrust laws given that they have twice championed their own exclusive provider status through

litigation, first against Dr. Sarabu and again in this suit. Accordingly, because there are more efficient enforcers of Plaintiffs' claims, this Court should find that Plaintiffs do not have standing to bring this action.

### 3.    The Alleged Antitrust Damages Are Speculative

Plaintiffs are also not efficient enforcers of the antitrust laws because the damages alleged are entirely speculative. Antitrust standing will not be found in the wake of speculative damage claims. *See Associated General Contractors of California, Inc., supra* at 542 (Supreme Court declining to find antitrust standing in part because of the speculative nature of the alleged damages); *see also Todorov v. DCH Healthcare Authority, supra* at 1451 ("Another factor the [courts consider is] that plaintiff's damage claims are highly speculative ... this, of course, weighs against affording a plaintiff antitrust standing.").

In this case, Plaintiffs allege in conclusory fashion only that the exclusive agreement had the effect of raising costs of medical care by eliminating Defendants' "incentive" to be "price sensitive in their delivery of services," by reducing the availability and supply of cardiothoracic surgeons, and by causing a decline in the quality of care. (See Complaint ¶¶ 33 and 56, Exhibit 1 to Rabinowitz Decl.). Nowhere does the Complaint allege, however, that prices have actually increased, or to what degree, or that patients have complained as to the quality of care at WMC, or that there has been a shortage of physicians on staff to handle cardio-related emergencies.

In addition, that the damages attributed to Plaintiffs are speculative, at best, is reinforced by Plaintiffs' allegation that "Insofar as the damages to Plaintiffs resulting from Defendants' unreasonable restraint on trade and commerce **are measurable**, they amount to in excess of $1,000,000 ..." (*see* Complaint ¶ 59, emphasis added, Exhibit 1 to Rabinowitz Decl.).

When considering the blatant contradictions in the Complaint (Plaintiffs alleging that Defendants engaged in anticompetitive behavior while Plaintiffs seek to enforce bylaws that will

lead to an anticompetitive result), and the fact that Plaintiffs took the polar opposite position as to the benefits of exclusive provider arrangements in the Sarabu action, coupled with the fact that Plaintiffs are "grandfathered" and continue to practice at WMC, it is clear that Plaintiffs are not the most efficient enforcers of the antitrust claims and fail to establish any antitrust injury.  In truth, Plaintiffs "have pleaded themselves out of court on the antitrust claim."  *See Daniel*, 428 F.3d. at 439.  Thus, this Court should dismiss Plaintiffs' action for lack of antitrust standing.

824248v.7

## POINT IV

### THIS COURT SHOULD NOT MAINTAIN JURISDICTION
### OVER PLAINTIFFS' STATE-LAW CLAIMS

Since it is clear that Plaintiffs' federal antitrust claims should not survive this motion, it is respectfully submitted that this Court should not retain supplemental jurisdiction over the remaining state-law claims. In fact, it is well established that when a case presents both state and federal pendent state claims, and the federal claims are dismissed, the state claims must be dismissed as well. *See Cine 42nd St. Theatre Corp. v. Nederlander Organization, Inc.*, 609 F. Supp. 113, 119 (S.D.N.Y. 1985) ("Simply put, once the federal claims are dismissed, the federal court has no subject matter jurisdiction over the pendent claims.")

37

824248v.7

## CONCLUSION

For all of the foregoing reasons, Defendants' motion should be granted in its entirety and Plaintiffs' antitrust claims dismissed, with prejudice.

Dated: Great Neck, New York
February 1, 2008

*Attorneys for Defendants New York Cardiothoracic*
*Group, PLLC, Steven L. Lansman, M.D.,*
*David Spielvogel, M.D., Westchester County*
*Health Care  Corporation and Westchester*
*Medical Center*

WESTCHESTER COUNTY HEALTH CARE CORP.
OFFICE OF LEGAL AFFAIRS

By: _____
         Jordy Rabinowitz (JR-6558)

Executive Offices – Taylor Care Center
Valhalla, New York 10595
(914) 493-2101

GARFUNKEL, WILD & TRAVIS, P.C.

By: _____
         Leonard M. Rosenberg (LR-6910)
         Justin M. Vogel (JV-5839)
111 Great Neck Road
Great Neck, New York  10021
(516) 393-2200