Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,      :      07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,      :

                      :
                Plaintiffs,      :

            -against-      :

NEW YORK CARDIOTHORACIC GROUP, PLLC,      :
STEVEN L. LANSMAN, M.D., DAVID      :
SPIELVOGEL, M.D., WESTCHESTER COUNTY      :
HEALTH CARE CORPORATION and      :
WESTCHESTER MEDICAL CENTER      :

                      :
                Defendants.      :

----------------------------------------------------------------X

## PLAINTIFFS' DECLARATIONS

March 4, 2008

LAFARO DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,     :    07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,       :

                     Plaintiffs,       :

              -against-       :

NEW YORK CARDIOTHORACIC GROUP, PLLC,    :
STEVEN L. LANSMAN, M.D., DAVID          :   **DECLARATION OF**
SPIELVOGEL, M.D., WESTCHESTER COUNTY    :   **ROCCO J. LAFARO, M.D.**
HEALTH CARE CORPORATION and            :
WESTCHESTER MEDICAL CENTER           :

                Defendants.     :

--------------------------------------------------------------X

ROCCO J. LAFARO, M.D., under penalty of perjury, declares as follows:

1.     I am one of the individual plaintiffs in this action, a director of plaintiff Cardiac Surgery Group P.C. ("CSG"), and a surgeon duly licensed to practice medicine in the State of New York. I am a Diplomate of the American Board of Thoracic Surgery, a Fellow of the American College of Surgeons, and Member of Alpha Omega Alpha (the Medical Honor Society). I am personally familiar with the matters set forth herein and make this declaration in opposition to defendants' motion for judgment on the pleadings.

2.     My colleague co-plaintiff Arlen Fleisher, M.D., and I are longtime cardiothoracic surgeons in the Section of Cardiothoracic Surgery at Westchester Medical Center ("WMC") and operate our practices through CSG. Within the parameters of that speciality, a number of different services are provided, including (a) emergency cardiothoracic surgery; (b) urgent cardiothoracic surgery; (c) emergency pulmonary and other non-cardiac thoracic surgery, (d) urgent

non-cardiac thoracic surgery, and (e) elective cardiac and non-cardiac thoracic surgery.

## A.    WMC as a Non-Exclusive Institution

3.    In all specialties other than four staff services (emergency medicine, radiology, pathology and anesthesiology), WMC is required by its Medical Staff Bylaws (Art. 4, §1(i)) to grant non-exclusive privileges to qualified practitioners in the region it serves. A copy of the relevant language from the Bylaws is annexed hereto as Exhibit A. The four staff services receive different treatment from other specialties staffed by independent attending physicians because those staff specialties provide support services - - i.e., such physicians do not have patients of their own but instead provide critical services to the patients admitted to the Hospital by other physicians. As a result, the four staff services need compensation guarantees and protections to assure their members livelihoods.

4.    In or about 1997, Westchester County Health Care Corporation ("WCHCC") was established to operate the health care services previously handled by the Westchester County Department of Hospitals. These responsibilities included operating WMC. WMC's policy of granting privileges to physicians on a broadly inclusive basis continued after WCHCC was established. At all times it remained clear that WCHCC was mandated to encourage a competitive medical environment as an express policy to improve the quality of patient care.

5.    The important role of competition in the functioning of WCHCC and WMC was emphasized during the period between 2001 and 2004, when both entities were investigated for questionable fiscal and management practices. A Report of Investigation by the New York State Comptroller in September 2005 cited a number of abuses by WCHCC management "to circumvent competitive bidding requirements," in violation of Section 103 of the General Municipal Law. A

- 2 -

copy of relevant excerpts from the Comptroller's Report is annexed hereto as Exhibit B. A copy of the Comptroller's public statement summarizing his findings (from which the quote above is derived) is annexed hereto as Exhibit C.

6.      WMC has an affiliation with New York Medical College (the "College"), which operates its principal teaching facility at the WMC complex in Valhalla, Westchester County. Many of the physicians who obtain privileges at WMC also become members of the College faculty. The College governs the functioning of the clinical faculty via an unincorporated Federated Faculty Practice Plan (the "FFPP").

7.      The FFPP Bylaws require that the "full-time" faculty must conduct their entire practice of medicine within a self-governing practice group which has been approved by the FFPP as a Faculty Clinical Practice ("FCP"). Beginning in the 1970s, CSG served as the FCP for cardiothoracic surgery at WMC. It was a nonexclusive and completely open organization governed on democratic principles as required by the FFPP Bylaws. Any cardiothoracic surgeon who qualified to practice at WMC and to serve as a faculty member at the College was welcomed into CSG, and it served as a useful basis for organizing access to operating rooms and patient coverage.

## B.      The Exclusivity Agreement at Issue

8.      As discussed in greater detail in the complaint, economic and management issues at WMC in the early 2000s led to turnover in the Hospital's cardiothoracic surgical staff, including the departure of WMC's heart transplant expert. In late 2004, WMC reached an agreement to bring in Dr. Steven Lansman, a surgeon with transplant experience who was terminating his relationship with Mount Sinai Medical Center in Manhattan. Fleisher and I actively assisted in the recruitment of Dr. Lansman in good faith to produce a cohesive, high-quality service at WMC.

- 3 -

9.    Dr. Lansman apparently set several conditions for affiliating with the Hospital – that he be accompanied by a colleague, David Spielvogel, M.D.; that he (Lansman) be named Chief of the Section of Cardiothoracic Surgery in WMC's Department of Surgery; and that his control of the Section include "exclusivity" in the specialty of cardiothoracic surgery at WMC. The details of these conditions were not disclosed to the surgical community at WMC when Lansman first affiliated with the Hospital.

10.    The last of these conditions is expressly set forth in the Professional Services Agreement between Dr. Lansman's company New York Cardiothoracic Group, PLLC ("NYCG") and WMC, dated December 29, 2004, sections 1.1 and 1.2. Not until we attempted to expand our practice by hiring a new physician's assistant in 2007 did we learn about the exclusivity condition. A copy of the actual exclusionary agreement itself was not provided to us until we demanded it in connection with this action. Defendants have annexed it as Exhibit 5 to the Rabinowitz declaration.

11.    Apparently recognizing the rights of the CSG member surgeons who were already affiliated with the Hospital, WMC included in the Professional Services Agreement with Dr. Lansman a "Grandfathered Physicians" exception to his company's exclusivity. Dr. Fleisher and I were specifically listed in the Agreement as "Grandfathered," along with two other former members of CSG (Drs. Sarabu and Zias) and a surgeon who was never affiliated with CSG. Any attempt to remove us would have run afoul of the Bylaws of the Hospital and related governing documents that bar involuntary termination of attending physicians except on specified grounds.

12.    When Drs. Lansman and Spielvogel became affiliated with WMC, Dr. Fleisher and I invited them to join the CSG, the recognized FCP for all faculty members of the College. They declined our invitation and instead set up their own company, NYCG. That company

- 4 -

was not set up on democratic principles, as required by the Bylaws of the FFPP; it is completely controlled by defendant Lansman, and accordingly has never been recognized by the FFPP.

13.    Drs. Lansman and Spielvogel violated WMC's Medical Staff Bylaws and the Rules and Regulations of the Medical Staff when they failed to meet the requirement to practice as members of an FFPP approved FCP. Such a requirement was important in the training of future medical professionals. For example, the day-to-day clinical training of medical students must be co-ordinated with the work of the Hospital, and such co-ordination is assured if the full-time faculty practice through a single recognized FCP.

14.    The provision of the Bylaws requiring membership in a single FCP in each practice area exists solely for College faculty members. Qualified physicians who do not serve on the faculty are welcome to obtain privileges at WMC on an independent basis, without joining an FCP. The Section of Cardiothoracic Surgery has had several such independent surgeons during the past decade, including most recently Dr. Suvro S. Sett and Dr. John E. Andersen and Drs. Lansman and Spielvogel themselves have never been members of a recognized FCP, which is completely permissible for obtaining WMC privileges (but not for College faculty members).

## C.    Defendants' Use of Exclusivity to Cut Back Competition

15.    Ever since he arrived at WMC, Dr. Lansman has resisted the idea that there should be any physicians in the Section of Cardiothoracic Surgery who are not within his complete control. He has thus used the exclusivity feature of the Professional Services Agreement wherever he could to undermine our ability to compete with him, with adverse implications for patient care. Such tactics have included co-opting thoracic anesthesiologists and other specialized staff at times that should have been shared with us; refusing to allow flexibility in OR allocation to meet urgent

- 5 -

patient needs; and monopolizing of ORs by stockpiling anesthetized patients in one room while surgery was being performed on other patients in other rooms. Such conduct is a major element of the present lawsuit.

16.    Historically, OR slots were not allocated to particular surgeons; they were available on an as-needed basis. A surgeon could reserve a slot for an elective surgery, but if an emergency case came in, the elective slot would be turned over to the patient with the greater need.

17.    This changed in 2005 when Dr. Lansman joined WMC with his colleague, Dr. Spielvogel. Upon his appointment as head of the Section, Dr. Lansman at first divided access to the ORs on a basis only slightly more favorable to him and Dr. Spievogel – 11 slots for them, 10 for Dr. Fleisher and me.

18.    In 2006, Dr. Lansman took another slot from us and arrogated it to his company, changing the allocation to 12 to 9 in NYCG's favor.

19.    The latest and most damaging tactic was Dr. Lansman's threatened cutback of our access to the ORs, which posed imminent harm to both patient care and the ability of Dr. Fleisher and me to earn our livelihoods. Dr. Lansman proposed the seizure of two of our five morning slots in operating room number 4, leaving us with two days during the week when we do not have morning access to the ORs. Perhaps not coincidentally, the seizure was made official on the same day that defendants filed their motion to dismiss this case.

20.    By letter to the Chairman of WMC's Department of Surgery, Dr. John A. Savino, dated January 9, 2008 (Ex. D hereto), Dr. Lansman asserted that the staff controlled by his company, defendant NYCG, was supposedly "doing 2/3 of all cardiothoracic volume and is approaching doing 3/4 of adult cardiac cases." Dr. Lansman proposed "to use the data for all

- 6 -

cardiothoracic cases, which would give CSG [plaintiffs' entity] 7 slots per week" a cutback of 2, but both during critical morning hours.

21.    Dr. Lansman's letter proposed reserving the cardiac ORs for adult cardiac cases. This meant that "General Thoracic cases," including pulmonary cases, should be directed to the "General OR, if the room and staff are available, and if a cardiac surgical case is waiting." This was another disturbing point. Dr. Fleisher and I handle more non-cardiac thoracic cases than Dr. Lansman and his colleagues. Now he was threatening to bar us from performing such surgeries in the cardiothoracic ORs because of the special staff used in the latter. But *all* thoracic surgery patients benefit from the use of medical personnel properly trained and experienced in cardiothoracic skills, from anesthesiologists to OR nurses and physicians' assistants. Dr. Lansman's letter ignored the overwhelming desirability, from a patient safety and quality of care standpoint, for use of such specialized staff (and particularly the thoracic anesthesiologists) for *all* thoracic surgery, rather than the general OR staff who lack the necessary thoracic skills and cannot in all cases deliver the requisite standard of care as well as the rooms themselves requiring specialized equipment.

22.    Dr. Lansman's January 9, 2008 letter was copied to me as well as to Elisha Briggs, R.N., the head nurse for all operating rooms, and Dr. James LaRosa, WMC's vice president for all OR administration. Despite the date on the letter, I did not receive my copy until approximately a week later.

23.    Upon receipt of the letter, I raised immediate objections with Dr. Savino and others in WMC's administration. I questioned Dr. Lansman's statistics, emphasized the quality of care problems, and noted the connection between the cutback and the competition issues highlighted in the present lawsuit. Shortly thereafter, Dr. Savino advised me that the Lansman proposal was

- 7 -

being tabled while an audit was undertaken to confirm the number of cases in relevant categories and assure that relevant facts were not overlooked. We understood from this news that Dr. Fleisher and I would be interviewed by a neutral auditor and that patient care issues would be carefully explored.

24.    My understanding was not borne out. I never heard a word from an auditor and was not interviewed. Instead, on or about January 29, 2008, Dr. Lansman notified me that the cutback of 2 morning slots was going to proceed. On February 1, 2008, Dr. Savino gave me official notice that WMC was authorizing the cutback and that it would take effect on February 11, 2008. When I met with Dr. Savino and requested an explanation, he replied that Dr. Lansman was Chief of the Section and, because he had "exclusivity" in his agreement with the Hospital, he could do as he liked. Dr. Savino added incidentally that Dr. Fleisher and I should not expect any reserved slots in the General ORs for our non-cardiac thoracic cases. There was simply no space to spare in those rooms.

25.    It is astonishing and dismaying to me, after more than 20 years of service at WMC, that the Hospital administration would have so little regard for patient safety or my career that it would allow the threatened cutback to occur. We have done everything we can to try to persuade Dr. Lansman, Dr. Savino and senior administrative officials at WMC to find another way to deal with Dr. Lansman's professed problem.

26.    Only when my attorney advised defendants that he would make a motion for a preliminary injunction did the defendants agree to "delay implementation of the new block time assignments for 30-60 days" (Ex. E hereto).

27.    The exclusivity requirement in defendants' Agreement harms competition and the quality of patient care in other significant ways. Most importantly, it prevents Dr. Fleisher and

- 8 -

me from expanding our staff. For example, in August 2006, we extended a proposed invitation to a highly qualified physician's assistant, Michael Evans, practicing at Saint Joseph's Hospital in Patterson, New Jersey, to join CSG and provide OR support. The credentialing committees at WMC approved Evans' application to permit employment.

28.     Despite the committee approvals, WMC's management refused to allow Evans to work with us because of the exclusivity provision in defendants' Agreement. By letter dated February 16, 2007, Linda Glickman, WMC's Vice President for Clinical and Academic Affairs, advised Evans and us that his "application cannot be processed because there is an existing exclusive agreement" with Lansman's company NYCG. A copy of the letter is annexed hereto as Exhibit F.

