Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,    :    07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,    :
                                         :

                     Plaintiffs,    :
                                         :

        -against-                   :
                                         :

NEW YORK CARDIOTHORACIC GROUP, PLLC,    :
STEVEN L. LANSMAN, M.D., DAVID    :
SPIELVOGEL, M.D., WESTCHESTER COUNTY    :
HEALTH CARE CORPORATION and    :
WESTCHESTER MEDICAL CENTER    :
                                         :

                     Defendants.    :
------------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

March 4, 2008

## TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     The Relevant Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.     The Relevant Relationships . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      D.     WMC's Invitation to Lansman and Spielvogel . . . . . . . . . . . . . . . . . . . . . . . . 7

      E.     The Exclusive Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      F.     Defendants' Conduct under the Exclusive Agreement . . . . . . . . . . . . . . . . . . 10

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.     Defendants' Motion Cannot Be Granted under Either
      Rules 12(c) or 56:  There Are Genuine Issues of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.     The Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.     Defendants' Motion Raises Basic Issues of Fact . . . . . . . . . . . . . . . . . . . . . . . . 14

II.    Plaintiffs' Claims Are Not Barred by the State Action Doctrine . . . . . . . . . . . . . . . . . . 18

      A.     Defendants Fail to Meet the First Prong of the *MIDCAL* Test:
            WCHCC Is Not Authorized to "Suppress Competition". . . . . . . . . . . . . . . . . . 18

      B.     Defendants Have Not Shown "Active Supervision"
            Under the Second Prong of the *MIDCAL* Test . . . . . . . . . . . . . . . . . . . . . . . . 22

III.   Defendants Have Not Established That They Are Entitled
      to Immunity from Damages under the LGAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

-ii-

IV.    Plaintiffs Have Standing to Assert Antitrust Claims ............................ 28

      A.    Plaintiffs Have Alleged Actionable Antitrust Injury ...................... 29

      B.    Plaintiffs Are the Right Parties to Raise the Antitrust Challenge ............ 33

Conclusion ................................................................. 37

## TABLE OF AUTHORITIES

Page

**Cases**

*Angelico v. Lehigh Valley Hosp., Inc.*
    184 F.3d 268 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 33, 34

*Atlantic Richfield Co. v. USA Petroleum Co.*
    495 U.S. 328 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*
    459 U.S. 519 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*Balaklaw v. Lovell*
    14 F.3d 793 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

*Bell Atlantic Corp. v. Twombly*
    __ U.S. __, 127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Blue Shield of Va. v. McCready*
    457 U.S. 465 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*Brader v. Allegheny Gen. Hosp.*
    64 F.3d 869 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Brown v. Presbyterian Healthcare Services*
    101 F.3d 1324 (10th Cir. 1996); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
    429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Burnette v. Carothers*
    192 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*
    445 U.S. 97 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Capital Freight Services, Inc. v. Trailer Marine Transp. Corp.*
    704 F. Supp. 1190 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.*
    790 F.2d 1032 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 24

*Cleveland v. Caplaw Enterprises*
    448 F.3d 518 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

*Consolidated Gold Fields PLC v. Minorco, S.A.*
    871 F.2d 252 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Crosby v. Hosp. Auth. of Valdosta and Lowndes County*
    93 F.3d 1515 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Daniel v. American Bd. of Emergency Med.*
    428 F.3d 408 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*Daniel v. American Board of Emergency Medicine*
    988 F. Supp. 127 (W.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*DeMuria v. Hawkes*
    328 F.3d 704 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Doron Precision Systems, Inc. v. FAAC, Inc.*
    423 F. Supp. 2d 173 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Electrical Inspectors, Inc. v. Village of East Hills*
    320 F.3d 110 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22-25

*Fuentes v. South Hills Cardiology*
    946 F.2d 196 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Iqbal v. Hasty*
    490 F.3d 143 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

*Islami v. Covenant Med. Ctr., Inc.*
    822 F. Supp. 1361 (N.D. Iowa 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*
    466 U.S. 2 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Korshin v. Benedictine Hosp.*
    34 F. Supp. 2d 133 (N.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*

940 F.2d 397 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Mahmud v. Kaufmann*
496 F. Supp. 2d 266 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*McMorris v. Williamsport Hosp.*
597 F. Supp. 899 (M.D. Pa. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Montauk-Caribbean Airways, Inc. v. Hope*
784 F.2d 91 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*New York v. Julius Nasso Concrete Corp.*
202 F.3d 82 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*New York Medscan LLC v. N.Y.U. Sch. of Med.*
430 F. Supp. 2d 140 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30

*New York ex. rel. Spitzer v. St. Francis Hosp.*
94 F. Supp. 2d 399 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-21

*Oltz v. St. Peter's Cmty. Hosp.*
861 F.2d 1440 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Parker v. Brown*
317 U.S. 341, 63 S. Ct. 307 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Patrick v. Burget*
486 U.S. 94 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pinhas v. Summit Health, Ltd.*
894 F.2d 1024 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Reddy v. Puma*
2006 WL 2711535 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-30, 32-34

*Robles v. Humana Hosp. Cartersville*
785 F. Supp. 989 (N.D. Ga. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sandcrest Outpatient Services, P.A. v. Cumberland County Hosp. System, Inc.*
853 F.2d 1139 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Sheppard v. Beerman*
18 F.3d 147 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Surgical Care Ctr. of Hammond v. Hospital Service Dist. No. 1 of Tangipahoa Parish*
    171 F.3d 231 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Todorov v. DCH Healthcare Auth.*
    921 F.2d 1438 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*U.S. Football League v. NFL*
    887 F.2d 408 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Zenith Radio Corp. v. Hazeltine Research, Inc.*
    395 U.S. 100 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Statutes and Rules**

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 28

15 U.S.C. § 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 12, 13

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Local Civil Rule 56.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.Y. Public Auth. Law, § 3301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

N.Y. Public Auth. Law, § 3303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

N.Y. Public Health Law § 2800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

**Other Authorities**

Jonathan M. Jacobson & Scott A. Sher, *"No Economic Sense" Makes No Sense for
    Exclusive Dealing*, 73 Antitrust L.J. 779 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                          :

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,    :    07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C.,     :
                          :

                Plaintiffs,       :
                          :

       -against-               :
                          :

NEW YORK CARDIOTHORACIC GROUP, PLLC,   :
STEVEN L. LANSMAN, M.D., DAVID          :
SPIELVOGEL, M.D., WESTCHESTER COUNTY   :
HEALTH CARE CORPORATION and          :
WESTCHESTER MEDICAL CENTER          :
                          :

                Defendants.    :
-----------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

         Defendants claim to move under Fed. R. Civ. P. 12(c) for "judgment on the pleadings," but their motion's title is a misnomer. The content of the papers shows that in reality defendants are seeking pre-discovery summary judgment, which is governed instead by Fed. R. Civ. P. 56. The motion proceeds on false premises and should be rejected.

         A Rule 12(c) motion must focus exclusively on the allegations of the complaint. Defendants, however, ground their motion on a twisted version of the facts, set forth in a declaration from in-house counsel which attaches various mischaracterized and misdescribed documentary items. Defendants' memorandum of argument adds further supposed extrinsic "facts," including

assertions about the conduct and motives of hospital officials that are unsupported by the evidentiary submissions, and it makes attributions of conduct and intent to plaintiffs that are simply untrue.

It is well established that "a complaint should not be dismissed on the pleadings unless it 'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006), quoting *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). Defendants here ignore the facts on which plaintiffs base their claims. Instead, apparently aware of their inability to meet the Rule 12(c) standard, they try to shore up their motion with a counter-set of supposed facts. But that in effect converts the motion to one for summary judgment under Fed. R. Civ. P. 56, which cannot be granted because defendants fail to show that there is no genuine issue as to any material fact. Issues of fact abound because defendants have their most basic "facts" wrong.

## STATEMENT OF THE CASE

The complaint pleads in detail the facts underlying plaintiffs' claims for relief, far surpassing the requirements of Fed. R. Civ. P. 8(a)(2) that the pleading provide "a short and plain statement of the claim showing that the pleader is entitled to relief," and of *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), that sufficient facts be alleged to show that the claims for relief are "plausible." As set forth in the complaint, and as further amplified in the motion papers submitted herewith,[1] plaintiffs allege conduct by defendants that unlawfully restrains competition in the markets for emergency and urgent cardiothoracic surgery. The relevant facts may be summarized as follows.

---

[1] The complaint is annexed as Exhibit 1 to defendants' motion. *See also* accompanying declarations of Rocco J. Lafaro, M.D., and Arlen M. Fleisher, M.D., both dated February 26, 2008, Craig Monsen, M.D., dated February 29, 2008, John E. Anderson, M.D., dated March 4, 2008, Suvro S. Sett, M.D., dated February 26, 2008, and Richard G. Menaker, dated March 4, 2008.

