UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROCCO J. LAFARO, M.D.,
ARLEN G. FLEISHER, M.D.,
and CARDIAC SURGERY GROUP, P.C.,

              Plaintiff,

  -against-

NEW YORK CARDIOTHORACIC
GROUP, PLLC, STEVEN L. LANSMAN, M.D.,
DAVID SPIELVOGEL, M.D., WESTCHESTER
COUNTY HEALTH CARE CORPORATION
and WESTCHESTER MEDICAL CENTER,

              Defendants.

Case No. 07 Civ. 7984 (SCR)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

*Attorneys for Defendants*

Jordy Rabinowitz (JR-6558)
Senior Associate General Counsel
WESTCHESTER COUNTY HEALTH CARE CORPORATION
Executive Offices – Taylor Care Center
Valhalla, New York  10595
(914) 493-2101

Leonard M. Rosenberg (LR-6910)
Justin M. Vogel (JV-5839)
GARFUNKEL, WILD & TRAVIS, P.C.
111 Great Neck Road
Great Neck, New York  11021
(516) 393-2200

862999v.10

## Table of Contents

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT .................................................................................................................. 3

POINT I

    DEFENDANTS' MOTION IS PROPERLY CONSIDERED
    UNDER RULE 12(c) OF THE FEDERAL RULES OF CIVIL
    PROCEDURE .................................................................................................. 3

POINT II

    DEFENDANTS ARE ENTITLED TO STATE ACTION
    IMMUNITY BECAUSE DEFENDANTS HAVE ACTED
    PURSUANT TO STATE POLICY AND ARE NOT REQUIRED
    TO SHOW ACTIVE STATE SUPERVISION ............................................... 5

A.    WCHCC/WMC Are Acting Pursuant To Clearly Authorized State
    Policy .................................................................................................................. 6

B.    All Of The Defendants Are Immune Under The State Action
    Doctrine And Do Not Need To Satisfy "Active Supervision" By
    The State ............................................................................................................ 9

POINT III

    DEFENDANTS ARE IMMUNE FROM ANTITRUST
    DAMAGES UNDER THE LGAA ............................................................... 14

## Table of Contents (cont'd)

Page

POINT IV

PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR
FEDERAL ANTITRUST CLAIM .................................................................16

A.    Plaintiffs Do Not Establish Antitrust Injury ........................................16

B.    Plaintiffs Are Not Efficient Enforcers Of The Antitrust Laws ...........................18

C.    Plaintiffs' Damage Claims Are Speculative ........................................19

CONCLUSION.................................................................................................20

862999v.10

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Associated Contractors of California, Inc. v. California
  State Counsel of Carpenters,*
  459 U.S. 519, 103 S. Ct. 897 (1983)......................................................................................18

*California Retail Liquor Dealers v. Midcal Aluminum, Inc.*
  445 U.S. 97, 100 S.Ct. 932 (198)...........................................................................................6

*Cargil, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104, 107 S.Ct. 484 (1986)......................................................................................18

*Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.,*
  790 F.2d 1032 (2d Cir. 1986)..........................................................................6, 11, 12, 16

*Coastall Neuro-Psychiatric Associates, P.A. v. Onslow Memorial
  Hospital, Inc.,*
  795 F.2d 340 (4th Cir. 1986) ...............................................................................................16

*Commercial Money Center, Inc. v. Illinois Union Ins. Co.,*
  508 F.3d 327 (6th Cir. 2007) .................................................................................................4

*Crosby v. Hosp. Auth. of Valdosta and Lowndes County,*
  93 F.3d 1515 (11th Cir. 1996), *cert denied,* 117 S.Ct. 1246 (1997)...................................14, 15

*Daniel v. American Board of Emergency Medicine,*
  428 F.3d 408 (2d Cir. 2005)..................................................................................................18

*Daniel v. American Board of Emergency Medicine,*
  988 F.Supp 127 (W.D.N.Y.1997) ...........................................................................7, 8, 14, 15

*Doron Precision Systems, Inc. v. FAAC Inc.,*
  423 F. Supp.2d 173 (S.D.N.Y. 2006).......................................................................7, 14

*Electrical Inspectors, Inc. v. Village of East Hills,*
  320 F.3d 110 (2d Cir. 2003)......................................................................2, 6, 10, 11, 12, 13

*In re AES Corp. Securities Litigation,*
  825 F. Supp. 578 (S.D.N.Y. 1993) .........................................................................................4

iii

*In re Enron Corp.,*
    2007 WL 2446498 (S.D.N.Y. 2007)..................................................................4

*International Audiotext Network, Inc. v. American Tel. & Tel. Co.,*
    893 F. Supp. 1207 (S.D.N.Y. 1994)
    *aff'd* 62 F.3d 69 (2d Cir. 1995)........................................................................4

*Jefferson Parish Hospital District No. 2 v. Hyde,*
    466 U.S. 2 (1984).................................................................................13, 16

*Johnson v. Nyack Hosp.,*
    773 F.Supp 625 (S.D.N.Y. 1991),
    *aff'd* 964 F.2d 116 (2d Cir. 1992).....................................................................13

*Korshin v. Benedictine Hosp.,*
    34 F. Supp.3d 133 (N.D.N.Y. 1999)................................................................17

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 1991)............................................................................4

*Lancaster Community. Hosp. v. Antelope Valley Hosp. Dist.,*
    940 F.2d 397 (9th Cir. 1991) ...........................................................................8

*Montauk-Caribbean Airways, Inc. v. Hope,*
    784 F.2d 91 (2d Cir. 1986)............................................................................15

*Name Space, Inc .v. Network Solutions Inc.,*
    202 F.3d 573 (2d Cir. 2000)..........................................................................12

*New York v. St. Francis Hosp.,*
    94 F. Supp.2d 399 (S.D.N.Y. 2000)..........................................................6, 7, 8

*Reddy v. Puma,*
    2006 WL 2711535 (S.D.N.Y.).................................................................18, 19

*Sandcrest Outpatient Servs. v. Cumberland Cty. Hosp Sys.,*
    853 F.2d 1139 (4th Cir. 1988)......................................................................15

*Todorov v. DCH Healthcare Authority*
    921 F.2d 1438 (11th Cir. 1991)....................................................................19

