Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
(212) 545-1900
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER, : 07 Civ. 7984 (SCR)
M.D., and CARDIAC SURGERY GROUP, P.C., :
:
Plaintiffs, :
:
-against- :
:
NEW YORK CARDIOTHORACIC GROUP, PLLC, :
STEVEN L. LANSMAN, M.D., DAVID :
SPIELVOGEL, M.D., WESTCHESTER COUNTY : **ORDER TO SHOW CAUSE**
HEALTH CARE CORPORATION and : **FOR PRELIMINARY**
WESTCHESTER MEDICAL CENTER : **INJUNCTION WITH**
: **TEMPORARY**
Defendants. : **RESTRAINING ORDER**
:
---------------------------------------------------------------X

Upon the Summons and Complaint, dated September 10, 2007, the annexed declaration of Rocco J. Lafaro, M.D., dated August 27, 2008, and the affidavit of Richard G. Menaker and Statement under Local Civil Rule 6.1(d), sworn to August 28, 2008, and the accompanying Memorandum of Law, and upon all the papers and proceedings heretofore had herein, it is hereby

ORDERED, that defendants Steven L. Lansman, M.D. ("Lansman") and Westchester Medical Center ("WMC"), or their attorneys, show cause before this Court at the Courthouse at 300 Quarropas Street, Room 621, White Plains, New York 10601, on the ____ day of September 2008,

of September 2008, at ____ in the ____ noon, or as soon thereafter as counsel can be heard, why an order should not be issued and entered pursuant to Rule 65, Fed. R. Civ. P. and Section 26 of the Sherman Act, 15 U.S.C. § 26, preliminarily enjoining during the pendency of this action Lansman and WMC, their agents, servants and employees, and all persons acting in concert with them or at their direction, directly or indirectly, from transferring to defendant New York Cardiothoracic Group, PLLC, two of plaintiffs' five morning slots in the cardiothoracic operating rooms at WMC; and granting such other and further relief as this Court may deem just, proper and equitable; and it is further

ORDERED, that pending the hearing of this Order to Show Cause, defendants Lansman and WMC, their agents, servants and employees, and all persons acting in concert with them, directly or indirectly, are hereby TEMPORARILY RESTRAINED from making any change in the allocation of access to cardiothoracic operating rooms at WMC except to meet medically-indicated patient needs; and it is further

ORDERED, that service of a copy of this Order and of the papers on which it is based by hand or overnight delivery upon defendants' counsel, Senior Associate General Counsel of Westchester County Health Care Corporation and Garfunkel, Wild & Travis, P.C., on or before September __, 2008, shall be deemed sufficient service; and it is further

ORDERED, that answering papers, if any, shall be served upon plaintiffs' counsel Menaker & Herrmann LLP so as to be received on or before September __, 2008, at __ o'clock p.m.

Dated: August __, 2008

_____
U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                                   : 07 Civ. 7984 (SCR)

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER,
M.D., and CARDIAC SURGERY GROUP, P.C.

                                                Plaintiffs,

               -against-                                **DECLARATION OF**
                                                    **ROCCO J. LAFARO, M.D.**

NEW YORK CARDIOTHORACIC GROUP, PLLC,
STEVEN L. LANSMAN, M.D., DAVID
SPIELVOGEL, M.D., WESTCHESTER COUNTY
HEALTH CARE CORPORATION and
WESTCHESTER MEDICAL CENTER

                                              Defendants
------------------------------------------------------------------X

       ROCCO J. LAFARO, M.D., under penalty of perjury, declares as follows:

       1.     I am one of the individual plaintiffs in this action. I am a surgeon duly licensed to practice medicine in the State of New York and a Director of plaintiff Cardiothoracic Surgery Group ("CSG"). I am personally familiar with the matters set forth herein and make this declaration in support of plaintiffs' motion for a preliminary injunction.

       2.     Plaintiff CSG, Arlen G. Fleisher, M.D. (my colleague at CSG), and I brought this action in 2007 based on an exclusionary Professional Services Agreement between and among defendants that violates the federal and state antitrust laws.

