Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
(212) 545-1900
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                    :

ROCCO J. LAFARO, M.D., ARLEN G.       :   07 Civ. 7984 (SCR)
FLEISHER, M.D., and CARDIAC SURGERY  :
GROUP, P.C.,                             :

                       Plaintiffs,        :

                                    :

        -against-                 :

NEW YORK CARDIOTHORACIC GROUP,     :
PLLC, STEVEN L. LANSMAN, M.D., DAVID  :
SPIELVOGEL, M.D., WESTCHESTER      :
COUNTY HEALTH CARE CORPORATION and :
WESTCHESTER MEDICAL CENTER       :

                   Defendants.     :

                                    :
-----------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

August 28, 2008

# TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    The Conduct Complained of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.    The Acts Necessitating Interim Relief . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    The Court Should Preliminarily Enjoin Dr. Lansman from
      Interfering with Plaintiffs' Operating Room Assignments . . . . . . . . . . . . . . . . 10

      A    Plaintiffs Face Irreparable Harm in the
           Absence of a Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    There Is a Likelihood That Plaintiffs
            Will Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      C.    The Balance of Hardships Decidedly
            Tips in Plaintiffs' Favor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      D.    Preliminary Injunctive Relief Will
            Serve the Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

Page

**Cases**

*Acquaire v. Canada Dry Bottling Co.,*
    24 F.3d 401 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Int'l, Inc. v. Oaktree Capital Management LLC,*
    317 F. Sup.2d 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kenworth of Boston, Inc. v. Paccar Fin. Corp.,*
    35 F.2d 622 (1st Civ. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Louis Vuitton Malletier v. Dooney & Burke, Inc.,*
    454 F.3d 108 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 16

*National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club,*
    325 F.3d 712 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nemer Jeep-Eagle, Inc. v. Jeep Eagle Sales Corp.,*
    992 F.2d 430 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rodriguez v. Debuono,*
    175 F.3d 227 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,13

*Semmes Motors, Inc. v. Ford Motor Co.,*
    429 F.2d 1197 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,14, 16

*Summit Health, Ltd. v. Pinhas,* 500 U.S. 322 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes and Rules**

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

15 U.S.C. § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

15 U.S.C. §§ 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 U.S.C. §15(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

New York General Business Law § 340 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14-15

Richard G. Menaker (RM 4716)
Stephen D. Houck (SH 0959)
Menaker & Herrmann LLP
10 East 40th Street
New York, New York 10016
(212) 545-1900
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                    :

ROCCO J. LAFARO, M.D., ARLEN G.    :   07 Civ. 7984 (SCR)
FLEISHER, M.D., and CARDIAC SURGERY  :
GROUP, P.C.,                           :

                      Plaintiffs,   :

                                      :

         -against-                   :

NEW YORK CARDIOTHORACIC GROUP,  :
PLLC, STEVEN L. LANSMAN, M.D., DAVID  :
SPIELVOGEL, M.D., WESTCHESTER COUNTY  :
HEALTH CARE CORPORATION and      :
WESTCHESTER MEDICAL CENTER,       :

                     Defendants.   :

                                      :
--------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Rocco J. Lafaro, M.D., Arlen G. Fleischer, M.D., and their surgical

practice Cardiac Surgery Group, P.C. ("CSG") move on urgent grounds pursuant to Rule 65,

Fed. R. Civ. P., and Sherman Act § 16, 15 U.S.C. § 26, for a preliminary injunction and

temporary restraining order to preserve the status quo by prohibiting, during the pendency of this action, defendant Steven L. Landsman, M.D. ("Dr. Landsman") from reassigning to himself two of plaintiffs' five morning operating room slots and defendant Westchester Medical Center ("WMC") from permitting such reassignment, in violation of Sherman Act §§ 1 and 2, 15 U.S.C. §§ 1, 2, and the Donnelly Act, New York General Business Law § 340.

