UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
: 07 Civ. 7984 (SCR)
ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER, :
M.D., and CARDIAC SURGERY GROUP, P.C. :
:
Plaintiffs, :
:
-against- : **SUPPLEMENTAL**
: **DECLARATION OF**
: <u>**ARLEN FLEISHER, M.D.**</u>
NEW YORK CARDIOTHORACIC GROUP, PLLC, :
STEVEN L. LANSMAN, M.D., DAVID :
SPIELVOGEL, M.D., WESTCHESTER COUNTY :
HEALTH CARE CORPORATION and :
WESTCHESTER MEDICAL CENTER :
:
Defendants :
:
------------------------------------------------------------------X

ARLEN G. FLEISHER, M.D., under penalty of perjury, declares as follows:

1. I am one of the individual plaintiffs in this action. I am a surgeon duly licensed to practice medicine in the State of New York and a Director of plaintiff Cardiothoracic Surgery Group ("CSG"). I am personally familiar with the matters set forth herein and make this supplemental declaration to address certain questions raised by the Court during the September 4, 2008 hearing on the request for the issuance of an order to show cause bringing on our motion for a preliminary injunction and our related request for a temporary restraining order.

2. It is my understanding that the Court raised several questions at the September 4 hearing relating to the practical effect of the threatened cutback of two of our five morning slots in the cardiothoracic operating rooms ("ORs") at WMC. There should be no doubt about that effect – it could destroy our practice, for the following reasons.

3. First, there is the matter of how we get our patients. The demand for cardiothoracic surgery is a function of referrals by other physicians, primarily cardiologists and other specialists who diagnose conditions in their patients that necessitate opening the thoracic region of the body for surgical repair. This is a sensitive process that carries risks, and the decision to proceed with it may involve life and death considerations. The selection of a cardiothoracic surgeon to handle a cardiac case or other case requiring opening the thoracic region, therefore, requires confidence in the competence and skill of the surgeon. That confidence is built up over time based on the relative performance records of the available surgeons and the referring physician's own experiences with the surgeons.

4. This means that we do not have our own patients as such. Rather, we have relationships with referring physicians who are the source of our practice. Those relationships are our good will, which is impossible to measure precisely in dollars. There is no question, however, that that good will is the economic core of our ability to make a living in the field of our expertise. If we are deprived of it, our practice is destroyed.

5. Since none of the cardiothoracic surgeons at WMC is an employee of the hospital (unlike the physicians in support fields such as pathology, anesthesiology and radiology), but all are independent attending physicians granted privileges to practice at WMC, a competitive market exists among us for referrals. Regrettably, Dr. Lansman and the other defendants have engaged in conduct, including the exclusionary agreement and Dr. Lansman's wrongful exploitation of his position, aimed at eliminating that competitive market. Simply stated, they are seeking to destroy the availability of *choice*, and in doing so threaten to deprive us of the good will on which our practice depends.

6. Second, it is critical to understand the relationship between the morning slots and the maintenance of our practice. As Dr. Lafaro has explained in his declaration, when a referring physician renders a diagnosis of an urgent need for surgery, whether for a cardiac patient, a pulmonary patient, or other thoracic case, that physician will often try to have the surgery performed the next morning. Right now Dr. Lafaro and I have the ability to handle such cases every morning of the week. The referring physicians know this and therefore do not hesitate to choose one of us whenever urgency is a factor. As soon as it becomes known, however, that we cannot be counted on to provide a morning slot, those physicians will in many cases decide that the need for urgent action trumps their preference of surgeon, and the case will go to Dr. Lansman and his colleagues.

7. If we cannot provide the availability needed to serve the urgent care patients of the referring physicians, our reputations will be harmed and relationships with the referrers will be undermined. This not only results in the immediate loss of referrals, but the resulting statistical imbalance creates a supposed rationale for even more cutbacks of our access to the cardiothoracic ORs. The vicious cycle will rapidly destroy our entire practice. (I note that neither Dr. Lafaro nor I have been permitted to see the data on which Dr. Lansman purports to base his current claim of an imbalance, and we doubt that the claim would hold up under scrutiny.)

8. Third, none of this is measurable in any defined monetary damages. Our relationships with the referring physicians were built over two decades of regular dealings, collaboration on patient cases, and performance experience. Loss of those relationships means loss of referrals not just in the present but permanently into the future even after a judgment in our favor on the merits of this case. How do we unscramble the eggs at that point? How do we

quantify such future loss? What is the likelihood that a jury or this Court would be satisfied by our effort to do so, particularly with our adversaries insisting it is all "speculative"?

9. Fourth, if we are unable to make a living from our practice at WMC, we have very little likelihood of being able to re-establish elsewhere. WMC has a virtual monopoly on cardiothoracic surgery in the geographic area where we live. Once we have lost our referral base, moreover, no hospital in New York City will want to grant us privileges. Even moving to another part of the country is not likely to be a viable option because we would have to rebuild a referral network from scratch. Also, surgical skills diminish when not steadily used. And given our ages and seniority, no cardiothoracic practice is going to take us on as junior surgeons in the way Dr. Lafaro and I got our start at WMC many years ago. In short, the end of our ability to practice at WMC means, for all practical purposes, the end of our careers as cardiothoracic surgeons.

10. Fifth, it is important to consider the potential harm to patients and to the public from allowing the threatened cutback. The loss of the ability to choose among competing surgeons adversely affects patient care by eliminating the availability of choice for referring physicians as well as for patients, and relegating non-cardiac patients to less satisfactory general ORs where the support staff is less qualified. Referrals made to us generally derive from the referring physicians' judgment that we provide the likelihood of a better result than the alternative offered by defendants. To eliminate that likelihood (as believed by well-qualified referrers) at the instance of the unilateral act of a self-interested market participant is a genuine harm both to the patients affected and to the public interest in the benefits of competition.

11.   I understand the Court asked at the hearing why WMC should not be free to schedule its ORs however it sees fit, even if it eliminates our ability to maintain a viable practice. The answer is two-fold. First, this would involve the destruction of competition in cardiothoracic surgery in the relevant market, a result the antitrust laws were designed to prevent. Second, the cutbacks in question emanate entirely from Dr. Lansman, a private person who is exploiting the position granted him by the challenged agreement to take anticompetitive action. There is no indication that WMC has initiated the cutbacks.

12.   I also understand the Court asked whether WMC would be at risk, if our claims were accepted, of having to accommodate numerous cardiothoracic surgeons who might decide at the same time that they wanted to practice at the hospital, which would create logistical problems. The answer has several parts. First, practically speaking, it would not happen. There simply are not very many cardiothoracic surgeons, even in the New York metropolitan area, because the training is long and difficult and the demand for their services is limited. So a scenario of large scale transfers does not occur. Second, because of the critical role of referring physicians, it is difficult for a surgeon simply to walk into a new hospital environment and be able to make a living. He or she will not get enough cases to survive.

13.   On the other hand, if the surgeon already has many referral relationships, the hospital he moves to will welcome him with open arms. In the special case of Drs. Lansman and Spielvogel, WMC granted them exclusivity and lobbied with potential referrers to use their services because they brought heart transplant skills with them.

14.   Finally, WMC historically has had an open door policy toward granting privileges to qualified attending physicians as long as they could get through the rigorous credentialing and approval process, which is based entirely on professional qualifications. But

unless a surgeon has referrals, he presents no logistical issue for the hospital because if he does not have patients he does not need an OR.

Dated: Valhalla, New York
September __, 2008

_____
Arlen G. Fleisher, M.D.