29.     Defendants' campaign to curtail our ability to compete has had an actual adverse effect on the number of patients we have been able to serve. Even before Dr. Lansman's latest effort to cut back our OR slots, he had increased NYCG's slots at our expense. As a result, we have lost a substantial number of cases from what we would have handled had the conduct at issue not occurred. Defendants' in-house counsel attempts to deny this (Rabinowitz Decl. ¶ 12). That denial, however, is flatly contradicted in Dr. Lansman's January 9, 2008 letter (Ex. D hereto), where he declares that his group is now "approaching doing 3/4 of all adult cardiac cases." We do not know the exact statistics and wish to see them. But even without verified statistics, it is indisputable that we are being squeezed back.

30.    Based on the foregoing, I respectfully request that defendants' motion for

judgment on the pleadings be denied.

Dated: Valhalla, New York
    February 26, 2008

Rocco J. Lafaro, M.D.

EXHIBIT A

# WESTCHESTER MEDICAL CENTER

## BYLAWS
## OF THE MEDICAL STAFF

| Revision: | November 2003 |
| --- | --- |
| Approved: | April 2004 |
| Approved: | November 2004 |
| Printed: | January 2005 |
| Revision: | September 2005 |
| Approved: | November 2005 |
| Printed: | January 2006 |
| | |
| Revision: | November 2006 |
| Approved: | March 2007 |
| Printed: | April 2007 |

## ARTICLE IV

### Membership

**Section 1.  Qualifications**

Membership on the Medical Staff shall require:

    (a)    graduation from an approved medical school or registered dental school, or school of osteopathy;

    (b)    a current license and registration to practice in the State of New York;

    (c)    good and ethical character and appropriate professional behavior;

    (d)    physical and mental ability to carry out the essential functions of their position;

    (e)    current competence as evidenced by training and/or clinical experience and performance;

    (f)    current evidence of continuing medical education; and

    (g)    current evidence of adequate professional liability insurance, in accordance with limits established by the Medical Center;

    (h)    members of the Active Staff to reside within established geographical limits, if any, in order to provide continuous and timely care of their patients as required by departmental policy;

    (i)    membership on the Medical Staff is open to all qualified candidates regardless of sex, race, creed, and/or national origin;

**Section 2.    Nature of Medical Staff Membership for Appointment and Reappointment**

All applicants and medical staff members have the responsibility to demonstrate:

    (a)    their educational background, training and experience;

    (b)    their continuing competence in accordance with their privileges;

    (c)    their adherence to the ethics of the profession;

    (d)    their good reputation;

    (e)    their ability to work well with others without being disruptive to the orderly and efficient operation of the Medical Center;

    (f)    their physical and mental health status;

    (g)    their willingness and ability to perform teaching, research, and clinical activity;

    (h)    submission to annual health status examinations and providing notification of any health or other impairment that might interfere with the performance of duties or pose a potential risk to personnel or patients;

    (i)    full cooperation with the overall functions and activities of the Medical Center;

    (j)    participation in continuing medical education as required;

    (k)    respect for patients' rights;

4

EXHIBIT B



# OFFICE OF THE NEW YORK STATE COMPTROLLER

## DIVISION OF LOCAL GOVERNMENT SERVICES & ECONOMIC DEVELOPMENT

# Westchester County Health Care Corporation

## Fiscal Management

### Report of Examination

**Period Covered:**

**January 1, 2002 — December 31, 2004**

**2005M-53**



## ALAN G. HEVESI

# TABLE OF CONTENTS

Page

**AUTHORITY LETTER** 3

**EXECUTIVE SUMMARY** 5

**INTRODUCTION** 9
Background 9
Objectives 9
Scope and Methodology 10
Comments of Local Officials and Corrective Action 10

**FISCAL MANAGEMENT** 11
Inaccurate Financial Projections 12
Preliminary Results of Operations for 2004 14
Medical Center Rescue Plan 15
Business Ventures 17
Significant Ongoing Liability and Risk With Insurance Account 17
Recommendations 19

**PAYMENTS TO CONSULTANTS** 20
Recommendations 23

**INTERNAL CONTROL DEFICIENCIES** 24
Credit Care Use and Management 24
Accounting and Management Reporting Systems and Controls 26
Recommendations 27

**APPENDIX A** Responses From Local Officials 28
**APPENDIX B** Audit Methodology and Standards 38
**APPENDIX C** Financial Ratios - Mandated by the Transition Agreement
With Westchester County 39
**APPENDIX D** How to Obtain Additional Copies of the Report 40
**APPENDIX E** Local Regional Office Listing 41

# State of New York
# Office of the State Comptroller

**Division of Local Government Services
and Economic Development**

September 2005

Dear Westchester County Health Care Corporation Officials:

One of the Office of the State Comptroller's top priorities is to identify areas where local governments can improve their operations and provide guidance and services that will assist local officials in making those improvements. Further objectives are to develop and promote short-term and long-term strategies to enable and encourage local government officials to reduce costs, improve service delivery and to account for and protect their governments' assets.

The reports issued by this Office are an important component in accomplishing these objectives. These reports are expected to be a resource and are designed to identify current and emerging fiscally related problems and provide recommendations for improvement. The following is our report on the Westchester County Health Care Corporation — Fiscal Management.

This audit was conducted pursuant to the State Comptroller's authority as set forth in Article V, §1 of the State Constitution and Article 10-C of the Public Authorities Law. The report contains opportunities for improvement for consideration by the Board of Directors.

If we can be of assistance to you, or if you have any questions concerning this report, please feel free to contact the local regional office for your county listed at the back of this report.

Respectfully submitted,

*Office of the State Comptroller
Division of Local Government Services
and Economic Development*



# State of New York
## Office of the State Comptroller

# EXECUTIVE SUMMARY

The Westchester County Health Care Corporation (WCHCC) is a public benefit corporation established by New York State in 1997 to assume the function of Westchester County's Department of Hospitals. It began operations in January 1998 to manage the Westchester Medical Center (WMC) and related facilities. Governed by a 15-member Board of Directors (Board), it is charged with providing health care services and operating health care facilities for seven counties in the lower Hudson Valley.

WCHCC financed itself by issuing serial bonds backed by Westchester County (County). Pursuant to a transition agreement with WCHCC, the County promised to guarantee debt to finance WCHCC's working capital with the stipulation that WCHCC meet certain performance measures – specifically that WCHCC meet 10 liquidity ratios every year (see Appendix C). Under this agreement, if WCHCC does not fulfill its contractual obligations, the County is able to compel WCHCC to hire consultants to evaluate WCHCC's fiscal affairs and report to the County.

WCHCC experienced operating deficits from 2001 to 2004, which contributed to a steady decline in corporate assets, and an inability to meet its County obligations. WCHCC achieved only 40 and 50 percent of its liquidity ratios in 2001 and 2002 respectively, triggering the consultant clause in the transition agreement. WCHCC paid five consultants $15 million from November 2002 through September 2004 to help diagnose its financial and operational deficiencies, and report to the County.

## Scope and Objectives

Our audit included a review of the factors which caused the operational deficits, payments to consultants and other vendors, and expense payments to corporate officials. This audit addressed the following related questions during the period January 1, 2002 through December 31, 2004:

- What was WCHCC's financial condition for the audit period?

- Were Board members and County officials adequately informed of WCHCC's financial condition?

- Did the Board implement suitable controls to ensure that payments for administrative expenses on behalf of corporate officers and consultants were properly authorized and approved?

## Audit Results

WCHCC management's failure to make sound investment decisions, adopt structurally balanced budgets, contain expenditures, and identify new revenue sources led to operational deficits from 2001 through 2004. By December 31, 2004, WCHCC reported a fund deficit of $171.4 million, representing a drop of $206 million from 2001. Its faltering financial position caused WCHCC to fall short of financial performance requirements contained in its transition agreement with the County. WCHCC's financial condition became so unsound that officials began to question whether the corporation could remain solvent.

Management adopted annual budgets in 2003, 2004, and 2005 that projected operating deficits of $14 million, $47 million, and $60 million, respectively. Both revenue insufficiency and the failure among corporate officials to curb expenses drove this operating imbalance. Although WCHCC officials adopted a number of approaches to reduce costs and increase revenues, they did not develop a plan to structurally balance annual budgets. Operational budget deficits continued, unabated.

Under the transition agreement, WCHCC was required to submit monthly financial reports to the County. But in 2003, WCHCC submitted reports that were so inaccurate they required extensive year-end adjustments and reclassifications, rendering them essentially useless as a monthly tracking tool. As a result, County officials did not have a clear picture of WCHCC's true financial condition until after the year was complete and the audited financial statement released.

WCHCC operated an offshore captive insurance company on the island of Bermuda, named WCHCC Bermuda Limited (WCHCC-BL).[1] The company did not comply with the terms of its license due to its failure to maintain a statutorily-required minimum capital and surplus, caused in large part by its failure to realize annual operating surpluses. This could lead to the collapse of WCHCC-BL, forcing WCHCC to find professional liability coverage elsewhere, most likely at a higher cost.

Between November 2002 and September 2004, WCHCC paid five consulting firms $15 million to diagnose WCHCC's financial and operational problems, and develop solutions. Supporting documentation for these services was often not itemized or documented to permit a proper audit of the charges. About $945,000 in reimbursed expenses were not properly itemized, documented and supported by paid bills or invoices that would have permitted a proper audit of the charges. Officials at WCHCC did not determine whether they received all of the services they paid for or whether the consultants' expenses were WCHCC-related.

There were several operational deficiencies regarding the payment, recording and reporting of accounts payable transactions. Additionally, WCHCC's internal controls system did not ensure that management had access to accurate information, and vouchers often lacked the proper documentation crucial for a proper audit.

Internal controls over credit card use as well as the audit and payment of credit card bills were almost non-existent resulting in the payment of $111,975 in charges over a two-year period that were not itemized or documented. This was due in part to an absence of a credit card use policy.

---

[1] Reacting to difficult property and casualty insurance markets, unavailable reinsurance, and underwriting restrictions imposed by domestic regulations, U.S. companies often create off-shore captive management companies. This option is particularly attractive to health care institutions seeking medical malpractice insurance, hospital professional liability, comprehensive general liability insurance, and workers' compensation. Bermuda and the Cayman Islands are popular locations.

The condition of WCHCC's accounting and management reporting systems were poor. They could not generate suitable reports for management to monitor payment histories, and provide a straightforward audit trail of all transactions that flowed through the system. Additionally, internal controls over payment to vendors were extremely lax, contributing to other deficiencies.

## Comments of Local Officials

The results of our audit and recommendations have been discussed with WCHCC officials and their comments, which appear in Appendix A, have been considered in preparing this report. WCHCC officials generally agreed with our recommendations and indicated that they had taken or planned to take corrective action.

# Introduction

**Background**

The Westchester County Health Care Corporation (WCHCC) is a public benefit corporation created in 1997 pursuant to Article 10-C, Title 1 of the New York State Public Authorities Law to operate the Westchester Medical Center (WMC), a regional care facility for Westchester and six other counties in the lower Hudson Valley. WCHCC was created "to provide health care services and health facilities for the benefit of the residents of the state of New York and the county of Westchester, including persons in need of health care services without the ability to pay." New York State established WCHCC in 1997 to assume the operation of Westchester County's Department of Hospitals. WCHCC began its operations as a public benefit corporation in January 1998. Prior to that time, the WMC was a public hospital owned by Westchester County (County) and operated by the County's Department of Hospitals. The WMC also operates several health care subsidiaries.

A 15-member Board of Directors (Board) governs WCHCC. Eight members are gubernatorial appointees, and seven are appointed by the County Legislature, with the County Executive's approval. The Board adopted WCHCC's by-laws in 1997 and financed WCHCC by issuing $255.1 million in serial bonds in 2000. The County guaranteed $257 million of WCHCC's $370 million outstanding debt. By December 31, 2004, County taxpayers were liable for the debt if WCHCC defaulted. According to the transition agreement between WCHCC and the County, WCHCC must achieve six of 10 financial goals, or the County is required to form a committee to select consultants to review WCHCC's operations and recommend corrective actions.

**Objectives**

This audit addressed the following related questions during the period of January 1, 2002 through December 31, 2004:

- What was WCHCC's financial condition for the audit period?

- Were Board members and County officials adequately informed of WCHCC's financial condition?

- Did the Board implement suitable controls to ensure that payments for administrative expenses on behalf of corporate officers and consultants were properly authorized and approved?

**Scope and
Methodology**

We examined WCHCC's financial activities from January 1, 2002 to December 31, 2004. Our audit included a review of financial trends and significant factors contributing to operational deficits, a review of payments to consultants and other selected vendors, an overview of the budgeting process, and a review of funds that were restricted for the purpose of financing insurance liabilities.

We conducted our audit in accordance with Generally Accepted Government Auditing Standards. More information on such standards and the methodology used in performing this audit are included in Appendix B of this report.

**Comments of
Local Officials and
Corrective Action**

The results of our audit and recommendations have been discussed with WCHCC officials and their comments, which appear in Appendix A, have been considered in preparing this report. WCHCC officials generally agreed with our recommendations and indicated that they had taken or planned to take corrective action.

Good management practices dictate that the Board has the responsibility to initiate corrective action. As such, the Board should prepare a plan of action that addresses the recommendations in this report and forward the plan to our office.

# Fiscal Management

The County has a vested interest in maintaining WCHCC's long-term viability as a tertiary-care[2] center and provider of specialty health services to residents, including indigent and uninsured patients, of the Hudson Valley region. WCHCC also offers specialized health services as an alternative to similar facilities in New York City and other parts of the State.