## A.     The Parties

Plaintiff Rocco J. Lafaro, M.D. ("Lafaro") and plaintiff Arlen G. Fleisher, M.D. ("Fleisher") are both cardiothoracic surgeons licensed to practice medicine in the State of New York, with their practices based at Westchester Medical Center in Valhalla, Westchester County ("WMC") (Compl. ¶¶ 1, 2, annexed as Ex. A to Rabinowitz Decl.). Lafaro and Fleisher are principals of plaintiff Cardiac Surgery Group, P.C. ("CSG"), a New York professional corporation (*id.* ¶ 3).

Defendants Steven L. Lansman, M.D. ("Lansman") and David Spielvogel, M.D. ("Spielvogel") are also New York-licensed cardiothoracic surgeons and practice at WMC through their entity defendant New York Cardiothoracic Group PLLC ("NYCG") (*id.* ¶¶ 6-8). Defendant Westchester County Health Care Corporation ("WCHCC") is a public benefit corporation established by New York State in 1997 to take over the function of Westchester County's Department of Hospitals (Compl. ¶ 4). Defendant WMC is the public hospital operated by WCHCC (*id.* ¶ 5).

## B.     The Relevant Markets

Both the individual plaintiffs and defendants hold surgical privileges at the WMC complex in Valhalla, whose facilities offer specialized inpatient and outpatient medical services for patients in the seven counties of the lower Hudson Valley (Compl. ¶ 12). Particularly at issue in this case is the work of the Section of Cardiothoracic Surgery, a unit of WMC's Department of Surgery. The four individual parties work within this Section, and defendant Lansman currently serves as Section Chief. The Section handles surgery that requires opening the thoracic region of the body. Such activity is a recognized sub-specialty within the surgical profession, has its own post-graduate training, and involves an examination and accreditation process separate from other branches of

surgery. Operating room staff also have to be specially trained, and the rooms themselves require specialized equipment (Lafaro Decl. ¶ 21).

Within the parameters of the specialty, a number of different services are provided, including (a) emergency cardiothoracic surgery; (b) urgent cardiothoracic surgery; (c) emergency pulmonary and other non-cardiac thoracic surgery; (d) urgent non-cardiac thoracic surgery; and (e) elective cardiac and non-cardiac thoracic surgery (Lafaro Decl. ¶ 2). This action concerns services in categories (a) - (c) (Compl. ¶ 49). In the vast majority of relevant patient cases, such services are not interchangeable either with treatment by medication or with intervention by non-surgical procedures using a catheter. These facts are significant for the definition of relevant product or services markets in connection with plaintiffs' Sherman Act § 1 claims (Compl. ¶ 49).

The relevant geographic market for the services at issue in this action is the segment of the lower Hudson Valley north of the Cross County Parkway in Westchester County, south of Interstate 84 and Rockland and Orange Counties. Emergency services involving apparent heart attack or collapsed lung are highly time- and distance-sensitive, and WMC, where the individual plaintiffs and defendants perform their specialties, is the medical facility used by greater than 80% of the patients experiencing symptoms of such conditions in that geographic area. Less than 20% of such patients use the services of any other medical facility. Because the selection of facility for such services must be made on an expedited basis, third-party payers have virtually no role in the selection of the medical facility with respect to the patients these services (Compl. ¶¶ 49-51).

## C.    The Relevant Relationships

As a public hospital, WMC has an inclusive mandate, granting privileges to any physician in the seven-county area who meets the professional criteria established by the Hospital's

-4-

medical board (Compl. ¶ 13). While WMC has agreements with individual medical staff members providing for guaranteed compensation, particularly in the four services in which the practitioners do not have patients of their own (radiology, anesthesiology, pathology and emergency medicine), the Hospital historically has not had exclusive provider arrangements outside those four support services. In fact, the Medical Staff Bylaws require WMC to grant non-exclusive privileges to qualified practitioners in the region it serves (Lafaro Decl. Ex. A). Its policy of inclusion, which encompasses the specialty of surgery and its various sub-specialties, assures WMC patients of choice among medical service providers, thereby encouraging competition to provide the most effective treatments, the highest standard of care, and reasonable cost (*id.* ¶¶ 13-14).

WMC is affiliated with New York Medical College (the "College"), a teaching institution that awards advanced degrees in medicine, science and the health professions. The College has its principal teaching facility at the WMC complex at Valhalla. Many of the physicians who obtain privileges at WMC also become members of the College faculty. The College governs the functioning of the clinical faculty via an unincorporated Federated Faculty Practice Plan (the "FFPP") (Compl. ¶ 16). Any physician with privileges at WMC who applies for and receives an appointment to the full-time faculty of the College is required to comply with the Bylaws of the FFPP for recognition as a "full-time" faculty member and to qualify for various rights and benefits that inure only to "full-time" faculty. WMC has been contractually bound to the College/FFPP via their Affiliation Agreement, which establishes the framework for administering the graduate medical education program. WMC also incorporates the terms of the FFPP Bylaws in its own Medical Staff Bylaws and Rules and Regulations (Compl. ¶ 17)

The FFPP Bylaws provide that "full-time" faculty of the College must conduct their

practice of medicine within self-governing practice groups, each known as a Faculty Clinical Practice ("FCP"), which have been approved by the FFPP.    Also per the FFPP Bylaws, "No FCP may retain or employ an individual to provide a service which an approved FCP already provides, unless the hiring of such person is approved by the existing FCP and the Executive Committee of the FFPP." (Article II.G.3 (b) of the FFPP Bylaws 2002).  Therefore, absent a qualifying waiver, each distinct sub-specialty service is provided by only one FCP.  No such waiver has ever been approved for the Cardiothoracic Service in which the individual plaintiffs and defendants have their practices (Compl. ¶ 18).

WMC recognizes the existence of the vital role of the FFPP by incorporating in its own Medical Staff Bylaws and in the Rules and Regulations of the Medical Staff Bylaws the requirement that each of its Directors of Service (*e.g.*, for the Departments of Surgery, Medicine, Pediatrics, etc.) and each of its Chiefs of Section (*e.g.*, within Surgery, Cardiothoracic, Plastics, General, Transplant, etc.) be "full-time staff." (Article VII, Sec. 3 (2)(b) Bylaws, 2007).  To meet that requirement, they "must practice as a member of an FFPP approved faculty clinical practice unless either or both of these requirements are waived by a majority of the voting members of the Executive Committee of the medical staff present."  (Full Time Staff, p. 12, 2007 Rules and Regulations) (Compl. ¶ 19).  The rationale for this requirement is straightforward. The day-to-day clinical training of medical students must be co-ordinated with the work of the Hospital, and such co-ordination is assured if the full-time faculty practice through a single recognized FCP (Lafaro Decl. ¶ 13).

Plaintiffs Lafaro and Fleisher have both long been full-time faculty members of the College, and their professional corporation CSG has been the approved cardiac surgery FCP under

the FFPP since 1999. Membership in CSG is open to any thoracic surgeon who obtains privileges at WMC and appointment as a full-time member of the College faculty. CSG is self-governing on democratic principles in accordance with the FFPP Bylaws (Compl. ¶ 20). NYCG, on the other hand, has never been recognized by the FFPP because Dr. Lansman's control arrangements contravene the democratic governance conditions in the Bylaws (Lafaro Decl. ¶ 12).

The provision of the Bylaws requiring membership in a single FCP in each practice area exists solely for College faculty members. Qualified physicians who do not serve on the faculty are still welcome to obtain privileges at WMC on an independent basis, without joining an FCP. The Section of Cardiothoracic Surgery has had several such independent surgeons during the past decade (Lafaro Decl. ¶ 14), and defendants Lansman and Spielvogel themselves have never been members of a recognized FCP (*see* pp. 14 *infra*). Defendants' repeated assertion that CSG "was the *de facto* sole provider of cardiothoracic surgery at WMC" (Defs' Mem. at 1, 5, 24-26, 29-31) is untrue.

## D.    WMC's Invitation to Lansman and Spielvogel

During the period 2001 through 2004, WCHCC and WMC experienced widely publicized problems with their management and fiscal operations. An audit by the New York State Comptroller found that the operating company went from a $2.6 million surplus in 2000 to a cumulative operating loss of $207 million by the end of 2004. According to the State Comptroller, WCHCC's "combination of fiscal challenges, financial control weaknesses and accounting problems brought it close to the point of collapse" (Compl. ¶22). Anticompetitive conduct was a significant component of the practices criticized by the Comptroller, including specifically improper use of credit cards by WCHCC officials "to circumvent competitive bidding requirements" (Compl. ¶ 23).