*Town of Hallie v. City of Eau Claire,*
    471 U.S. 34, 105 S.Ct. 1713 (1985)............................................................6, 11

*United States v. Arlen Fleisher, et al.,* 05 Mag. 757.......................................................4

*Automated Salvage Transport, Inc. v. Wheelabrator Envt'l Sys., Inc.,*
    155 F.3d 59 (2d Cir. 1998)............................................................................10

iv

**STATE CASES**

*Gulbor v. Manhattan Eye, Ear and Throat Hosp. Inc.,*
    46 N.Y.2d 736, 413 N.Y.S.2d 638 (1978) ............................................................................13

**STATE STATUTES**

N.Y. Health Care Reform Act of 1996 ...............................................................................7, 8

N.Y. Pub. Auth § 3301(4) ...............................................................................................6, 10

N.Y. Pub. Auth. §§ 3301(5) and 3305 (11) ..........................................................................7

N.Y. Pub. Auth. §§ 3306(2) and (6) .....................................................................................7

N.Y. Pub. Health Law § 2801-b ......................................................................................... 13

**RULES**

F.R.C.P. Rule 12(c)...........................................................................................................3, 4, 5

F.R.C.P. Rule 56 ....................................................................................................................3

862999v.10

## PRELIMINARY STATEMENT

Defendants' moving papers demonstrate that they are immune from antitrust claims and damages pursuant to the State Action Doctrine and the Local Government Antitrust Act ("LGAA"). Defendants cite a series of Second Circuit and New York District Court cases that confirm that Public Benefit Corporations, like Defendants WCHCC/WMC, and the private actors with whom they contract, need only satisfy the first prong of the Supreme Court's *Midcal* test, to be entitled to such immunity. Defendants also show that they are immune from antitrust damages under the LGAA because WCHCC/WMC constitute a "local government" providing a "public function," and Drs. Lansman and Spielvogel (and NYCG) act at the direction of WCHCC.

Defendants' moving papers (the "Initial Memo" and "Rabinowitz Delar.") also establish that Plaintiffs lack standing to bring their federal antitrust claim. For example, Defendants reveal stark contradictions and inconsistencies between allegations in the Complaint and Plaintiffs' prior sworn statements in the Sarabu Action – contradictions that obliterate any showing of antitrust injury. Specifically, in the Sarabu Action, Dr. Fleisher, Dr. Fleisher's attorney, and the former founder of Plaintiff CSG, stated that a "sole source" or exclusive provider model for cardiothoracic surgery services at WMC "provide[s] the most benefit to the hospital in affording comprehensive coverage of patient care, result[ing] in a decreased length of stay and more efficient uses of hospital resources."

Defendants also show that Plaintiffs are not the most efficient enforcers of the antitrust laws because: (i) they seek to enforce anticompetitive bylaws that would permit them to continue as the "sole source" provider of cardiothoracic services at WMC; (ii) they make no showing of any decline in patient care as a result of the exclusive services agreement; and (iii) there are other parties (*i.e.,* patients and insurance companies) that are better choices to enforce the antitrust claims alleged herein.

1

Against this showing, Plaintiffs' opposition falls measurably short. Predictably, Plaintiffs attack Defendants' right to state action immunity by questioning whether WCHCC/WMC acts pursuant to a clearly-articulated state policy. However, as detailed below, Plaintiffs' superficial analysis, relying on a district court case examining rate-setting collusion between private hospitals with third-party payors, mischaracterizes the "foreseeability" standard under *Midcal*, and severely overstates what this case stands for in terms of deregulation of healthcare in New York.

Plaintiffs also incorrectly argue that Defendants are required to meet *Midcal's* second "active supervision" prong. But, their reliance on *Electrical Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110 (2d Cir.2003), for that proposition is simply perplexing, given that the Court of Appeals reaffirmed its prior holding in *Cine 42nd Street Theater*, 790 F.2d 1032 (2d Cir. 1986), that private actors **contracting with an immune entity** are themselves immune from antitrust liability where, like here, it is the contract with the immune entity that is at issue.

Plaintiffs' challenge to LGAA immunity is equally unavailing. On this point, Plaintiffs incorrectly claim that the LGAA requires Defendants to satisfy the same two-pronged test as under a state action analysis, and that there are questions of fact as to whether WMC is an entity separate and apart from WCHCC to qualify as a "local government." But the case upon which Plaintiffs rely for this proposition does not even address the *Midcal* test as to the "local government" at issue. And, the case law cited in the Initial Memo confirms that the *Midcal* test does not apply to LGAA analysis. Moreover, WMC is not a private or public entity – it is simply the name given to hospital operations by WCHCC – in effect, a d/b/a.

Turning to their arguments in favor of antitrust standing, Plaintiffs claim that they never had an exclusive arrangement with WMC and submit affidavits of other physicians – who are not members of CSG – who claim to have provided cardiac services at the Hospital along-side Plaintiffs. Notwithstanding these affidavits, the fact remains that Plaintiffs, by their prior sworn statements, considered themselves to be the exclusive provider of cardiothoracic services **and**

2

extolled the virtues of such an arrangement as beneficial to patient care. Indeed, Plaintiffs recently attempted to negotiate their own exclusive arrangement with WMC.

In addition, Plaintiffs argue that they are efficient enforcers of the antitrust laws because their "injury" is aligned with injury to consumers. However, the Complaint contains conclusory allegations with regard to a purported "decline" in patient care without any explanation as to how patients would be effected. This is not surprising since, by grandfathering Plaintiffs and adding Drs. Lansman and Speilvogel, the exclusive services agreement increases the number of physicians providing cardiothoracic services.

Plaintiffs attempt to obfuscate the insurmountable hurdles that they have in demonstrating antitrust standing by arguing that Defendants' inclusion of "facts" is premature and converts this motion under Rule 12(c) to one for summary judgment. But Defendants merely introduce Plaintiffs' own sworn statements and it is completely appropriate for the court to take judicial notice of such publicly-filed statements on a motion to dismiss.

In light of the above, and based on the arguments and authority contained in the Initial Memo, as well as the Rabinowitz Declaration and exhibits thereto, the Complaint should be dismissed in its entirety, with prejudice.