       3.     We now seek a preliminary injunction because of the imminent risk to patients and threatened harm to our livelihoods posed by defendant Lansman's threat to cut back in our access to the cardiothoracic surgery operating rooms ("ORs") at Westchester Medical Centre ("WMC"). The cutback has no valid medical purpose and is primarily aimed at disabling

our ability to compete with Dr. Lansman and his practice group. More important, the cutback would have immediate adverse implications for patient care.

4. Specifically, Dr. Lansman, who controls the administration of cardiothoracic surgery at WMC under the exclusionary Professional Services Agreement, threatens to reallocate the ORs so that we will lose two morning slots and one afternoon slot effective September 2, 2008. Only a directive by this Court to that date can prevent the threatened cutback from occurring.

### A. Factual Background

5. Dr. Fleisher, and I are longtime cardiothoracic surgeons at WMC and operate our practices through CSG. In all specialties other than four staff services, WMC is required by its charter to grant non-exclusive privileges to practitioners in the region it serves. WMC has an affiliation with New York Medical College (the "College"), which operates its principal teaching facility at the WMC complex in Valhalla, Westchester County. Many of the physicians who obtain privileges at WMC also become members of the College faculty. The College governs the functioning of the clinical faculty via an unincorporated Federated Faculty Practice Plan (the "FFPP").

6. The FFPP Bylaws require that the "full-time" faculty must conduct their entire practice of medicine within a self-governing practice group which has been approved by the FFPP as a Faculty Clinical Practice ("FCP"). Beginning in the 1970s, CSG served as the FCP for cardiothoracic surgery at WMC. It was a completely open organization governed on democratic principles as required by the FFPP Bylaws. Any cardiothoracic surgeon who qualified to practice at WMC and to serve as a faculty member at the College was welcomed into CSG, and it served as a useful basis for organizing access to operating rooms and patient coverage.

7.  Historically at WMC, OR slots not reserved for particular operations were available on an as-needed basis. A surgeon could reserve a slot for an elective surgery, but if an emergency case came in, the elective slot would be turned over to the patient with the greater need, regardless of who was handling the surgery. The main feature of this arrangement was maximum flexibility to assure that emergency and urgent cases had priority. In this regard, *morning access* to the ORs was of particular importance because many of the referrals to cardiothoracic surgery result from diagnostic work performed in the Hospital by cardiologists who then issue a recommendation for immediate surgical action. The morning hours on the day following diagnosis are usually the first time when such action can be taken.

8.  As discussed in greater detail in the Complaint, economic and political turmoil at WMC in the early 2000s led to turnover in the Hospital's cardiothoracic surgical staff, including the departure of WMC's heart transplant expert. In late 2004, WMC reached agreement to bring in defendant Lansman, a surgeon with transplant experience who was terminating his relationship with Mount Sinai Medical Center in Manhattan. While the details were undisclosed at the time, we later learned that Dr. Lansman set several conditions for affiliating with the Hospital -- that he be accompanied by a colleague, David Spielvogel, M.D.; that he (Lansman) be named chief of the Section of Cardiothoracic Surgery in WMC's Department of Surgery; and that his control of the Section include "exclusivity" in the specialty of cardiothoracic surgery at WMC. The last of these conditions is expressly set forth in the Professional Services Agreement between Dr. Lansman's company NYC TG and WMC, dated December 29, 2004, sections 1.1 and 1.2. (The exclusionary agreement was not shown to us until we demanded it in connection with this action.)

9. WMC included in the Professional Services Agreement with Dr. Lansman a "Grandfathered Physicians" exception to his company's exclusivity. Dr. Fleisher and I were specifically listed in the Agreement as "Grandfathered." Any attempt to remove us would have run afoul of the Bylaws of the Hospital and related governing documents that bar involuntary termination of attending physicians except on specified grounds.

10. When Drs. Lansman and Spielvogel became affiliated with WMC, Dr. Fleisher and I invited him to join CSG, the recognized FCP for all faculty members of the College. They declined our invitation and instead created their own company, New York Cardiothoracic Group, PLLC ("NYCTG"). That entity was not set up on democratic principles, as required by the Bylaws of the FFPP; it is completely controlled by defendant Lansman and accordingly has never been recognized by the FFPP. (A material element of this lawsuit is our objection that defendant WMC continues to allow NYCTG to function at the hospital in violation of the affiliation agreement between the College and WMC.)