On Monday, August 18, 2008, plaintiffs learned from Dr. Lansman that, in his capacity as chief of the division of cardiothoracic surgery at WMC, he was unilaterally taking two of plaintiffs' five operating room slots and arrogating them to defendant New York Cardiothoracic Group, PLLC ("NYCTG"), his own practice group. His power to take that damaging step derives entirely from the exclusionary agreement at issue in this case. Unless restrained by this Court, plaintiffs' loss of access *will take effect September 23, 2008.*

That loss of access will undermine patient care, gravely harm plaintiffs' livelihoods, and adversely affect the public interest. Reduced quality of patient care is the first concern. No longer will plaintiffs Lafaro and Fleisher be able to provide next-morning surgery each weekday for their urgent care patients. Surgery for heart patients will be delayed, while slots for urgent thoracic surgery will be unavailable unless heart patients are displaced or less qualified anesthesiologists are assigned. Or alternatively, the patients will simply be taken away from plaintiffs and assigned to Dr. Lansman or his colleagues at defendant NYCTG. The effect will be a squeeze-out of plaintiffs – the ultimate objective of the exclusionary agreement at issue in this case. The loss of choice in the provision of

cardiothoracic surgical services in Westchester would constitute a substantial set-back for the public interest in this critical medical field.

The Chairman of the Department of Surgery at WMC, Dr. John Savino, has told plaintiffs that, while he understands their concerns, he must allow the cutback at issue because "Lansman has exclusivity" on operating rooms. The sole ground for that "exclusivity" is the exclusionary agreement at the center of plaintiffs' Sherman Act § 1 claim. Defendant Lansman's tactic will harm patients, decimate plaintiffs' practice and cause irreparable injury to competition in emergency and urgent cardiac and thoracic surgery in Westchester County. No possible harm to defendants could arise from preserving the status quo while the issues before the Court are addressed and decided. The threatened September cutback should be temporarily restrained and preliminarily enjoined until those issues are resolved.

## FACTUAL BACKGROUND

### A.    The Parties.

Plaintiffs Dr. Rocco J. Lafaro and Dr. Arlen G. Fleisher, and their practice group, are engaged in the practice of cardiothoracic surgery (Compl., ¶¶ 1-3).[1] Defendants are two other cardiothoracic surgeons, Dr. Lansman and Dr. David Spielvogel, and their practice group New York Cardiothoracic Group PLLC ("NYCTG"), together with

---

[1] The evidentiary support for this motion appears in the Complaint, dated September 10, 2007 ("Compl.") which is annexed as Exhibit A to the affidavit of Richard G. Menaker, sworn to August 28, 2008 ("Menaker Aff.") and in the declaration of Rocco J. Lafaro, M.D., dated August 27, 2008 ("Lafaro Decl.").

Westchester Medical Center ("WMC"), a public hospital based in Valhalla, New York, and

Westchester County Health Corporation ("WHCC"), the entity that owns and operates WMC

(¶¶ 4-8). For the past three and a half years, Dr. Lansman has controlled the administration

of cardiothoracic surgery at WMC through a Professional Services Agreement that is at issue

in this action.

**B.     The Conduct Complained of.**

The gravamen of plaintiffs' complaint is that their competitors, Dr. Lansman,

Dr. Spielvogel and NYCTG, entered into an unlawful exclusionary agreement with the other

defendants that has restricted plaintiffs' ability to practice at WMC and to fully serve their

patients (Compl. ¶¶ 24 *et seq.*).[2]  Plaintiffs allege that the exclusionary arrangement

at issue is set forth explicitly in the Professional Services Agreement entered into by all

defendants on or about December 29, 2004 (the "Exclusive Agreement") (Menaker Aff., Ex.

C) Compl. ¶¶ 31-32). That Agreement authorizes defendants Lansman, Spielvogel and

NYCTG to restrict the quantity and quality of services provided by plaintiffs and other

physicians at WMC with whom they compete (Compl. ¶ 56).