Since 2000, WCHCC has incurred operating losses of $207 million. These losses, which were due in part to management's failure to make sound investments, adopt structurally balanced annual budgets, contain expenditures, and identify new revenues, have threatened WCHCC's survival as a corporation.

| Consolidated - WCHCC Gains/Losses from Operations and Net Assets/Deficits at End of Year (In Millions) | |
| --- | --- |
| 2000 | $2.6 |
| 2001 | ($10.8) |
| 2002 | ($59.9) |
| 2003 | ($83.0) |
| Un-Audited 2004 (a) | ($55.9) |
| Total | ($207.0) |

(a) – includes WMC and Taylor Care Center

Accumulated net assets also decreased from a surplus of $34.8 million in 2001 to a projected net deficit of $171.4 million by the end of 2004. This triggered the consultant clause in WCHCC's transition agreement with the County. Five consulting firms were hired over several years to examine WCHCC's operations, and they blamed WCHCC's poor financial health on bad investments, operational inefficiencies, and weak expenditure controls. Investments included the acquisition of a hospital in Ellenville, N.Y. and the operation of the St Agnes Hospital in White Plains, N.Y., which it renamed Westchester Medical Center - White Plains Pavilion. The consultants recommended that WCHCC divest itself of the Ellenville and White Plains facilities, conduct a major restructuring of the accounts receivable and billing process, renegotiate vendor contracts, and significantly reduce staffing levels.

---

[2] Tertiary care services are provided by specialized hospitals or departments that are often linked to medical schools or teaching hospitals. They treat patients with complex conditions who have usually been referred by other hospitals or specialist doctors.

**Inaccurate Financial
Projections**

WCHCC's financial condition has deteriorated rapidly, faster than WCHCC officials projected. WCHCC budget projections have been inaccurate every year since 2000 as officials have been unable to accurately predict the extent of the corporation's collapsing situation. Early indications of budget difficulties occurred in 2000 when results of operations were worse than expected. This was followed by large deficits, which persisted throughout our audit period, progressively eroding WCHCC's fiscal soundness to the point where its survival was in doubt.

| Year | Operating Surplus (Deficit) | | Results of Operations-Better (Worse) Than Planned |
| --- | --- | --- | --- |
| | Planned | Actual | |
| 2000 | $7.75 | $0.07 | ($7.67) |
| 2001 | $6.14 | ($9.67) | ($15.81) |
| 2002 | $2.87 | ($60.84) | ($63.72) |
| 2003 | ($14.48) | ($80.95) | ($66.47) |
| 2004-Unaudited | ($46.64) | ($55.89) | ($9.25) |
| 2005 | ($60.35) | — | — |

WCHCC officials consistently presented overly optimistic projections despite the growing evidence of their operational problems.[3] For example, as the above chart shows, despite an operating deficit of $61 million for 2002, WCHCC projected a 2003 deficit of only $14 million. The actual result was a nearly $81 million deficit in 2003.

One reason for these widely inaccurate projections may be that the WCHCC's financial records did not provide accurate information. For example, monthly financial reports submitted to the County were not accurate, rendering them useless to County officials charged with overseeing WCHCC's financial condition.

The transition agreement required WCHCC to submit monthly un-audited financial reports to the County. For the 2003 fiscal year, we confirmed with County officials that these reports were submitted up to and including November 2003, and that the 2003 audited financial statement report was submitted in 2004. However, the 2003 monthly financial reports were inaccurate or did not comply with Generally Accepted Accounting Principles (GAAP), forcing independent auditors to make extensive adjusting and reclassification entries by year's end. The reports were useless to the County until after the independent auditors' annual work was done.

---

[3] The annual operating budget represents an orderly financial plan in which estimated revenues depict the resources expected to finance operations and planned expenses. It organizes the Board's choices to allocate those resources to specific activities. A budget is structurally balanced when recurring revenues can sufficiently finance recurring expenses. Conversely, a budget is structurally imbalanced when resources cannot fully finance planned expenses.

The following table illustrates the disparity between the monthly year-to-date results as reported to the County and the results in the audited financial statements by December 31, 2003. From January through October the average reported monthly operating deficit was $3.4 million, or an aggregate of $34.5 million as of October 31. However, the audited consolidated operating deficit as of December 31, 2003 was $83 million which would be an average of about $7 million a month, more than double what WCHCC reported to the County through October. WCHCC then reported more significant monthly deficits in an attempt to correct for the previous underreporting, but these reports were still nearly $12 million less than the actual deficit.



**Westchester County Health Care Corporation**
Cumulative Monthly Operating Deficit - 2003

Monthly Reports

Operating Deficit - In Millions

Our review identified a variety of factors contributing to the inaccurate monthly financial reports:

- Officials underestimated professional liability insurance expenses by $14 million, or more than $1 million a month.

- While allowance to cover bad debt was reported at an average of $1 million per month, the actual cost to WCHCC was $23 million in 2003, or nearly $2 million a month.

- Officials underestimated workers' compensation costs by about $7 million. While the average monthly allocation was $261,000, it should have been approximately $850,000.

- Medical and laboratory supplies expenses were understated by about $580,000 a month.

- Salaries and fringe benefits were also understated by about $580,000 a month.

Although it is generally expected that an independent public accountant will recommend some year-end adjustments to bring financial statements into compliance with Generally Accepted Accounting Principles, adjustments can be kept to a minimum if there are reliable reporting systems that allow officials to gather and report accurate financial data on a timely basis. In the case of WCHCC, accounting and reporting systems were limited and unreliable, creating the need for huge year-end accounting adjustments.

**Preliminary Results of Operations for 2004**

Expenditures in 2004 for WMC and the subsidiary Taylor Care Center (TCC) went over budget and revenues fell short. TCC's revenue shortfall reached $1.57 million, and its expenditures surpassed budget expectations by $600,000. TCC ended 2004 with a preliminary operating loss of $3.9 million.

Although financial statements indicated that WMC exceeded its revenue estimates for the 2004 fiscal year by $20 million, there was an approximate deficit of $52 million. Actual expenses exceeded the budget by $29 million. Given that the original budget included a planned deficit of $44.97 million and actual results of operations are worse than planned, WMC incurred a $52 million deficit.

One significant variance in the preliminary financial statements was the dramatic $25.9 million increase in accounts payable and $12.2 million drop in accounts receivable over the 2003 year-end balance. The number of days that moneys were in accounts receivable had declined from 66 to 52.4. This is an indication that WCHCC was able to improve its collection process, although there were fewer assets available to be collected. Furthermore, the days in accounts payable showed an increase from 112.4 to 141.9, which is an indication that WCHCC was unable to satisfy its debts in a timely manner. The current ratio dropped from 0.58 to 0.43 which is an indication that WCHCC's current assets declined in relation to current liabilities.

Personal Services - In 2003, personal service costs increased primarily due to an $11 million expenditure for staffing the White Plains Pavilion, $10 million in consultancy fees, and collective bargaining increases. Although WCHCC laid off 200 employees, personal service costs increased by $18.4 million. Preliminary 2004 results show that personal services costs for WMC and TCC decreased by $12 million from 2003.

Fringe Benefits - Although the 2004 budget contained a 190-position reduction and an approximate $10 million decrease in personal service costs, WCHCC reported increases in fringe benefits of approximately $15.37 million in 2004, up from $55.27 million in 2003. Management attributed this spike to an increase in pension costs of approximately $11 million, higher medical claims of approximately $3.3 million, and a $1 million payment in unemployment benefits for layoffs in 2003 and 2004.

Medical and Laboratory Supplies - Officials at WCHCC said they renegotiated contracts with their suppliers with an eye toward saving money. However, in 2004 medical and laboratory supplies cost $91.98 million, marking an increase of $6 million from the previous year. WCHCC officials attributed this hike to an increase in service volume and inflation. They said that had they not implemented these measures, costs would have been even higher.

**Medical Center Rescue Plan**

A major cause of WCHCC's financial difficulties has been an inability on the part of corporate officials to increase or maintain revenues at levels that match or exceed the growth in expenses. From 2000 through 2002 revenues essentially stayed flat and then grew in 2003, while costs continued to increase for the entire period from 2000 through 2003. While revenues increased at an average rate of three percent, operational expenses increased at an average rate of 8.3 percent.

|          | 2000    | 2001    | 2002    | 2003    |
|----------|---------|---------|---------|---------|
| Revenues | $477.5  | $487.6  | $479.5  | $519.2  |
| Expenses | $474.9  | $498.4  | $539.4  | $602.2  |

WCHCC's agreement with the County requires WCHCC to meet financial ratios, as described in Appendix C. WCHCC had to achieve financial results for at least six of the 10 financial measures that were:

- At least as favorable as results achieved by the former County Department of Hospitals for fiscal year 1997; and

- At least 75 percent as favorable as the previous year's results.

If WCHCC officials fail to meet these requirements, they are mandated to hire outside consultants to analyze WCHCC's management practices and the viability of its subsidiary businesses. WCHCC is required to follow the consultant recommendations as long as they are consistent with all applicable laws and WCHCC's mission statement and bylaws.

Starting in 2001 WCHCC failed to meet at least six of the 10 financial ratios as required, achieving only four in 2001 and five in 2002. The independent auditor also reported that WCHCC failed to meet the required number of ratios in 2003. Consequently, in 2003, WCHCC officials hired several financial and management consultants who assessed WCHCC's operations, and made cost reduction and revenue enhancement recommendations. In 2004, the County contracted with a consulting firm to oversee WCHCC's daily operations.

WCHCC carried out several internal initiatives and some of the various consultants' recommendations in 2003 and 2004. These initiatives included implementing new accounts receivable software, training WCHCC staff on new billing procedures and software, and revamping the accounts receivable process. Other initiatives included contract renegotiation with drug companies and medical suppliers, and changes in various operational processes, although increases in medical and laboratory supply costs in 2004 put those cost saving estimates in doubt.

Partially as a result of these actions WCHCC increased revenues in 2003 and 2004 and, after significant cost growth in 2003, maintained expenses below 2003 levels in 2004. However, these very positive improvements have not been sufficient to get WCHCC's budget back into structural balance where recurring revenue matched recurring expenses.

|  | 2002 | 2003 | Un-Audited 2004 (a) |
|---|---|---|---|
| **Revenues** | $479.5 | $519.2 | $542.2 |
| **Expenses** | $539.4 | $602.2 | $598.1 |

WCHCC management estimated that as a result, the 2004 budget deficit would be approximately $47 million. However, preliminary results of operations for 2004 revealed an operating deficit of $56 million. In addition, WCHCC faced working capital problems and was unable to pay operational expenses. When the seriousness of WMC's financial difficulties was apparent, the County became actively involved in overseeing WCHCC's financial operations.

Near the end our audit, the Board had prepared a proposal that addressed WCHCC's financial difficulties through a combination of management improvements and initiatives, union concessions and increased funding from the County, State and Federal governments. In addition, the State Legislature was also considering several bills which would have provided increased funding for WCHCC. At the time of this report, no State Legislative action had been taken. However, in June 2005, the County refinanced its outstanding tobacco settlement-backed bonds and intended to use the proceeds to provide WCHCC with $27 million in 2005 and about $4 million in annual payments over the next 25 years.

**Business Ventures**

Another factor in WCHCC's financial struggles has been its investments in two new ventures. Investments in new ventures should be made when conditions for expansion exists, together with the expectation that the investments would yield a positive return. Officials at WCHCC invested in two ailing Hudson Valley medical facilities at a time when they were struggling with WCHCC's own financial difficulties.

Westchester-Ellenville Hospital. – As part of an expansion effort, WCHCC established Westchester-Ellenville Hospital in late 2000, in the Ulster County Village of Ellenville. Westchester-Ellenville was formed to operate the facilities of the former Ellenville Community Hospital, Inc., which filed for Chapter 11 bankruptcy protection in 1999. From 2001 to 2003, WCHCC experienced $15 million in losses that were the direct result of discontinued operations at Westchester-Ellenville, as WCHCC divested itself of Westchester-Ellenville. In November 2003, Westchester-Ellenville filed for Chapter 11 bankruptcy protection.

Westchester Medical Center, White Plains Pavilion. – At the request of the State Department of Health (DOH), WCHCC temporarily took over from the State the operation of the St. Agnes Hospital, Inc. of White Plains, N.Y., commencing as the Westchester Medical Center, White Plains Pavilion in 2003. The State agreed to provide WCHCC with up to $5.4 million, which was included as revenue for fiscal year ended December 31, 2003. Although WCHCC experienced no apparent loss as a result of this venture, and eventually returned the facility to the State, we question management's judgment for assuming additional managerial burdens at a time when WCHCC management was struggling to find solutions to resolve financial problems with its core operations.

**Significant Ongoing Liability and Risk With Insurance Account**

Captive insurance companies are closely held businesses primarily supplied and controlled by their owners. Captives fund the owner's risk, with an eye toward reducing costs. WCHCC established an offshore captive insurance company in Bermuda, named WCHCC Bermuda Limited (WCHCC-BL),

to provide WCHCC with insurance and reinsurance for general liability, medical liability, and physician medical professional liability. In 2003, WCHCC paid $44.7 million in premiums, marking a $17 million increase from 2002. Figures for 2004 were unavailable as the CPA's final report was not released in time for the publication of this report.

By December 31, 2003, WCHCC-BL was out of compliance with its license terms, having failed to maintain minimum levels of capital and surplus required by the Bermuda Insurance Authority. As of that date, WCHCC-BL reported a capital and surplus shortfall of $5.7 million. The failure to comply with terms of its license could force the subsidiary to shut down, compelling WCHCC to seek other professional liability coverage at a higher cost.

WCHCC's professional liability cost increases were largely due to the reserves required for self-insurance claims for incurred but not reported (IBNR) cases and other general liability self-insurance reserves. The estimated short- and long-term self-insurance liability in 2003 was $94 million, representing an increase of $29 million over the prior year.

The WCHCC-BL reported net losses of $6.1 million and $3.7 million for 2003 and 2002, and shareholder deficits of $10 million and $3.9 million, respectively, for those same years, caused by WCHCC's inability to pay sufficient premiums to cover the captive's operational costs. By December 31, 2003, WCHCC-BL was required to maintain a minimum statutory capital and surplus of $5.2 million. Instead, it had a deficit of $5.7 million. WCHCC-BL's 2003 draft balance sheet[4] reported assets of $43.3 million, liabilities of $53.3 million, and the shareholder deficit of $10 million. Short term investments of $17.9 million include $11.7 million in cash pledged as collateral for letters of credit that WCHCC-BL's bankers issued in favor of a ceding insurance company. In addition, WCHCC owed $25.3 million for premiums.