The financial issues at WMC created a crisis environment, resulting in disagreements

among the professional staff and ultimately in the departures of a number of physicians.    The

Section of Cardiothoracic Surgery was among the units that experienced unrest and attrition during

this period, although Drs. Lafaro and Fleisher remained loyal to the institution and continued their

practice at WMC and their membership on the faculty of the College (Compl. ¶ 24).    Nevertheless,

the reduced size of the Section caused WMC management to search for additional cardiothoracic

surgeons who could help restore patient volume in this field.

In late 2004, WMC (with the enthusiastic support of Lafaro and Fleisher) recruited

defendant Lansman to affiliate with WMC (Lafaro Decl. ¶ 8).    Dr. Lansman had previously served

as a cardiothoracic surgeon at Mount Sinai Hospital in Manhattan and had cardiac transplant

experience.    The latter was a field that WCHCC and WMC were seeking to restore to the Hospital

in the wake of the WMC's financial issues and reputational decline (Compl. ¶ 25).    As part of the

inducement to join WMC, it appears that Lansman was promised the position of Chief of the

Section, as well as a full-time faculty position in the College (Compl. ¶ 26).    Further, it appears that

Lansman conditioned his acceptance of WMC's offer on the appointment of his former Mount Sinai

colleague, defendant Spielvogel, to both the Section and to the College faculty, and the WMC

representatives agreed to those conditions (Compl. ¶ 27).

On or about January 4, 2005, Lansman established a limited liability entity company,

eventually known as New York Cardiothoracic Group, through which Lansman would contract with

WMC (Compl. ¶ 28).    Shortly thereafter, Lafaro and Fleisher (who had enthusiastically supported

the recruitment of Lansman) invited Lansman and Spielvogel to join CSG.    While membership in

CSG was not a precondition to obtain privileges to serve in the Section of Cardiothoracic Surgery

at WMC, it was the sole approved FCP for that medical service, and membership was a precondition

at WMC, it was the sole approved FCP for that medical service, and membership was a precondition to appointment as a full-time member of the College faculty (Compl. ¶¶ 18, 20, 29). Nevertheless, Lansman and Spielvogel rejected the plaintiff's invitation to join CSG, responding that Lafaro and Fleisher should disband CSG and join NYCG instead. Lafaro and Fleisher declined the counter-proposal because of Lansman's absolute control of NYCG, which violated the democratic self-governance requirements of the FFPP Bylaws (Compl. ¶ 30).

## E.    The Exclusive Agreement

In or about January 2005, WCHCC entered into a written Professional Services Agreement with NYCG, Lansman and Spielvogel, dated as of December 29, 2004, under which NYCG was engaged to be the exclusive provider of cardiothoracic surgical, professional and administrative services at WMC (the "Exclusive Agreement")[2]. No prior notice was given to plaintiffs of such Agreement, nor was any effort made to obtain consent from the governing body of the FFPP (Compl. ¶ 31). The Exclusive Agreement covenanted to Lansman and Spielvogel that NYCG (and thus effectively its owners, Lansman and Spielvogel) would be the only surgeons who could provide the service of cardiothoracic surgery at WMC, with an exception for certain "Grandfathered" physicians, including Lafaro and Fleisher of CSG, two other surgeons formerly members of CSG (Drs. Sarabu and Zias), and a fifth surgeon who had never been affiliated with CSG (Dr. Sett) (Rabinowitz Aff., Ex. A, at p. A-2). The effect of the restrictive covenant was to bar any heart and lung surgeon other than one controlled by Lansman and Spielvogel from obtaining cardiothoracic surgery privileges to perform such services at WMC and thereby to prevent CSG from

---

[2] *See* declaration Jordy Rabinowitz, in-house counsel at WCHCC, dated February 1, 2008, in support of defendants' motion ("Rabinowitz Decl.") Ex. 5.

bringing in other professionals to expand its capacity to provide cardiothoracic surgery (Compl. ¶ 32).

**F.    Defendants' Conduct under the Exclusive Agreement**

Under color of the Exclusive Agreement, defendants have taken a number of steps with adverse implications for quality of care and competition in cardiothoracic surgery. First, the Agreement has reduced defendants' incentive to be price sensitive. For example, Lansman and Spielvogel apparently decline to be providers under several major healthcare insurance plans that might reimburse them at less than their established rate (Compl. ¶ 33). Second, the Agreement has empowered Lansman and Spielvogel to exclude competitors at WMC, thereby limiting patient choice. Thus, in August 2006, CSG invited a highly qualified physician's assistant, Michael Evans, ("Evans") then practicing in New Jersey, to join CSG and provide operating room support. Evans' application for privileges received approval from both the requisite WMC committees (*id.* ¶ 38). Despite such approvals, WMC has announced that Evans' "application cannot be processed *because there is an existing exclusive agreement*" with NYCG with respect to the Section of Cardiothoracic Surgery (*id.* ¶ 39, Ex. A) (emphasis added) Letter of Linda Glickman, WMC's Vice President for Clinical and Academic Affairs, dated February 16, 2007.

Third, and of particular concern for competition and quality of care, defendants have used their advantage under the Exclusive Agreement to limit availability of competitive services. As Chief of the Section of Cardiothoracic Surgery, Lansman has directed that the scheduling of access to the operating rooms, assignment of staff and availability of equipment for cardiac and non-cardiac thoracic surgery at WMC be handled in a manner that gives preference to him and Spielvogel and causes maximum disadvantage to CSG and their patients. In February 2008, for example,

-10-

Lansman arrogated to his company, NYCG, two of the five morning slots in the cardiothoracic operating rooms that had previously been assigned to CSG. He also directed that non-cardiac thoracic cases (which are handled largely by Lafaro and Fleisher) be handled in non-cardiothoracic operating rooms "if a cardiac surgical case is waiting" (Lafaro Decl. Ex. D). Elimination of 40 percent of plaintiffs' morning slots would deprive them a major part of the urgent cases referred to them by WMC cardiologists, which ordinarily require action the morning following diagnosis (Monsen Decl. ¶ 2). And consignment to the general operating rooms for non-cardiac thoracic surgery would deprive those patients of support staff, including specialized cardiothoracic anesthetists, who are needed to assure the highest quality of patient care (Lafaro Decl. ¶ 21).

Plaintiffs' objections have been ignored. Only when plaintiffs' counsel advised his counterpart of their intent to seek a preliminary injunction was the reallocation of operating room slots tabled for "30-60 days while...designing an appropriate process for reviewing block time requests" (Menaker Decl. ¶ 7). Meanwhile, the risk remains that defendants Lansman and Spielvogel will take actions in their own interests that impair both plaintiffs' ability to compete and the quality of care available to patients at WMC.

\* \* \*

At a difficult time in its history, WMC management recruited a heart transplant surgeon to restore its prestige and enhance its stature as the leading tertiary care medical facility between New York City and Albany. The appointment of Dr. Lansman was intended to achieve that objective. But the affiliation came with conditions that contravene federal and state competition law and harm the quality of patient care. Thus this action.

-11-

## SUMMARY OF ARGUMENT

The motion for judgment on the pleadings is flawed. To begin with, and most obviously, it is largely predicated on extrinsic facts or on theories that are fact intensive. This is the stuff of Rule 56, not Rule 12(c). The Court should permit discovery and then allow summary judgment motions at an appropriate time. Plaintiffs believe that, at least on certain issues, summary judgment may ultimately be granted in their favor.

Defendants cannot prevail on either of their immunity theories. The state action doctrine requires that two prongs be satisfied – proof of a legislative authorization for the defendant entities "to suppress competition," and "active supervision" by government of the private parties. Both prongs must be shown, and defendants cannot show either. Moreover, the active supervision prong is highly fact intensive; it cannot be established on the face of a pleading. The alternative immunity theory, based on the Local Government Antitrust Act, is equally unavailing. Defendants admit that it relates only to the availability of *damages* against a local government, so the injunctive portion of the case is concededly unaffected. And the statute only covers local government under circumstances that do not exist here as a factual matter. Defendants' attempt, in addition, to stretch the immunity to the non-governmental actors is without merit.

Defendants' back-up theory based on antitrust standing flies in the face of settled authority, including several recent decisions in Second Circuit courts. The anticompetitive agreement at issue and the conduct associated with it diminish the quality of patient care in ways that are described in concrete terms in both the complaint and these papers. That impact aligns plaintiffs' interests with the interests of consumer welfare, renders the injury precisely the kind of harm the antitrust laws are designed to prevent, and makes plaintiffs "efficient enforcers" of those laws.

-12-

Defendants' resort to a (misstated) recitation of extrinsic facts and a false and gratuitous smear of

plaintiff Fleisher demonstrate the lack of confidence they have in their legal arguments.  Their claim

that damages are "speculative," at this early stage of the proceedings, in a case focused in significant

part on injunctive relief, is frivolous.