## ARGUMENT

### POINT I

### DEFENDANTS' MOTION IS PROPERLY CONSIDERED UNDER RULE 12(c) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiffs' preliminary argument is that this motion is more properly considered as one for summary judgment under Rule 56, rather than a Rule 12(c) motion for judgment on the pleadings. The basis for Plaintiffs' argument is that Defendants put facts in issue that are beyond the four corners of the Complaint, *i.e.,* Plaintiffs' affidavits publicly filed in connection with the Sarabu Action. (*See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings ("Pltfs.' Memo") at pp. 13-17).

3

Plaintiffs are incorrect. It is well-settled that a court may take judicial notice of publicly-filed documents as an aid to deciding a motion to dismiss.[1]

In addition, the inclusion of public documents from another litigation does not change a motion under Rule 12(c) to one for summary judgment where the documents are presented, "not to establish disputed facts, but to incorporate the arguments articulated in an analogous situation." *See Commercial Money Center, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (submission of amicus brief filed in another case did not convert Rule 12(c) motion to motion for summary judgment). Here, Defendants do not submit Plaintiffs' affidavits "to establish disputed facts." Rather, Defendants ask the Court to take judicial notice of publicly-filed, sworn statements made by Plaintiffs in another litigation, that directly contradict the primary theory in the Complaint, *i.e.*, that an exclusive provider arrangement is anticompetitive and detrimental to patient care (*see* Rabinowitz Decl., Exhs. 8, 9, 10).

For example, Plaintiffs allege that the exclusive services agreement between WCHCC and NYCG "empowers Lansman and Spielvogel to exclude competitors at WMC, thereby limiting patient choice and reducing the quantity and quality of cardiothoracic surgeons available to patients in the relevant markets." (Complaint at ¶ 33; Rabinowitz Decl., Exh. 1).

Against this allegation, it is appropriate -- and does not convert this motion into one for summary judgment -- to alert the Court that Dr. Fleisher took a quite contrary position in the Sarabu Action when his former partner notified CSG that he was terminating his relationship with CSG, but that he would continue to provide cardiothoracic surgery services at WMC. Dr. Fleisher attested that Dr. Sarabu should not be permitted to practice at WMC "in order to

---

[1]    *In re Enron Corp.*, 2007 WL 2446498 at n.18, August 27, 2007 (S.D.N.Y.); *International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F. Supp. 1207, 1212 (S.D.N.Y. 1994), *aff'd* 62 F.3d 69 (2d Cir. 1995) (in antitrust action, on motion to dismiss, court held that "materials publicly filed ... of which the Court may take judicial notice, may also be considered in the motion ..."); *see also In re AES Corp. Securities Litigation*, 825 F. Supp. 578, 585, n.6 (S.D.N.Y. 1993)(court took judicial notice of publicly-filed prospectus on defendant's motion to dismiss complaint); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). The Court may also take judicial notice of the criminal complaint with regard to Dr. Fleisher, unsealed in *United States v. Arlen Fleisher, et al.*, 05 Mag. 757. Defendants made reference to Dr. Fleisher's arrest for, allegedly, providing prescription drugs to organized crime figures merely as a background to the allegations in the Complaint regarding WMC's financial condition.

preserve the integrity of CSG and in order to allow CSG to continue to be the single full service provider of all aspects of cardiac surgery at WMC." Dr. Fleisher was quite clear on this point when he stated:

> CSG attempted to negotiate with Sarabu in the belief that its financial viability in a very competitive cardiac surgery market area depended upon preserving the integrity of the group. In addition, a single full services cardiac care provider such as CSG provided the most benefit to the hospital in affording comprehensive coverage of patient care, which results in a decreased length of stay and more efficient use of hospital resources.

*See* Rabinowitz Decl., Exh. 8 at 23.[2]

In addition to Plaintiffs' sworn statements, Dr. Fleisher's former partner and CSG founder, Dr. Reed, agreed that a "sole source" arrangement was "integral" to CGS's success and critical to patient care. Dr. Fleisher's attorney even admitted that he tried to negotiate a formal exclusive arrangement with WMC on behalf of CDG. (*See* Rabinowitz Declar., Exhibit 9 at ¶¶ 6-8 and Exhibit 10 at ¶ 5).

In light of the foregoing, Defendants do not "present factual assertions that extend far beyond the complaint ..." (*See* Pltfs.' Brief at 13-14). Rather, Plaintiffs seek to incorporate Plaintiffs' sworn statements of which the Court may take judicial notice. Clearly, the motion should be considered under Rule 12(c).

## POINT II

### DEFENDANTS ARE ENTITLED TO STATE ACTION IMMUNITY BECAUSE DEFENDANTS HAVE ACTED PURSUANT TO STATE POLICY AND ARE NOT REQUIRED TO SHOW ACTIVE STATE SUPERVISION

In their moving papers, Defendants cite to Second Circuit authority and Supreme Court decisions, holding that Public Benefit Corporations are immune from antitrust liability under the

---

[2]     Plaintiffs explain these glaring inconsistencies by (i) hoping to convince the court that the statements should be ignored under Rule 12(c) standards; and (ii) significantly back-peddling from their prior statements, now claiming that the affidavits were submitted only in the context of a restrictive covenant litigation and only to "respond to public policy argument." *See* Pltfs' Memo at p. 16.

State Action Doctrine if they satisfy the first prong of the *Midcal* test, *i.e.*, that the alleged anticompetitive conduct was undertaken pursuant to clear state policy as dictated by the corporation's enabling statute. *See California Retail Liquor Dealers v. Midcal Aluminum, Inc.* 445 U.S. 97, 100 S.Ct. 932 (1980). The cases also make clear that this first prong should be one of foreseeability-whether the legislature could foresee the anticompetitive effects that would follow from the express authority delegated by the state. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713 (1985). Furthermore, Defendants establish that public entities and the private parties with whom they contract are not subject to the second *Midcal* prong-"active state supervision". *See id.* at 1715-1716; *see also Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1048 (2d Cir. 1986).[3]

Ignoring these holdings, Plaintiffs argue that Defendants are not entitled to State Action immunity based on: (i) a faulty analysis of *dicta* from *New York, ex rel Spitzer v. St. Francis Hosp.*, 94 F. Supp.2d 399 (S.D.N.Y. 2000); (ii) inapplicable Fifth and Ninth Circuit law; and (iii) perplexing reliance on *Electrical Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110 (2d Cir. 2003) – perplexing in that *Electrical Inspectors* supports Defendants' position that all defendants, including Drs. Lansman and Spielvogel, are entitled to state action immunity.