11. Since he arrived at WMC, defendant Lansman has resisted the idea that there should be any physicians in the Section of Cardiothoracic Surgery who are not controlled by his practice entity, NYCTG. He has used the exclusivity feature of the Professional Services Agreement wherever he could to undermine our ability to compete with him, with adverse implications for patient care. Such tactics have included co-opting thoracic anesthesiologists and other specialized staff at times that should have been shared with us; refusing to allow flexibility in OR allocation to meet urgent patient needs; and monopolizing of ORs by stockpiling anesthetized patients in one room while surgery was being performed on other patients in other rooms. Such conduct is a major element of the present lawsuit.

## B. Defendant Lansman's Plan to Cut Back OR Access.

12.     On August 18, 2008, Dr. Lansman provided written notice that, effective September 2, 2008, he intends to deprive CSG of three of its OR slots, including two morning slots, and re-allocate them to his own practice group NYCTG. A copy of Dr. Lansman's notice letter, dated August 12, 2008, but hand-delivered six days later, is annexed hereto as Exhibit A.

13.     The threatened new allocation is a sharp departure from past practice. Historically, as stated above, OR slots were not allocated to particular surgeons; they were available on an as-needed basis. A surgeon could reserve a slot for an elective surgery, but if an emergency case came in, the elective slot would be turned over to the patient with the greater need. This changed in 2005 when defendant Lansman joined WMC with his colleague, defendant Spielvogel. Upon his appointment as head of the Section, Dr. Lansman at first divided access to the ORs on a basis only slightly more favorable to him and Dr. Spievogel - 11 slots for them, 10 for Dr. Fleisher and me.

14.     In 2006, Dr. Lansman took another slot from us and arrogated it to NYCTG, changing the allocation to 12 to 9 in NYCTG's favor. We were dismayed, but we did not take action because the new allocation at least preserved five *morning* slots for us in Room 4. Morning slots are critical because of the way patients are often referred for cardiothoracic surgery. A patient will come into the Hospital complaining of severe chest pains. Under the supervision of a cardiologist, the patient will undergo diagnostic tests, usually including cardiac catheterization. If a severe blockage or other condition is discovered that requires urgent surgery, a cardiologist will make the referral to the cardiothoracic surgeon for an operation as soon as possible and certainly no later than the following morning. Even if the cardiologist prefers a particular surgeon

if that surgeon cannot provide service by the next morning, the cardiologist is likely to turn to another surgeon who can. The slots as of 2006 were assigned as follows:

| Room | | Mon | Tues | Wed | Thurs | Fri | SLOTS |
|---|---|---|---|---|---|---|---|
| 4 | AM | CSG | CSG | CSG | CSG | CSG | 5 |
|   | PM | CSG | CSG | CSG | CSG | NYCG | 5 |
| 3 | PM |     |     |     | NYCG |     | 1 |
|   | AM | NYCG | NYCG | NYCG | NYCG | NYCG | 5 |
| 5 | PM | NYCG | NYCG | NYCG | NYCG | NYCG | 5 |
| Totals = | NYCG-9 | CSG-9 | | | | | 21 |

15. In January 2008, Dr. Lansman proposed a dramatic change in the allocation in January 2008. By letter to the Chairman of WMC's Department of Surgery, Dr. John A. Savino, dated January 9, 2008 (Ex. B hereto), Dr. Lansman stated Dr. Fleisher and I would be cut back to 7 slots per week, eliminating two of our prior slots *during critical morning hours.*

16. We promptly objected to the threatened cutback of OR slots, providing a list of patient safety concerns and noting our questions concerning Dr. Lansman's purported statistical rationale (Ex. C hereto). When I spoke to Dr. Savino about these issues, he responded simply that Dr. Lansman was empowered to control the cardiothoracic ORs based on his "exclusivity." WMC disregarded our objections, and the cutback was scheduled for February 11, 2008. Our attorneys thereupon gave notice of our intent to seek a temporary restraining order and preliminary injunction. In response, WMC advised that the cutback would be placed on hold while the subject of "block time requests" was reviewed (Ex. D hereto).