Plaintiffs allege that defendants have taken specific actions supposedly on the

authority of the Exclusive Agreement,  preventing plaintiffs from expanding their practice

and better serving their patients (Compl. ¶¶ 32 *et seq*). For example, the Complaint avers that

---

[2] The Complaint also charges defendants with violations of applicable bylaws and rules
governing the affairs of WMC medical staff (Count II), as well as common law tortious interference
(Count III), and seeks injunctive relief in connection with those claims.

since the Agreement took effect, defendants have sought to eliminate competition "by strategic denial of access to the operating room[s] and to required medical staff and equipment" (Compl. ¶ 55(c)). The Complaint further avers that defendants have obstructed plaintiffs' efforts to strengthen their practice by adding new professionals, including specifically Michael Evans, a highly qualified physician's assistant whose candidacy for employment was approved by WMC's various screening panels but was vetoed by Dr. Lansman (Compl. ¶¶ 37-41).

Defendants' unlawful actions have diminished the quality of care available to cardiothoracic surgery patients, while harming plaintiffs' ability to earn a livelihood in the relevant markets (Compl. ¶¶ 37, 38, 46, 56 and 71). Plaintiffs have identified with specificity both the relevant product/service markets (for emergency cardiothoracic surgery, for urgent cardiothoracic surgery and for emergency pulmonary surgery) and the relevant geographic market (the segment of the lower Hudson Valley north of the Cross County Parkway in Westchester County and south of Interstate 84 and Rockland and Orange Counties) (Compl. ¶¶ 49 and 50).

The Complaint seeks a determination that the Exclusive Agreement and related exclusionary conduct by defendants violate the Sherman Act and New York State law. The prayer for relief seeks, *inter alia*, an injunction enjoining defendants "from engaging in the exclusionary conduct alleged," including "strategic denial of access to the operating room and to required medical staff and equipment," and from "interfering with the duties of WMC

and WCHCC to plaintiffs under the terms of WMC's Medical Staff Bylaws and Rules and Regulations" (Compl. at 14, 17-18).

Defendants have answered, denying the material allegations and interposing thirty-two affirmative defenses. The parties' cross-motions to dismiss (plaintiffs' to dismiss defenses, defendants' for judgment on the pleadings) have been sub judice since March 2008.

## C.    The Acts Necessitating Interim Relief.

Within the past 10 days, defendants have raised the anticompetitive stakes to a disturbing new level, with devastating implications for plaintiffs. On August 18, 2008, Dr. Lansman gave notice of his intent to reassign two of plaintiffs' operating room ("OR") slots, which he reassigned to his own group NYCTG, effective September 2, 2008 (Lafaro Decl., Ex. A). Dr. Lansman can carry out that reassignment based upon the powers accorded to him under the Exclusive Agreement, because he has (as the Chairman of the Surgery Department has put it) "exclusivity" (id. ¶ 17).

Dr. Lansman's threatened reallocation of OR slots is a sharp departure from past practice, as illustrated by the charts below. As of now, and for the past two years, access to the cardiothoracic ORs at WMC has been assigned on the following basis:

Table 1

| Room | | Mon | Tues | Wed | Thurs | Fri | SLOTS |
|---|---|---|---|---|---|---|---|
| 4 | AM | CSG | CSG | CSG | CSG | CSG | 5 |
| | PM | CSG | CSG | CSG | CSG | NYCG | 5 |
| 3 | PM | | | | NYCG | | 1 |
| 5 | AM | NYCG | NYCG | NYCG | NYCG | NYCG | 5 |
| | PM | NYCG | NYCG | NYCG | NYCG | NYCG | 5 |

Totals =    NYCG-12    CSG-9                                              21

The ratio of availability is currently 12 to 9, with NYCTG having the greater access as a result of Dr. Lansman's machinations a year after he had arrived at WMC.[3]  A critical element of that allocation is the retained availability of five morning slots for CSG in Room Number 4.