The Bermuda Monetary Authority is empowered to take corrective action against WCHCC-BL. It could direct WCHCC-BL to dictate what it can and cannot insure, avoid investments of a specified class, refuse to declare or pay any dividends, refuse to enter into specific transactions, and transfer all assets to a specified bank.

The independent auditors raised substantial doubt about WCHCC-BL's ability to continue as a going concern. They cited the following factors that may lead to WCHCC-BL's demise:[5]

---

[4] Final audited financial statements for 2003 are not yet available.

[5] WCHCC (Bermuda) Limited, Draft Financial Statements - December 31, 2003 and 2002: Note 2. Summary of significant accounting policies.

- Net losses of about $6.1 million for 2003 (2002 - $3.7 million);

- Shareholder's deficit of $10 million at December 31, 2003 (2002 - $3.9 million);

- WCHCC-BL's failure to maintain the minimum statutory capital and surplus requirements; and

- The financial difficulties and continued operating losses experienced by WCHCC, its ultimate parent company.

WCHCC-BL may not be able to obtain sufficient working capital from its operations to meet liabilities and commitments as they fall due. If this occurs, leading to WCHCC-BL's shutdown, WCHCC will be compelled to seek new professional liability coverage at a higher cost. This could have a negative impact on WCHCC's financial condition.

**Recommendations**

1. The Board should develop accurate annual budgets that will give State and County officials' confidence that WCHCC officials are taking a realistic approach to solving the corporation's financial difficulties.

2. Corporate officials should continue to work with all interested parties, including labor unions, to achieve effective spending reductions and revenue enhancements.

3. Given ongoing financial problems the Board should avoid expansion programs that distract officials' attention from managing WCHCC's financial affairs and drain corporate resources.

4. The Board should review WCHCC-BL's financial condition, evaluate its viability, and ensure that the company complies with its license terms.

5. WCHCC should upgrade its computer systems to improve the accuracy of records and increase system efficiency.

# Payments to Consultants

Written agreements between organizations and professional consultants enable both parties to clearly understand the terms of their transaction. Claims for services provided should plainly state their association with a particular contract and be verified with the terms and conditions of that contract. A rate schedule, listing the names of individuals or consultants involved in particular projects with their respective hourly rates, should be made part of a contract. This schedule should also be updated to reflect changes in personnel, so that an independent verification of the charges can be made when claims are submitted for payment.

A sound claims verification process also requires that claims are sufficiently itemized with detailed information about the service provided including service dates, vendor names, and hourly rates. Vendors should include sufficient documentation when filing payment claims for expenses. Without such documentation, management cannot accurately determine whether reimbursement claims are verifiable as valid corporate charges.

WCHCC engaged five consulting firms to diagnose and correct its financial and operational deficiencies, paying them $15 million for services and expenses between November 2002 and September 2004 that were not properly itemized or documented. WCHCC paid $945,000 in expense claim reimbursements, which lacked such documentation as paid bills or invoices that would have allowed for a proper audit of the charges. Some reimbursements were based on a vendor's estimates, and were not reconciled or supported by paid billing statements. Each vendor detailed the nature of the services rendered and the basis for compensation, which included expense reimbursement. We examined $6 million of the $15 million WCHCC paid to consultants for services rendered and $1 million for reimbursed expenses.

Consultant Firm A – This consultant was hired in late 2002 to revamp certain accounting processes with particular emphasis on accounts receivable and billing. From November 2002 to December 2003, WCHCC paid the consultant over $6 million for professional services, expense reimbursement, new software applications, and staff training. While professional services payments met the terms of the agreement, reimbursed expenses, summarized below, were not properly documented by vendor invoices.

| Expenses | Amount |
|---|---|
| Airfare | $149,776 |
| Lodging | $175,604 |
| Meals | $46,649 |
| Transportation | $67,718 |
| Other | $7,381 |
| Total | $447,128 |

The only documentation provided were the consultant's billing statements showing vendors' names and a summary of their charges. We therefore could not determine whether the $447,128 for reimbursed expenses were for a legitimate purpose.

Consultant Firm B – During 2003, WCHCC contracted with this firm to assess the organization's ongoing strategic, operational, and financial activities being implemented by the corporation to improve the financial ratios. For its services, the firm was to be paid no more than $300,000.

WCHCC also retained this firm to provide interim consulting services and managerial and specialized assistance from March 15 to June 15, 2004. On June 17, 2004, WCHCC signed an agreement with the firm that was to terminate on September 14, 2005 but could be extended through March 14, 2006. The consultant's fee for Core Team Component services was contractually fixed at $375,000 per month for an initial 90-day period, and scheduled to be reduced to $325,000 per month thereafter. The Core Team Component was comprised of professionals who acted as managers after the WCHCC terminated its senior managerial staff. To support those fees, the interim contract included the names, position titles, and hourly rates of the individuals providing services. However, the agreement lacked a compensation schedule to cover specialized services other than the Core Team Component. Both contracts stipulated that out-of-pocket expenses would be reimbursed on an actual cost basis.

We could not verify the validity of specialized professional service charges in the amount of $450,737 because the June 17, 2004 contract lacked a compensation rate schedule for specialized services. These services were provided in the areas of Risk Management, Human Resources, Revenue Cycle, Surgical Services Assessment and Plan, and Utilization Management. After we discussed the issue with WCHCC officials, they presented us with a newly re-negotiated rate schedule for the specialized professionals who were not included in the written agreement.

Of the $130,793 in reimbursed expenses examined, the vendor did not sufficiently itemize $51,376, or support these claimed expenses with paid bills from third party vendors. This prevented us from determining the nature of these charges or whether they had anything to do with providing professional services to WCHCC. For example, the vendor provided invoices for $49,493 that simply stated "Travel." It included the professionals' initials, the time periods and amounts claimed. These invoices did not include the basis for these charges such as destinations, mileage, rates, airfares or local transportation charges. The remaining $1,883 pertained to copier, courier and telephone charges, which had no written justification.

Consultant Firm C – In June 2003, WCHCC hired a consultant to assist the Board in evaluating and overseeing certain WMC operating and capital restructuring initiatives, including management strategies for the children's hospital. In 2003 and 2004, WCHCC paid this firm $2,258,000 in professional fees and expenses. Although WCHCC paid the fees in accordance with the contract, reimbursed expenses, as shown in the table below, were paid based on estimates not itemized or documented by paid bills or third party vendor receipts. Consequently, we could not determine whether the total expense charge of $155,480 was legitimate.

| Expense | Amount |
|---|---|
| Airfare | $63,538 |
| Lodging | $49,079 |
| Meals | $6,803 |
| Transportation | $30,057 |
| Telephone | $5,473 |
| Copies | $530 |
| Total | $155,480 |

Consultant Firm D – Hired in 2003, this firm was charged with providing the tools and techniques, coaching and mentoring, knowledge transfer and implementation teams to help WCHCC realize $50.1 million in potential savings that another consultant identified. In 2003 and 2004, WCHCC paid this firm over $1 million for professional fees and reimbursed expenses. Although the professional fees were paid in accordance with the agreement, $276,999 of the expense reimbursements were paid based on estimated costs rather than actual and documented charges. These expenses lacked paid bills or vendor receipts. In addition, WCHCC officials did not reconcile the estimated charges with the actual reimbursable costs which the consultant claimed. This prevented us from determining if these charges were legitimate expenses.

Consultant Firm E – In December 2003, WCHCC hired a law firm in connection with its contemplated restructuring. The firm based its professional fee for attorneys and legal assistants on a blended hourly rate of $453, which, on February 2, 2004 was increased to $478. Other employees were to be compensated at rates ranging from $95 to $140 per hour. WCHCC paid this firm over $1 million in legal fees and $13,000 for reimbursed expenses in 2003 and 2004.

Invoices totaling $954,051 did not contain such itemized information as dates, number of hours worked, and the description of services rendered. They merely stated that the services related to "Restructuring" and included the total number of hours worked by each professional each month, for which the firm applied its blended rate. Since the term "Restructuring" was not clearly defined in the retainer agreement, and no description of the services provided were included on the consultant's invoices, we could not determine the nature of the services or whether they were covered by contract. Moreover, the reimbursed expenses of $13,000 were not sufficiently itemized to determine the nature of the charges or supported with paid bills from third party vendors to indicate that the expenses were a proper corporate charge.

**Recommendations**

6.  Implement policies and procedures to ensure that consultant expense invoices are properly itemized, explained, fully supported by third party vendor documentation, and in accordance with the terms of their respective agreements. Invoices should not be paid until proper documentation is presented, audited, and compared against the consultants' respective agreements.

7.  When expense reimbursement is paid based on estimates, management should reconcile the estimate with the actual documentation of the expense before final payment.

8.  When professional service agreements require services to be compensated based on hourly rates for specific individuals, officials should maintain an updated list containing their names together with their respective hourly rates.

# Internal Control Deficiencies

Officials entrusted with public resources are responsible for complying with laws and regulations, meeting goals and objectives, safeguarding assets, and issuing reports that inform the public about government activities. An effective control system should help officials meet these responsibilities. We examined internal controls over credit card use and the reliability of WCHCC's reporting systems, and determined that they did not provide sufficient assurance that assets were properly safeguarded or that information generated was reliable.

**Credit Card Use and Management**

Effective internal controls are the first line of defense against credit card abuse. A sound credit card policy establishes the parameters for card usage and enumerates the internal controls required to minimize the risk of error or fraud. It also assigns duties and responsibilities among different people for the approval, authorization, verification, reconciliation, and production of relevant records and documentation required to support credit card transactions.

Organizations should have credit card policies that: require prior higher authorization for credit card charges; specify and enumerate the types of charges that can be incurred; require the submission of sufficient documentation, explanation, and itemization of the charges; and require that charges for travel and conference expenses for lodging, meals, airfares and ground transportation costs be reconciled to an expense report, which a supervisor reviews and approves.

Internal controls over credit card use at WCHCC were almost non-existent. This was due in part to the absence of formal policies and procedures governing corporate credit card usage, further compounded by a lack of internal controls over credit card bill audit and payment. The accounts payable unit based its processing of credit card bills solely on monthly statements from the credit card company. There was no third party vendor documentation, which is essential to determine the nature and propriety of the charges.

Between January 1, 2002 and December 31, 2003, WCHCC paid $111,957 to a credit card company for charges that were not properly itemized or documented by the 11 corporate officials who used the cards. An examination of credit card statements disclosed payments for restaurants, hotels, airlines, florists and ground transportation services for which there

was no written justification. For example, $20,000 of the payments covered local restaurant charges which lacked itemized bills. Several other payments totaling $54,000 were not itemized or documented to establish the nature or propriety of the charges. The accompanying schedule shows a breakdown of the credit card charges for each credit card used over the two year period.

| Official | 2002 | 2003 | Total |
|---|---|---|---|
| Former President and CEO | $28,705 | $27,178 | $55,883 |
| Former Executive Vice President - COO | $10,605 | $1,840 | $12,445 |
| Former General Counsel | $7,968 | $4,203 | $12,171 |
| Former Executive Vice President - Head of Transplant Unit | $00.00 | $11,572 | $11,572 |
| Former Executive Vice President - CFO | $6,607 | $1,884 | $8,491 |
| Six Other Officials | $7,803 | $3,592 | $11,395 |
| Total | $61,688 | $50,269 | $111,957 |

Some of the restaurant charges were for more than one individual. But because there was no proper documentation explaining the nature and circumstances of the charges, including the names of the individuals for whom WCHCC incurred the charges, we could not determine whether they were justified. For example:

- In October 2003 the former chief executive officer spent $1,393 at a yacht club in New York and another $1,500 at local restaurants. This official also spent $1,300 at a local restaurant the following month. He did not itemize, document or justify the charges, and did not identify the persons on whose behalf WCHCC incurred the charges.

- A former executive vice president of the transplant unit spent $9,980 on air fares in November and December 2003 without documentation or explanation. It is possible this expense was related to organ transplant transportation services for which WCHCC would be entitled to reimbursement. However, this payment was unlike other organ transport costs because it lacked the necessary invoice and purchase order documentation that would have clearly linked it to WCHCC patient-related expenditures. Because this official did not link the charges to a specific procedure or patient, we could not establish whether WCHCC was reimbursed for the costs.

Section 103 of the General Municipal Law requires the WCHCC to request competitive bidding when awarding public work contracts that exceed $20,000 during the fiscal year. We examined claim vouchers totaling $118,229 and $136,691 for payments made to two vendors in 2003 and 2004, respectively, for transporting organs and personnel for organ transplant purposes. Officials used their credit cards to circumvent this process for transporting organs. For example, the total amount WCHCC spent for these air transportation services exceeded the public bidding threshold. However, they did not solicit public bids for these services, nor did they enter into a contract with the vendors that would have detailed the terms and conditions of providing the services. Given that WCHCC had prior knowledge of a routine need for air transportation services, officials should have advertised for competitive bids. Because WCHCC did not solicit public bids there is no assurance that the best prices were paid for the service.

The use of corporate credit cards to purchase goods and services without the benefit of the checks and balances of an established purchasing function undermines the system of internal controls designed to detect and prevent corporate expenditures for non-corporate purposes. It circumvents the authorization process for goods and services procurement, which includes a determination of need, propriety and compliance with competitive bidding laws.

**Accounting and Management Reporting Systems and Controls**

Management is responsible for maintaining an accounting and reporting system that meets the organization's needs. An effective financial reporting system with appropriate accounting codes can allocate costs over various departments and report on such allocations. The system should also identify various segments of the operation and account for both revenues and expenses, as a way of measuring each segment's contribution to the profit or loss of the corporation as a whole. Likewise, vendor payment history reports can be automated and searchable. Pairing such a system with suitable internal controls can safeguard assets, and provide management with reliable information. Lacking this system and controls makes supervisory reviews and audit trails laborious and inefficient. Management often cannot obtain the information it needs to make knowledgeable decisions.

WCHCC's accounting and management reporting system was inadequate. It could not generate reports that helped management to monitor payment histories or provide a straightforward audit trail of all transactions flowing through the system. In addition, internal controls over vendor payments were extremely lax and contributed to other deficiencies.