**ARGUMENT**

**I.      Defendants' Motion Cannot Be Granted under Either
         Rules 12(c) or 56: There Are Genuine Issues of Fact.**

**A.      The Applicable Legal Standards**

Defendants present their motion as one for judgment on the pleadings under Rule

12(c). The legal standard governing such a motion is identical to that governing a motion to dismiss

under Rule 12(b)(6) for failure to state a claim. *Clevelend v. Caplaw Enterprises*, 448 F.3d. at 521;

*see also DeMuria v. Hawkes,* 328 F.3d 704 (2d Cir. 2003); *Burnette v. Carothers*, 192 F.3d 52 (2d

Cir. 1999).  Under this standard, "the court must accept as true the complaint's factual allegations

and draw all inferences in the plaintiff's favor." *Cleveland v. Caplaw Enterprises*, *supra.*  As long

as the plaintiff has pled "enough facts to state a claim to relief that is plausible on its face,"  the

complaint survives. *See Bell Atlantic Corp. v. Twombly,* __ U.S. __, 127 S.Ct. 1955, 1974 (2007).

The Second Circuit has interpreted *Bell Atlantic* to require "a flexible 'plausibility standard' which

obliges a pleader to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir.

2007). A "heightened fact pleading of specifics" is not required. *Twombly,* 127 S. Ct. at 1974.

Defendants do not, however, limit their motion to a challenge to the adequacy of the

allegations in the complaint. Instead, they present factual assertions that extend far beyond the

-13-

complaint, request the Court to accept those assertions as true, and premise their demand for dismissal on a determination that the assertions are correct. Rule 12(c) anticipates that a party might proceed in that manner, providing as follows:

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The standard for a motion under Rule 56 is altogether different from the Rule 12(c) test. A Rule 56 motion may be granted only if upon the entire record, including "the affidavits, if any," the movant can successfully "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). Moreover, on any motion for summary judgment, this Court requires that the moving party include with the notice of motion "a separate, a short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of a motion." Local Civil Rule 56.1 (a).

**B.    Defendants' Motion Raises Basic Issues of Fact.**

From the very first words of their memorandum, defendants have their facts wrong. Defendants describe this action as "a study in contradiction," by which they mean that plaintiffs' objection to the Exclusive Agreement is hypocritical (Defs' Mem. at 1). Defendants go on to chide Lafaro and Fleisher for complaining about exclusivity when plaintiffs' own entity CSG was previously "the *de facto* sole provider of cardiothoracic surgery at WMC" (*id.*). Defendants contend that Dr. George Reed, a now-retired founder of CSG who is not involved in this action, argued in

-14-

another case involving enforcement of a noncompetition clause in the CSG shareholders agreement "that a 'sole provider' model was in the best interest of all cardiac patients" (*id.*).

These contentions of supposed fact are repeated a half dozen times or more throughout defendants' memorandum (*e.g.*, at 1, 2, 5, 6, 24-26, 29-31, 34-35). At one point, defendants have plaintiffs claiming that CSG "is the only 'approved provider of cardiothoracic service'" at WMC (*id.* at 29). Defendants' assertions are factually inaccurate and misleading, and they cannot serve as a basis for accelerated judgment.

To begin with, CSG is not and never has been the exclusive entity through which cardiothoracic surgeons could provide their services at WMC. To be sure, it is the only FCP (Faculty Clinical Practice) for cardiothoracic surgery recognized by the College, in accordance with the requirements of the FFPP (Compl. ¶¶ 16-20; Fleisher Decl. ¶ 9). As such, it is open to any thoracic surgeon who obtains privileges at WMC and appointment as a full-time member of the College faculty (Compl. ¶ 20). But that is altogether different from claiming CSG was the "*de facto* sole provider of cardiothoracic surgery at WMC" to the exclusion of other surgeons. To the contrary, WMC, because of its inclusive mandate as a public hospital, has allowed a number of qualified surgeons to provide cardiothoracic services at the Hospital without their being affiliated with CSG. Thus, for example, during the years immediately prior to the arrival of defendants Lansman and Spielvogel, Drs. John E. Anderson and Suvro S. Sett both had privileges to perform cardiac surgery at WMC (Anderson Decl. ¶¶ 2-3). Both were able to carry on their practices without any exclusivity limitation by CSG (Sett Decl. ¶¶ 2-3; Fleisher Decl. ¶ 6).

Defendants also refer to court papers from a lawsuit between CSG and its former member, Mohan Sarabu, M.D., as supposed evidence for their "*de facto* sole providers" assertion

-15-

(Rabinowitz Decl. ¶ 15, Ex. 8, 9, 10; Defs' Mem. at 5-6). The reference is distorted and misleading. Dr. Sarabu had signed an employment agreement with CSG that required him, in the event he left, not to compete with CSG for a two-year period within a limited geographic area. An arbitrator upheld that noncompete clause and awarded CSG damages for Dr. Sarabu's violation of it when he left CSG and set up a competing practice group in 2003 (Fleisher Decl. ¶ 7). The court papers in question were filed in a related state court action by CSG seeking to preliminarily enjoin Sarabu from violating the noncompete clause while the arbitration was pending (Fleisher Decl. ¶ 8). Sarabu opposed the motion by claiming, *inter alia*, that the noncompete clause should not be enforced because, if it was, "Westchester Hospital will likely suffer irreparable harm, [and] the patients in the surrounding community will suffer irreparable harm ..." (Fleisher Decl. Ex. A, ¶ 4).

The affidavits of Drs. Fleisher and Reed and attorney Anthony Demetracopoulos (now relied on by defendants in this case) responded to Sarabu's public policy argument, correctly noting that CSG was the sole approved Faculty Clinical Practice under the FFPP and that this actually provided a public benefit (Fleisher Decl. ¶ 9). Significantly, nowhere did any of those affiants claim other cardiothoracic surgeons were barred from practicing at WMC, because, as noted above, other such surgeons *were in fact practicing there*. Indeed, Sarabu himself stressed that WMC "expressed no reservation" in having him and his new practice entity operating at WMC (Fleisher Decl. Ex. A, ¶ 39). Sarabu's problem was not that CSG was the "sole provider" – it was not – but that he had signed an enforceable noncompete clause. The request for an injunction was denied, but CSG prevailed in the arbitration (Fleisher Decl. ¶10).

Defendants also attempt to minimize the impact of the Exclusive Agreement by providing supposed statistics purporting to show no significant reduction in plaintiffs' number of

surgical cases from 2005 to 2007 (Rabinowitz Decl. ¶ 12). Plaintiffs have had no discovery concerning those figures and thus no opportunity to test their accuracy. Injecting this kind of extrinsic matter into the record raises serious questions under Fed. R. Civ. P. 12(c) as well as Fed. R. Civ. P. 56(f). The latter rule authorizes the Court to deny a summary judgment motion where the opposing party, for good reason, "cannot present facts essential to justify its opposition."

Moreover, defendants' figures are suspicious. As noted above, Dr. Lansman recently attempted to arrogate to his company two of plaintiffs' five morning surgical slots on the express ground that "[t]he data shows that the New York Cardiothoracic Group (NYCTG) is doing 2/3 of all cardiothoracic volume and is approaching doing 3/4 of adult cardiac cases." These statistics supposedly justified the proposed re-apportionment of access to the operating rooms (1/9/08 Lansman letter, Lafaro Decl. Ex. D). Lansman's claim that he and his colleagues are dramatically surpassing plaintiffs in volume of cases does not square with in-house counsel's supposed statistics. Rather, it reinforces plaintiffs' claim that the Exclusive Agreement is having a devastating anticompetitive effect.

Defendants' extrinsic "facts" cannot support accelerated judgment, whether on the pleadings or by summary judgment. They are sharply disputed and demonstrably wrong. Nor should those assertions be allowed to smear plaintiffs, even if irrelevantly and gratuitously. The Court will have seen defendants' astonishing falsehood that in 2005, "it was widely reported in the media that Dr. Fleisher and two other area physicians were indicted by the U.S. District Attorney [sic]" (Defs' Mem. at 6). What defendants refer to was in fact an investigation under a criminal complaint that was in due course voluntarily withdrawn by the Government (Fleisher Decl. ¶ 11). Defendants have

-17-

submitted a supplemental declaration correcting their falsehood. It is impossible to conceive what valid or relevant purpose was supposed to have been served by the mistaken accusation.

## II.    Plaintiffs' Claims Are Not Barred By The State Action Doctrine.

Defendants argue that they are entitled to immunity for their anticompetitive acts under the state action doctrine first articulated in *Parker v. Brown*, 317 U.S. 341, 63 S. Ct. 307 (1943). *See* Defs' Mem. at 9 -18. To prevail on their motion, defendants must establish as a matter of law that they satisfy the two-pronged test set out in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980): 1) that the challenged anticompetitive restraint is "one clearly articulated and affirmatively expressed as state policy"; and 2) that the state's policy is "actively supervised" by relevant government officials. *Both* prongs must be satisfied; defendants satisfy neither.