### A.    WCHCC/WMC Are Acting Pursuant To Clearly Authorized State Policy

WCHCC/WMC's enabling statute grants WCHCC, as a Public Benefit Corporation, the "legal, financial and managerial flexibility to take full advantage of the opportunities and challenges presented by the evolving health care environment." *See* N.Y. Pub. Auth. § 3301(4). Included in this authority is, *inter alia*, WCHCC's ability "[t]o provide health and medical services for the public *directly or by agreement ... with any person or private or public corporation or association ...*" and "*to determine the conditions under which a physician may be extended the privilege of practicing within a health facility under the jurisdiction of the*

---

[3] The Court is directed to Defendants' extensive discussion on this point in pages 9-17 of the Initial Memo and the authority cited therein.

*corporation*" (*See* N.Y. Pub. Auth. §§ 3306(2) and (6); Rabinowitz Decl., Exh. 4) (emphasis added).[4]  Indeed, the authority granted by the New York legislature is almost identical to the enabling statutes examined in *Daniel v. American Board of Emergency Medicine*, 988 F.Supp 127 (W.D.N.Y. 1997) and *Doron Precision Systems, Inc. v. FAAC*, 423 F. Supp.2d 173 (S.D.N.Y. 2006).  In both of those cases, the Courts were prompted to dismiss the plaintiffs' antitrust claims against the public and private defendants based on the State Action Immunity Doctrine. (*See* Initial Memo at pgs. 13-17).

Plaintiffs conveniently gloss over these holdings, merely stating that Defendants "have not established that the state legislature has given WCHCC the authority to suppress competition." (*See* Pltfs.' Brief at p. 19).  In support of their position, Plaintiffs rely, almost entirely on *St. Francis*, 94 F. Supp.2d 399.  But that case is entirely irrelevant to the issues presented here.

In *St. Francis*, the State sued two private not-for-profit hospitals alleging antitrust violations arising from the hospitals' joint negotiation of rates with health insurers.  The defendants claimed that such joint negotiation was permitted under their operating certificate for a joint venture pursuant to Article 28 of the Public Health Law.  The certificate was granted prior to the enactment of the New York Health Care Reform Act of 1996 ("HCRA"), that deregulated the State's strict control over hospitals' ability to negotiate rates with HMO's.  On cross-motions for summary judgment, the District Court found, under a *Midcal* analysis, that the hospitals' conduct prior to enactment of the HCRA was consistent with the State's "clearly articulated policy of replacing competition with State regulation" and that the first prong of *Midcal* was satisfied.  In *dicta*, the Court questioned whether the hospitals could meet the first prong for its conduct after HCRA, noting that the Act "promote[s] competition in the health care market place by increasing reliance on market incentives while reducing the role of legislation." *See id.*

---

[4]     The enabling statute also permits WCHCC/WMC to "enter into contracts and to execute all instruments necessary or convenient or desirable for the purposes of the corporation to carry out any powers expressly given to it in this title," the performance of which "constitutes the performance of an essential public and governmental function," (*See id. at* §§ 3301 (5) and 3305 (11)).

7

at 409, *quoting* 1998 N.Y. Law § 639. The Court did not grant State Action immunity, however, because the private hospital defendants could not satisfy the active supervision prong of *Midcal*. That part of the holding is irrelevant to Plaintiffs' argument that there is no dispute that WCHCC, as a public entity, is not subject to this analysis.

Ignoring the actual reason for the holding, and relying only on *dicta*, Plaintiffs argue that *St. Francis* stands for the proposition that the enactment of the HCRA led to an across-the-board policy shift to completely deregulate health care in the State and that as a result no court should grant state action immunity even when anticompetitive conduct is authorized and foreseeable. This broad reading of the *dictum* in *St. Francis* is, of course, absurd and, if adopted, would stand the law on its head.

Critically, Plaintiffs' argument also ignores the holding in *Daniel*, issued **after the enactment of HCRA**, where the District Court granted state action immunity to the HHC hospitals based on language in their enabling statutes that are all-but identical to the language in WCHCC/WMC's statute. (*See* Initial Memo at pp. 14-15).

In addition, *St. Francis* does not address what impact, if any, HCRA has on the situation present in this case where a **public** health care corporation seeks state action immunity based on conduct that is specifically authorized in its **enabling statute**. In *St. Francis*, the **private** defendants were not operating under an enabling statute but, rather, pursuant to an operating certificate. Moreover, *St. Francis* has nothing to do with a public hospital's ability to enter into exclusive contracts with physicians, (and its *dicta* has no bearing on the issues presented here).

In an attempt to bolster their illogical interpretation of *St Francis*, Plaintiffs also cite to cases in the Fifth and Ninth Circuits for the proposition t.hat "when there are abundant indications that a state's policy is to support competition, a subordinate entity must do more than merely produce an authorization to "do business" to show that the state's policy is to displace competition." *Lancaster Community. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 403 (9th Cir. 1991). But given that *St. Francis* **does not** demonstrate wholesale deregulation of the hospital industry, Plaintiffs' citation to these decisions is moot. Moreover, the Legislature does

8

much more than to grant WCHCC/WMC the authority to do "do business." In fact, as noted above, the enabling statute specifically authorizes WCHCC to "determine the condition under which a physician may be extended privileges" and to enter into any contracts necessary to carry out its enumerated powers. Thus, it was plainly foreseeable by the legislature that WCHCC could enter into an exclusive agreement that would affect competition.

Finally, Plaintiffs' argument that New York State's policy is to deregulate hospital operations is completely foreclosed by the Berger Commission enabling legislation. (*See* L. 2005 Ch. 63, Part E). Rather than leaving hospital operations to be decided by free market forces, while reducing the role of legislation in 2005, the New York State Legislature did just the opposite - it created a state-run commission to determine which hospitals, state-wide, represented excess capacity in the health care system, and to mandate the closing or restructuring of those hospitals.