17. On February 21, 2008, I suggested to Dr. Savino, with copy to Dr. Lansman and others, two proposals aimed at assuring that all cardiothoracic patients have equal access to patient care (Ex. E hereto). Despite requesting that WMC actively discuss these proposals, we received no response, and Dr. Lansman has not taken any steps known to us to implement a schedule where patient care is allocated according to patient needs.

18. In the notice letter Dr. Lansman delivered to me on August 18, he advises of his intent to deprive CSG of three current OR slots, including two of our five morning slots (*see* Ex. A hereto). The new proposed allocation of OR slots is as follows:

| Room | | Mon | Tues | Wed | Thurs | Fri | SLOTS |
|---|---|---|---|---|---|---|---|
| 4 | AM | CSG | NYCTG | CSG | NYCTG | CSG | 5 |
| 4 | PM | CSG | CSG | NYCTG | CSG | NYCTG | 5 |
| 3 | PM | | | | NYCTG | | 1 |
| 5 | AM | NYCTG | NYCTG | NYCTG | NYCTG | NYCTG | 5 |
| 5 | PM | NYCTG | NYCTG | NYCTG | NYCTG | NYCTG | 5 |
| Totals = | | NYCG-14 | CSG-7 | | | | 21 |

19. Dr. Lansman claims to rationalize his re-allocation of our OR slots based on case volume statistics. But given my own direct knowledge of our volume of cases and anecdotal evidence, I believe the statistics are fundamentally flawed and inaccurate. CSG's volume over the past six months has remained steady. During the same period, I believe the statistics will show that NYCTG's volume of cases has not grown. After having used its improper exclusivity to deprive us of cases, NYCTG appears to have reached a plateau. Accordingly, in a reply letter to WMC's Chairman of Surgery, Dr. Savino, dated August 20, 2008, I have requested WMC to perform an audit on case volume (Ex. F hereto). I have attempted to personally discuss the matter with Dr. Savino, but he has declined to speak to me.

20. By letter dated August 25, Dr. Lansman gave notice that his August 12 letter had contained a "typographical error" and that the cutback in our access to the cardiothoracic ORs would occur on September 23 rather than September 2, 2008 (Ex. G hereto).

21. As of the date of this writing, we stand to lose two morning OR slots in less than three weeks, with potentially devastating consequences for our practice, for patient choice, and ultimately for patient care, unless WMC can be persuaded to rescind Dr. Lansman's directive or unless the Court provides temporary injunctive relief.

22. More specifically, by removing our morning slots, Dr. Lansman and WMC are placing our patients at increased risk because of our inability to commence surgery first thing on two days of every week. The cutback also would force many of our non-cardiac thoracic cases into the General ORs, where we would not have reserved space and would have to settle for support staff with less than optimum skills for thoracic surgery. It is highly preferable, from a patient safety and quality of care standpoint, to employ specialized cardiothoracic OR staff (particularly thoracic anesthesiologists)) for all thoracic surgery. Moreover, in many instances, we would have to choose between cardiac and non-cardiac cases, which has the potential to force us out of non-cardiac service. Any referring cardiologist or other physician knowing we are in this predicament would think twice before referring their patients to us unless the timing coincides exactly with the cardiothoracic OR slots still available to us.

23. It is dismaying to me, after more than 20 years of service at WMC, that the Hospital administration would have so little regard for patient safety or my career that it would allow the threatened cutback to occur. We have done everything we can to try to persuade Dr. Lansman, Dr. Savino and senior administrative officials at WMC to find another way to deal with Dr. Lansman's professed problem.

24. If Dr. Lansman truly believes his practice has grown that much at our expense (which is unproven at this point), that would of course show an extreme level of anticompetitive impact from NYCTG's exclusivity even beyond what we believe has occurred. But assuming it were true, there is no reason why such supposed increased volume of patients cannot be accommodated by establishing neutral OR slots that would be filled on a patient-need basis, at the same time preserving for us our morning slots in Room 4. I proposed something along these lines in my February 21, 2008 letter to Dr. Savino concerning these issues (Ex. E hereto). In

- 9 -

the absence of a reasoned response from WMC, we must request the Court to step in and preserve the status quo while the merits of our claims are considered.

Dated: Valhalla, New York
      August 27, 2008

                                          Rocco J. Lafaro, M.D.

                                          8/27/08