The importance of morning OR slots cannot be overstated. Historically, OR slots not reserved for particular operations were available on an as-needed basis (Lafaro Decl. ¶ 13). A surgeon could reserve a slot for an elective surgery, but if an emergency case came in, the elective slot would be turned over to the patient with the greater need, regardless of who was handling the surgery.  The main feature of this arrangement was maximum flexibility to assure that emergency and urgent cases had priority. *Morning access* to the ORs was of particular importance because many of the referrals to cardiothoracic surgery result

---

[3] The original ratio established when WMC first engaged Drs. Lansman and Spielvogel in 2005 was 11 for NYCTG to 10 for CSG.  Lansman unilaterally changed this to 12 to 9 in January 2006, a cutback plaintiffs did not contest at the time because it left them with five morning slots.

from diagnostic work by cardiologists who then issue a recommendation for immediate surgical action. *The morning hours on the day following diagnosis are usually the first time when such action can be taken.* (Lafaro Decl. ¶ 14).

The implications of the foregoing are as follows. If the surgeon to whom the referral is made cannot have access to an OR the next morning, either there will be a delay in surgical action or the patient will be referred to another surgeon who has a lock-hold on the morning OR. In the former case, patient care is placed at risk; in the latter, the excluded surgeon's livelihood is adversely affected. (Lafaro Decl. ¶¶ 14, 21-22). That is precisely the issue before the Court now. The August 18 notice letter from Dr. Lansman states his intent to deprive plaintiffs of two current OR slots, specifically two of plaintiffs' five morning slots, as shown in the following table:

Table 2

| Room | | Mon | Tues | Wed | Thurs | Fri | SLOTS |
|------|-----|-----|------|-----|-------|-----|-------|
| 4 | AM | CSG | NYCG | CSG | NYCG | CSG | 5 |
| | PM | CSG | CSG | CSG | CSG | NYCG | 5 |
| 3 | PM | | | | NYCG | | 1 |
| 5 | AM | NYCG | NYCG | NYCG | NYCG | NYCG | 5 |
| | PM | NYCG | NYCG | NYCG | NYCG | NYCG | 5 |
| Totals | NYCG =14 | CSG-7 | | | | Total | 21 |

The proposed reallocation would leave plaintiffs with only three morning slots, resulting in problems for urgent care patients and dangers to plaintiffs' practice described above.

Dr. Lansman' August 18 letter contends that the proposed reallocation "equitably reflects current usage, with NYCTG volume approaching 3/4 of cardiothoracic cases" (Lafaro Decl., Ex. A). Plaintiffs believe that Dr. Lansman's statement is inaccurate and that the actual statistics do not support any change in the allocation of cardiothoracic ORs (*id.* ¶ 20 ). Dr. Lansman's letter also proposes to reserve the cardiothoracic ORs "for adult cardiac cases" and to assign so-called "General Thoracic cases" to the "General OR room, with the General OR staff" (*id.*, Ex. A). This ignores the overwhelming desirability, from a patient safety and quality of care standpoint, of using the specialized cardiothoracic OR staff (and particularly the thoracic anesthesiologists) for *all* thoracic surgery, rather than general OR staff who lack necessary thoracic skills and cannot in all cases deliver the requisite standard of care (*id.* ¶ 22).

The threatened cutback in plaintiffs' access to cardiothoracic ORs was foreshadowed in an attempt earlier this year by Dr. Lansman to obtain the same result. In early January, he had sent a notice letter proposing a similar cutback (Lafaro Decl. Ex. B). Plaintiffs raised objections with WMC's administrators, which fell on deaf ears. The Chairman of the Department of Surgery, Dr. Savino, stated that Dr. Lansman's "exclusivity" under the Exclusive Agreement gave him the power unilaterally to control the cardiothoracic ORs (Lafaro Decl. ¶ 17, Ex. C). Only when plaintiffs advised of their intention to seek injunctive relief did WMC pull the plug on Dr. Lansman's power-play, at least temporarily (*id.* Ex. D). At that point, Dr. Savino claimed the general issue of operating room allocation

would be given further study. Plaintiffs submitted a specific proposal to have cardiothoracic ORs assigned on the basis of patient need rather than surgeon convenience (*id.* ¶ 18, Ex. E). Plaintiffs have heard nothing further on her proposal since then.