WCHCC operated several computer systems that were inefficient, inflexible, and incapable of fulfilling management's accounting and reporting needs. For example, the accounts payable department used a system for recording payment transactions that was not integrated with the purchasing department's system. This resulted in a duplication of effort (data to be entered more than once) and could have compromised data reliability. Information derived from vendor payment files contained payments not recorded in the accounts payable system. They included manual input of wire transfers, which represented a high number of payments to vendors. Consequently, payment histories taken from the accounts payable system were unreliable. Furthermore, the system could not generate routine management reports on vendor payment histories, and certain ledger activity details. Such reports were based on information manually gathered from computer screen shots and then manually entered into a separate computer application.

Staff members responsible for accounts payable handled non-routine transactions differently than others. Although vendors received a code used to identify and associate their payment receipts, various payments for one-time transactions, including fees for legal settlements, were collectively associated to a "Reuse" or "Misc" account code. In 2003 and 2004 the transactions recorded under the "Misc" account amounted to $6.3 million. The system was already unable to generate automated routine management reports on vendor payment histories without a manual manipulation of the data. Recording such a large sum into a collective "Misc" account code prevented management from readily monitoring, reviewing and analyzing vendor payment histories for errors and irregularities, and take corrective action in a timely manner.

**Recommendations**

9. The Board should adopt a corporate credit card policy that: establishes clear internal controls and levels of authorization for the issuance of credit cards; enumerates the circumstances under which credit card charges can be incurred; requires credit card charges to undergo the same level of scrutiny afforded to other processed transactions; and provides for higher levels of control and documentation for those charges that could be misconstrued as personal in nature, such as travel and hospitality expenses.

10. The Chief Fiscal Officer should implement internal controls to ensure that the accounts payable process operates efficiently. These procedures should include: upgrading computer applications for the accounts payable and the financial accounting and reporting systems; effecting integration between computer applications to minimize manual input; reviewing support documentation for credit card charges and payments for reimbursements of expenses to consultants; and reviewing all vendor payments to ensure that the audit process had taken place.

EXHIBIT C



# NEWS

**From the Office of the New York State Comptroller**

# Alan G. Hevesi

**CONTACT:** Press Office
(518) 474-4015

**FOR RELEASE:** Immediately
September 1, 2005

## Audit Details Severe Mismanagement at Westchester County Health Care Corp.

**Inaccurate Budget Projections, Bad Management Decisions, Poor Financial Controls, Inadequate Accounting Systems All Contributed to $207 Million Loss Over Four Years**
**Deficits Persist, But Progress Being Made on Financial Operations Under New Management Team**

Poor fiscal management and budgeting combined with a failure to control expenses and operate efficient accounting and reporting systems resulted in a documented $207 million operating loss from 2001 through 2004 for the Westchester County Health Care Corporation (WCHCC), according to an audit released today by New York State Comptroller Alan G. Hevesi. This does not include an additional projected loss of $60 million in 2005.

The audit covered transactions and reports from January 2002 through December 2004, under the Corporation's former management team. Auditors found that monthly financial reports submitted to the County by WCHCC – which operates the Westchester Medical Center regional health care complex and related facilities – were so inaccurate that they prevented County officials from having an up-to-date and clear picture of the Corporation's financial condition.

WCHCC went from a $2.6 million operating surplus in 2000 to a cumulative operating loss of $207 million by the end of 2004, and failed to address its structural budget deficit. During that time, Corporation officials:

- **Presented overly optimistic fiscal projections.** In 2003, officials projected a $14.48 million deficit; the actual deficit was nearly $81 million – $66.47 million (456%) more than predicted.

- **Provided inaccurate financial reports.** Throughout 2003, officials submitted required monthly reports to County officials that dramatically understated expenses and liabilities and, in some cases, did not comply with Generally Accepted Accounting Principles (GAAP). As a result, accurate financial information was not available until June, 2004, when year-end statements prepared by independent auditors were released.

- **Made financially-damaging operational decisions.** Ellenville Hospital in Ellenville, New York filed for bankruptcy in 1999, and the Corporation acquired the facility in 2000. The Hospital experienced $15 million in losses from 2001 to 2003. At the request of the State Department of Health, WCHCC temporarily took over operation of St. Agnes Hospital in White Plains in 2003. This acquisition did not result in financial losses, but auditors questioned why the Corporation would take on additional managerial burdens when it was struggling to address serious financial problems in its existing operations.

- **Failed to sufficiently fund a self-insurance subsidiary.** WCHCC established an off-shore captive insurance company to reduce its liability insurance costs. The continued operation of the subsidiary was placed in jeopardy due to failure to ensure that required capital and surplus funds were maintained.

- **Did not obtain documentation for reimbursement of consultant expenses.** WCHCC paid consultants for nearly $1.9 million for expenses and other charges without back-up documentation.

- **Lacked effective controls over credit card use.** The Corporation had no effective internal

controls over credit card use by Corporation executives, which led to the payment of nearly $112,000 in charges for restaurants, hotels, airfare, florists and other expenses that were not itemized or documented.

- **Violated competitive bidding laws.** WCHCC officials used credit cards to circumvent competitive bidding requirements.

- **Maintained inadequate and non-integrated accounting and financial reporting systems.** As a result, the same data had to be entered more than once, and information provided by the systems was often incomplete.

"As a vital health care provider and major employer, Westchester Medical Center is an important part of the community. But the Corporation's combination of fiscal challenges, financial control weaknesses and accounting problems brought it close to the point of collapse," Hevesi said. "We have seen some promising improvements over the past couple of years, but much more must be done."

Financial Conditions Worsen Each Year, Some Signs of Improvements in Recent Years
WCHCC was established in 1997 to take over operations of the Westchester Medical Center in Valhalla and other facilities run by the County Department of Hospitals. The Corporation was financed by a $255.1 million bond issuance in 2000, and the County guaranteed much of WCHCC's debt.

Auditors found that WCHCC budget projections were inaccurate every year since 2000. The Corporation has had an operating deficit for every year since 2001, for a total of $207 million in operating losses from 2001 to 2004. The deficits were far larger than predicted:

- In **2001**, officials foresaw a $6.14 million surplus, but instead had a $9.67 million deficit.

- An expected surplus of $2.87 million in **2002** turned out to be a deficit of $60.84 million.

- The predicted deficit of $14.48 million for **2003** actually amounted to $80.95 million.

- Unaudited figures for **2004** show a deficit of $55.89 million, more than the $46.64 million predicted

In addition, the Corporation's expected deficit for **2005** is $60.35 million.

Required monthly financial reports submitted during 2003 by WCHCC to the County were off by a total of at least $3.7 million per month, including the following discrepancies:

- Professional liability insurance expenses were underestimated by more than $1 million a month.

- The allowance to cover bad debt was reported at about $1 million per month, but was actually closer to $2 million per month.

- Workers compensation costs were understated by about $589,000 per month.

- Medical and lab supply expenses and salaries and fringe benefit costs were each understated by about $580,000 per month.

"During the time period covered by the audit, the County government was not receiving accurate monthly financial reports about the Corporation, so it was impossible for County officials to know exactly what was going on or determine how they might address the problem," Hevesi said. "Reliable financial information only became available after a full year of the Corporation's finances were reviewed by its outside auditor, when millions in deficits had already been incurred."

State auditors' review of 2004 finances, based on preliminary reports, showed a $12 million decrease in personal service costs and some improvements in procedures for accounts payable and receivables. However, auditors also found cost increases for employee fringe benefits, despite a reduction in staff, and for medical and lab supplies.

When WCHCC was established, the transition agreement between the County and the Corporation outlined financial goals that, if not met by the Corporation, allows the County to select consultants to review operations and recommend corrective actions. Failure to meet these goals led the State and County in 2004 to direct the Board to hire a consulting firm to oversee all daily operations of WCHCC.

The Corporation did take a number of actions recommended by consultants in 2003 and 2004, including renegotiating contracts with drug companies and medical suppliers, adopting new accounting software and revamping some accounting procedures. Revenues did increase in 2003 and 2004, but not enough to bring WCHCC's budget into structural balance.

Auditors noted that, early in 2005, the WCHCC Board and the new consultant hired in 2004 developed a proposal to address the Corporation's financial problems through management improvements, labor concessions and increased County, State and Federal funding. The State Legislature was also considering measures to provide increased funding, but to date has taken no action. In June 2005, the County refinanced tobacco settlement-backed bonds and will direct some of the proceeds to WCHCC.

### Absence of Financial Controls Raises Questions Regarding Expenditures
From 2002 through 2004, five consulting firms were paid a total of $15 million by WCHCC to address financial and operational issues. Auditors found a total of nearly $1.9 million in expenditures by consultants that lacked proper or complete documentation:

- Stockamp & Associates (referred to in the audit as Consultant A) was engaged to revamp accounting processes. Auditors found $447,128 in reimbursements without proper documentation for airfare, lodging, meals, ground transportation and other expenses.

- Pitt Management (Consultant B) was hired to assess WCHCC's overall strategic, operational and financial activities. Auditors found that the agreement with the consulting firm did not include details regarding the compensation rate for some specialized consultants. When the matter was brought to the attention of WCHCC officials, they re-negotiated a rate schedule for the specialized consultants. Auditors also found $51,376 in reimbursements without proper documentation for travel and other expenses.

- Casas, Benjamin & White, LLC (Consultant C) was hired to assist WCHCC with restructuring initiatives. Auditors found $155,480 in reimbursements without proper documentation for airfare, lodging, meals, ground transportation and other expenses.

- Cap Gemini Ernst & Young (Consultant D) provided facilitation to help WCHCC implement cost-saving measures. Auditors found $276,999 in expense reimbursements were paid based on estimated costs, rather than actual documented charges.

- Kirkland & Ellis (Consultant E) was a law firm hired in connection with restructuring efforts. Auditors found $954,051 in billings for attorneys and legal assistants without any information regarding dates, number of hours works and description of services rendered. Auditors also found $13,000 in expense reimbursements without proper documentation.

WCHCC had virtually no internal policies regarding the use of Corporation credit cards, and a lack of internal controls over the payment and audit of credit card bills. Auditors found $111,957 in charges between January 2002 and December 2003 that were not properly documented on cards used by 11 Corporation officials, including expenses for restaurants, hotels, airfare, ground transportation and florists. Charges by the former chief executive officer included $1,393 at a New York yacht club and $1,500 and $1,300 at local restaurants in October and November of 2003.

Top Corporation officials also used credit cards to pay a total of $254,920 in 2003 and 2004 for the transportation of human organs and personnel involved in organ transplants. Because WCHCC knew of the routine need for air transportation relating to transplants, auditors determined that the service should have been competitively bid and procured through a contract or contracts. Competitive bidding is required by State law for any contract that exceeds $20,000 in the fiscal year.

WCHCC operates the Westchester Medical Center – which offers advanced medical services including a burn unit, trauma center and organ transplant program – and provides other health care services in a seven-county area in the lower Hudson Valley. The Corporation had an annual budget in 2004 of $559.3 million. It is governed by a 15-member Board of Directors, eight of whom are appointed by the Governor and seven by the County Legislature with the approval of the County Executive.

In their response to the audit, Corporation officials generally agreed with auditors' findings. The complete WCHCC response is included in the audit.

Click here for a copy of the audit report.

Albany Phone: (518) 474-4015 Fax:(518) 473-8940
NYC Phone: (212) 681-4825 Fax:(212) 681-4468
Internet: http://www.osc.state.ny.us
E-Mail:press@osc.state.ny.us

EXHIBIT D



NEW YORK CARDIOTHORACIC GROUP

January 9, 2008

John A. Savino, M.D.
Professor and Chairman of Surgery
The Westchester Medical Center
Munger Pavilion
Valhalla, NY 10595

Dear Dr. Savino,

I am writing to update the data on OR utilization and its impact on block time
assignments within the Section of Cardiothoracic Surgery, which I last reviewed
in my memo to you of August 3, 2006.

These are the data for all cases (cardiac + thoracic) and adult cardiac cases for
the past 6 & 12 months. The data shows that the New York Cardiothoracic
Group (NYCTG) is doing 2/3 of all cardiothoracic volume and is approaching
doing 3/4 of adult cardiac cases. Accordingly, cardiac OR room assignments
have been re-apportioned to reflect these data, as diagrammed on the attached
chart.

Using the data for adult cardiac surgical cases, the apportionment would be 6
slots per week for the Cardiac Surgical Group (CSG). A better scenario for CSG
would be to use the data for all cardiothoracic cases, which would give CSG 7
slots per week, and the attached plan is based on that allocation.

The schedule also presumes allocation of room #3 to NYCTG for 1 case on
Thursdays, as is currently the case.

An important principle in maximizing the service's resources is that the adult
cardiac rooms are optimally used for adult cardiac cases; alternatively the
perfusion team is sidelined, while engaging cardiac nursing and cardiac
anesthesia in cases that could be done in a General OR room, with the General
OR staff. Therefore, we will continue the recently adopted policy of attempting
to place General Thoracic cases in a General OR, if the room and staff are
available, and if a cardiac surgical case is waiting.

Members of the OR Block Time Committee, Mr. Weems and Dr. LaRosa have reviewed these data. The proposed plan equitably reflects current usage and, importantly for patient care, most efficiently distributes the available OR time. OR usage will continually be monitored and block allocations will be re-assessed every 6 months.

Yours truly,

Steven Lansman, MD PhD
Chief, Section of Cardiothoracic Surgery

Enclosure (1)

cc:    Elisha Briggs, R.N.
       James LaRosa, M.D.
       Rocco LaFaro, M.D.