## A.    Defendants  Fail To Meet The First Prong of the *MIDCAL* Test: WCHCC Is Not Authorized To "Suppress Competition."

As the Second Circuit stated in *Electrical Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 118 (2d Cir. 2003), the first prong of the *Midcal* test has two components:

> [M]unicipalities that wish to avail themselves of *Parker* immunity must show that their regulations were authorized by the state. The requisite showing of authority has two components: first, the municipality must have "authority to regulate"; second, it must have "authority to suppress competition." (Citations omitted.)

Defendants argue that WCHCC is a public benefit corporation exempt from antitrust liability because it is authorized to contract, to provide health services, and to credential physicians.[3]

---

[3] The dispute here relates not to plaintiffs' professional qualifications, but to defendants' attempt to restrict their ability to practice at WMC for the commercial benefit of the individual defendants and their practice group.

*See* Defs' Mem., at 3-4. Defendants, however, have not established that the state legislature has given WCHCC the "authority to suppress competition." Indeed, defendants do not cite the case most directly on point, *New York ex. rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000), which makes clear that New York State's deregulation of hospitals in 1997 was intended to subject hospitals to competition -- not to thwart it.

In *St. Francis*, Judge Conner granted summary judgment in favor of plaintiff State of New York and rejected the defendant hospitals' claim of antitrust immunity under the "disfavored" state action defense. *Id.* at 409. After carefully considering the history of hospital regulation in New York, Judge Conner concluded that the state legislature had ended its "policy of replacing competition with state regulation" in 1997 and, instead, had "determined to promote competition in the health care marketplace by increasing reliance on market incentives while reducing the role of legislation." *Id.* at 409-11. Accordingly, the Court found that, as here, "[d]efendants' anticompetitve conduct thwarts the State's policy of promoting competition for hospital services." *Id.* at 411. The Court's analysis in *St. Francis* is consistent with the Ninth Circuit's in *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 402-03 (9th Cir. 1991), where a hospital's claim of *Parker* immunity was rejected because California's heath care policy, like New York's, favors competition:

> California has not displaced competition with regulation in the provision of hospital services and ... defendants [a public hospital, hospital district and medical group] are therefore not shielded by state-action immunity.... [W]hen there are abundant indications that a state's policy is to support competition, a subordinate entity must do more than merely produce an authorization to "do business" to show that the state's policy is to displace competition.

*See also Surgical Care Center of Hammond v. Hospital Service Dist. No. 1 of Tangipahoa Parish,* 171 F.3d 231, 235-36 (5th Cir. 1999) (rejecting defendant Louisiana hospital's claim of *Parker* immunity because "it is not the foreseeable result of allowing a hospital district to form joint ventures that it will engage in anticompetitve conduct" and "[t]o infer a policy to displace competition from, for example, authority to enter into joint ventures or other business forms would stand federalism on its head.").

Defendants have not even come close to demonstrating the existence of a "clearly articulated and affirmatively expressed" state policy giving WCHCC the "authority to displace competition." That the state legislature empowered WCHCC to enter into contracts or to provide health services hardly establishes it "foresaw" that WCHCC would exercise those powers in an anticompetitve manner. *See Lancaster Cmty. Hosp., supra,* 940 F.2d at 402-03; and *Surgical Care Center of Hammond, supra,* 171 F.3d at 235-26. If such a generalized showing were sufficient, federalism would, indeed, be stood on its head and the "disfavored" defense of state action immunity allowed to swallow the Sherman Act's general rule in favor of competition. Could *Parker* immunity be invoked simply by showing that a public benefit corporation had the power to contract and deliver services, federal competition law would be ousted from a wide swath of the state's economy wherever a public benefit corporation was authorized to do business.[4]

---

[4] Defendants reliance on *Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.,* 790 F.2d 1032 (2d Cir. 1986) is misplaced. The Second Circuit noted there that a state subdivision does "not enjoy the deference due a state as a sovereign;" that to be entitled to "state immunity from federal law, it must first identify a 'clearly expressed state policy' that authorizes its actions;" and that "the existence of such policy [is] more readily discernible in narrowly drawn legislation." *Id.,* at 1042-43 (citations omitted). There is a stark difference between general powers conferred by the state legislature upon WCHCC to do business and the specific powers conferred upon the *Cine* defendant (the UDC) to condemn, clear, improve and redevelop property without the necessity of competitive bidding. *Id.,* at 1044-45. It is telling that the same judge who dismissed the *Cine* complaint on *Parker* grounds also rejected that defense in *St. Francis* - Judge Conner.

The goal of New York's Public Health Law is to maintain the highest quality health care at reasonable cost. N.Y. Pub. Health Law § 2800. As Judge Conner held in *St. Francis*, the legislature's intent - at least since 1997 - has been to effectuate those policy goals by subjecting hospitals to the laws of competition. Defendants point to no state statute or regulation that permits WCHCC to displace competition by entering into contracts, combinations, or conspiracies that violate § 1 of the Sherman Act. On the contrary, in 2005 the State Comptroller criticized WCHCC for engaging in various improper financial practices, including the use of credit cards "to circumvent competitive bidding requirements." Complaint, ¶ 23.[5]

Surely, if the state legislature, which created WCHCC in 1997 — the same year it changed its policies to "promote competition in the health care marketplace" (*St. Francis, supra,* 94 F. Supp. 2d at 411) – had intended to exempt WCHCC from those policies, it would have said so "clearly and affirmatively" in WCHCC's authorizing legislation. The state legislature did not do so, and WCHCC is not entitled to shield its anticompetitve acts under the cloak of state action immunity. On this basis alone, defendants' state action arguments must be rejected.

---

Two lower court cases also relied upon by defendants are, likewise, inapt. At issue in *Daniel v. American Board of Emergency Medicine*, 988 F. Supp. 127 (W.D.N.Y. 1997) was a credentialing dispute that occurred prior to the state's deregulation of hospitals in 1997. At issue in *Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F.Supp.2d 173 (S.D.N.Y. 2003) was a sole source contract let by the New York City Transit Authority where its authorizing legislation - in marked contrast to WCHCC's - specifically exempted it from competitive bidding requirements.

[5] Contracts let by public subdivisions above certain *de minimis* amounts are generally subject to competitive bidding requirements. *See* §103, General Municipal Law (McKinney's 2007). In upholding *Parker* immunity in *Cine*, the Second Circuit found it noteworthy that the state had not required the UDC to engage in competitive bidding and had permitted the UDC to set whatever criteria it wanted when competitive bidding was employed. 790 F.2d at 1045. Here, by contrast, WCHCC's authorizing legislation subjects it to the competitive bidding requirements of the General Municipal Law except in very narrow circumstances and specifies, even as to those, that "cost should in all cases be a major criterion." Public Auth. Law, §3303 (8-10).

**B.    Defendants Have Not Shown "Active Supervision"
under the Second Prong of the *MIDCAL* Test.**

Even assuming, *arguendo*, that the Court were to conclude that the first *Midcal* prong were somehow satisfied because the state Legislature had authorized WCHCC "to suppress competition," the Court would still have to conduct a factual inquiry to determine how the second, "active supervision," prong of the *Midcal* test should be applied.[6] Defendants argue that the private actors here are automatically entitled to the same *Parker* immunity as WCHCC. Defs' Mem., at 17-18. That is not the law, and there are numerous factual issues arising under the second prong of the *Midcal* test that must be resolved before the Court can determine whether any defendant, including WCHCC, is entitled to state action immunity. The existence of those factual issues necessarily requires denial of defendants' motion to dismiss (*see* Point I *supra*).

A threshold question – a mixed one of law and fact – is whether WMC is a public or private defendant for purpose of a *Parker* analysis[7]. Defendants assume that WMC is a public defendant. Defs' Mem., at 17-18. The complaint, however, alleges in paragraph 5 – and the answer admits as true – that WMC is a separate entity from WCHCC – *i.e.* that WMC is "a public hospital... managed by WCHCC." (*See* Rabinowitz Decl. Ex. 1 and 2). Moreover, WCHCC's authorizing legislation makes clear that WCHCC and WMC are indeed separate entities, describing WMC as a pre-existing public hospital owned by Westchester County. Pub. Auth. Law, §3301. The *St. Francis* court applied the second, "active supervision" prong of the *Midcal* test to the activities of

---

[6] Such a factual inquiry would not be necessary, of course, if the Court were to determine as a matter of law that the state legislature had not authorized WCHCC "to suppress competition."