**B.    All Of The Defendants Are Immune Under The State Action Doctrine And Do Not Need To Satisfy "Active Supervision" By The State**

Plaintiffs also argue that State Action Immunity does not apply because the private Defendants do not satisfy the second *Midcal* prong of "active state supervision." Plaintiffs' position is fatally flawed for several reasons.

Attempting to wrap the hospital into those private entities that are subject to the "state supervision" prong, Plaintiffs first fabricate an argument that there is "a mixed question of law and fact" as to whether "WMC is a public or private defendant ...." (*See* Pltfs.' Brief at p. 22). Plaintiffs base this frivolous argument on Defendants' admission in their Answer that WMC is a "public Hospital managed by WCHCC" and that, therefore, it is a separate entity. (*See id.*) First, Defendants' admission that WMC is a "public hospital" supports the conclusion that the Hospital does not need to show supervision for state action immunity purposes. Second, WMC is not a separate entity from WCHCC because: (i) it is not separately incorporated as either a for-profit or not-for-profit corporation, and is not a partnership or natural person; (ii) it does not have its own board or officers or directors, or even employees; (iii) it is listed as a d/b/a of WCHCC on

the exclusive agreement at issue in this case (*see* Rabinowitz Decl. at Exh. 5); and (iv) WCHCC's enabling statute makes clear that WMC is simply the arm of the corporation that provides medical services for WCHCC. (*See* Pub. Auth. §§ 3301(4) and (5); Rabinowitz Dec., Exh. 4).

Plaintiffs also argue that under *Electrical Inspectors, Inc. v Village of East Hills*, 320 F.3d 110 (2d Cir. 2003), the "active supervision prong of the *Midcal* test may well apply to actions of WCHCC itself, not just those of the private defendants here." (*See* Pltfs.' Brief at p. 23) (emphasis added). Plaintiffs misinterpret *Electrical Inspectors*, which, in fact, supports Defendants' position that **all** Defendants herein are immune under the State Action Doctrine.

In *Electrical Inspectors*, the Village of Islandia (the "Village," a public governmental entity) required all property owners seeking a Certificate of Occupancy to obtain an electrical inspection pursuant to the Uniform Fire Prevention and Building Code Act. The Village entered into an exclusive contract with the New York Board of Fire Underwriters (the "Board"), a private entity, to perform the inspections. The plaintiff, a competing electrical inspection company, claimed that the private defendant Board acted anticompetitively by threatening persons who contracted with plaintiff in other districts, in an attempt to corner the market. The plaintiff also challenged the Boards' relationship with the Village under the antitrust laws. The District Court granted summary judgment to the defendants based on state action immunity.

Disagreeing with the lower court's grant of immunity to the Board based on the record before it, the Court of Appeals clarified that, under a state action immunity analysis, the relevant inquiry "is the activity challenged, not the identity of the [private] party." *See Id.* at 126. The Court also noted that a "private party's mere status as a government contractor does not entitle it to antitrust immunity for all its conduct." *See Id.* at 127 (internal quotes and citations omitted). But, contrary to what Plaintiffs would have this Court believe, the Court did not change its prior holdings that private parties contracting with a government entity share that entity's state action immunity. In fact, the Court specifically reaffirmed its holding in *Cine 42nd Street Theaters* and its later decision in *Automated Salvage Transport, Inc. v. Wheelabrator Envt'l Sys., Inc.*,

10

155 F.3d 59 (2d Cir. 1998) that state action immunity is extended to those private entities whose "only alleged antitrust violation was entering into a contract with the government" and that, in those cases, that courts "do not go through a separate *Midcal* analysis." To the contrary, the Court explained:

> We think that *Cine* and *Wheelabrator*, rather than departing from the logic of *Midcal* and subsequent Supreme Court precedent, are consistent with it. We decided in both cases that the governmental entities were authorized to engage in contracting with private parties, establishing that the first prong of *Midcal* was satisfied with regard to the private parties' actions. We then went on to extend that immunity to the private parties, reasoning that to allow suits against private parties *who contract* with governmental entities, who are themselves authorized to contract, with private parties, would effectively undermine the governmental entities ability to contract. *The private parties are the necessary counterparts to the governments acts, and authorization of the government's contracting therefore necessitates authorization of the private parties' contracting.*

*Electrical Inspectors,* 320 F.3d. at 126. (emphasis added).

The instant action is analogous to *Cine 42nd Street* and Wheelbalator, not *Electrical Inspectors.* Here, Plaintiffs' only antitrust violation alleged against Drs. Lansman and Spielvogel and NYCG was their entering into the exclusive services agreement with WCHCC/WMC. By contrast, in *Electrical Inspectors,* "none of the Board's alleged anticompetitive conduct involved acts of contracting with a governmental entity authorized to enter into contracts with private parties." *See id.* at 127. Indeed, independent from its contract with the Village, "when the Board conducts an inspection, or allegedly threatens those who hire the plaintiff, it is engaging in transactions . . .with other private parties . . ." *See id.* Thus, unlike the situation here, the Court concluded that, because the anticompetitive conduct alleged against the Board derived from its transactions with **other private entities,** the "active supervision" prong of *Midcal* needed to be satisfied. *See id.* at 127. The Court then remanded the case for such a determination. In light of the above, Plaintiffs' reliance on *Electrical Inspectors* is unavailing

Moeover, the Court, citing *Hallie,* reaffirmed that "[w]here **state or municipal regulation is involved** ... active state supervision must be shown, even where a clearly articulated state policy exists." *See, Electrical Inspectors* at 122 (emphasis added). Unlike

11

*Electrical Inspectors*, this suit does not involve "state or municipal regulation by a private party." It involves only an exclusive **contract**. Neither Dr. Lansman, nor Dr. Spielvogel perform state or municipal regulatory functions, in contrast to the Board in *Electrical Inspectors*. As the Court also noted in distinguishing *Cine* from the facts before it in *Electrical Inspectors*, "municipal ordinances, not contracts created the monopolies within the municipalities at issue in this case. *See id.* at 127. Here, we are dealing solely with the contract between WCHCC and NYCG, and the effects of that contract on Plaintiffs.