Upon receipt of Dr. Lansman's August 18 letter, plaintiff Lafaro raised immediate objections with Dr. Savino and others in WMC's administration (Lafaro Decl., Ex. F). In an August 20 letter to Dr. Savino, with copies to other relevant WMC administrators and to Dr. Lansman, Dr. Lafaro disputed the statistics in the Lansman letter and emphasized the quality of care problems that would result from the reallocation of cardiothoracic ORs (*id.* ¶ 20). On August 25 and 26, Dr. Lafaro attempted to discuss the issue in person with Dr. Savino, but the Chairman declined to speak with him (*id.*).   On August 25, 2008, Dr. Lansman delivered a second notice letter which changed the effective date for the cutback from September 2 to September 23, 2008 (Lafaro Decl. Ex. G).  Thus, it remains urgent that the Court address the issue at an early date and provide relief maintaining the status quo while this action proceeds toward resolution.

## ARGUMENT

I.    **The Court Should Preliminarily Enjoin Dr. Lansman from Interfering with Plaintiffs' Operating Room Assignments.**

A party to an action may obtain temporary injunctive relief pending the final outcome of an action when he establishes "irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's

-10-

favor." Rule 65, Fed. R. Civ. P.; *Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d

108, 113-114 (2d Cir. 2006)(citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d

70, 72 (2d Cir. 1979)(per curiam)); *see also Acquaire v. Canada Dry Bottling Co.*, 24 F.3d

401, 409 (2d Cir. 1994)(affirming preliminary injunction granted to private plaintiff in

antitrust case). Each of those elements is satisfied here.

### A.    Plaintiffs Face Irreparable Harm in the Absence of a Preliminary Injunction.

The concept of "irreparable harm" ordinarily refers to damage to the moving

party that would arise during the pendency of the action and, in so doing, would render the

final judgment ineffectual.    Irreparable harm is "[p]erhaps the single most important

prerequisite for the issuance of a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756

F.2d 273, 275 (2d Cir. 1985); *Rodriguez v. Debuono,* 175 F.3d 227, 233-234 (2d Cir. 1999).

The movant must "demonstrate an injury that is neither remote nor speculative, but actual and

imminent and that cannot be remedied by an award of monetary damages." *Id.*, 175 F.3d at

234.

Here, Dr. Lansman's proposed appropriation of the two morning OR slots for

his group, and WMC's support of that reallocation, threaten irreparable harm in two major

respects. First, it will adversely affect care to an extent that may, in the cases of particular

patients, prove irremediable.  Most urgent cardiac and thoracic surgery cases emerge from

diagnostic work performed at the Hospital. Typically, a cardiologist will diagnose an

immediate need for surgery based on test findings. The morning hours on the day following

-11-

diagnosis are usually the first time when such action can be taken (Lafaro Decl. ¶ 7). If plaintiffs cannot undertake surgery on those mornings, the patients will be at increased risk due to the delays (*id.* ¶ 22). In addition, the cutback will force many of plaintiffs' non-cardiac thoracic cases into the general ORs, where the staffing would be less qualified for thoracic surgery, another major risk (*id.*).

Second, Dr. Lansman's appropriation of the two morning OR slots threatens to eviscerate plaintiffs' practice. To begin with, plaintiffs will inevitably lose many of the patients who otherwise would have been referred to them for urgent surgery. If plaintiffs have no access to a cardiothoracic OR on a particular morning, the patient may simply be re-assigned to Dr. Lansman or his colleagues to avoid delay, even if the referring physician would otherwise have preferred Drs. Lafaro or Fleisher (Lafaro Decl. ¶ 22). Further, once referring cardiologists or other physicians find out that plaintiffs have this limitation on their schedules, many of those referral sources will simply stop sending patients to them unless the timing coincides exactly with the cardiothoracic OR slots still available to them (*id.*).