**Cardiothoracic Service**
**August 2006**
**OR Room Assignments**

| | | | | | Slots | | |
|---|---|---|---|---|---|---|---|
| *12 mo All Cases | 338 | 670 | 0.34 | 0.56 | 21 | 7.0 | 14.0 |
| **6 mo All Cases | 158 | 334 | 0.32 | 0.68 | 21 | 6.7 | 14.3 |
| *12 mo Cardiac Cases | 231 | 547 | 0.30 | 0.70 | 21 | 6.2 | 14.8 |
| **6 mo Cardiac Cases | 100 | 257 | 0.28 | 0.72 | 21 | 5.9 | 15.1 |

* 12/06 - 11/07
** 6/07 - 11/07

| Room | | Mon | Tues | Wed | Thurs | Fri | SLOTS |
|---|---|---|---|---|---|---|---|
| 4 | AM | | | | | | 5 |
| | PM | | | | | | 5 |
| 3 | PM | | | | | | 1 |
| 5 | AM | | | | | | 5 |
| | PM | | | | | | 5 |
| | | | | | | | 21 |

| | | Mon | Tues | Wed | Thurs | Fri | TTL |
|---|---|---|---|---|---|---|---|
| NYCTG | | 2 | 3 | 3 | 3 | 3 | 14 |
| CSG | | 2 | 1 | 1 | 2 | 1 | 7 |
| SLOTS | | 4 | 4 | 4 | 5 | 4 | 21 |

CSG 7
NYCTG 14

EXHIBIT E

FEB-06-2008 18:05 From:                                To:94932321                        P.1/1



WESTCHESTER MEDICAL CENTER    DEPARTMENT OF SURGERY        NEW YORK MEDICAL COLLEGE
ACADEMIC HEALTH CENTER
OF NEW YORK MEDICAL COLLEGE

JOHN A. SAVINO, M.D.
PROFESSOR AND CHAIRMAN OF SURGERY
NEW YORK MEDICAL COLLEGE
DIRECTOR OF SURGERY
WESTCHESTER MEDICAL CENTER

914-493-7231 OR 914-594-4052
914-594-4359 FAX
EMAIL: john_savino@nymc.edu

February 6, 2008

Arlen G. Fleisher, M.D.
Rocco J. Lafaro, M.D.
Cardiac Surgery Group
PO Box 434
Elmsford, NY 10523

Re: Block Time Allocation

Dear Dr. Fleisher and Dr. Lafaro:

This letter is in response to your letter to me dated February 4, 2008. First, given the envelope accompanying the letter, as well as, the contents of the letter, it is evident that this letter was scripted by your attorney, and seems to attempt to involve me in your pending lawsuit against WMC and Drs. Lansman and Spielvogel. Further, you attribute statements to me that are simply not true and come very close to accusing me of ignoring patient care concerns. While I understand your desire to protect your practice, I do not appreciate becoming embroiled in this matter.

For the record, I absolutely reject that I told you or anyone that "Dr. Lansman can get away" with certain conduct "because of his exclusivity at the Hospital." I also deny that I ever indicated, directly or indirectly, to Dr. Lafaro that CSG will not be able to do urgent or emergent non-heart thoracic surgery. Additionally, I resent any implication that any decision made by me as Director of Surgery will negatively affect patient care.

Putting aside these "litigation" positions you have written into the letter, I do believe that Dr. Lansman's request for additional block time appears appropriate. However, based on your concerns, and because we no longer have an active Peri-Operative Governance Team, I will ask Dr. Lansman to delay implementation of the new block time assignments for 30-60 days while I work with Dr. Larosa and others in designing an appropriate process for reviewing block time requests. I look forward to working with you and Dr. Lansman in a collegial manner in this process.

Very truly yours,

John A. Savino, M.D.

JAS:ic
Cc: Steven Lansman, M.D.
    James Larosa, M.D.

FLEISHER DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                 :

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,    :    07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,       :
                                   :

                  Plaintiffs,      :

       -against-                   :

NEW YORK CARDIOTHORACIC GROUP, PLLC,     :
STEVEN L. LANSMAN, M.D., DAVID            :
SPIELVOGEL, M.D., WESTCHESTER COUNTY   :    **DECLARATION OF**
HEALTH CARE CORPORATION and           :    **ARLEN FLEISHER, M.D.**
WESTCHESTER MEDICAL CENTER          :
                                   :

                  Defendants.     :
                                   :

-------------------------------------------------------------------X

ARLEN G. FLEISHER, M.D., under penalty of perjury, declares as follows:

1.      I am one of the individual plaintiffs in this action, a director of plaintiff Cardiac Surgery Group P.C. ("CSG"), and a surgeon duly licensed to practice medicine in the State of New York. I am a Diplomate of the American Board of Thoracic Surgery and a Fellow or Member of the American College of Surgeons, the American College of Cardiology, the American College of Chest Surgeons, and the Society of Thoracic Surgeons, among others. I am personally familiar with the matters set forth herein and make this declaration in opposition to defendants' motion for judgment on the pleadings.

2.      Defendants make a number of assertions in their motion papers that are contrary to facts about which I have first-hand knowledge. They support their motion with a declaration of Jordy Rabinowitz, an in-house lawyer at defendant Westchester County Health Care Corporation ("WCHCC"), dated February 1, 2008 ("Rabinowitz Decl."). Mr. Rabinowitz

recently joined WCHCC, having previously been employed elsewhere. I have never met him, and it seems unlikely that he could have personal knowledge of many of the matters he refers to in his declaration because he was not even at WCHCC at the time.

3.    Mr. Rabinowitz contends that we have taken the position that we were "the *de facto* exclusive provider of cardiothoracic surgery at WMC for over 30 years" (Rabinowitz Decl. ¶ 2). To support that contention, he attaches to his declaration (Ex. 8) and quotes from an affidavit I submitted in proceedings involving a dispute between CSG and one of its former members, Dr. Mohan R. Sarabu, concerning whether he violated a noncompete clause in his agreement with CSG. Defendants' memorandum of law in support of their motion makes similar references. Mr. Rabinowitz and defendants have their facts wrong and misconstrue the plain language of my affidavit.

4.    In all sub-specialties other than staff services (emergency medicine, radiology, pathology and anesthesiology), WMC grants non-exclusive privileges to medical practitioners from the region it serves. Historically, prior to the arrival of defendant Lansman in 2005, there was not to my knowledge any requirement at WMC that a cardiothoracic surgeon be affiliated with any particular group such as CSG in order to have privileges to practice that specialty at the Hospital. Defendants repeatedly confuse the arrangements at WMC with the special arrangements for faculty status at WMC's affiliated medical college.

5.    As described in our complaint, WMC is affiliated with New York Medical College (the "College"), and many practitioners at WMC also become faculty members of the College. Both my colleague Rocco J. Lafaro, M.D., and I are longtime members of the faculty. The College governs the functioning of the clinical faculty via an unincorporated Federated Faculty Practice Plan ("FFPP"). That Plan requires, in its Bylaws, that "full-time" faculty of the

2

College must conduct their practice of medicine within self-governing practice groups, each known as a Faculty Clinical Practice ("FCP"), which have been approved by the FFPP. One such FCP is supposed to exist for each practice area. In the absence of a qualifying waiver, each distinct sub-specialty service is provided by only one FCP. Each FCP must be democratically governed and open to all qualified members of the sub-specialty who obtain privileges to practice at WMC.

6.    CSG has historically served as the FCP for the sub-specialty of cardiothoracic surgery. However, it is not and never has been the exclusive vehicle for cardiothoracic surgeons to practice at WMC. Over the years, a number of able surgeons have practiced in the Section of Cardiothoracic surgery without being members of CSG, including Dr. John E. Anderson and Dr. Suvro S. Sett during the period immediately prior to the arrival of Dr. Lansman.

7.    In view of this factual background, defendants' reference to the lawsuit between CSG and its former member Dr. Sarabu for their "*de facto* sole providers" assertion is baseless. Dr. Sarabu had signed an employment agreement with CSG that required him, in the event he left, not to compete with CSG for a two-year period within a limited geographic area. An arbitrator upheld that noncompete clause and awarded CSG damages for Dr. Sarabu's violation of it when he set up a competing practice group in 2003.

8.    The three affidavits attached to the Rabinowitz Declaration were filed in a state court action on behalf of CSG seeking to preliminarily enjoin Dr. Sarabu from violating the noncompete clause while the arbitration was pending. Sarabu opposed a motion by claiming, among other things, that if the noncompete clause was enforced, "Westchester Hospital will likely suffer irreparable harm, [and] the patients in the surrounding community will suffer

3

irreparable harm ...." A copy of Dr. Sarabu's affidavit making that assertion (in ¶ 4) is annexed hereto as Exhibit A.

      9.     We responded to Dr. Sarabu's argument that public policy should require the abrogation of the noncompete clause he had signed. In my affidavit, as well as in affidavits of Dr. George Reed and attorney Anthony Demetracopoulos (Rabinowitz Decl. Ex. 8, 9, 10), we pointed out that CSG was the sole approved FCP under the FFPP and that this actually provided a public benefit. Thus I stated in paragraph 4 of my affidavit, "CSG is the only practice whose members are permitted under the Federated Faculty Practice Plan bylaws to perform cardiac surgery at Westchester Medical Center." Elsewhere I explained why this is beneficial (Rabinowitz Decl. Ex. 8, ¶ 23). I did not state that WMC itself prohibited independent attending surgeons from practicing in the Section. In fact, the contrary was the case at the time. As Dr. Sarabu himself noted in his affidavit, "Westchester Hospital expressed no reservation in having [Sarabu] practice at Westchester Hospital along with CSG" (Ex. A hereto ¶ 39).

      10.    In short, the issue in the Sarabu litigation and arbitration was not that CSG was the "sole provider" of cardiothoracic surgery services at WMC, for it certainly was not the sole such provider. Rather, the issue was that Dr. Sarabu had signed an enforceable noncompete clause that an arbitrator ultimately required him to pay damages for violating. The preliminary injunction we requested was not granted, but that part of the case became academic because Dr. Sarabu left WMC while the proceedings were underway. I should add that I have great respect for Dr. Sarabu's surgical skills but disagreed with the way he did business, and the arbitrator supported my view in the latter regard.

      11.    One other major falsehood in defendants' papers warrants a very brief comment. Both the Rabinowitz Declaration by annexing a press release and defendants

4

memorandum of law convey the message that I was "indicted" for wrongful dispensing of prescription medications. No such indictment ever occurred. I was one of several doctors who were investigated on the subject under a criminal complaint issued on the initiative of the United States Attorney's office. Following such investigation, in which I cooperated completely, the matter was dismissed. None of this has anything to do with the issues now before the Court. Defendants' conduct in conveying such misinformation should not go unremarked.

Dated: February 26 2008

Arlen G. Fleisher, M.D.

5

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-------------------------------------------X

CARDIAC SURGERY GROUP P.C., :

                   Plaintiff, :        Index No. 04-6401

         - against – :        **AFFIDAVIT OF**
                            :        **MOHAN SARABU, M.D.**
MOHAN SARABU, :

                            :

              Defendant. :

-------------------------------------------X

STATE OF NEW YORK    )
                        ) ss:
COUNTY OF WESTCHESTER  )

          MOHAN SARABU, M.D., being duly sworn, deposes and says:

          1. I am the named defendant in this action and have personal knowledge of the facts asserted herein. I submit this affidavit in opposition to the motion of the plaintiff, Cardiac Surgery Group, P.C. ("CSG"), for a preliminary injunction which seeks to prevent me from practicing cardiac surgery at Westchester Medical Center ("Westchester Hospital") as I have done for the last 22 years including at least six years prior to even the formation of CSG. The preliminary injunction sought also seeks to prevent me from practicing anywhere in Westchester, Putnam, Duchess, Rockland, Orange, Sullivan and Ulster Counties in New York, or in the Bronx, or in Bergen County, New Jersey, or Fairfield County, Connecticut. For the reasons set forth below and in my accompanying papers, I do not believe that such an injunction is warranted as a matter of law or equity and respectfully ask this Court to deny the motion.

<u>Summary of The Basis For My Opposition To Plaintiff's Motion</u>

          2. In the first instance, Plaintiff is not under any threat of immediate irreparable harm. The current situation (with me no longer part of CSG but continuing my practice of

cardiac surgery at Westchester Hospital) has existed without incident since the beginning of the year and Plaintiff only saw fit to commence this litigation *approximately four months after the fact.* Under these circumstances, Plaintiff can hardly claim now any immediate irreparable harm regardless of what the agreement might say. Indeed, the only irreparable harm that will result in this instance is if the Court *were* to grant the injunction. In that case, not only would I suffer irreparable harm, but so too would Westchester Hospital as well as the patient community it serves. I am by far the cardiothoracic surgeon most in demand at the hospital as a result of a long professional career dedicated to my patients and thankfully one of the lowest mortality rates in the state and the nation. There is also a shortage of cardiac surgeons available to the hospital at this point in time, much less cardiothoracic surgeons of the highest skill level, which shortage would be exacerbated by my absence with a consequential adverse affect on the care available to patients and the reputation of the cardiac unit of Westchester Hospital.

3. As also explained further below, Plaintiff's skewed presentation of the facts is far from accurate and I firmly believe that I will ultimately prevail on the merits of this action for a number of reasons. First, I do not believe that the restrictive covenant at issue is or should be enforceable under these circumstances as a matter of law and public policy. Second, my former group CSG was entirely dysfunctional and members of the group were breaching their obligations and fiduciary duties to my detriment and depriving me of the benefits of the agreement. Any agreement with CSG was also effectively terminated *de facto* by the Group's actions and conduct, and precludes CSG from enforcing any restrictive covenant. Of course, the substantive merits of the dispute will ultimately be determined in an arbitration proceeding that has already been commenced before the American Health Lawyers Association and will address both CSG's damage claims against me and my damage claims against them.

2

4.   As to the balancing of the equities, CSG gains little, if anything, by virtue of its requested relief. Contrary to the suggestions in their moving papers, virtually all the patients who come to me or who are referred to me seek my *individual* care based on my personal reputation and objectively measured skills as a cardiothoracic surgeon. Plaintiff does not point to a solitary instance in which a patient who came to me would have otherwise come to CSG or where a cardiologist who referred a patient to me would otherwise have referred the patient to CSG. Indeed, contrary to the Plaintiff's suggestions, a substantial portion of my referrals come from cardiologists who have referred cases to me going back to a time period that pre-dates the formation of CSG. By contrast, as I have noted, if the injunction is granted, Westchester Hospital will likely suffer irreparable harm, the patients in the surrounding community will suffer irreparable harm and, of course, I will as well.