[7] There is no dispute that WCHCC is a public defendant and that Lansman, Spielvogel and NYCG are private defendants for this purpose.

the two defendant hospitals there although both were non-profit corporations, one affiliated with the

Catholic church and the other not. *St. Francis, supra,* 94 F. Supp.2d, at 409-11. At a minimum,

discovery is required here to determine the details of the relationship between WCHCC and WMC

in order to assess whether WMC should be considered a public defendant for purposes of a *Parker*

analysis.

The *Electrical Inspectors* decision is the leading Second Circuit precedent with

respect to how the *Parker* doctrine should be applied in situations involving both public and private

defendants. Whatever WMC's status, *Electrical Inspectors* makes clear that additional factual

inquiry is necessary to determine whether any defendant here – public or private – is entitled to state

action immunity. Indeed, the Second Circuit there vacated a grant of summary judgment in

defendants' favor and remanded for further fact-finding proceedings regarding the proper application

of the second prong of the *Midcal* test. As the court said, "we decline to decide this heavily factual

issue in the first instance on the record before us." *Electrical Inspectors*, 320 F.3d at 129.

The *Electrical Inspectors* decision makes clear that the "active supervision" prong

of the *Midcal* test may well apply to the actions of WCHCC itself, not just to those of the private

defendants here. Stressing that "[l]ocal governments are not sovereign and so their actions are not

automatically immune under *Parker*" *(id.,* at 118), the Second Circuit concluded that there was an

unresolved question of law as to whether a municipality itself was entitled to state action immunity

where it had failed to discharge its obligation of "active supervision":

> Whether a municipality must make such a showing [active
> supervision of a private party] appears to be an open question. The
> Supreme Court held in *Town of Hallie* that a municipality need not
> show that it is supervised by state officials for it to qualify for state-
> action immunity. But the Supreme Court also indicated that "[w]here

-23-

> state or municipal regulation by a private party is involved, ... active
> state supervision must be shown, even where a clearly articulated
> state policy exists." This raises the question of whether a failure to
> show active supervision of a private party can defeat *both* the
> municipality's claim of immunity *and* the private party's, or only the
> private party's. We are not aware of any decision that squarely
> addresses this issue.

*Id.,* at 122 (emphasis in original and citations omitted.) The court ultimately declined to decide this

issue of law absent a fuller factual record regarding the municipality's "active supervision" of the

private defendant. *Id.*, at 129. Moreover, the Second Circuit instructed the district court to consider

whether an injunction should be issued against the municipality even though its actions were

authorized by the state if, on remand, it was found not to have "actively supervised" the private

defendant. *Id.*

The *Electrical Inspectors* decision is also highly instructive with regard to the proper

application of the second prong of the *Midcal* test to the activity of private defendants. The Second

Circuit there distinguished the *Cine* and *Wheelabrator* cases, on which defendants here rely for the

proposition that Lansman, Spielvogel and NYCG are automatically entitled to state action immunity

by virtue of their contract with WCHCC (320 F.3d at 126):

> *Cine* and *Wheelabrator* do not stand for the proposition that private
> parties who contract with governmental agencies are always immune
> from antitrust liability. As the Supreme Court has made clear, the
> relevant object of analysis under the state-action immunity doctrine
> is the activity challenged, not the identity of the party.... [T]he private
> party's "mere status as a government contractor does not entitle it to
> antitrust immunity for all its conduct," reinforcing the notion that the
> relevant unit of analysis is the activity challenged, not the status of the
> party. The suspension of the requirement for an independent
> immunity inquiry for the private parties in *Cine* and *Wheelabrator,*
> therefore, should be understood to apply only to their acts of
> contracting with an authorized government entity. (Citations
> omitted.)

Here, of course, the anticompetitve acts challenged go well beyond the contract into which WCHCC entered with the private defendants.   They include such additional acts as defendants' limitation of plaintiffs' ability to expand their practice and better serve their patients at WMC by refusing to let them hire a physician's assistant from New Jersey and by attempting to restrict their access to operating rooms (Compl. ¶¶ 36-46 Lafaro Decl. ¶¶ 19-26).  Thus, as *Electrical Inspectors* holds, the private defendants here are not entitled to state action immunity absent a showing that their challenged acts, beyond the mere act of contracting with WCHCC, have been "actively supervised" by appropriate government officials.

The Second Circuit grounded its ruling in *Electrical Inspectors* (320 F.3d at 125) on the rationale set forth in *Patrick v. Burget*, 486 U.S. 94, 100-101 (1988).  On appeal there was a jury verdict in favor of plaintiff physician injured by defendant physicians' misuse of the peer review process in violation of the antitrust laws. The Supreme Court, concluding that defendants were not entitled to state action immunity because the  "active supervision" prong of the *Midcal* test had not been satisfied, explained:

> The active supervision requirement stems from the recognition that "[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." The requirement is designed to ensure that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies.  To accomplish this purpose, the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct. The mere presence of some state involvement or monitoring does not suffice. (Citations omitted.)

Accordingly, even were this Court to conclude that the first prong of the *Midcal* test had been satisfied, a factual inquiry would nevertheless be necessary under *Midcal*'s second prong to make

sure that the private defendants had not acted in their own commercial self-interest rather than pursuant to a sanctioned state policy to assure delivery of the highest quality health care at reasonable cost at WMC.  *See* N.Y. Pub. Health Law § 2800.

### III.   Defendants Have Not Established That They Are Entitled to Immunity from Damages under the LGAA.

Defendants argue that they are entitled to immunity from damages under the Local Government Antitrust Act ("LGAA").  *See* Defs' Mem. at 18-22.  It should be noted, of course, as an initial matter that the LGAA "does not apply to claims for injunctive relief under the Sherman Act."  *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 95 (2d Cir. 1986).  The only issue raised by this part of defendants' motion, therefore, is whether plaintiffs can recover antitrust damages under the federal statute.

Defendants' LGAA argument fails for reasons similar to those that fatally infect their claim to state action immunity.  Indeed, the courts have held that the same two-pronged *Midcal* test used to determine *Parker* immunity applies to the LGAA.  *See, e.g., Crosby v. Hosp. Auth. of Valdosta and Lowndes County,* 93 F.3d 1515, 1535-36 (11th Cir. 1996).  Accordingly, the same intensely fact-based  issues arise that caused the Second Circuit in *Electrical Inspectors* to vacate and remand for additional fact-finding on the question of "active supervision."  Moreover,  there is a substantial mixed question of fact and law as to whether WMC, a separate entity predating the formation of WCHCC, is a "local government" within the meaning of the LGAA.  *See* discussion *supra* at 22.

Defendants' argument that the individual defendants and their corporate entity are entitled to damages immunity under the LGAA is, at the very least, premature.  Indeed, in a case

defendants themselves cite, *Capital Freight Services, Inc. v. Trailer Marine Transp. Corp.*, 704

F.Supp. 1190 (S.D.N.Y. 1989), Judge Leval denied a motion to dismiss a claim for damages against

private defendants on LGAA grounds because "[t]he issue whether a person or entity has acted at

the direction of a local government is manifestly one of fact." *Id.*, 704 F.Supp. at 1201. Judge

Leval's decision is, thus, in accord with the Second Circuit's decision in *Electrical Inspectors*.[8]

Defendants argue here that Drs. Lansman, Spielvogel and NYCG are entitled to

damages immunity under the LGAA because they purportedly "act in their official capacity...

pursuant to the Hospital's bylaws." Defs' Mem. at 21-22. This statement of "fact," however, is

inconsistent with the allegations of the complaint which must be accepted as true for purposes of a

motion to dismiss.[9]  That alone is sufficient to defeat defendants' motion. *See* discussion *supra* at

Point I. More troubling, the assertion that Lansman, Spielvogel and NYCG acted in an "official

capacity" at WMC is flatly contradicted by defendants' *own* factual submission which reveals that

these three defendants were not even WMC employees. *See* the Professional Services Agreement,

annexed as Exhibit 5 to the Rabinowitz Decl., which specifically provides at § 2 that the "Company

[NYCG] and its Physicians [Lansman and Spielvogel] shall be independent contractors and *not*

*employees* of the Hospital" (emphasis added). This recital in the Exclusive Agreement at the heart

of the instant dispute raises, at the very least, critical factual issues that mandate denial of any

---

[8] The principal LGAA cases on which defendants rely with respect to the liability of the individual defendants and NYCG are not to the contrary. *See Crosby v. Hosp. Auth. of Valdosta and Lowndes County*, *supra;* and *Sandcrest Outpatient Services, P.A. v. Cumberland Cmty. Hosp. System, Inc.*, 853 F.2d 1139 (4th Cir. 1988). Both cases were decided on motions for summary judgment, not on motions to dismiss, based upon extensively developed factual records – absent here – regarding the relationships between the various defendants and the extent of supervision by government officials.