Nevertheless, Plaintiffs attempt to force Drs. Lansman and Spielvogel within the holding of *Electrical Inspectors* by arguing that here, the anticompetitive acts go "well beyond" the exclusive agreement because the individual defendants allegedly refuse to permit Plaintiffs to hire a physician assistant. But, Plaintiffs allege that WMC, not the individual defendants, precluded Plaintiffs from hiring their own physician assistant. In fact, Plaintiffs attach a letter to the Complaint from WMC's Vice President for Clinicial and Academic Affairs, wherein **the Hospital** advised that Plaintiffs could not hire a physicians assistant due to the exclusive agreement. Thus, the individual Defendants are immune because parties acting under the direction of a contract with a government agency are immune from antitrust liability if their actions are compelled by the terms of the contract. *See Name Space, Inc .v. Network Solutions Inc.*, 202 F.3d 573, 582 (2d Cir. 2000). Here, as alleged by Plaintiffs, the alleged conduct regarding the OR assistant **arises out of the exclusive agreement**. (*See* Complaint ¶¶ 39, 40 and 41, Exhibit 1 to Rabinowitz Declar. and Letter filed by Plaintiffs). Thus, it is not independent conduct.

Simply stated, if entry into the exclusive contract is immune under the State action Doctrine, then efforts to enforce its exclusive terms are likewise immune. Since Plaintiffs complain about their inability to hire a physician assistant due to the exclusive contract, the challenged conduct is immune. The Court made clear in *Electrical Inspectors* that a separate immunity analysis for private defendants is not required in cases arising form authorized contracts with a government entity like WCHCC:

862999v.10

We have twice declined to engage in an independent immunity inquiry for a private party whose alleged anticompetitive conduct was to participate in 'concerted' action with a government entity authorized by the state to take such action.

*Id.* at 125. As noted above, the issues raised in *Electrical Inspectors* , *i.e.* municipal regulation by private parties, and challenged conduct beyond the contract itself, do not arise in this case.[5]

Clearly, neither WCHCC, nor Drs. Lansman and Spielvogel, nor NYCG need satisfy the "active supervision prong" of *Midcal* to be awarded State Action immunity. Therefore, for the reasons set forth above and in the Initial Memo, Defendants are immune from Plaintiffs antitrust claims under the State Action Doctrine.

Finally, some mention must be made of the fact that exclusive service agreements between hospitals and physicians are legal and recognized by the Courts as legitimate and pro-competitive institutional policy choices. *See, e.g., Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2 (1984). Thus, WCHCC had no legal obligation to "grandfather" Plaintiffs to begin with, and Plaintiffs have no common-law or statutory right to be in the Hospital. The fact that the Hospital chose to recognize Plaintiffs' many years of affiliation by allowing them to continue to practice even under the grant of an exclusive to Defendants does not and should not cloak Plaintiffs with standing to assert antitrust violations based on their inability to directly employ a physician's assistant or their annoyance at not hearing what they consider to be optimal access to operating room time.[6]

---

[5] There is a further distinction. In *Electrical Contractors,* the Court held "Because [defendant's] actions were not pursuant to state policy, but rather in pursuit of it, they do not appear to qualify for Parker immunity." *See id.* at 128. Plaintiffs here allege the opposite – that (i) WCHCC recruited Defendants to bolster its cardiothoracic department (Complaint ¶ 25, Exhibit 1 to Rabinowitz Declar.), and that the challenged conduct regarding the physician assistant was pursuant to the exclusive contract.

[6] However, to the extent the Court feels that an "active state supervision" analysis is required, New York State law satisfies that element. Public Health Law § 2801-b provides an administrative mechanism for review by the New York State Department of Health, Public Health Council, of any physician's complaint that hospital privileges or medical staff appointments have been improperly restricted or denied. The New York State Court of Appeals has held that exhaustion of such administrative remedies is mandatory and must be pursued prior to seeking judicial relief. *See, generally, Guibor v. Manhattan Eye, Ear and Throat Hosp. Inc.,* 46 N.Y.2d 736, 413 N.Y.S.2d 638 (1978). Indeed, this Court has applied the requirement of preliminary Public Health Council review to a physician's antitrust claim against a hospital and multiple private parties. *See, Johnson v. Nyack Hosp.*773 F.Supp 625, 631 (S.D.N.Y. 1991), *affirmed (*under doctrine of primary jurisdiction), 964 F.2d 116 (2d Cir. 1992).

13

## POINT III

### DEFENDANTS ARE IMMUNE
### FROM ANTITRUST DAMAGES UNDER THE LGAA

Defendants also establish that they are immune from antitrust damages under the LGAA because WCHCC/WMC, as a public benefit corporation, is a "local government" (as defined in the statute) and provides a "public function" in the provision of health care services. *See Daniel v. American Bd. of Emergency Medicine*, 988 F. Supp. at 192, *Doron Precision Systems, Inc. v. FAAC Inc.*, 423 F. Supp.2d at n.18. Likewise, Drs. Lansman and Spielvogel are immune because, under the exclusive services agreement with WCHCC/WMC, they act at the direction of a "local government."[7]

Plaintiffs argue, however, that to establish LGAA immunity, WCHCC/WMC must meet the two-prong *Midcal* test and that the "active supervision" prong is unsettled. Pla intiffs' position is wrong on multiple fronts. For one thing, Plaintiffs completely misinterpret the case law on which they rely. Plaintiffs cite to the 11th Circuit's decision in *Crosby v. Hosp. Auth. of Valdosta and Lowndes County*, 93 F.3d 1515 (11th Cir. 1996), *cert denied*, 117 S.Ct. 1246 (1997) for the proposition that the *Midcal* test should apply in this Court's analysis of LGAA immunity as to WCHCC and WMC. In *Crosby*, a physician brought an antitrust action against the defendant, a public hospital authority, and individual physicians, after plaintiff's staff privileges were denied. The Court affirmed the lower court's grant of summary judgment based on state action immunity and the LGAA. But, in so doing, the Court did not even address the lower court's finding of LGAA immunity as to the public hospital system because the plaintiff **conceded** that it was a "local government." *See id.* at 1535. Accordingly, *Crosby* **does not** dictate that *Midcal* is at all relevant to an LGAA analysis. In fact, the District Court in *Daniel* established that an entity "is entitled to immunity from damages under the LGAA" if it is a "local government" and if the complained of conduct is "undertaken in an official capacity,

---

[7] The Court is directed to the extensive analysis of LGAA immunity in Defendants' Initial Memo in support of the motion at pp. 19-22

862999v.10

regardless of whether it acted within its lawful regulatory authority." *See Daniel v. American Bd. of Emergency Medicine*, 998 F. Supp. at 192.