That result is exactly what Dr. Lansman's tactic is aimed at – squeezing plaintiffs out as competitors of NYCTG by limiting supply of cardiothoracic services from anyone other than NYCTG. It is a classic violation of the antitrust laws, and the immediate harm it will cause could not be clearer. *See Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 332 (1991).

-12-

Plaintiffs' loss of access now set to be imposed September 23, 2008, constitutes an injury that is "actual and imminent." *Rodriguez v. Debuono*, 175 F.3d at 233-34. The scheduled effective date for Dr. Lansman's appropriation of the two morning slots is September 23, 2008, less than a month away. If judicial intervention does not occur, the two major areas of harm – harm to patient care and harm to plaintiffs' careers – will actually occur. Moreover, the harm cannot be remedied by an award of damages, particularly where patient safety is at issue and where the loss of referrals would be difficult to quantify. Certainly defendants themselves would argue, if found liable, that such loss could not be proven with razor sharp certainty. It is far better to preserve the status quo under such circumstances.

**B.    There Is a Likelihood That Plaintiffs Will Succeed on the Merits.**

The second element required for issuance of a preliminary injunction is the showing of "either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial." *Louis Vuitton Malletier, supra*, 454 F.3d at 114. Indeed, where the balance of hardships leans sharply toward the movant, it is sufficient that the movant have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205-06 (2d Cir. 1970) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)); *accord, Nemer Jeep-Eagle, Inc. v. Jeep Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993).

-13-

Where, as here, the injunction seeks only to maintain the status quo, the burden on the movant is limited and not heightened to the level of demonstrating "'clear' or 'substantial' likelihood, of success on the merits." *Louis Vuitton Malletier, supra.*

In this case, plaintiffs predicate their legal grounds for relief on federal and state antitrust claims and common law claims for tortious interference with business relations. Each of those legal grounds presents a likelihood of success. Further, as the Court will have seen from the extensive briefing on the parties' cross-motions, they raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Semmes Motors, supra.*

**The Antitrust Claims**

Count I of the complaint charges defendants with a "continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1" (Compl. ¶ 54). Under Section 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found ...." 15 U.S.C. §15(a). This is the statutory basis upon which plaintiffs assert standing to obtain relief in their own behalf under the antitrust laws. In addition, Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes the Court to issue both preliminary and permanent injunctions where a private plaintiff has made the requisite showings. *Acquaire v. Canada Dry Bottling Co., supra.* New York's Donnelly

Act generally follows the same basic elements of proof as the federal law. *Reading Int'l, Inc. v. Oaktree Capital Management LLC*, 317 F. Supp.2d 301, 332-33 (S.D.N.Y. 2003).

      Here, plaintiffs' Complaint amply pleads the requisite elements of a valid Sherman Act § 1 claim. It demonstrates how defendants' violations affect interstate commerce (Compl. ¶ 48). It defines with specificity the relevant markets at issue. The services or product markets are "(a) the market for emergency cardiothoracic surgery; (b) the market for urgent cardiothoracic surgery; and c) the market for emergency pulmonary surgery" (Compl. ¶ 48). The relevant geographic market is "the segment of the lower Hudson Valley north of the Cross County Parkway in Westchester County, south of Interstate 84 and Rockland and Orange Counties" ( *Id.*, ¶ 50).

      The existence of the agreement in restraint of trade is unquestioned; at issue is only whether the law permits plaintiffs to challenge it. Indeed, the Exclusive Agreement and its challenged terms are squarely before the Court on the parties' cross-motions of last spring. The harmful effects of the Agreement are alleged with particularity in the Complaint (¶¶ 45, 56-57). And of special importance for the relief sought here, the specific anticompetitive conduct in question *is fully established by Dr. Lansman's own correspondence* (Lafaro Decl. Ex. A), and the threat that conduct poses is spelled out in the record (*id.* ¶¶ 21-22). *See Nemer Jeep-Eagle, supra,* 992 F.2d at 435 ("major disruption of a business can be as harmful as termination").