## General Background Regarding My Practice

5.   I have been practicing cardiothoracic surgery for more than twenty two years. I am licensed to practice medicine in New York State, among other states, and a Diplomat of the American Board of Surgery and the American Board of Thoracic Surgery. I am also an Associate Professor of Clinical Surgery at the New York Medical College. I have published and lectured extensively and participated in various humanitarian missions. A copy of my *curriculum vitae* is attached hereto as Exhibit A.

6.   For the entire twenty two years of my professional career, I have practiced cardiothoracic surgery at the Westchester Medical Center ("Westchester Hospital"), an affiliate of New York Medical College (where I also taught). Westchester Hospital is an academic medical center and the region's tertiary and Level 1 Trauma Center. Upon information and belief, Westchester Hospital serves more than 3.5 million people in the Hudson Valley region

and is one of only three hospitals north of New York City that offers cardiac care. Until about 1998, Westchester Hospital was a public hospital but, upon information and belief, it separated from Westchester County at that time and became a public benefit corporation. Westchester Hospital is currently in the midst of a well-publicized and extremely serious financial crisis. Its credit rating was reduced to near junk-bond status, and there have been a series of layoffs to reduce Westchester Hospital's staff as well as numerous other cost-cutting measures to avoid potential bankruptcy. I personally account for a significant amount of revenues for Westchester Hospital. I do not believe that those revenues can be easily replaced.

## Formation of CSG

7.  From 1982 to 1988, I practiced at Westchester Hospital and maintained an office there on my own as did, upon information and belief, the other cardiac surgeons who practiced at Westchester Hospital at the time.

8.  In or about 1988, Dr. George E. Reed, Dr. Eric Somberg, Dr. Peter Juan Praeger, Dr. Richard Albert Moggio, Dr. Richard W. Pooley and myself decided it would be mutually convenient and beneficial to form a group and we therefore formed CSG, a professional corporation which was treated like a partnership.

9.  Our intent in forming CSG was to facilitate our practice of cardiothoracic surgery by addressing all the administrative, coverage and related aspects of practice collectively.

10. Although CSG was formed in 1988, there were no employment agreements or restrictive covenants to my knowledge for more than a decade thereafter during which time we acquired certain new employees and members. Upon information and belief, the members of CSG eventually each signed a Partner Employment Contract. At the time that I

signed the Partner Employment Contract, on or about November 28, 2001, I was not advised to retain my own counsel and did not have the benefit of my own counsel prior to executing that agreement. I was told at the time that I would be the President of CSG and would receive the authority and responsibility associated with that position. It was based on such representations that I was induced to execute an employment agreement.

11.    Upon information and belief, the Certificate of Incorporation, By Laws and the Partner Employment Contract were drafted by CSG's attorney, Anthony Demetracopoulos. In addition to representing CSG, Mr. Demetracopoulos, also eventually represented the Multiple Faculty Health Alliance ("MFHA"), a consortium of doctors and professional corporations that negotiates with insurance companies and hospitals on behalf of its members for more favorable contract terms. Dr. Reed was not only a member of CSG, he was also president of the MFHA until his recent resignation. Other medical groups expressed concern about the conflict of interest that existed because Mr. Demetracopoulos represented both the MFHA and CSG at the same time. Subsequent to November 2001, Mr. Demetracopoulos resigned his representation of CSG due to his apparent conflicts. It was, in fact, Mr. Demetracopoulos, operating in a conflict of interest situation, who coerced me to sign the employment agreement by repeatedly visiting me in my office, requesting the signed document.

### CSG's Breach Of The Agreements

12.    By November 2001, CSG was comprised of seven cardiothoracic surgeons, including three of its founders, Dr. Reed, Dr. Moggio, and me; as well as four other surgeons, Dr. Rocco Lafaro, Dr. Howard Axelrod, Dr. Arlen Fleisher, and Dr. Elias Zias. Dr. Reed, however, was well beyond retirement age and had not performed surgery for many years. Dr. Elias Zias was an employee of CSG at the time and not yet a partner.

5

13.    Since approximately 2001, Dr. Zias and I were the most active and productive surgeons in the practice. As a result, we were the primary generators of CSG's profits and were responsible for the financial growth and success of CSG. Pursuant to the terms of paragraph 3 of the Partner Employment Contract: "The Employee's compensation will take into consideration the Employee's contribution to the Corporation, including both billable and non-billable services, such as teaching, research, and administration, to the extent the factors are relevant."

14.    Although I was the busiest and most profitable surgeon for CSG, taught classes at New York Medical College, conducted extensive research, and performed various administrative duties, my compensation was at all times equal to the compensation paid to all of the other shareholders, regardless of their contribution. Contrary to the provisions of the employment agreement and the Bylaws, I was not compensated in a manner at all commensurate with my contribution to CSG.

15. In violation of the terms of its Bylaws and in an effort to directly undermine my promised authority as President, CSG's decision making was often effected during private, closed door meetings of Drs. Reed, Lafaro, Fleisher and Axelrod. The remaining members were advised of decisions the group of four made at the few board of directors meetings that were ever held. Although I was nominally the President, I was effectively stripped of any power, had no control and was never privy to the decision-making process of these four doctors or the minutes, if any, generated by their meetings.

16. In addition, I was confronted with an increasingly hostile or indifferent attitude of other group members both inside and outside of the operating room. Other group members, apart from Dr. Zias, routinely neglected or refused to cover my patients during office

6

hours when they were supposed to cover. Upon information and belief, one member of the group, Dr. Fleisher, would routinely direct physician assistants to contact me about a patient's care on weekends or when I was not on call. Other than Dr. Zias, the members of the group were reluctant to assist me in operations and rarely, if ever, affirmatively offered assistance. I was also confronted by a routine indifference to the growing disparity in the commitment and work ethic of the members of CSG.

17. By 2003, I became increasingly concerned with the lackadaisical attitude of some members, their lack of contribution and negative approach, and most importantly, the level of care they offered. The mortality rates for some of the surgeon members of CSG were unacceptably high by any objective standard and the group's reputation was suffering as a consequence. Westchester Hospital expressed concern as well with various members of the group. My efforts to address these concerns were uniformly rebuffed. Apart from the contributions of Dr. Zias, the remaining members of the group were essentially ineffective, uncooperative, or not performing at a skill level that was acceptable. As set forth below, the group had become entirely dysfunctional and had effectively ceased to operate as intended and expected.

18. As previously stated, Dr. Reed had not by this time been an active surgeon for over a decade nor had he actively contributed to CSG. Indeed, he had proved to be, if anything, a negative influence in the group's affairs, deliberately taking actions to undermine me and others in the group such as Dr. Zias.

19. In 2003, Dr. Lafaro was unfortunately seriously ill with cancer and he remains unable to this date to perform cardiac surgery, much less at the level expected of an active

member of the group. It still remains unclear to this day, if and when Dr. Lafaro will ever return to an active medical practice.

20. In 2003, Dr. Axelrod was embroiled in an apparently bitter divorce commenced earlier that obviously detracted his attention from the practice of medicine. Dr. Axelrod's productivity likewise diminished as a result. Upon information and belief, Dr. Axelrod has in fact recently announced that he is leaving Westchester Hospital to practice elsewhere at the end of the month.

21. By 2003, Dr. Moggio was also on the verge of retirement and his productivity was also declining. Upon information and belief, Dr. Moggio has in fact announced that he is retiring this month.

22. Upon information and belief, beginning sometime prior to 2003, Dr. Fleisher was suffering from scleroderma, a disease that affects the joints in the hands and can prove detrimental to the ability of a surgeon to perform at an optimal level. Despite reassurances from Dr. Moggio about Dr. Fleisher's abilities, I was concerned about his continuing ability to perform cardiac surgeries.

23. As is apparent from the above, the reality was that there were only two excellent cardiothoracic surgeons in CSG who were active and productive for the group, Westchester Hospital. Dr. Zias and myself, and we were increasingly supporting the group without any foreseeable change in the future. My efforts to address this situation were unsuccessful. I also received disturbing reports that members of the group were in fact disparaging Dr. Zias and myself.

24. The proverbial "straw that broke the camel's back" was the termination without warning of Dr. Zias by CSG's Board of Directors in my absence and without my

consent. Dr. Zias was effectively the only surgeon employed by CSG who actively assisted me in surgery and was not reluctant to cover my patients and who had a practice that was nearly as busy as mine. Dr. Zias was initially an employee but, upon information and belief, was informed that he was a partner in 2002, although he apparently never received formal recognition of his status as a shareholder. Then, upon information and belief, Dr. Moggio informed Dr. Zias on December 3, 2003, that the Board had voted to terminate his employment for economic reasons. The decision to terminate Dr. Zias was made by the Board knowing that I would not agree if I were present for a vote and over my express objection to his termination. Upon information and belief, it was also rendered in blatant violation of the operative agreements and bylaws. See Exhibit B (an email from Dr. Moggio acknowledging this violation).

25. The termination of Dr. Zias was critical for a number of reasons. First, I knew it would have a profoundly adverse effect upon my ability to deliver quality treatment to my patients because I depended upon him both to cover my patients when I was unable to do so, and to assist me in surgery when required. I could not entrust any of the other members of CSG to do so. Second, the members of CSG had deliberately acted in a manner that was destructive of both my practice and the group's practice and reputation. Third, the members were essentially leaving me alone to support the group. Finally, and perhaps most critically, it became apparent from the state of the group and nature of its conduct that the core foundation that had sustained the group was gone and that the group was no longer viable or supportable.

26. As a result of the various deliberate breaches and disregard of obligations, and systematic destruction and deprivation of the very benefits and consideration to which I was entitled pursuant to the operative agreements, I tendered my resignation to CSG effective December 31, 2003. A copy of my resignation letter is attached as Exhibit C.

27. On January 1, 2004, I began practicing in my own right in partnership with Dr. Zias through our newly created entity, Westchester Cariothoracic Surgery, LLP ("WCS"). Although we have offices at Westchester Hospital, we have been conducting our business separate and apart from CSG since January 1, 2004. The remaining members of CSG were aware at all times of our activities and there has been no confusion to my knowledge at Westchester Hospital with respect to the distinction between the two groups.

28. Since January 1, 2004, Westchester Hospital was well aware of my departure from CSG and formation of WCS and agreed to have two groups perform cardiac surgery. Although I was no longer affiliated with CSG, all of the remaining physicians at CSG, as well as Dr. Zias and I, continued to maintain offices at Westchester Hospital and we have generally worked cooperatively with one another. Indeed, several meetings were held with all the cardiothoracic surgeons (both CSG and WCS) present as well as the Chairman of the Department of Surgery, John Savino, M.D. At these meetings, delineation of responsibilities and services to Westchester Hospital were discussed and finalized. Correspondence was exchanged among the parties confirming such details as the shared call schedule and shared coverage of the cardiac transplant and pediatric cardiac surgery programs. Attached as Exhibit D are emails demonstrating the cooperation.

29. Contrary to Plaintiff's present intimations, I have not used CSG's files or property without its knowledge and consent. In fact, we have made arrangements to compensate CSG where certain services were used. An example of CSG's acquiescence and acknowledgement of our group, WCS, is the manner in which they track shared office equipment (e.g., photocopier). CSG tracks our group's usage of the photocopier via a unique usage code and

bills us. Exhibit E shows the first bill from CSG for photocopy usage which bill was paid by
WCS.

30. In short, CSG had not, until the filing of this action, formally objected to this
arrangement or taken any steps to challenge it and was indeed cooperating with it.

## My Patient Pool Is Referred Independent Of My CSG Affiliation

31. Contrary to the Plaintiff's suggestions, approximately 80% of my patient pool
comes as a result of referral relationships that have existed since before my affiliation with any
of the doctors at CSG. Nearly 100% of my client base comes from doctors from whom I have
been receiving referrals since prior to the execution of my Partner Employment Contract.
Patients come to me, or are referred to me, not because of my affiliation with any group, but
because of my skills as a surgeon and my historically low mortality rate. Attached as Exhibit F
are the objective historical records reflecting surgical mortality rates for surgeons at Westchester
Hospital as well as articles and correspondence attesting to my reputation.

32. The statement in the Affidavit of Dr. Arlen Fleisher (the "Fleisher Aff.") that
beginning in March 2003, I began to direct patient referrals to myself by developing independent
patterns of communication with CSG referring physicians is not only without substantive
support, it is entirely false and fabricated. Fleisher Aff. at ¶ 16. The referral relationships I have
in place and had in place in March of 2003 were in fact in place prior to my signing the Partner
Employment Contract and in significant part, prior to even the formation of CSG.

33. Additionally, for the patients for whom I perform surgery, I generally do not
treat them on a long-term basis. The patient's primary care physicians and cardiologists
generally refer the patient to me. I see the patient pre-operatively, I perform the surgery, and
then I see them post-operatively. After the surgery and a post-operation visit, it is unlikely that I

11

will see any of my patients again. Therefore, my patient pool is separate and apart from the patients previously seen by other CSG surgeons, with very limited exceptions such as patients undergoing a second procedure.

### Dr. Fleisher's Affidavit Is Replete With Other Inaccuracies

34. Dr. Fleisher alleges that I limited myself to performing routine cardiac surgeries while other members of CSG performed essential administrative and other non-income producing activities and clinical support for the cardiac transplant and pediatriac cardiac surgery programs without my assistance. Fleisher Aff ¶ 18. This is absolutely untrue. Among other things, I conducted research, I taught medical students, gave lectures, and I was the surgeon representative assigned to interface with Cap Gemini in 2003, the management company hired by Westchester Hospital at that time to run it more profitably.

35. With respect to heart transplant procedures within the last three years, upon information and belief, between Dr. Zias and myself, we assisted in 30% to 40% of the surgeries performed by CSG. We assisted Dr. Anderson, the pediatric surgeon, on complex cases and he discussed surgery management with me on a regular basis, even in cases where one of us did not assist him.