[9] Plaintiffs have alleged that the individual defendants and NYCG are engaged in the practice of cardiothoracic surgery at WMC in violation of WMC's own bylaws. Complaint, ¶¶ 16-19 and 34-35.

attempt – especially one at the pleading stage – to insulate these defendants from liability for damages caused by their unlawful conduct.

### IV.    Plaintiffs Have Standing to Assert Antitrust Claims.

Defendants argue in the alternative that plaintiffs' claims are barred for lack of antitrust standing (Defs' Mem. at 23-35). The argument is without merit. Plaintiffs amply meet the requirements of Clayton Act § 4, 15 U.S.C. § 15(a), which authorizes private antitrust claims precisely of the kind brought here. Innumerable such actions have been upheld at the pleading stage, including many brought by health services providers against the predatory or monopolistic acts of competitors.

Count I of the complaint charges defendants with a "continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1" (Compl. ¶ 54). Under Section 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found ...." 15 U.S.C. §15(a). This is the statutory footing upon which any private right of action for damages under the antitrust laws stands. Defendants never mention it.

Over the course of the Clayton Act's long history, the standing to sue provision in § 4 has been refined through judicial construction to delineate the kind of injury that will count as a proper ground for private action. To determine whether a plaintiff has standing in an antitrust case, the courts now employ a two-prong inquiry. *Reddy v. Puma*, 2006 WL 2711535 (E.D.N.Y.) at *4. Specifically, the Court must ask: "(1) has the plaintiff asserted an antitrust injury and (2) is the plaintiff the proper plaintiff to assert the antitrust laws?" *N.Y. Medscan LLC v. N.Y.U. Sch. of Med.*,

430 F. Supp.2d 140, 146 (S.D.N.Y 2006) (citing *Balaklaw v. Lovell*, 14 F. 3d 793, 797 n. 9 (2d Cir. 1994). Both prongs of the tests are satisfied here.

**A.    Plaintiffs Have Alleged Actionable Antitrust Injury.**

Defendants argue that the harms to plaintiffs set forth in the complaint do not constitute an actionable antitrust injury (Defs' Mem. at 23-30). That argument should be rejected. It is indeed true that a plaintiff must be able to assert "injury of the type that the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Moreover, as stressed in *Balaklaw, supra*, the alleged injury must be in harmony with the design of the antitrust laws to "protect competition and not merely competitors." 14 F.3d at 797. Harm to competition is properly pled through allegations that defendants' anticompetitive behavior had "adverse effects on the price, quality, or output of the relevant good or service." *N.Y. Medscan*, 430 F. Supp. 2d at 146. And as the Court in *Reddy* noted, the injuries suffered by a competitor "need not be the exact injury suffered by consumers, but, so long as the competitor's injury flows from the same alleged anticompetitive acts, the competitor will have satisfied the first prong in the test to determine standing to sue. 2006 WL 2711535 at *4, citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 258 (2d Cir. 1989).

The healthcare industry has been a frequent testing ground for restraints on competition. In case after case, the courts have upheld the right of health care providers like plaintiffs here to seek redress under the antitrust laws for harm caused by the exclusionary conduct of their direct competitors. In *Summit Health*, for example, the Ninth Circuit, in a decision affirmed by the Supreme Court, reversed a dismissal based on supposed lack of standing and held that

individual medical care providers injured by exclusionary concerted action had standing to seek redress under the Clayton Act § 4. *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1032 (9th Cir. 1989), *cert. granted in part*, 496 U.S. 935 (1990), *cert. denied*, 498 U.S. 817 (1990), *aff'd*, 500 U.S. 322 (1991). In *Brader v. Allegheny*, the Third Circuit reversed a similar dismissal, holding that a physician had antitrust standing to sue peers who had limited his ability to practice and thereby reduced competition in the relevant market. *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869 (3d Cir. 1995). *Accord, Reddy v. Puma, supra*; *Angelico v. Lehigh Valley Hosp. Inc.*, 184 F.3d 268, 273-75 (3d Cir. 1999); *see also Fuentes v. South Hills Cardiology*, 946 F.2d 196 (3d Cir. 1991); *Mahmud v. Kaufmann*, 496 F. Supp. 2d 266, 275-76 (S.D.N.Y. 2007); *N.Y. Medscan LLC v. N.Y.U. Sch. of Med., supra.* Similar results have been reached on summary judgment motions, *Islami v. Covenant Med. Ctr. Inc.*, 822 F.Supp. 1361 (N.D.Iowa 1992), and after trial, *Brown v.   Presbyterian Healthcare Services*, 101 F.3d 1324 (10th Cir. 1996); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F. 2d 1440, 1435-48 (9th Cir. 1988).

   In this case, Drs. Lafaro and Fleisher have alleged in detail grounds for a determination that they have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which make defendants' acts unlawful." *Brunswick Corp., supra*, 429 U.S. at 489. The complaint describes the clause in the Exclusive Agreement as well as exclusionary acts in furtherance of it – e.g., obstruction of plaintiffs' ability to employ a physician's assistant, strategic denial of access to the cardiothoracic ORs and to required medical staff and equipment (Compl. ¶¶ 39, 55) – that have caused or threaten specific injuries both to competition and to plaintiffs. In addition, since the complaint was filed, defendant Lansman has taken new exclusionary steps, this time to deprive plaintiffs of two of their five morning slots in the cardiothoracic ORs, with

potentially devastating implications for patient care and for plaintiffs' livelihoods (Lafaro Decl. ¶ 19).

Within the framework of organized medical care, courts have repeatedly found allegations of this kind sufficient to state an antitrust injury, irrespective of a showing of increased prices to consumers. *See, e.g., Reddy v. Puma, supra*, at *4. As pointed out in *N.Y. Medscan*, in a healthcare context, "the quality of care is likely to be at least as important to patients as the price." 430 F.Supp.2d at 148. There is a major convergence of interest between a healthcare provider whose livelihood is harmed by exclusionary practices and the patient population whose quality of treatment is degraded by those practices. *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d at 276 (deterioration of quality or reduction of output is sufficient to show antitrust injury).

Defendants' motion papers do not seriously address these points, and they ignore the entirety of the jurisprudence that contradicts their position. Instead, they introduce extrinsic facts and argue that plaintiffs complain about "nothing more than a 'reshuffling' of competitors" (Defs' Mem. at 24). But as discussed in detail above (pp. 15-17 *supra*), defendants have their facts wrong. Their focus on the dispute between CSG and Dr. Sarabu misstates the status of competition at WMC before Lansman and Spielvogel arrived. Neither Dr. Fleisher nor Dr. Reid contended in that dispute that CSG had a right to exclusive provision of services in cardiothoracic surgery at WMC. Nor did they claim, contrary to defendants' assertion now, that they were the "*de facto* exclusive provider of cardiothoracic services" (*id.* at 25). Rather, as Fleisher states explicitly in the language quoted from his affidavit (but misconstrued by defendants), CSG was the recognized FCP under the FFPP in relation to *appointment of faculty at New York Medical College*. CSG did not claim any basis to exclude independent surgeons, such as Drs. Anderson or Sett, from practicing cardiothoracic surgery

at WMC – exactly the opposite position from that taken now by Lansman concerning his company, defendant NYCG.

Defendants are also mistaken in purporting to draw parallels between the circumstances in this case and those in *Balaklaw v. Lovell, supra*, 14 F.3d 793, and *Korshin v. Benedictine Hosp.*, 34 F. Supp. 2d 133 (N.D.N.Y. 1999). In both those cases, the courts stressed the absence of any showing that the challenged restraints on trade affected consumer welfare in the relevant markets. The plaintiffs there, anesthesiologists in both instances,[10] simply focused on the harm to their own pocketbooks. Here, in contrast, the complaint emphasizes the adverse impact on quality of patient care resulting from the Exclusive Agreement (Compl. ¶¶ 46, 56). These effects are also described in detail in the accompanying declarations (*see* Lafaro Decl. ¶¶ 15-21 and 27-29; Monsen Decl. ¶¶ 3-4). Moreover, the Exclusive Agreement, combined with the refusal of defendants Lansman and Spielvogel to be a provider under several major healthcare plans that might reimburse them at less than their customary rate, may well have lead to an increase in price to cardiothoracic patients at WMC. *See* Compl. ¶ 33.