Plaintiffs also argue that LGAA immunity should not apply to WMC because "there is a substantial mixed question of fact and law as to whether WMC ... is a 'local government' within the meaning of the LGAA. *(See* Pltfs.' Brief at p. 26). This argument is frivolous. As established above, WMC is a d/b/a of WCHCC which is, without question, a "local government" as defined by the statute.

Finally, Plaintiffs contend that it is "premature" to apply LGAA immunity to Drs. Lansman and Spielvogel because whether they are acting "at the direction of a local government" is an issue of fact. *(See* Pltfs.' Brief at p. 27). Again, Plaintiffs attempt to categorize Defendants' motion as one for summary judgment where "fact issues" would be relevant. But Defendants' application is based purely on Plaintiffs' allegations in the Complaint. What is more, that Drs. Lansman and Spielvogel share in WCHCC's immunity under the LGAA is without question. Both individual defendants act at the direction of a "local government" *i.e.*, WCHCC, under the exclusive services agreement. *See Crosby v. Hosp. Auth. of Valdosta and Lowndes Cty.*, 93 F.3d at 1535-1536; *see also Sandcrest Outpatient Servs., P.A., v. Cumberland Cty. Hosp. Sys.,Inc.*, 853 F.2d 1139 (4th Cir. 1988); *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 94 (2d Cir. 1986).[8] As stated in the Initial Memo, it would defeat the purpose of the LGAA if WMC and WCHCC were shielded from liability but the individual defendants and

---

[8] Plaintiffs' argument that LGAA immunity should not be extended to Drs. Lansman and Spielvogel because they are independent contractors is of no moment. Indeed, in *Sandcrest Outpatient Services, Inc.*, the Fourth Circuit extended the LGAA to the defendant hospital systems' private management company even though its relationship with the hospital was contractual. Specifically, the Court stated:

> The record does not contain sufficient information for us to determine whether SunHealth can be classified as an 'employee' of the Hospital System for the purposes of immunity under Section 3 of the LGAA. It may be that, due to the fact that the relationship with the Medical Center was through a management contract, SunHealth cannot be classified as an employee. Nevertheless, we need not resolve this issue because, as stated above, we find that SunHealth was entitled to immunity from damages under Section 4 of the LGAA.

*See id.* at n.4. Furthermore, the Second Circuit confirms that the phrase "acting in an official capacity" under the LGAA is to be given "broad meaning," *See Montauk Caribbean Airways, Inc. v. Hope*, 784 F.2d at 94.

15

NYCG- who are contractually obligated to perform their services- were nevertheless deemed liable to Plaintiffs for damages. *See Cine* 790 F.2d at 1049.

## POINT IV

### PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR FEDERAL ANTITRUST CLAIM

**A.    Plaintiffs Do Not Establish Antitrust Injury**

Plaintiffs first argue that they establish antitrust injury by alleging "exclusionary acts" in furtherance of the exclusive services agreement *i.e.*, that Defendants (i) deny them the ability to hire a physician assistant as an employee of CSG; and (ii) deny them access to cardiothoracic operating rooms at the time Plaintiffs prefer. According to Plaintiffs, this purported conduct "[has] caused or [threatens] specific injuries both to competition and to plaintiffs." (*See* Pltfs' Brief at p. 30). But Plaintiffs do not point to any paragraph in the Complaint that alleges these "specific injuries." (*See id.*).

This is not surprising since rescheduling of the operating room rotation is an effect of **increased competition** for use of WMC's facilities. In addition, the Courts recognize that an exclusive provider's control over scheduling of operations and use of equipment is a beneficial component of exclusive provider agreements, both to enable smooth hospital operation and to cut down on in-fighting between physicians.[9]

Furthermore, Plaintiffs' claim that they are prohibited from utilizing Michael Evans as a physician assistant and, thus, unable to expand "their practice" highlights Plaintiffs' concern with the effects of the exclusive agreement on themselves, not competition.

Next, Plaintiffs argue that Defendants "have their facts wrong" by contending that Plaintiffs were the *de facto* exclusive providers of cardiothoracic services at WMC prior to the

---

[9] *See Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 43-44 (1984), 104 S.Ct. 1551, 1575 ("[Exclusive contracts] aid in the standardization of procedures and efficient use of equipment, facilitate flexible scheduling of operations, and permit the hospital more effectively to monitor the quality of [medical] services."); *Coastall Neuro-Psychiatric Associates, P.A. v. Onslow Memorial Hospital, Inc.*, 795 F.2d 340, 342 (4th Cir. 1986) ("exclusive contracts "lead to greater control and standardization of procedures resulting in lower operation costs ... better scheduling and use of facilities ... improved team work and routines . . . and reduced machinery breakdowns.").

16

exclusive services agreement.   In support of their position, Plaintiffs submit self-serving affidavits to establish that other cardiothoracic surgeons worked along-side CSG before Defendants arrival.  Regardless of how Plaintiffs now characterize their arrangement with WMC, they simply cannot hide from Dr. Fleisher's sworn statement in the Sarabu Action that ***"CSG is the only practice whose members are permitted under the Federated Faculty Practice Plan and by laws to perform cardiac surgery at Westchester Medical Center."***  (*See* Fleisher Aff. at ¶ 4, Rabinowitz Decl., Exh. 8) (emphasis added).  Nor do Plaintiffs even attempt to explain Dr. Fleisher's statement that "a single full service cardiac care provider such as CSG provided the most benefit to the hospital in affording complete coverage of patient care, which results in a decreased length of stay and more efficient use of hospital resources." (*See id.* at ¶ 23).[10]  What is more, Plaintiffs do not deny the fact that CSG very recently attempted to negotiate their own formal exclusive provider relationship with the Hospital.  (*See* Rabinowitz Decl. at ¶ 15).

In light of the above, it is clear that Plaintiffs complain of a "reshuffling of competitors" in that "the claimed injury came as a result of losing out in the competition for an exclusive ... contract ... and nothing more." *See Balaklaw,* 14 F.3d at 798, *Korshin v. Benedictine Hosp.,* 34 F. Supp.3d, 133,139 (N.D.N.Y. 1999).