      To be sure, defendants have offered up various defenses in their motion for

judgment on the pleadings. While plaintiffs submit the defenses are without merit, this Court need not rule definitively at this time to grant the temporary relief requested here. Even a first pass through the papers in support of and opposing defendants' motion shows the existence of "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Semmes Motors*, *supra*. Since the relief sought is only preservation of the status quo, the standard for issuance of the preliminary injunction is not heightened. *Louis Vuitton Malletier*, *supra*.

**The Common Law Claims.**

Plaintiffs' claims for breach of contract, and for tortious interference with plaintiffs' contract with WMC and WCHCC and with plaintiffs' prospective business relations have likelihood of success as well (Compl., ¶¶ 60-73). Plaintiffs have presented evidence in the pending motions concerning the wrongfulness of the conduct complained of, which supports liability under the traditional common law theories alleged. And because defendants do not provide practical justifications for the exclusionary conduct, only legal demurrers, there is a clear likelihood of success on the common law claims if those demurrers are rejected, as plaintiffs have shown they should be. This leg of the preliminary injunction standard is satisfied.

### C.    The Balance of Hardships Decidedly Tips in Plaintiffs' Favor.

The final element in the Second Circuit's standard for issuance of a preliminary injunction is "a balance of hardships tipping decidedly in plaintiff's favor." Louis Vitton

Malletier, *supra*, 454 F.3d at 114. Here virtually all the hardships burden plaintiffs, their patients and the public. Indeed, it is difficult to see what problem defendant Lansman and his practice would face at all if the status quo is preserved. The only thing defendants would lose would be the ability to put a further squeeze on plaintiffs, not a legitimate "hardship." The balance of harms component is satisfied.

### D.    Preliminary Injunctive Relief Will Serve the Public Interest.

Although the Second Circuit is not among them, many courts of appeals address attention to public interest considerations in determining the appropriateness of injunctive relief in an antitrust case. *National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719 (6th Cir. 2003); *Kenworth of Boston, Inc. v. Paccar Fin. Corp.*, 735 F.2d 622, 623 (1st Cir. 1984). Here, factoring in the public interest overwhelmingly points towards the need for a preliminary injunction.

WMC is one of the region's major hospitals and accepts the responsibility to serve patients in a range of life-or-death circumstances. Having a disease or condition that mandates cardiothoracic surgery is a life-or-death circumstance. Where, as here, a professional involved in serving the public proposes action that exposes patients to life-threatening delays and reduces the choice of available surgeons, all primarily to increase the volume of his own practice, he impinges upon the public interest. It would be different if the cardiothoracic ORs allocated to plaintiffs were unused by them on weekday mornings, but that is not even suggested. And in any event, plaintiffs have recommended a system that

-17-

would assure flexibility by making ORs available on the basis of patient need, not surgeon convenience, an alternative that defendants have never seriously addressed (Lafaro Decl. ¶ 17, Ex. E).

Significantly, nowhere in Dr. Lansman's notices that purport to justify his proposed reassignment of ORs does he provide any public interest rationale for the cutback of plaintiffs' access. He simply claims the change is somehow compelled by statistics, the actual data support for which has not been disclosed. Against this is the obvious harm to the public interest from a reduction in the surgeons referring physicians can choose from to serve their patients, as well as the attendant shifting of serious thoracic cases from specialized staffing to less qualified generalist staffing. The public has a decided interest in quality and choice, and Dr. Lansman's proposed reassignment is to the contrary.

CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction should be granted. Pending the hearing on the motion, the Court should issue a temporary restraining order preserving the status quo.

Dated: August 28, 2008

Respectfully submitted,

MENAKER & HERRMANN LLP

By: _s/ Richard G. Menaker_____
        Richard G. Menaker (RM-4716)

Attorneys for Plaintiffs
10 East 40th Street
New York, New York 10016
(212) 545-1900

Stephen D. Houck,
        Of Counsel.