36. Dr. Fleisher also claims I used a New Windsor satellite office to further cultivate my personal referral sources and that I declined to distribute referrals among the group members. Fleisher Aff. at ¶ 19. Dr. Joseph George was a founding member of the New Windsor office of the practice of cardiology, which was separate and apart from CSG. It is 40 miles from Westchester Hospital and I went there to visit patients. Dr. Fleisher had a similar arrangement with a practice in Poughkeepsie, and Dr. Lafaro had a similar arrangement with a practice in Goshen.

12

37. Dr. Fleisher also states:

> In addition, a single full service cardiac care provider such as CSG
> provides the most benefit to the hospital in affording comprehensive
> coverage of patient care, which results in a decreased length of stay and
> more efficient use of hospital resources.

Fleisher Aff. at ¶ 23. This assertion is simply untrue. Since Dr. Zias and myself started WCS,

the average length of stay for our patients is shorter than it was for CSG, our mortality rate is far

lower, and Westchester Hospital resources are thus conserved and used more efficiently.

38. Dr. Fleisher argues that my separate practice has resulted in a significant loss

of opportunities otherwise available to CSG. Fleisher Aff. at ¶ 30. This is also pure speculation

based on not a shred of evidence. The pool of referring physicians is equally available to CSG as

it is to Dr. Zias and me. It is not a particular practice that receives a referral, however, it is

almost always a specific cardiothoracic surgeon. Others refer patients to me because of my

reputation and my capabilities.

39. Dr. Fleisher claims that CSG is the only approved practice pursuant to the

Federated Faculty Practice Plan ("the FFPP"). If true, this is irrelevant. Westchester Hospital

expressed no reservation in having WSC practice at Westchester Hospital along with CSG.

Moreover, the MFHA likewise recognized WSC. See Exhibit G. Although the FFPP may or

may not have "approved" only one group per subspecialty to practice at Westchester Medical

Center, many groups per subspecialty actually practice. Some examples, upon information and

belief, there are 5 cardiology groups, 2 anesthesia groups, and 4 or more general surgery groups

currently practicing at Westchester Medical Center. Moreover, it is my understanding that the

FFPP is being dissolved in the very near future.

40. Finally, Dr. Fleisher claims that "CSG does not seek to deprive Sarabu's

existing patients of his services, and accordingly, CSG does not seek to enjoin Sarabu from

treating existing patients." Fleisher Aff. at ¶ 34. Obviously, I cannot treat my patients if I resign

my privileges at Westchester Hospital.

WHEREFORE, for the foregoing reasons and those stated in the other papers

submitted in opposition to Plaintiff's motion, it is respectfully requested that this Court deny the

Plaintiff's motion for an injunction pursuant to CPLR 6301 and grant me such other and further

relief as this Court deems just and proper.

_____
Mohan Sarabu, M.D.

Sworn to before me
This 7th day of June, 2004

_____
Notary Public

DONALD H. CHASE
Notary Public, State of New York
No. 02CH6072453
Qualified In New York County
Commission Expires April 6, 2006

14

ANDERSON DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                    :
ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,           :        07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,              :
                                                    :
                          Plaintiffs,               :
                                                    :
            -against-                               :
                                                    :
                                                    :
NEW YORK CARDIOTHORACIC GROUP, PLLC,                :
STEVEN L. LANSMAN, M.D., DAVID                      :        **DECLARATION OF**
SPIELVOGEL, M.D., WESTCHESTER COUNTY                :        **JOHN E. ANDERSON, M.D.**
HEALTH CARE CORPORATION and                         :
WESTCHESTER MEDICAL CENTER                          :
                                                    :
                          Defendants.               :
-----------------------------------------------------------------X

JOHN E. ANDERSON, M.D., under penalty of perjury, declares as follows:

1.      I am a cardiothoracic surgeon licensed to practice in the States of New York, Indiana, Pennsylvania, and New Jersey, a Diplomate of the American Board of Thoracic Surgery and a Member of the Society of Thoracic Surgeons. I hold privileges to perform surgery at Pocono Medical Center in the East Stroudsburg, Pennsylvania. I am personally familiar with the matters set forth below.

2.      From approximately May 2003 through January 2005, I served as a cardiothoracic surgeon at Westchester Medical Center in Valhalla, New York. At first my work was primarily focused on pediatric cardiothoracic surgery addressing pediatric congenital heart issues but in 2004 I also received privileges to perform cardiothoracic surgery on adults within the WMC Section of Cardiothoracic Surgery.

3.      Throughout my period of work at WMC, I was an independent attending surgeon without being affiliated with any practice group such as Cardiothoracic Surgery Group

P.C. ("CST"). I was not a member of the faculty of New York Medical College, but that did not prevent me from being permitted to perform surgery in my field of specialty at WMC, which took a welcoming approach with respect to my independent attending status.

4.    In late 2004, Dr. Steven Lansman joined WMC as the new Chief of the Section of Cardiothoracic Surgery. He had a practice group that operated under the name New York Cardiothoracic Group, PLLC. I met with Dr. Lansman to see whether there would be an open door for me to work in what was now his Section. He responded that I would not be able to continue with my "adult" privileges.

5.    As a result of Dr. Lansman's unwillingness to allow me to continue at WMC, I left in January 2005 for a position in Sioux City, Iowa. I did not, however, formally terminate my privileges at WMC and received by mail periodic invitations from WMC in 2005 to renew my privileges. Finally in December 2005, I notified WMC that I did not intend to renew. I would be glad to consider an opportunity to go back to WMC if Dr. Lansman would be willing to allow my return.

Dated: March 4, 2008

John E. Anderson, M.D.

MONSEN DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                     :
ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,            :        07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,               :
                                                     :
                                    Plaintiffs,      :
                                                     :
            -against-                                :
                                                     :
NEW YORK CARDIOTHORACIC GROUP, PLLC,                 :
STEVEN L. LANSMAN, M.D., DAVID                       :
SPIELVOGEL, M.D., WESTCHESTER COUNTY                 :        **DECLARATION OF**
- HEALTH CARE CORPORATION and                        :        **CRAIG E. MONSEN, M.D.**
WESTCHESTER MEDICAL CENTER                           :
                                                     :
                                    Defendants.      :
                                                     :
------------------------------------------------------------------X

CRAIG E. MONSEN, M.D., under penalty of perjury, declares as follows:

1.      I am a cardiologist licensed to practice in the State of New York and am

affiliated with the Cardiology Division of the Department of Medicine at Westchester Medical

Center in Valhalla, New York ("WMC"), where I have practiced since 1987. I am a Diplomate

of the American Board of Cardiology and an Associate Professor at New York Medical College,

which is affiliated with WMC. I state the matters set forth below from personal knowledge.

2.      I am a physician at WMC in the sub-specialty of interventional cardiology.

That means I specialize in the use of catheters for diagnosis and therapy with respect to coronary

disease. Interventional cardiologists play a leading role in determining whether a patient with

symptoms of heart disease should receive surgery. The diagnostic work we perform on patients

in the so-called "Cath Lab" may result in the conclusion that a particular patient requires urgent

surgery, preferably at the next opening in the cardiothoracic surgical operating room which

would commonly be the next morning following diagnosis.

3.      During the time I have served as an interventional cardiologist at WMC, I have regularly referred patients with an urgent need for cardiothoracic surgery to members of the Section of Cardiothoracic Surgery at the Hospital, including Drs. Rocco Lafaro and Arlen Fleisher. Having a choice as to which cardiothoracic surgeon to refer a patient to is important in order to meet the specific needs of the patient.

4.      I recently learned that a proposal had been made to reduce the number of operating room slots available during morning hours for use by Drs. Lafaro and Fleisher. This would be unfortunate because there are certain cases that I would be inclined to refer to those surgeons as a matter of professional judgment. Limiting morning operating room time could adversely affect the choice of surgeon.

Dated: February 2008

Craig E. Monsen, M.D.

- 2 -

SETT DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,      :
M.D., and XARDIAC SURGERY GROUP, P.C.,          :

07 Civ. 7984 (SCR)

                                                             :
                                         Plaintiffs,          :

**DECLARATION OF
SUVRO S. SETT, M.D.**

                                                             :
-against-                                                    :
                                                             :

NEW YORK CARDIOTHORACIC GROUP, PLLC,      :
STEVEN L. LANSMAN, M.D., DAVID                      :
SPIELVOGEL, M.D., WESTCHESTER COUNTY         :
HEALTH CARE CORPORATION and                        :
WESTCHESTER MEDICAL CENTER                         :
                                                             :
                                         Defendants.         :

------------------------------------------------------------------X

SUVRO S. SETT, M.D., under penalty of perjury, declares as follows:

1.      I am a cardiothoracic surgeon licensed to practice in the State of New
York, am a member of Children's and Women's Physicians of Westchester, P.C., and hold
privileges at Westchester Medical Center, Valhalla, New York ("WMC"). I am currently Chief
of the Section of Pediatric Cardiac Surgery at the Maria Fareri's Children's Hospital in WMC. I
am personally familiar with the matters set forth below.

2.      My principal areas of concentration are pediatric cardiac surgery and adult
cardiac surgery involving congenital defects, and my privileges at WMC cover surgical services
to both categories of patients. This entitles me to perform surgery on both adult and juvenile
patients and to enlist the services of WMC's nurses, perfusionists, physicians assistants, nurse-
practitioners and other allied health professionals as well as other subspecialty physicians
including pediatric cardiac anesthetists and intesivists with specialized cardiothoracic training
and experience.

3.    Since my arrival at WMC in April 2004, I have regularly performed surgical services within the Section of Cardiothoracic Surgery of the Department of Surgery. After a brief initial affiliation with Cardiothoracic Surgery Group, P.C. ("CSG"), in or about July 2004, that economic relationship was ended and I joined Children's and Women's Physicians of Westchester LLP ("CWPW"), and I have continued with CWPW ever since. At no time since have I been required to join any particular practice group to perform cardiothoracic surgery at WMC. Rather, I have worked cooperatively with all the surgeon members of the Section. Since my arrival at WMC, the pediatric cardiac surgery service at The Maria Fareri Children's Hospital at Westchester Medical Center has experienced good outcomes. In this regard, in 2005 we had a 4.1% mortality rate on 74 cases, and in 2006 we had a 2.7% mortality rate on 74 cases for cases reportable to New York State Department of Health ("NYSDOH"). In 2007 the mortality rate for NYSDOH reportable cases is being currently verified by the state and appears to be 0% on 72 cases. The overall mortality for pediatric congenital cardiac surgeries performed in NYS 2002-2005 was 4.08%.

Dated: February 26, 2008

Suvro S. Sett, M.D.

-2-

MENAKER DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                        :

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,     :    07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,       :
                                          :

                 Plaintiffs,          :
                                          :

                -against-          :
                                          :    **DECLARATION OF**
NEW YORK CARDIOTHORACIC GROUP, PLLC,      :    **RICHARD G. MENAKER**
STEVEN L. LANSMAN, M.D., DAVID              :
SPIELVOGEL, M.D., WESTCHESTER COUNTY     :
HEALTH CARE CORPORATION and             :
WESTCHESTER MEDICAL CENTER,            :
                                          :

                Defendants.       :
                                          :
--------------------------------------------------------------------X

        RICHARD G. MENAKER, under penalty of perjury, declares as follows:

        1.     I am a member of the Bar of this Court and of the firm of Menaker &

Herrmann LLP, attorneys for plaintiffs. I am personally familiar with the matters set forth herein,

and make this declaration in opposition to defendants' motion for judgment on the pleadings.

        2.     This action concerns the adverse effects on competition resulting from the

grant of exclusivity to defendants Lansman and Spielvogel and their company New York

Cardiothoracic Group, PLLC ("NYCG") at Westchester Medical Center. The exclusivity is

expressly granted in a Professional Services Agreement dated as of December 29, 2004 (the

"Exclusive Agreement").

        3.     As described in the Complaint, the acts complained of include the denial to

plaintiffs of the ability to hire qualified staff, and strategic limitation of plaintiffs' access to the

cardiothoracic operating rooms and to required staff and equipment, resulting in harm to the quality

of patient care at WMC (Compl. ¶ 55).

    4.     On February 1, 2008, in accordance with a briefing schedule authorized by the Court, defendants filed a motion for judgment on the pleadings.

    5.     On the same day defendants filed their motion, plaintiffs learned that defendant WMC, at the demand of defendant Lansman, had decided to restructure access to the cardiothoracic operating rooms to reallocate to Lansman and his company two of the five morning slots previously available to plaintiffs, effective Monday, February 11, 2008. *See* accompanying Lafaro Decl. ¶ 24. The announced cutback threatened irreparable harm to competition at WMC.

    6.     On February 6, 2008, I advised defendants' in-house counsel, Jordy Rabinowitz, that plaintiffs would be constrained to move for immediate injunctive relief if the proposed reallocation of access to the operating rooms was not deferred pending resolution of defendants' motion..

    7.     Thereafter, by letter dated February 6, 2008, WMC's Chief of Surgery advised plaintiffs that WMC had suspended the plan to reallocate the cardiothoracic operating room slots for "30-60 days while . . . designing an appropriate process for reviewing block time requests." *See* Lafaro Decl. Ex. E.

    8.     Defendants' motion papers include the false (as well as utterly irrelevant) statement that plaintiff Fleisher was once "indicted by the U.S. District Attorney." In my February 6, 2008, telephone conversation with Mr. Rabinowitz, therefore, I requested that the statement be withdrawn immediately because it was untrue. Mr. Rabinowitz subsequently sent me a letter dated February 8, 2008, in which he advised that defendants would correct their mistaken assertion.

    9.     On February 11, 2008, defendants submitted a supplemental declaration

-2-

withdrawing their indictment assertion. The supplemental declaration ends with the statement that

Mr. Rabinowitz declined my supposed "request that Defendants' motion papers be withdrawn due

to this issue..." because defendants regarded this mistaken assertion "immaterial to the issues raised

by Defendants' motion" (Rabinowitz Supp. Decl. ¶ 5). I did not, however, request that defendants

withdraw their entire motion; indeed I agreed that the falschood was utterly irrelevant to anything

in this case.

Dated: March 4, 2008

_Richard G. Menaker_

Richard G. Menaker