Defendants argue that "the courts decline to find antitrust standing when a physician alleges antitrust violations while retaining privileges at a defendant hospital" (Defs' Mem. at 27). The argument is frivolous, as evidenced by the recent decision of Judge Vitaliano in the *Reddy* case,

---

[10] Hospitals establish relationships with staff physicians, who do not have their own patients, that is materially different from their relationship with independent attending physicians, who compete for patients in the health care market. Radiologists, pathologists, anesthesiologists and emergency physicians are in the staff physician category (Lafaro Decl. ¶ 3), and the courts have given hospitals somewhat more latitude to have exclusive arrangements with such health care professionals where quality of care is unaffected. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984). The courts give much sharper scrutiny where the service providers compete directly for patients, as do the cardiothoracic surgeons in this case, because of the implications for patient care. *See Reddy v. Puma, supra* (discussing cardiologists).

where the cardiologist in question had retained his privileges. Equally misplaced is defendants'

contention that "it is perfectly permissible under the Sherman Act for one business entity to refuse

to deal with another business entity" (Defs' Mem. at 27, citing *McMorris v. Williamsport Hosp.*, 597

F. Supp. 899, 913 (M.D.Pa. 1984)). Of course that is true – unilateral conduct does not violate § 1

of the Sherman Act. But a group of business entities may not get together, enter into an exclusive

agreement, and take other action in combination with one another if their conduct harms competition

in a relevant market, thereby undermining consumer welfare. Sherman Act § 1.[11]  Nor is this a case,

such as *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 441 (2d Cir. 2005), where the plaintiff

seeks "to join the exclusive arrangement of which he complains while leaving the exclusivity

requirement otherwise intact" (quoted in Defs' Mem. at 30).  Plaintiffs here seek restoration of

WMC's general policy of non-exclusivity.  Its abrogation has caused genuine antitrust injury.

**B.      Plaintiffs Are the Right Parties to Raise the Antitrust Challenge.**

The second prong in the test for standing is whether the plaintiffs are the proper

parties to assert a claim for wrongdoing under the antitrust laws. *Blue Shield of Va. v. McCready*,

457 U.S. 465 (1982). The critical issue here is "whether the interests of the plaintiff-competitor align

with those of consumers generally." *Reddy v. Puma*, 2006 WL 2711535, at *5. This principle

follows from a series of Supreme Court decisions in which the court sorted out what constitutes

adequate alignment with the interests of the consuming public. *Compare McCready, supra*, with

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983); *see*

*also Angelico v. Lehigh Valley Hosp. Inc.*, 184 F.3d at 275.  Where the plaintiff can show that the

---

[11]  For a recent scholarly analysis by two respected commentators emphasizing the role of consumer
welfare in the context of unlawful exclusive agreements, *see* Jonathan M. Jacobson & Scott A. Sher, "'*No
Economic Sense" Makes No Sense for Exclusive Dealing*, 73 Antitrust L.J. 779, 799-801 (2006).

harm complained of consists of a cutback in services or other decline in the quality of the services

provided, the courts have held such plaintiff to be an appropriate, or "efficient," enforcer of the

antitrust laws. *Angelico, supra.* Again, the *Reddy* case provides useful guidance. There, the court

found that the plaintiff cardiologist's

> alleged interests do not diverge from consumers in any significant
> way as to deny him standing to bring suit. Notably, the primary
> alleged antitrust injury here is a decrease in the provision of qualified
> care. As Dr. Reddy correctly asserts, he is knowledgeable about
> defendant's anticompetitive conduct. In fact, as a cardiologist
> practicing in the relevant marketplace, he is among those most
> competent to show how defendants' alleged anticompetitive conduct
> has affected the quality of interventional cardiology services in that
> market. Moreover, because of the nature of the alleged injury to the
> public, which is widely dispersed, third parties have less incentive to
> sue.

2006 WL 2711535 at *5.

Precisely the same thing can be said of Drs. Lafaro and Fleisher here. This case

involves specific allegations of a cutback in the provision of qualified care, including constraints on

CSG's ability to hire appropriate personnel and reduction of plaintiffs' access to the cardiothoracic

ORs. Likewise, as competitors of the individual defendants in a highly specialized field, they are

among the most competent to show how defendants' anticompetitive conduct has affected the quality

of surgical services of the relevant markets. It is hard to imagine how consumers, i.e., the patients

or the third-party payers, would be in a position to address the issues knowledgeably. Indeed,

defendants' exclusive agreement is not generally a matter of public knowledge and defendants even

refused initially to produce it to plaintiffs. Accordingly, plaintiffs are by far the most efficient

enforcers of the antitrust laws given the issues here.

Defendants contest this view, calling Drs. Lafaro and Fleisher "the worst possible choice to bring these claims," but again that position derives from their mistaken contention that plaintiffs at an earlier point had a "*de facto* exclusive arrangement" at WMC (Defs' Mem. at 31). As shown above and in the accompanying declarations, defendants are beating a dead winged horse. It never existed, and repeatedly claiming the contrary does not make it so.

Defendants place mistaken reliance on *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1450-51 (11th Cir. 1991), and *Daniel v. Am. Bd. of Emergency Med., supra*, 428 F.3d at 443, both of which derive their analyses from the alignment-of-interest principle in *McCready* and *Assoc. Gen. Contractors*. Both cases are inapposite. In *Todorov*, a neurologist had sued after he was denied permission to perform head CT scans in his hospital's radiology department. The Eleventh Circuit found that he lacked antitrust standing because, *inter alia*, he was not harmed by the allegedly inflated fees imposed by the defendants on patients, nor would the court support his effort to benefit from inflated fees. 921 F.2d at 1454.

In *Daniel*, the plaintiffs were uncertified emergency room physicians who charged that two professional organizations and several hospitals had imposed certification criteria that unlawfully excluded the plaintiffs from Board-certification in the field of emergency medicine, preventing them from being compensated at the same level as certified specialists. 428 F.3d at 418-19. The court found a lack of standing to sue. The inability of the plaintiffs to earn "super-competitive remuneration that the cartel scheme makes available to ABEM-certified doctors" was not a valid antitrust injury. *Id.* at 441. By seeking to join in such a remuneration arrangement, plaintiffs did not have interests aligned with consumer welfare. Moreover, the injury to the plaintiffs in *Daniel* was less direct than it would be to healthcare insurers or other medical fee payers who

-35-

were better situated to pursue a valid antitrust objectives – e.g., to have plaintiffs certified to create more competition and bring costs down. *Id.* at 444. Similar considerations render the other case relied on by defendants, *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989 (N.D. Ga 1992), equally inapposite.

The facts of those cases are far removed from those presented here. Plaintiffs do not complain about being paid lower fees as a result of defendants' exclusionary acts. Rather, the Exclusive Agreement and conduct related thereto have adversely affected overall competition in a way that affects plaintiffs *and* patients – it has cut back on the supply of professional services in emergency and urgent cardiothoracic surgery and left the field to competitors who, facing less competition, offer less choice and a reduced quality of patient care (Compl. ¶ 56). On that basis, and under all the relevant authority, plaintiffs have standing to sue under the antitrust laws.

Finally, defendants argue that plaintiffs lack standing to sue because their damage claim is "speculative." Defs' Mem. at 35-36. Defendants' argument makes no sense because plaintiffs seek injunctive relief in addition to monetary damages. In addition, the complaint alleges injury to plaintiffs' business and property resulting directly from defendants' conduct that impaired their ability to maintain and expand their practice. *See, e.g.,* Complaint at ¶¶ 37-46 and 55-57.[12] Lost business and profits are a traditional source of damages in many contexts, from contract to tort to antitrust, and – far from being "speculative" – are susceptible of proof in a variety of ways.

Defendants' baseless, unsupported  characterization of the damage claim here is not

---

[12] *Assoc. Gen. Contactors of Cal., Inc. v. California State Council of Carpenters, supra,* on which defendants rely, bears no relationship to this case. The Supreme Court there specifically noted that, based on its theory of the case, the plaintiff union could have suffered, at most, only attenuated, indirect injuries and that more directly injured parties would have had standing to sue. 459 U.S. at 541-42.

a proper reason for dismissing the complaint, especially since the "burden of proving antitrust damages is not as rigorous as in other types of cases." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir.2000). *See also Zenith Radio Corp. v. Hazeltine Research, Inc..* 395 U.S. 100, 123 (1969) ("[D]amages issues in [antitrust cases] are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.") Indeed, where antitrust damages are difficult to calculate, even nominal damages have been held sufficient to support a valid claim and even an award of attorneys' fees. *See, e.g., U.S. Football League v. NFL*, 887 F.2d 408 (2d Cir.1989) ($1 actual damages, $5.5 million in attorneys' fees.)

### CONCLUSION

For all these reasons, and for the reasons stated in the accompanying declarations, defendants' motion for judgment on the pleadings should be denied.

Dated: New York, New York
     March 4, 2008

Respectfully submitted,

MENAKER & HERRMANN LLP

By: _____
     Richard G. Menaker (RM 4716)

Attorneys for Plaintiffs
10 East 40th Street
New York, New York 10016
(212) 545-1900

Stephen D. Houck,
    Of Counsel.