Plaintiffs seek to distinguish their allegations from the above decisions by contending that "the complaint emphasizes the adverse impact on quality of patient care resulting from the exclusive agreement." (*See* Pltfs' Brief at p. 32).  But Plaintiffs cite to only two conclusory paragraphs in the Complaint to demonstrate this "emphasis" on patient care.   And, those paragraphs do not explain how the exclusive agreement impacts on the quality of patient care, only that Plaintiffs' are, allegedly, unable to expand **their** practice and enhance **their** quality of care.  The "emphasis" is clearly on CSG, not patients. (*See* Complaint ¶¶ 46, 56; Rabinowitz Decl., Exh. 1).For these reasons, as well as those set forth in the Initial Memo, Plaintiffs do not suffer an antitrust injury and their complaint should be dismissed.

---

[10] Dr. George E. Reed, the founder of CSG made similar statements in the *Sarabu* Action.  *See* Reed Aff. at ¶ 8; Rabinowitz Decl., Exh. 9.

862999v.10

**B.     Plaintiffs Are Not Efficient Enforcers Of The Antitrust Laws**

Plaintiffs' also fail to establish that they are efficient enforcers of the antitrust laws – a necessary component of antitrust standing. *See Cargil, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484 (1986); *Daniel v. American Board of Emergency Medicine,* 428 F.3d 408, 443 (2d Cir. 2005). In fact, Plaintiffs' are the poorest possible choice to enforce alleged antitrust claims because (a) Plaintiffs championed the benefits of an exclusive provider arrangement in the *Sarabu* Action; (b) Plaintiffs seek to enforce their *defacto* exclusive status at WMC through enforcement of anticompetitive faculty practice bylaws; and (c) Plaintiffs sought to negotiate their own exclusive agreement with WMC. In addition, there are other parties who would be more efficient enforcers than plaintiffs, namely patients and insurance companies. *See Associated General Contractors of California, Inc. v. California State Counsel of Carpenters,* 459 U.S. 519, 542, 103 S. Ct. 897, 910-911 (1983).

Plaintiffs contest this by arguing that the "critical issue" for efficient enforcer determination is whether the interests of the plaintiff align with consumers. (*See* Pltfs.' Brief at p. 33). Plaintiffs cite to *Reddy v. Puma,* 2006 WL 2711535, Sept. 21, 2006 (E.D.N.Y.) to support this proposition and argue that, like the plaintiff in that case, Plaintiffs make specific allegations that the exclusive services agreement has lead to a "cutback on the supply of professional services in emergency and urgent cardiothoracic surgery and left the field to competitors who, facing less competition, offer less choice and a reduced quality of patient care." (*See* Pltfs.' Brief at pgs. 34 and 36). Under the facts of this case, however, it is impossible for Plaintiffs to make those claims.

For one thing, due to the grandfather clause, there has not been a "cutback" in the supply of cardiothoracic services at WMC or in the relevant market. To the contrary, with the addition of NYCG, there has been *an increase in services*. In addition, it stretches beyond the realm of sound reasoning to suggest that the exclusive services agreement results in *less* competition to Defendants. In sum, patients have more doctors to choose from. Indeed, Plaintiffs continue to practice at WMC and vie for the same patients as NYCG. Finally, there is simply no evidence to

18

suggest that the agreement has or will lead to a reduced quality of patient care and, in any event, patients and insurers would be more efficient enforcers of that claim. Accordingly, Plaintiffs do not establish **any** injury suffered by patients and so, Plaintiffs cannot satisfy that their interests are aligned with consumers -- which they characterize as the "critical element" to establish the efficient enforcer prong of antitrust standing.[11]

### C.    Plaintiffs' Damage Claims Are Speculative

Plaintiffs also do not have antitrust standing because their alleged antitrust damages are speculative. *See Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir. 1991) ("Another factor the [courts consider is] that plaintiff's damage claims are highly speculative ... this, of course, weighs against affording a plaintiff antitrust standing."). Here, the issue is not the difficulty in calculating damages, as Plaintiffs suggest, but rather, the fact that Plaintiffs are unsure if Defendants have any monetary liability. Indeed, Plaintiffs allege that "insofar as the damages to Plaintiffs resulting from Defendants' unreasonable restraint on trade and commerce **are measurable**, they amount to in excess of $1,000,000. (*See* Complaint ¶ 59, emphasis added; Rabinowitz Decl., Exh. 1).

---

[11] Plaintiffs' heavy reliance on *Puma* throughout their opposition is entirely misplaced. In *Pumma*, the plaintiff alleged antitrust injury, not due to the existence of an exclusive contract, but because other physicians engaged in a pattern of behavior to exclude plaintiff from the hospital and the relevant market by, *inter alia*, discouraging other physicians to make referrals to plaintiff; threatening physical violence; misstating plaintiff's complication rate and causing an investigation to be launched which harmed plaintiff's reputation, effectively chasing plaintiff from the relevant market. In this case, however, Defendants have not engaged in any such exclusionary behavior and Plaintiffs continue to work, unimpeded, at WMC. Defendants' recognize that Plaintiffs' counsel was also the attorney for the plaintiff in *Pumma*, but it does not follow that a square peg should be forced into a round hole.

862999v.10

## CONCLUSION

For all of these reasons, Defendants' motion for judgment on the pleadings should be granted and Plaintiffs complaint dismissed in its entirety, with prejudice.

Dated: Great Neck, New York
     April 8, 2008

*Attorneys for Defendants New York Cardiothoracic Group, PLLC, Steven L. Lansman, M.D., David Spielvogel, M.D., Westchester County Health Care Corporation and Westchester Medical Center*

WESTCHESTER COUNTY HEALTH CARE CORP.
OFFICE OF LEGAL AFFAIRS

By: _____
    Jordy Rabinowitz (JR-6558)
Executive Offices - Taylor Care Center
Valhalla, New York 10595
(914) 493-2101

GARFUNKEL, WILD & TRAVIS, P.C.

By: _____
    Leonard M. Rosenberg (LR-6910)
    Justin M. Vogel (JV-5839)
111 Great Neck Road
Great Neck, New York 10021
(516) 393-2200

862999v.10